# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

IN RE: ETHICON, INC. PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY LITIGATION

                                                        MDL NO. 2327

------------------------------------------------------------------
THIS DOCUMENT RELATES:
**CASES IDENTIFIED IN EXHIBIT A**

## PLAINTIFFS' MOTION TO LIMIT THE OPINIONS AND TESTIMONY
## OF JAIME L. SEPULVEDA-TORO, M.D.

Plaintiffs in actions listed on attached Exhibit A, pursuant to Federal Rule of Evidence 702, 403, 104 and *Daubert* v. *Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), hereby submit this Motion to Limit the Opinions and Testimony of Jaime L. Sepulveda-Toro, M.D. Defendant Ethicon has designated Dr. Sepulveda-Toro, an obstetrician-gynecologist with little to no clinical experience, to offer clinical medical opinions regarding pelvic organ prolapse (POP) and stress urinary incontinence (SUI). The Court should exclude certain opinions of Dr. Sepulveda-Toro because he attempts to opine on subjects well outside his expertise. In support of this motion, Plaintiffs have submitted a memorandum of law and also rely upon the following attached exhibits:

1.   A true copy of the Expert Report of Jaime L. Sepulveda-Toro, M.D. Gynemesh PS, Prolift and Prosima Devices is attached hereto as Exhibit B.

2.   A true copy of the Expert Report of Jaime L. Sepulveda-Toro, M.D. TVT and TVTO Devices is attached hereto as Exhibit C.

3.   A true copy of the Curriculum Vitae of Jaime L. Sepulveda-Toro, M.D. is attached hereto as Exhibit D.

4.   A true copy of the March 30, 2016, Deposition Transcript of Jaime L. Sepulveda-Toro, M.D. is attached hereto as Exhibit E.

5.   A true copy of the April 8, 2016, Deposition Transcript of Jaime L. Sepulveda-Toro, M.D. is attached hereto as Exhibit F.

6.      A true copy of the PowerPoint Presentation titled LCM Project Photographs Comparing Laser Cut Mesh vs Mechanical Cut Mesh, ETH.MESH.08334245 is attached hereto as Exhibit G.

Specifically, Dr. Sepulveda-Toro, an obstetrician-gynecologist, attempts to offer unqualified expert opinions regarding the causes of pelvic organ prolapse (POP) and stress urinary incontinence (SUI), treatment options for POP and SUI, and success and failure rates of POP and SUI treatments. As set forth more fully in Plaintiffs' Memorandum in Support of Its Motion, the Court should exclude the testimony of Defendant's expert witness Jaime L. Sepulveda-Toro, M.D.

Dated: April 21, 2016

Respectfully submitted,

By:    /s/ Aimee Wagstaff
Aimee H. Wagstaff (CO Bar No. 36819)
John R. Crone (CO Bar No. 48284)
ANDRUS WAGSTAFF, P.C.
7171 W. Alaska Dr.
Lakewood, CO 80226
Telephone: (720) 208-9403
Fax Phone: (303) 376-6361
aimee.wagstaff@andruswagstaff.com

/s/Thomas P. Cartmell
Thomas Cartmell, Esq.
Jeffrey M. Kuntz, Esq.
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300  Kansas City, MO 64112
816-701-1102
Fax 816-531-2372
tcartmell@wcllp.com
jkuntz@wcllp.com

/s/ D. Renee Baggett
Renee Baggett, Esq.
Bryan F. Aylstock, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, Florida  32563
(850) 202-1010
(850) 916-7449 (fax)
rbaggett@awkolaw.com
baylstock@awkolaw.com

## CERTIFICATE OF SERVICE

I certify that on April 21, 2016, I electronically filed this document with the clerk of the court using the CM/ECF system, which will send notification of this filing to CM/ECF participants registered to receive service in this MDL.

By: ___/s/ Aimee Wagstaff_____
Aimee H. Wagstaff (CO Bar No. 36819)
ANDRUS WAGSTAFF, P.C.
7171 W. Alaska Dr.
Lakewood, CO 80226
Telephone: (720) 208-9403
Fax Phone: (303) 376-6361
aimee.wagstaff@andruswagstaff.com

# EXHIBIT A

## EXHIBIT A – SEPULVEDA-TORO DAUBERT MOTION

**THIS DOCUMENT RELATES TO PLAINTIFFS:**

*Mary Cone*
*Case No. 2:12-cv-00261*

*Dina Destefano-Raston*
*Case No. 2:12-cv-01299*

*Nancy Hooper*
*Case No. 2:12-cv-00493*

*Alfreda Lee*
*Case No. 2:12-cv-01013*

*Charlene Miracle*
*Case No. 2:12-cv-00510*

*Jennifer Reyes*
*Case No. 2:12-cv-00939*

*Carrie Smith*
*Case No. 2:12-cv-00258*

*Beth Harter*
*Case No. 2:12-cv-00737*

*Sheri Scholl*
*Case No. 2:12-cv-00738*

*Margaret Stubblefield*
*Case No. 2:12-cv-00842*

*Roberta Warmack*
*Case No. 2:12-cv-01150*

*Jackie Frye*
*Case No. 2:12-cv-01004*

*Dina Sanders Bennett*
*Case No. 2:12-cv-00497*

*Joan Adams*
*Case No. 2:12-cv-01203*

*Barbara Vignos-Ware*
*Case No. 2:12-cv-00761*

*Fran Collins*
*Case No. 2:12-cv-00931*

*Pamela Gray Wheeler*
*Case No. 2:12-cv-00455*

*Deborah Lynn Joplin*
*Case No. 2:12-cv-00787*

*Donna Shepher*
*Case No. 2:12-cv-00967*

*Paula Fisk*
*Case No. 2:12-cv-00848*

*Teresa Georgilakis*
*Case No. 2:12-cv-00829*

*Jennifer Sikes*
*Case No. 2:12-cv-00501*

*Isabel Swint*
*Case No. 2:12-cv-00786*

*Krystal Teasley*
*Case No. 2:12-cv-00500*

*Susan Thaman (Reeves)*
*Case No. 2:12-cv-00279*

*Kimberly Thomas (Wyatt)*
*Case No. 2:12-cv-00499*

*Louise Grabowski*
*Case No. 2:12-cv-00683*

*Cathy Warlick*
*Case No. 2:12-cv-00276*

# EXHIBIT B

**Expert opinion of Jaime L Sepulveda MD FACOG FACS PRPC**
**Gynemesh PS, Prolift and Prosima devices**

<u>I. Credentials and qualifications</u>

My name is Jaime L. Sepulveda-Toro. My attached curriculum vitae reflects my education, training and unique qualifications to render opinions in this case. I graduated from the University of Puerto Rico with a Bachelor in Sciences in 1981 and from the University of Puerto Rico School of Medicine in 1985. I did a Postdoctoral Research Fellowship in Molecular Pharmacology at the same medical school followed by a direct internship and residency training program at the University of Puerto Rico University Hospital. Following completion of my residency program I had an appointment as assistant professor of Obstetrics and Gynecology at the University of Miami School of Medicine where I completed postgraduate education in Pelvic Surgery and Urogynecology. I have been in private practice since 1992.

I am Board Certified in Obstetrics and Gynecology with a subspecialty certification in Female Pelvic Medicine and Reconstructive Surgery. I also hold the only Pelvic Rehabilitation certification available to physicians and surgeons after becoming part of the first class of Certified Pelvic Rehabilitation Practitioners from Herman and Wallace Pelvic Rehabilitation Institute.

I am the Medical Director of the South Miami Medical Arts Surgery Center and Principal Investigator of the Fibroid Registry Research Project of the Center for Women and Infants at South Miami Hospital- Baptist Health, where I hold full privileges for gynecologic surgery. I am the Conference Director for the for the Pelvic Floor Board, a multi-specialty group of physicians specializing in colorectal surgery, physical medicine, urology, neurology, radiology, and urogynecology devoted to the discussion and analysis of challenging pelvic floor conditions seen at our hospital. I am a fellow of the American College of Obstetrics and Gynecology and also a Fellow of the American College of Surgeons. I am a member of the American Urogynecologic Society, the American Urological Association, the International Urogynecologic Association and the International Continence Society.

I have had extensive experience in the care of female urinary incontinence and pelvic organ prolapse. During my 23 years in practice I have seen the

1

evolution of continence and prolapse care with and without surgery. I have used native tissue repairs, sacral colpopexy, and the use of vaginal mesh (specifically polypropylene) for the treatment of pelvic organ prolapse. I have had experience in the treatment of complications arising from the use of native tissue, suture repairs, and synthetic and non-synthetic grafts for the surgical treatment of pelvic organ prolapse.  My expertise extends to the daily use of diagnostic testing for urinary and fecal incontinence and pelvic organ prolapse.

I have used and continue using midurethral slings made of polypropylene in the care of my patients with urinary stress incontinence. I continue to use macroporous monofilament polypropylene in the transabdominal repair of pelvic organ prolapse and used Prolift and Prosima until decommercialized.  I have accumulated experience with all three generations of midurethral slings, retropubic, transobturator and single incision.( TVT, TVTO and TVT Secur). I have also accumulated experience with the use of tension free Gynemesh PS, and the implantation of mesh for the treatment of moderate and severe prolapse with and without the use of trocars. I have also placed over 2,000 miduretheral slings, the vast majority of which use Prolene polypropylene. I have conducted various types of professional education activities for other surgeons on the use of Gynemesh PS, Prolift and Prosima.  These activities encompassed implantation and use, the potential benefits and risks of the device, the IFU and professional education materials, as well as my clinical experience and the medical literature and studies.

I have devoted over a decade to study the anatomy of the obturator an area in which I have done surgery and have explored with the systematic study of its anatomy using imaging and cadaver dissections.  I have studied the anatomy of this space through the dissection of over 300 cadaver specimens and through MRI imaging of cadaver and patients. I have had over 500 physicians visit my operating room and watch me place a transobturator sling, and in the use of Prolift and the use of Prosima. These visits have been with and without industry sponsorship. Over the years I have spoken to colleagues, scientist researchers, engineers and anatomists getting a thorough understanding of the mechanism safety, operative technique and management of intraoperative and postoperative complications of repairs with and without synthetic non absorbable mesh for the treatment of prolapse and incontinence.

I have researched and regularly read the medical and scientific literature concerning prolapse and its treatment, including the mechanism, efficacy and safety of abdominal and transvaginal mesh. Over the years I have spoken to colleagues, scientists, researchers, engineers and anatomists to get a thorough understanding of the mechanism, efficacy and safety of abdominal and transvaginal prolapse mesh repair. I have counseled my patients on the inherent risks of all prolapse procedures, including the risk of revision whenever a permanent suture or mesh graft is used.

My education and experience in clinical sciences has allowed me to discriminate the clinical relevance of all information involved in the placement and outcomes of prolapse mesh. My background in basic sciences, specifically my formal training in molecular pharmacology including benchwork preparation of cytotoxicity assays, gives me a unique expertise in implants science.

A list of materials that I have reviewed is attached and includes company documents, the medical literature, and materials relating to Gynemesh PS, Prolift, and Prosima. All of my opinions are held to a reasonable degree of medical and scientific certainty. I have also reviewed the reports of experts for the Plaintiffs. I reserve the right to amend this report and my opinions pending receipt of additional materials.

## II. Overview and Review of literature

Pelvic organ prolapse, like urinary incontinence, is a common condition in women. There are various types of prolapse including cystocele, rectocele and vault prolapse with cystocele being the most common. A cross sectional analysis of the WHI revealed that in women with a uterus, the rate of uterine prolapse was 14.2%, the rate of cystocele was 34.3%, and the rate of rectocele was 18.6% and in the women who had undergone a hysterectomy, the prevalence of cystocele was 32.9% and rectocele was 18.3%.[1] The prevalence of prolapse increases with age and is a major public health concern as our population ages. The lifetime risk of surgery for POP in American women is 12.6% and the combined rate for either SUI or POP surgery is 20.0% per a

---

[1] Hendrix SL, Clark A, Nygaard I, Aragaki A, Barnabei V, McTiernan A. Pelvic organ prolapse in the Women's Health Initiative: gravity and gravidity. Am J Obstet Gynecol. 2002 Jun;186(6):1160-6.

study evaluating a large, population-based cohort of more than 10 million women.[2]

Risk factors include pregnancy, childbirth, congenital or acquired connective tissue abnormalities, denervation or weakness of the pelvic floor, aging, hysterectomy, menopause, and factors associated with chronically raised intra-abdominal pressure such as repetitive heavy lifting, smoking, chronic cough and COPD.[3]   The pelvic floor support system gets its first test at the first vaginal delivery with lower levels of damage after subsequent deliveries. The damage of a vaginal delivery is permanent and is characterized by a torn fibromuscular support to the pelvic organs. With impaired support, the resistance to hold organs in place is lower than the force generated by an increase in intra-abdominal pressure and the transmitted pressure to the pelvic floor. Restoration of the deficient pelvic floor support structure by placing a durable prosthesis to support the pelvic organs forms the scientific rationale to treat pelvic organ prolapse with synthetic mesh.

Symptoms of pelvic organ prolapse include vaginal bulging, pelvic heaviness, urinary voiding problems and urinary incontinence, bowel changes, vaginal discharge, dyspareunia and sexual dysfunction, pelvic and lower abdominal pain, and are associated with poorer quality of life.[4]   The burden of untreated prolapse is significant.  Studies have shown that POP adversely affects numerous aspects of a woman's quality of life including social, psychological, physical, sexual, body image and overall wellbeing.[5]

---

[2] Wu JM, Matthews CA, Conover MM, Pate V, Jonsson Funk M. Lifetime risk of stress urinary incontinence or pelvic organ prolapse surgery. Obstet Gynecol. 2014 Jun;123(6):1201-6.
[3] Maher C, Feiner B, Baessler K, Christmann-Schmid C, Haya N, Marjoribanks J. Transvaginal mesh or grafts compared with native tissue repair for vaginal prolapse. Cochrane Database Syst Rev. 2016 Feb 9;2:CD012079. [Epub ahead of print]
[4] Fritel X, Varnoux N, Zins M, Breart G, Ringa V. Symptomatic pelvic organ prolapse at midlife, quality of life, and risk factors. Obstet Gynecol. 2009 Mar; 113(3):609-16.
[5] Rogers GR, Villarreal A, Kammerer-Doak D, Qualls C. Sexual function in women with and without urinary incontinence and/or pelvic organ prolapse. Int Urogynecol J. 2001;12:361–365; Ozel B, White T, Urwitz-Lane R, Minaglia S. The impact of pelvic organ prolapse on sexual function in women with urinary incontinence. Int Urogynecol J  Pelvic Floor Dysfunct. 2006 Jan;17(1):14-7; Handa VL, Cundiff G, Chang HH, Helzlsouer KJ. Female sexual function and pelvic floor disorders. Obstet Gynecol. 2008 May;111(5):1045-52; Ghetti C, Lowder JL, Ellison R, Krohn MA, Moalli P. Depressive symptoms in women seeking surgery for pelvic organ prolapse. Int Urogynecol J. 2010 Jul;21(7):855–60; Lowder J, Ghetti C, Moalli P, Zyczynski H, Cash TF. Body image in women before and after

4

Conservative options such as pelvic floor exercises and use of a pessary are often offered, but patient understanding and follow through lead many to choose a surgical option.

The use of native tissue surgical repair for prolapse has been associated with high rates of recurrence of 30 to 50%.[6] The high failure rates as well as complications led surgeons to use synthetic materials to augment the deficient pelvic floor support structure via the abdominal approach beginning over 50 years ago.[7] However, the preferred route for the majority of prolapse surgeries in the United States is vaginal (80-90%),[8] and there was a trend in the progressive movement towards less invasive vaginal hysterectomies, which are often performed concomitantly. Prolapse following hysterectomy is also common and often involves a combination of failures to the pelvic levels of support including a loss of apical support which is frequently seen with more advanced degrees of prolapse extending beyond the hymen.[9] These

reconstructive surgery for pelvic organ prolapse. International Urogynecology Journal. 2010;21(8):919–925;

[6] Benson JT, Lucente V, McClellan E. Vaginal versus abdominal reconstructive surgery for the treatment of pelvic support defects: a prospective randomized study with long-term outcome evaluation. Am J Obstet Gynecol. 1996;175:1418–21; Olsen AL, Smith VJ, Bergstrom JO, Colling JC, Clark AL. Epidemiology of surgically managed pelvic organ prolapse and urinary incontinence. Obstet Gynecol. 1997; 89(4):501–506; Weber AM, Walters MD, Piedmonte MR, Ballard LA. Anterior colporrhaphy: a randomized trial of three surgical techniques. Am J Obstet Gynecol. 2001; 185(6):1299–1304; Sand PK, Koduri S, Lobel RW, et al. Prospective randomized trial of polyglactin 910 mesh to prevent recurrence of cystoceles and rectoceles. Am J Obstet Gynecol. 2001;184(7):1357–1362; Clark AL, Gregory T, Smith VJ, Edwards R. Epidemiologic evaluation of reoperation for surgically treated pelvic organ prolapse and urinary incontinence. Am J Obstet Gynecol. 2003;189(5):1261–1267; Whiteside JL, Weber AM, Meyn LA, Walters MD. Risk factors for prolapse recurrence after vaginal repair. Am J Obstet Gynecol. 2004;191(5):1533–1538.

[7] Lane FE. Repair of posthysterectomy vaginal-vault prolapse. Obstet Gynecol. 1962 Jul; 20:72-7.

[8] Brown JS, Waetjen LE, Subak LL, Thom DH, Van den Eeden S, Vittinghoff E. Pelvic organ prolapse surgery in the United States, 1997. Am J Obstet Gynecol. 2002; 186:712–16; Boyles SH, Weber AM, Meyn L. Procedures for pelvic organ prolapse in the United States, 1979-1997. Am J Obstet Gynecol. 2003; 188:108–15.

[9] DeLancey JO. Anatomic aspects of vaginal eversion after hysterectomy. Am J Obstet Gynecol 1992; 166:1717-28; Chen L, Ashton-Miller JA, Hsu Y, DeLancey JO. Interaction among apical support, levator ani impairment, and anterior vaginal wall prolapse. Obstet Gynecol. 2006;108:324–32; Rooney K, Kenton K, Mueller ER, FitzGerald MP, Brubaker L.

factors and the demonstrated benefit of mesh augmentation for pelvic organ prolapse via the abdominal route shown in a Level 1 randomized controlled trial[10] led to the use of transvaginal non-absorbable mesh utilization for pelvic organ prolapse which demonstrated efficacy and a known safety profile.[11] Absorbable mesh was studied early on in prolapse repair with mixed results.[12] The use of synthetic mesh for hernia repair had been utilized for over 60 years.[13] Moreover, the vaginal placement of synthetic slings for the treatment of stress urinary incontinence had also been described,[14] and the midurethral TVT macroporous polypropylene sling demonstrated that the vaginal

---

Advanced anterior vaginal wall prolapse is highly correlated with apical prolapse. Am J Obstet Gynecol. 2006; 195:1837–40.

[10] Benson JT, Lucente V, McClellan E. Vaginal versus abdominal reconstructive surgery for the treatment of pelvic support defects: a prospective randomized study with long-term outcome evaluation. Am J Obstet Gynecol. 1996; 175:1418–21.

[11] Julian TM. The efficacy of Marlex mesh in the repair of severe, recurrent vaginal prolapse of the anterior midvaginal wall. Am J Obstet Gynecol. 1996;175:1472–1475; Flood CG, Drutz HP, Waja L. Anterior colporrhaphy reinforced with Marlex mesh for the treatment of cystoceles. Int Urogynecol J Pelvic Floor Dysfunct. 1998;9:200–204; Nicita G. A new operation for genitourinary prolapse. J Urol. 1998;160:741–745; Hardiman P, Oyawoye S, Browning J. Cystocele repair using polypropylene mesh. Br J Obstet Gynaecol. 2000;107:825–826; Migliari R, De Angelis M, Madeddu G, Verdacchi T. Tension-free vaginal mesh repair for anterior vaginal wall prolapse. Eur Urol. 2000;38:151–155; De Tayrac R, Gervaise A, Fernandez H. [Cystocele repair by the vaginal route with a tension-free sub-bladder prosthesis] J Gynecol Obstet Biol Reprod (Paris) 2002;31:597–599; Adhoute F, Soyeur L, Pariente JL, Le Guillou M, Ferriere JM. [Use of transvaginal polypropylene mesh (Gynemesh) for the treatment of pelvic floor disorders in women. Prospective study in 52 patients] Prog Urol. 2004;14:192–196.

[12] Weber AM, Walters MD, Piedmonte MR, Ballard LA. Anterior colporrhaphy: a randomized trial of three surgical techniques. Am J Obstet Gynecol. 2001; 185(6):1299–1304; Sand PK, Koduri S, Lobel RW, et al. Prospective randomized trial of polyglactin 910 mesh to prevent recurrence of cystoceles and rectoceles. Am J Obstet Gynecol. 2001;184(7):1357–1362.

[13] Usher FC, Hill JR, Ochsner JL. Hernia repair with Marlex mesh. A comparison of techniques. Surgery. 1959 Oct;46:718-24; Luijendijk RW, Hop WC, van den Tol MP, de Lange DC, Braaksma MM, IJzermans JN, Boelhouwer RU, de Vries BC, Salu MK, Wereldsma JC, Bruijninckx CM, Jeekel J. A comparison of suture repair with mesh repair for incisional hernia. N Engl J Med. 2000 Aug 10;343(6):392-8.

[14] Moir JC. The gauze-hammock operation. (A modified Aldridge sling procedure). J Obstet Gynaecol Br Commonw. 1968 Jan; 75(1):1-9; Morgan JE. A sling operation, using Marlex polypropylene mesh, for treatment of recurrent stress incontinence. Am J Obstet Gynecol. 1970 Feb 1; 106(3):369-77.

approach was feasible.[15]  The monofilament macroporous Prolene PP also demonstrated useful attributes, tolerability and had a long history of use as both a mesh and a suture.[16]

Gynemesh PS was cleared by the FDA on January 8, 2002 for use in pelvic organ prolapse.  Gynemesh PS is a macroporous type 1 monofilament polypropylene mesh with a pore size of 2.4mm and a light weight of 42 g/m$^2$ for the prolapse indication.  It was studied in a one year study and demonstrated efficacy and safety.[17]  In 2002, a group of French surgeons began studying and developing a standardized way, mesh and device to treat prolapse.[18]  Vypro mesh was assessed and was not tolerated.[19]

The TVM Group settled on Gynemesh PS which was state of the art and biocompatible.  After several years of study by the TVM Group[20] and including

---

[15] Rezapour M, Falconer C, Ulmsten U. Tension-Free vaginal tape (TVT) in stress incontinent women with intrinsic sphincter deficiency (ISD)--a long-term follow-up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S12-14; Rezapour M, Ulmsten U. Tension-Free vaginal tape (TVT) in women with recurrent stress urinary incontinence--a long-term follow up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S9-11; Rezapour M, Ulmsten U. Tension-Free vaginal tape (TVT) in women with mixed urinary incontinence--a long-term follow-up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S15-18; Ward K, Hilton P on behalf of the UK and Ireland TVT Trial Group. Prospective multicentre randomised trial of tension-free vaginal tape and colposuspension as primary treatment for stress incontinence. BMJ 2002; 325:67.

[16] Falconer C, et al. Influence of different sling materials on connective tissue metabolism in stress urinary incontinent women. Int Urogynecol J Pelvic Floor Dysfunct. 2001; 12 Suppl 2:S19-23; Petros P. Creating a gold standard surgical device: scientific discoveries leading to TVT and beyond: Ulf Ulmsten Memorial Lecture 2014. Int Urogynecol J. 2015 Apr; 26(4):471-6.

[17] Lucente V, Hale D, Miller D, Madigan J. A Clinical Assessment of GYNEMESH PS for the Repair of Pelvic Organ Prolapse (POP).  J Pelvic Med Surg 2004; 10:Supp.1 Oral Poster 55.

[18] Debodinance P, Berrocal J, Clavé H, Cosson M, Garbin O, Jacquetin B, Rosenthal C, Salet-Lizée D, Villet R. [Changing attitudes on the surgical treatment of urogenital prolapse: birth of the tension-free vaginal mesh]. J Gynecol Obstet Biol Reprod (Paris). 2004 Nov;33(7):577-88.

[19] Denis S, Bernard J, Joël A, Lemli O. Pelvic organ prolapse treatment by the vaginal route using a Vypro® composite mesh: preliminary results about 106 cases. ICS IUGA 2004 Abs 620.  http://www.ics.org/Abstracts/Publish/42/000620.pdf

[20] Cosson M, Caquant F, Collinet P, Rosenthal C, Clave H, Debodinance P, Garbin O, Berrocal J, Villet R, Jacquetin B. Prolift mesh (Gynecare) for pelvic organ prolapse surgical treatment using the TVM group technique: a retrospective study of 687 patients. ICS 2005 Abs 121. http://www.ics.org/Abstracts/Publish/43/000121.pdf

the one year Gynemesh PS study earlier mentioned, all together totaling over 700 patients, the Prolift was introduced in 2005. Prospective multi center TVM studies using Gynemesh PS were started in 2004 and would report data beginning in 2005 at 6 months, with later presentations at 1, 3 and 5 years.[21] This is a significant amount of study and well surpassed all industry standards at the time for prolapse mesh.

By 2009 more than 30 studies were reported in the literature comprising over 4,000 patients. Since that time, Gynemesh PS and Prolift have continued to be studied, more so than any other mesh for the treatment of prolapse. These data document the favorable benefit to risk profile.

Gynemesh PS and Prolift have been studied in several randomized controlled trials which overall demonstrate anatomic superiority to native tissue, statistically significant subjective and quality of life improvements, and lower rates of reoperation.[22]

---

[21] Jacquetin B, Fatton B, Rosenthal C, Clavé H, Debodinance P, Hinoul P, Gauld J, Garbin O, Berrocal J, Villet R, Salet Lizée D, Cosson M. Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 3-year prospective follow-up study. Int Urogynecol J. 2010 Dec;21(12):1455-62; Miller D, Lucente V, Babin E, Beach P, Jones P, Robinson D. Prospective clinical assessment of the transvaginal mesh technique for treatment of pelvic organ prolapse-5-year results. Female Pelvic Med Reconstr Surg. 2011 May;17(3):139-43; Jacquetin B, Hinoul P, Gauld J, Fatton B, Rosenthal C, Clavé H, Garbin O, Berrocal J, Villet R, Salet-Lizée D, Debodinance P, Cosson M. Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 5-year prospective follow-up study. Int Urogynecol J. 2013 Oct;24(10):1679-86.

[22] Carey M, Higgs P, Goh J, Lim J, Leong A, Krause H, Cornish A. Vaginal repair with mesh versus colporrhaphy for prolapse: a randomised controlled trial. BJOG. 2009 Sep;116(10):1380-6; Withagen MI, Milani AL, den Boon J, Vervest HA, Vierhout ME. Trocar-guided mesh compared with conventional vaginal repair in recurrent prolapse: a randomized controlled trial. Obstet Gynecol. 2011 Feb;117(2 Pt 1):242-50; Altman D, Väyrynen T, Engh ME, Axelsen S, Falconer C; Nordic Transvaginal Mesh Group. Anterior colporrhaphy versus transvaginal mesh for pelvic-organ prolapse. N Engl J Med. 2011 May 12;364(19):1826-36. doi: 10.1056/NEJMoa1009521. Erratum in: N Engl J Med. 2013 Jan 24;368(4):394; Sokol AI, Iglesia CB, Kudish BI, Gutman RE, Shveiky D, Bercik R, Sokol ER. One-year objective and functional outcomes of a randomized clinical trial of vaginal mesh for prolapse. Am J Obstet Gynecol. 2012 Jan;206(1):86.e1-9; Halaska M, Maxova K, Sottner O, Svabik K, Mlcoch M, Kolarik D, Mala I, Krofta L, Halaska MJ. A multicenter, randomized, prospective, controlled study comparing sacrospinous fixation and transvaginal mesh in the treatment of posthysterectomy vaginal vault prolapse. Am J Obstet Gynecol. 2012 Oct;207(4):301.e1-7; El-Nazer MA, Gomaa IA, Ismail Madkour WA, Swidan KH, El-Etriby MA. Anterior colporrhaphy versus repair with mesh for anterior vaginal wall prolapse: a

The chart below shows the anatomic superiority of Gynemesh PS* and Prolift RCTs over native tissue repair.



These studies also show positive effects on numerous domains including high patient satisfaction, improvement in bowel, prolapse and sexual function and show a positive benefit to risk profile. In the largest RCT by Altman 2011, 75.4% of anterior Prolift patients had no symptoms of vaginal bulge compared to 62% for the anterior colporrhaphy group (p=0.008). In the El-Nazer 2012 Gynemesh PS RCT, subjective symptom improvements in urinary incontinence or urgency, voiding difficulty, vaginal pressure/bulge and sexual dysfunction symptoms were seen in the Gynemesh PS arm and voiding difficulty and vaginal bulge symptoms were significantly improved with

comparative clinical study. Arch Gynecol Obstet. 2012 Oct;286(4):965-72; Qatawneh A, Al-Kazaleh F, Saleh S, Thekrallah F, Bata M, Sumreen I, Al-Mustafa M. Transvaginal cystocele repair using tension-free polypropylene mesh at the time of sacrospinous colpopexy for advanced uterovaginal prolapse: a prospective randomised study. Gynecol Surg 2013; 10:79–85; Svabik K, Martan A, Masata J, El-Haddad R, Hubka P. Comparison of vaginal mesh repair with sacrospinous vaginal colpopexy in the management of vaginal vault prolapse after hysterectomy in patients with levator ani avulsion: a randomized controlled trial. Ultrasound Obstet Gynecol. 2014 Apr;43(4):365-71; Dos Reis Brandão da Silveira S, Haddad JM, de Jármy-Di Bella ZI, Nastri F, Kawabata MG, da Silva Carramão S, Rodrigues CA, Baracat EC, Auge AP. Multicenter, randomized trial comparing native vaginal tissue repair and synthetic mesh repair for genital prolapse surgical treatment. Int Urogynecol J. 2015 Mar;26(3):335-42.

Gynemesh PS compared to native tissue repair (p<0.05). Besides significantly better anatomic cure, the da Silveira 2014 RCT reported statistically significant higher patient quality of life improvements with Total Prolift versus native tissue SSL repair. The Carey 2009 Gynemesh PS RCT reported 91.5% satisfaction with surgery and symptoms and quality-of-life improvements data were observed with Gynemesh PS.

In the Withagen 2011 Prolift RCT, Defecatory Distress Inventory domains of "pain" and "incontinence" scored significantly better in the Prolift group compared to native tissue at 12 months (p=0.01 and p=0.05). Additionally, significant improvements in the Urogenital Distress Inventory domains "genital prolapse," "pain" and "overactive bladder," and "physical functioning" of the Incontinence Impact Questionnaire were noted. In the Sokol 2012 Prolift RCT, quality of life improved and 96.2% of patients reported a cure of bulge symptoms. In the Halaska 2012 Prolift RCT, significant improvements were reported based on Urinary, Colorectoanal and Pelvic Organ Prolapse Impact Questionnaires. Prolift also had higher improvement in bowel symptoms than the SSL arm.

The most recent Cochrane Review demonstrates that there are lower rates of awareness of prolapse, reoperation for prolapse, and prolapse on examination with permanent polypropylene mesh like Gynemesh PS compared to native tissue repair and there is no difference in repeat surgery for incontinence or dyspareunia versus native tissue repair.[23] Although Ultrapro and PVDF have been referenced by some of the Plaintiffs' experts as a safer alternative than Gynemesh PS, the data including the Cochrane Review do not support this as there is still a risk of mesh exposure of 15% and a 9% rate of dyspareunia with Ultrapro in the Prolift +M device. The data also do not demonstrate that Ultrapro mesh is more effective than Gynemesh PS.

Similar to the Cochrane Review's findings regarding permanent polypropylene mesh, the above-referenced Gynemesh PS and Prolift studies demonstrate an overall positive effect on sexual function with many patients having dyspareunia at baseline resolve after surgery. These data also do not show a statistically significant difference in de novo dyspareunia, de novo

---

[23] Maher C, Feiner B, Baessler K, Christmann-Schmid C, Haya N, Marjoribanks J. Transvaginal mesh or grafts compared with native tissue repair for vaginal prolapse. Cochrane Database Syst Rev. 2016 Feb 9;2:CD012079. [Epub ahead of print] Review. PubMed PMID: 26858090.

pelvic pain or vaginal pain, change in sexual function, or change in vaginal length or vaginal caliber.  This is consistent with the findings by Dietz and Maher whose systematic review found no difference in post-operative or de novo dyspareunia or change in sexual function as assessed by PISQ for mesh versus native tissue repair.[24]

Significant dyspareunia and sexual dysfunction rates at baseline are demonstrated in these and other studies.  It has long been known that dyspareunia is common in women with pelvic floor disorders.  It has also long been known that prolapse repair can lead to dyspareunia.[25]  The rates seen with Gynemesh PS and Prolift are generally lower than or equivalent to native tissue repair as seen in the study by Lowman below.[26]

**TABLE 4**
**De novo dyspareunia after prolapse surgery**

| Dyspareunia | ASC<br>N = 224 (148)[a]<br>Handa et al[21] | SSLF<br>N = 287 (106)[a]<br>Maher et al[6] | USS<br>N = 110 (34)[a]<br>Silva et al[27] | APR<br>N = 165 (81)[a]<br>Weber et al[18] | Prolift<br>N = 129 (57)[a] |
|---|---|---|---|---|---|
| Baseline (preop) dyspareunia (%) | 40.5 (60/148) | Unknown | 20.6 (7/34) | 8.0 (6/81) | 36.8 (21/57) |
| De novo (postop) dyspareunia (%) | 14.5 (11/76) | 36.1 (22/61) | 25.9 (7/27) | 19.0 (14/75) | 16.7 (6/36) |

[a] Number sexually active preop.

Lowman. Does the Prolift system cause dyspareunia? Am J Obstet Gynecol 2008.

Vaginal wound dehiscence, graft and biologic erosion, and wound complications can occur with any prolapse repair.  They are multifactorial and not infrequently seen by vaginal surgeons even when using native tissue repair.  Suture erosions and granulation tissue are seen in 15-40% of patients in numerous studies.   A 36% suture-related complication rate at 18.9 months follow up including a 25% rate of suture removal with SSL native tissue repair has been reported.[27]  A study of USLS found a 44% suture related

---

[24] Dietz V, Maher C. Pelvic organ prolapse and sexual function. Int Urogynecol J. 2013 Nov;24(11):1853-7.
[25] Francis WJ, Jeffcoate TN. Dyspareunia following vaginal operations. J Obstet Gynaecol Br Commonw. 1961 Feb;68:1-10.
[26] Lowman JK, Jones LA, Woodman PJ, Hale DS. Does the Prolift system cause dyspareunia? Am J Obstet Gynecol. 2008 Dec;199(6):707.e1-6.
[27] Toglia MR, Fagan MJ. Suture erosion rates and long-term surgical outcomes in patients undergoing sacrospinous ligament suspension with braided polyester suture. Am J Obstet Gynecol. 2008 May;198(5):600.e1-4.

11

complication rate including 36% rate of suture erosion.[28] In the Sokol 2012 Prolift RCT, there was a 15% rate of mesh exposure and a 15% rate of suture erosion in the native tissue group. In the Svabik 2014 Prolift RCT there was a 8% mesh exposure rate and a 15% granulation tissue rate in the SSLF group.

In the recent multicenter NIH sponsored OPTIMAL RCT which compared USLS to SSL native tissue repairs, 19% and 14% rates of granulation tissue and 15% and 17% suture erosion rates were reported for USLS and SSL respectively at 6-24 months follow up.[29] A systematic review by the Society of Gynecologic Surgeons comparing synthetic and biologic grafts for prolapse reported a 10.3% erosion rate (synthetic 10.3%; biological 10.1%) and a 7.8% wound granulation rate (synthetic 6.8%; biological 9.1 %).[30]

Mesh exposure is the only unique complication with Gynemesh PS and Prolift although as noted above other wound complications occur without the use of mesh.[31] In many cases it can be treated conservatively with estrogen or a simple office procedure to excise the exposure. The vagina wound opens at the site of least resistance, the incision line, under a variety of stressors. Although infection has been theorized to be a factor due to the convention of a "clean contaminated environment," the evidence does not support that the separation of the incision edges in the vagina is primarily due to infection as infection rates do not correlate with mesh exposure rates with Gynemesh PS,

---

[28] Yazdany T, Yip S, Bhatia NN, Nguyen JN. Suture complications in a teaching institution among patients undergoing uterosacral ligament suspension with permanent braided suture. Int Urogynecol J. 2010 Jul;21(7):813-8.

[29] Barber MD, Brubaker L, Burgio KL, Richter HE, Nygaard I, Weidner AC, Menefee SA, Lukacz ES, Norton P, Schaffer J, Nguyen JN, Borello-France D, Goode PS, Jakus-Waldman S, Spino C, Warren LK, Gantz MG, Meikle SF; Eunice Kennedy Shriver National Institute of Child Health and Human Development Pelvic Floor Disorders Network. Comparison of 2 transvaginal surgical approaches and perioperative behavioral therapy for apical vaginal prolapse: the OPTIMAL randomized trial. JAMA. 2014 Mar 12;311(10):1023-34 (Suppl. App.).

[30] Abed H, Rahn DD, Lowenstein L, Balk EM, Clemons JL, Rogers RG; Systematic Review Group of the Society of Gynecologic Surgeons. Incidence and management of graft erosion, wound granulation, and dyspareunia following vaginal prolapse repair with graft materials: a systematic review. Int Urogynecol J. 2011 Jul;22(7):789-98.

[31] Murphy M, Holzberg A, van Raalte H, Kohli N, Goldman HB, Lucente V; Pelvic Surgeons Network. Time to rethink: an evidence-based response from pelvic surgeons to the FDA Safety Communication: "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse". Int Urogynecol J. 2012 Jan;23(1):5-9.

which is a macroporous, monofilament polypropylene mesh. The overall data do not show a statistically significant increased risk of infection and the larger studies report infection rates that are lower than alternative surgeries. For example, de Landsheere reported a rate of 0.2% for surgery to treat mesh infection in a large cohort of 524 Prolift patients with 38 months follow up.[32] In addition, there was a low rate of 0.4% for surgery due to symptomatic contraction, a 2.5% rate of surgery to treat mesh exposure, and a 3% rate of reoperation for prolapse recurrence in this cohort. Another longer term study with 54 months follow up reported an 85% cure rate, no reoperations for recurrence, a 5.3% mesh exposure rate of which two were excised and two resolved with estrogen, and no infections.[33]

Bacteriologcal analysis of explants have shown flawed collection methodology, lack of prospective design and lacked an explant of Prolene polypropylene specimen.[34] Additionally, the presence of bacteria at the surgical site is not equivalent to infection.[35]

Other factors contributing to exposure or wound complications in native tissue repair include the formation of a hematoma at dissection sites. As a hematoma of significant volume is accumulated under the vaginal epithelium, the volume creates enough pressure to find a course and drain though the incision. The incision is being held by absorbable sutures and progressive loss of tensile strength is expected from the moment the sutures are placed. Once the incision is open the exposure of the implant is evident. The limited dissection required for implantation of these devices decreases the potential risk of wound dehiscence. The role of mechanical disruption of the wound at the suture line, smoking, and deleterious effect of a catheter in the wound healing process are important factors to consider in the etiology of exposure.

---

[32] de Landsheere L, Ismail S, Lucot JP, Deken V, Foidart JM, Cosson M. Surgical intervention after transvaginal Prolift mesh repair: retrospective single-center study including 524 patients with 3 years' median follow-up. Am J Obstet Gynecol. 2012 Jan;206(1):83.e1-7.
[33] Benbouzid S, Cornu JN, Benchikh A, Chanu T, Haab F, Delmas V. Pelvic organ prolapse transvaginal repair by the Prolift system: evaluation of efficacy and complications after a 4.5 years follow up. Int J Urol. 2012 Nov;19(11):1010-6.
[34] Boulanger L, Boukerrou M, Rubod C, Collinet P, Fruchard A, Courcol RJ, Cosson M. Bacteriological analysis of meshes removed for complications after surgical management of urinary incontinence or pelvic organ prolapse. Int Urogynecol J Pelvic Floor Dysfunct. 2008 Jun; 19(6):827-31.
[35] Culligan P, Heit M, Blackwell L, Murphy M, Graham CA, Snyder J. Bacterial colony counts during vaginal surgery. Infect Dis Obstet Gynecol. 2003; 11(3):161-5..

Overall, these data show that the Gynemesh PS and Prolift are safe and effective. Efficacy and cure is high and better than native tissue repair. There are high levels of patient satisfaction and improvements in distressing symptoms and quality of life which shows the utility of the devices. There are no differences in pelvic pain, vaginal pain, dyspareunia or change in vaginal length or caliber and no significant difference in change in sexual function compared to native tissue prolapse repair.

I have also used the Prosima device, which is a trocarless system that utilized Gynemesh PS and a Vaginal Support Device (VSD) for moderate symptomatic pelvic organ prolapse. Like Prolift, it underwent many years of study with development and testing of surgical technique, prototype and mesh configuration. Study began in 2004 and the device was not introduced until more than five years later. Over time the device and technique were honed to provide a safe and effective method.[36]

The 12 and 29 month Prosima study results demonstrate good efficacy and a positive safety profile.[37] Anatomic cure is a little less than that seen with Prolift, although there is a high degree of lack of awareness of vaginal bulge and patient satisfaction which corresponds with the rates of 87% and 84.5% of patients with prolapse above the hymen at these time intervals. Overall there are low rates of dyspareunia and a positive effect on preexisting dyspareunia and sexual function. The cumulative mesh exposure rate for this

---

[36] Carey M, Slack M, Higgs P, Wynn-Williams M, Cornish A. Vaginal surgery for pelvic organ prolapse using mesh and a vaginal support device. BJOG. 2008 Feb;115(3):391-7; Zyczynski HM, Carey MP, Smith AR, Gauld JM, Robinson D, Sikirica V, Reisenauer C, Slack M; Prosima Study Investigators. One-year clinical outcomes after prolapse surgery with nonanchored mesh and vaginal support device. Am J Obstet Gynecol. 2010 Dec;203(6):587.e1-8; Reisenauer C, Shiozawa T, Huebner M, Slack M, Carey MP. Anatomic study of prolapse surgery with nonanchored mesh and a vaginal support device. Am J Obstet Gynecol. 2010 Dec;203(6):590.e1-7.

[37] Zyczynski HM, Carey MP, Smith AR, Gauld JM, Robinson D, Sikirica V, Reisenauer C, Slack M; Prosima Study Investigators. One-year clinical outcomes after prolapse surgery with nonanchored mesh and vaginal support device. Am J Obstet Gynecol. 2010 Dec;203(6):587.e1-8; Sayer T, Lim J, Gauld JM, Hinoul P, Jones P, Franco N, Van Drie D, Slack M; Prosima Study Investigators. Medium-term clinical outcomes following surgical repair for vaginal prolapse with tension-free mesh and vaginal support device. Int Urogynecol J. 2012 Apr;23(4):487-93.

extended follow-up period was 9.1%, with only one report of mesh exposure beyond 1 year, which resolved following treatment with topical estrogen.

There have been several other studies of Prosima which demonstrate its efficacy and safety. Rates of objective/anatomic cure are reported generally in the 80-95% range with accompanying significant improvements in subjective measures, symptoms and quality of life, a low reoperation rate, a low rate of de novo dyspareunia with a positive effect seen on sexual function and resolution of pre-existing dyspareunia, and acceptable rates of mesh exposure in the range of 2-15% which can be treated in many cases with estrogen or excision.[38] Overall, like Gynemesh PS and Prolift, the Prosima device is safe and effective, useful in treating moderate prolapse, and is not defective in my opinion.

In 2008, the FDA published a Public Health Notice concerning surgical pelvic mesh. This Public Health Notice discussed both potential complications and counseling of patients. Pelvic floor surgeons using mesh to treat SUI and POP, would be aware of and would be expected to know of the Notice, the potential complications, as well as their severity and need for reoperation discussed

---

[38] D'Afiero A, Tommaselli GA, Basilica F, Affinito P, Stanco D, Nappi C. Short term efficacy and safety of a single incision mesh (Prosima) for the treatment of pelvic organ prolapse. Int Urogynecol J 2011; 22 (Suppl 1):S1144-45 Pres 150; Khandwala S, Slack M, Hinoul P, Urquhart C, Al-Salihi S, A trocar-free procedure for vaginal prolapse repair using mesh and a vaginal support device - an observational registry. FPMRS 2011; 17:5(Supp 2)S164 Poster 143; Krofta L, Krcmar M, Otcenasek M, Feyereisl J, Kasikova E, Dlouha K. Pelvic organ prolpase surgery with non-anchored mesh implants and vaginal support device in women with moderate symptomatic prolapse: prospective study. Int Urogynecol J 2011; 22(Suppl 1):S115=16 IUGA Pres 116; Malinowski A, Maciolek-Blewniewska G, Wojciechowski M. Initial experience with Gynecare Prosima pelvic floor repair system. Int Urogynecol J 2011; 22 (Suppl 3):S1794-95 IUGA Pres 472; Singh R, Lim J, Muscat K, Carey M. Anatomic, functional and ultrasound outcomes after vaginal prolapse surgery using non-anchored mesh. ICS 2011 Abs 575; Chen J, Zhu L, Lang JH, Shi HH, Lou WJ, Sun ZJ, Gong XM. Prospective study on total pelvic reconstruction surgery with Prosima in the treatment of pelvic organ prolapse stage III. Chin J Obstet Gyn 2012; 47:664-8; DAfiero A, Tommaselli GA, Forleo F, Affinito P, Stanco D. Short-term effects of mesh augmented surgery for pelvic organ prolapse on functional outcomes and qol: a comparison between trocar guided and single incision devices. Int J Gynecol Obstet 2012; 19S3 Abs 0156; Bezhenar V & Guseva E. The pelvic floor repair with the use of Prosima implant – the assessment of complications and life quality. ICS 2013 Abs 765; Tsai CP, Hung MJ, Shen PS, Chen GD, Su TH, Chou MM. Factors that affect early recurrence after prolapse repair by a nonanchored vaginal mesh procedure. Taiwan J Obstet Gynecol. 2014 Sep;53(3):337-42.

therein, and recommendations made. In 2011 the FDA published an updated notice concerning POP meshes. This notice identified similar risks as earlier and a reported new risk, contraction. Notably, contraction was identified as a potential adverse event in the initial 2002 Gynemesh PS IFU, the initial 2005 Prolift IFU and the initial 2008 Prosima IFU and this well known risk which can lead to pain was also identified in Ethicon professional education which the IFUs also recommended surgeons undergo.

As noted, each Gynemesh PS, Prolift and Prosima device is accompanied by an IFU. I have reviewed these IFUs and find them adequate and complete for its use in the operating room by the intended users. As a surgeon, I understand that the IFU is not a comprehensive guide for the surgical treatment of POP. The IFU builds on the knowledge that we as pelvic floor surgeons have acquired through prior education, instruction and experience and warns that users should be pelvic floor surgeons familiar with surgical procedures and techniques regarding pelvic floor repair and nonabsorbable meshes before using the device. Moreover, the IFUs on the very first page state that training is recommended and available. The IFU adequately informs surgeons of the use of Gynemesh PS, Prolift, Prosima and the potential risks and complications.

For example, the initial 2005 Prolift IFU states that "Training on the use of the Gynecare Prolift Pelvic Floor Repair Systems is recommended and available. Contact your company sales representative to arrange for this training. Refer to the recommended surgical technique for the Gynecare Prolift Pelvic Floor Repair Systems for further information on the Gynecare Prolift procedures."

Ethicon's IFU warns pelvic floor surgeons:

WARNINGS AND PRECAUTIONS
•        Users should be familiar with surgical procedures and techniques involving pelvic floor repair and nonabsorbable meshes before employing the GYNECARE PROLIFT Pelvic Floor Repair Systems.
•        Acceptable surgical practices should be followed in the presence of infected or contaminated wounds.
•        Post-operatively the patient should be advised to refrain from intercourse, heavy lifting and/or exercise (e.g. cycling, jogging) until the physician determines when it is suitable for the patient to return to her normal activities.

- Avoid placing excessive tension on the mesh implant during handling.
- Refer to the recommended surgical technique for the GYNECARE PROLIFT Pelvic Floor Repair System for further information on the GYNECARE PROLIFT procedures.
- The GYNECARE PROLIFT Pelvic Floor Repair Systems should be used with care to avoid damage to vessels, nerves, bladder and bowel. Attention to patient anatomy and correct use of the device will minimize risks.
- Transient leg pain may occur and can usually be managed with mild analgesics.
- Do not manipulate the GYNECARE PROLIFT Retrieval Device with sharp instruments or cut it to alter its length.

The pertinent adverse reactions are also set forth:
ADVERSE REACTIONS
- Potential adverse reactions are those typically associated with surgically implantable materials, including infection potentiation, inflammation, adhesion formation, fistula formation, erosion, extrusion and scarring that results in implant contraction.
- Punctures or lacerations of vessels, nerves, bladder, urethra or bowel may occur during GYNECARE PROLIFT Guide passage and may require surgical repair.

Additionally, the Prolift Surgeon's Resource Monograph, which Ethicon made available to surgeons in early 2007 provided detailed information on the following post-operative complications:
- Postoperative complications:
  o Hemorrhage
  o Hematoma
  o Fistula
  o Infection
  o Urinary Retention
  o Mesh Exposure
  o Mesh Erosion
  o Dyspareunia
  o Vaginal Pain

Similarly, Ethicon presented clinical data on Prolift in the Monograph regarding mesh exposure rates, de novo dyspareunia rates, and other complications.

17

The complications such as tissue contraction, scarring, pelvic pain and dyspareunia are well-known complications that can occur with any pelvic floor surgery, including Prolift. The complication of mesh erosion or exposure is a wound complication like those seen with non-synthetic mesh repair and is not caused by a defect in the mesh. These are well-known complications that surgeons learn in medical school, residency, fellowship, through continued medical education, peer-reviewed literature, discussions with colleagues, and the FDA Public Health Notifications.

I have conducted numerous activities for the purpose of professional education including surgical anatomy laboratories with the use of models and cadavers, consensus conferences among experienced users, surgical demonstrations in the operating room and didactic lectures. All these activities offer the opportunity to address the complications and details of the surgery along with the interpretation of the IFU. The professional education activities provided the opportunity to exchange knowledge among surgeons. Ethicon's professional education, which is recommended in the IFU, supplements the IFU.

I have used the Prolift and Prosima patient brochures in my practice. Both allow a patient to construct a base to be used in the conversation about the procedure. These brochures are not meant to supplant the informed consent process, but rather are a resource for additional information and mention complications inherent to continence procedures. The IFU, surgical technique guide, surgeons resource monograph, patient brochure, professional education, medical literature, the 2008 and 2011 FDA Public Health Notifications discuss potential complications to be addressed in the informed consent process and were available to surgeons.

There have been several claims made by the Plaintiff's experts regarding the Prolene polypropylene mesh and the devices which in my opinion are incorrect and lack scientific support. Moreover, the large volume of clinical data on Gynemesh PS (as well as the TVT slings) including the highest level of evidence and long term data are inconsistent with these theories.

The monofilament knitted Gynemesh PS polypropylene mesh has pores which are macroporous (over 75 microns). A pore size above 75 microns allows for the migration of neutrophils (9-12 microns) and mature inflammatory cells

(20 microns), considering that most studies are on explants.  The clinical data show that the pore size, weight, and construct of Gynemesh PS polypropylene mesh is optimal for treating prolapse.

Explants from humans get forces well beyond the intended force for a sling or prolapse procedure; explants are in essence useless in the evaluation of the host-graft interaction. Explanted material is the subject of mechanical stressors beyond its limits and has no clinical predictive value.

The use of Prolene polypropylene has been used in millions of sutures, slings and Gynemesh PS.  A Medline search for sarcoma and polypropylene does not yield a single case of sarcoma or malignancy due to the use of polypropylene material in humans. MSDS and rat studies reporting sarcoma formation after implantation of polypropylene discs and powder are not transferable to humans.[39]  Raw materials as referenced in MSDS are not implanted in humans. Instead they are processed and formulated.  The same is true for pharmaceuticals.  The available data does not show any causal link between polypropylene and cancer.[40],[41],[42],[43]

There is no evidence of human cytotoxicity. Cytotoxicity assessment of the Ulmsten Prolene polypropylene sling using the ISO Elution method showed cell lysis and toxicity; however, this was not confirmed by the ISO Agarose Diffusion method.[44],[45]  Cytotoxicity assessment of normal production Prolene polypropylene using the Agarose Overlay Method and Extraction Filter

---

[39] King AB, Goldman HB. Current controversies regarding oncologic risk associated with polypropylene midurethral slings. Curr Urol Rep. 2014 Nov;15(11):453. doi: 10.1007/s11934-014-0453-y. PubMed PMID: 25234187.

[40] Moalli P, Brown B, Reitman M, Nager C. Polypropylene mesh: evidence for lack of carcinogenicity. Int Urogynecol J. 2014 May;25(5):573-6.

[41] March 12, 2014 AUGS-SUFU Frequently Asked Questions by Providers: Mid-urethral slings for Stress Urinary Incontinence.
http://www.augs.org/p/bl/et/blogid=16&blogaid=194

[42] King AB, Zampini A, Vasavada S, Moore C, Rackley RR, Goldman HB. Is there an association between polypropylene midurethral slings and malignancy? Urology. 2014 Oct;84(4):789-92.

[43] Linder BJ, Trabuco EC, Carranza DA, Gebhart JB, Klingele CJ, Occhino JA. Evaluation of the local carcinogenic potential of mesh used in the treatment of female stress urinary incontinence. Int Urogynecol J. 2016 Feb 10. [Epub ahead of print] PubMed PMID: 26864666.

[44] ETH.MESH.08476311

[45] ETH.MESH.08476314

Method showed no cytotoxicity.[46,47]   An exploratory cytotoxicity assessment of unwashed non-sterile Prolene polypropylene mesh raw material using the ISO Elution method did not show cytotoxicity or cell lysis.[48,49]  Normal production Prolene polypropylene has not shown cytotoxicity at drug elution, ISO Agarose overlay method, or with the extraction /filter paper method.  All testing methods use a monolayer of  L-929 mouse fibroblast cells.[50,51]

Polypropylene is a stable and well-accepted biomaterial with a history of over five decades of use in mesh implants.[52] In recent years, concerns regarding implanted polypropylene degradation have been raised as a result of very high magnification images that show portions of some explanted synthetic meshes with "cracked" surfaces.[53] These case reports and case series of explants lack reliability and one cannot drawn any causal inference from them or extrapolate their reported SEM findings to the larger population.  In the referenced Clave study there were several methodologic flaws.  Moreover, only a minority of the explants were reported to have surface cracking and degradation and oxidation were not shown on chemical analyses.  While the purported surface changes were hypothesized to lead to adverse clinical outcomes, these hypotheses have not been confirmed.  Nor are these hypotheses supported by the extensive peer-reviewed literature.

The medical literature including over 100 Gynemesh PS studies, meta-analyses and systematic reviews do not support that the mesh is cytotoxic, that it degrades or leads to a harmful inflammatory response in humans.  To the contrary, the use of macroporous Type 1 Prolene polypropylene is the most biocompatible material for use to treat pelvic organ prolapse as evidenced by the high level data.  The high degree of efficacy, the low rates of complications, the lack of a significant increased risk of dyspareunia or sexual function as compared to non-mesh native tissue repair, and the low rates of reoperation based on the highest level of scientific data are inconsistent with

[46] ETH.MESH.08476315
[47] ETH.MESH.08476316
[48] ETH.MESH.08476317
[49] ETH.MESH.08476318
[50] ETH.MESH.08476315
[51] ETH.MESH.08476316
[52] AUGS-SUFU FAQs by Providers on Mid-urethral Slings for SUI, 2014.
[53] Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, Clavé H. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J. 2010 Mar;21(3):261-70.

and refute the Plaintiff's experts' claims and hypotheses, which in essence are speculation and conjecture based on irrelevant, unreliable and/or low level data.

Overall the data show that Gynemesh PS, Prolift and Prosima are safe and effective. They are not defective and instead these well studied devices have significant usefulness and utility. In my opinion the data does not support the theories that the mesh is cytotoxic, that it degrades or causes a harmful inflammatory response, that the pore size, weight, or other features are harmful or cause significant clinical outcomes.

I reserve the right to supplement or modify my expert opinion based on the discovery, disclosure and timely provision of new findings and the depositions of the Plaintiffs' experts.


## III. Fees & Testimony

My hourly charge is $500.00 per hour.

In the past four years, I have given testimony as an expert in the following cases: Cavness v. Johnson & Johnson, et al., (9/30/2015 trial testimony) and Sandra Garcia v. Johnson & Johnson, Cameron County, TX Case No. 2013-DCL-3511-D (3/13/2015 deposition testimony).


_____

Jaime L. Sepulveda-Toro, M.D.

February 25, 2016

# EXHIBIT C

**Expert opinion of Jaime L Sepulveda MD FACOG FACS PRPC**
**TVT and TVTO devices**

I. Credentials and qualifications

My name is Jaime L. Sepulveda-Toro. My attached curriculum vitae reflects my education, training and unique qualifications to render opinions in this case. I graduated from the University of Puerto Rico with a Bachelor in Sciences in 1981 and from the University of Puerto Rico School of Medicine in 1985. I did a Postdoctoral Research Fellowship in Molecular Pharmacology at the same medical school followed by a direct internship and residency training program at the University of Puerto Rico University Hospital. Following completion of my residency program I had an appointment as assistant professor of Obstetrics and Gynecology at the University of Miami School of Medicine where I completed postgraduate education in Pelvic Surgery and Urogynecology. I have been in private practice since 1992.

I am Board Certified in Obstetrics and Gynecology with a subspecialty certification in Female Pelvic Medicine and Reconstructive Surgery. I also hold the only Pelvic Rehabilitation certification available to physicians and surgeons after becoming part of the first class of Certified Pelvic Rehabilitation Practitioners from Herman and Wallace Pelvic Rehabilitation Institute.

I am the Medical Director of the South Miami Medical Arts Surgery Center and Principal Investigator of the Fibroid Registry Research Project of the Center for Women and Infants at South Miami Hospital-Baptist Health, where I hold full privileges for gynecologic surgery. I am the Conference Director for the for the Pelvic Floor Board, a multi-specialty group of physicians specializing in colorectal surgery, physical medicine, urology, neurology, radiology, and urogynecology devoted to the discussion and analysis of challenging pelvic floor conditions seen at our hospital. I am a fellow of the American College of Obstetrics and Gynecology and also a Fellow of the American College of Surgeons. I am a member of the American Urogynecologic Society, the American Urological Association, the International Urogynecologic Association and the International Continence Society.

I have had extensive experience in the care of female urinary incontinence. During my 23 years in practice I have seen the evolution of continence care with and without surgery. I have used native tissue repairs, retropubic and transvaginal suture repairs, autologous slings and synthetic material (specifically polypropylene) for the treatment of stress urinary incontinence. I have had experience in the treatment of complications arising from the use of native tissue, suture repairs, and synthetic and non-synthetic grafts for the surgical treatment of urinary incontinence. My experience has been as a primary surgeon as well as a consultant in treating patients with recurrent and persistent urinary incontinence. My expertise extends to the daily use of diagnostic testing for urinary and fecal incontinence including anorectal physiology testing, anorectal and pelvic floor ultrasound imaging, endoscopic assessment of the bladder and urodynamic testing. I oversee the daily operations in my own clinical facility and of a unit dedicated to the nonsurgical treatment of fecal and urinary incontinence with Pelvic Floor Rehabilitation, Biofeedback and Pelvic Floor Neurostimulation. I devote a significant amount of my day to seeing patients with intractable urge incontinence, voiding dysfunction, urinary retention and recurrent urinary tract infections. I am proficient in the use of neuromodulation for the treatment of voiding dysfunction and urgency incontinence.

I have used and continue to use midurethral slings made of Prolene polypropylene in the care of my patients with stress urinary incontinence. I have accumulated experience with all three generations of midurethral slings - retropubic, transobturator and single incision (TVT, TVTO and TVT Secur). The vast majority of the over two thousand slings I have placed in my practice have been through the transobturator route. I have conducted various types of professional education activities for other surgeons on the use of minimally invasive polypropylene midurethral slings, including TVT and TVTO.  These activities encompassed implantation and use, the potential benefits and risks of the device, the IFU and professional education materials, as well as my clinical experience and the medical literature and studies concerning midurethral slings.  I have studied the anatomy of this space through the dissection of over 300 cadaver specimens and through MRI imaging of cadavers and patients. I have had over 500 physicians visit my operating room and watch me place a midurethral sling. These visits have been with and without industry sponsorship. I have researched and regularly

2

read the medical and scientific literature concerning urinary incontinence and its treatment, including the mechanism, efficacy and safety of midurethral slings.  Over the years I have spoken to colleagues, scientists, researchers, engineers and anatomists to get a thorough understanding of the mechanism, efficacy and safety of midurethral slings. I have used midurethral slings with and without laser cut Prolene polypropylene mesh graft material. I have counseled my patients on the inherent risks of all continence procedures, including the risk of revision whenever a permanent suture or mesh graft is used.

My education and experience in clinical sciences has allowed me to discriminate the clinical relevance of all information involved in the placement and outcomes of midurethral slings. My background in basic sciences, specifically my formal training in molecular pharmacology including benchwork preparation of cytotoxicity assays, gives me a unique expertise in implants science. My experience working with synthetic midurethral slings, its rare complications and long follow up in my practice also qualifies me to render opinions about the TVT and TVTO.

A list of materials that I have reviewed is attached and includes company documents, the medical literature, and materials relating to midurethral slings including TVT and TVTO.  All of my opinions are held to a reasonable degree of medical and scientific certainty.  I have also reviewed the reports of experts for the Plaintiffs.  I reserve the right to amend this report and my opinions pending receipt of additional materials.


II. Overview and Review of literature

Stress urinary incontinence is a common condition in women. The prevalence of incontinence increases with age and is a major public health concern as our population ages.  In the non-elderly population the expectation of cure has increased the utilization of a surgical approach.[1] SUI is defined by the involuntary loss of urine during effort and activity

---

[1] Nygaard I, Barber MD, Burgio KL, Kenton K, Meikle S, Schaffer J, Spino C, Whitehead WE, Wu J, Brody DJ (2008) Prevalence of symptomatic pelvic floor disorders in US women. JAMA 300:1311–6.

3

associated with increases in intra-abdominal pressure. The lifetime risk
for a female is increased with the physical trauma and denervation of
parturition.  The physical trauma to the paraurethral structures affects
the specific areas of urethral support.  Non-surgical approaches are
available but are limited by the lack of available qualified providers and
the gap in knowledge of evidence based protocols.[2],[3] Midurethral slings
have been compared against pelvic floor behavioral therapy and the
slings have been found to have a superior cure rate.[4]  The lifetime risk of
a woman developing stress incontinence surgery is 13.6%.[5]  As
illustrated in the chart below, the number of surgical procedures
increased from 37,953 in 1998 to 94,910 in 2007.[6]

---

[2] McBride A. Pathophysiology of Stress Urinary Incontinence. Journal of Pelvic
Medicine and Surgery • Volume 10, Number 1, January/February 2004.

[3] Starr JA[1], Drobnis EZ, Lenger S, Parrot J, Barrier B, Foster R. Outcomes of a
comprehensive nonsurgical approach to pelvic floor rehabilitation for urinary
symptoms, defecatory dysfunction, and pelvic pain. Female Pelvic Med Reconstr
Surg. 2013 Sep-Oct;19(5):260-5.

[4] Labrie J, et al. Surgery versus physiotherapy for stress urinary incontinence. N Engl
J Med. 2013;369:1124-33.

[5] Wu JM, Matthews CA, Conover MM, Pate, V, Funk MJ. Lifetime risk of stress urinary
incontinence or pelvic organ prolapse surgery. Obstet & Gynecol 2014; 123:1201-
1206.

[6] Wu JM, Ghandi MP, Shah AD, Shah JY, Fulton RG, Weidner AC. Trends in inpatient
urinary incontinence surgery in USA, 1998-2007. Int Urogynecol J (2011) 22:1437-
1443.



| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total SUI surgery** | 37,953 | 35,113 | 34,951 | 34,584 | 117,235 | 110,620 | 106,862 | 104,160 | 97,839 | 94,910 |
| **Other SUI surgery** | 8,491 | 9,472 | 13,541 | 15,772 | 63,322 | 67,675 | 70,411 | 73,704 | 70,520 | 71,412 |
| **Retropubic surgery** | 19,850 | 17,534 | 15,417 | 13,731 | 41,873 | 32,742 | 25,805 | 19,928 | 16,591 | 13,115 |
| **Suprapubic sling** | 6,012 | 5,375 | 3,853 | 3,349 | 7,077 | 5,736 | 7,769 | 7,471 | 7,526 | 7,782 |

Fig. 1 Total number of stress urinary incontinence inpatient surgeries and different types of SUI surgeries in the USA based on the Nationwide Inpatient Sample data from 1998 to 2007

The earlier primary procedures for urinary incontinence were retropubic suspension of paraurethral tissue with absorbable and/or permanent sutures and the pubovaginal slings. A variety of materials have been used in these procedures, among them Prolene polypropylene (PP) sutures in the retropubic procedures and a variety of autologous, synthetic and animal implants for the pubovaginal slings. All procedures, but in particular these earlier procedures, carried the risk of urinary outlet obstruction, voiding dysfunction, major nerve and vascular injuries, pain, relatively high frequency of revisions and wound healing complications. The recovery from these earlier procedures was burdensome and the cosmetic results at the incisions were unacceptable in cases of seroma formation as well as wound hematoma and excisional hernia. Primary and secondary surgical site infections were also known risks when obtaining fascia from the patient. Understandably the introduction of midurethral sling procedures using PP changed the type of procedure being chosen as the primary surgical approach in a female with SUI.

Burch colposuspensions had earlier been associated with the term "gold standard," which establishes a clinical benchmark for efficacy for the treatment of SUI. However, studies in the medical literature prior to the arrival of TVT were lacking and of poor quality, making

recommendations about efficacy speculative.[7] Studies have shown that
efficacy of the Burch colposuspension declines after a few years with
significant intraoperative and post operative complications, as well as
late complications including prolapse development, voiding dysfunction,
wound complications, dyspareunia, groin and suprapubic pain.[8]

In 2002, the Burch colposuspension was compared to MUS using TVT
and the results proved the noninferiority from one procedure compared
to the other, with follow up lasting to five years.[9] In  2004, laparoscopic
Burch colposuspension was compared to TVT with mean follow up of
20.6 months and the results showed shorter operating time for TVT and
the TVT also led to greater objective and subjective cure rates for
urodynamic stress incontinence than did laparoscopic Burch
colposuspension.[10] TVT has been found to have shorter operative time
and hospital stay, and higher objective urodynamic cure than
laparoscopic Burch colposuspension,[11] as well as significantly less de
novo urgency, urgency incontinence and time to return to daily

---

[7] Black NA, Downs SH. The effectiveness of surgery for stress incontinence in women:
a systematic review. Br J Urol. 1996 Oct; 78(4):497-510.

[8] Demirci F, Yucel O, Eren S, Alkan A, Demirci E, Yildirim U. Long-term results of
Burch colposuspension. Gynecol Obstet Invest. 2001; 51(4):243-7; Chaliha C, Stanton
SL. Complications of surgery for genuine stress incontinence. Br J Obstet Gynaecol.
1999 Dec; 106(12):1238-45; Alcalay M, Monga A, Stanton SL. Burch colposuspension:
a 10-20 year follow up. Br J Obstet Gynaecol. 1995 Sep;102(9):740-5. Erratum in: Br J
Obstet Gynaecol 1996 Mar; 103(3):290; Kjølhede P. Long-term efficacy of Burch
colposuspension: a 14-year follow-up study. Acta Obstet Gynecol Scand. 2005 Aug;
84(8):767-72; Richter HE, Brubaker L, Stoddard AM, Xu Y, Zyczynski HM, Norton P,
Sirls LT, Kraus SR, Chai TC, Zimmern P, Gormley EA, Kusek JW, Albo ME; Urinary
Incontinence Treatment Network. Patient related factors associated with long-term
urinary continence after Burch colposuspension and pubovaginal fascial sling
surgeries. J Urol. 2012 Aug; 188(2):485-9.

[9] Ward K, Hilton P on behalf of the UK and Ireland TVT Trial Group. Prospective
multicentre randomised trial of tension-free vaginal tape and colposuspension as
primary treatment for stress incontinence. BMJ 2002; 325:67; Ward K, Hilton P on
behalf of the UK and Ireland TVT Trial Group. Tension-free vaginal tape versus
colposuspension for primary urodynamic stress incontinence: 5-year follow up. BJOG
2008; 115:226–233.

[10] Paraiso MF, Walters MD, Karram MM, Barber MD. Laparoscopic Burch
colposuspension versus tension-free vaginal tape: a randomized trial. Obstet
Gynecol. 2004 Dec; 104(6):1249-58.

[11] Dean N, Herbison P, Ellis G, Wilson D. Laparoscopic colposuspension and tension-
free vaginal tape: a systematic review. BJOG. 2006 Dec; 113(12):1345-53.

6

activities.[12] Given the minimally invasive nature of a TVT, its technical simplicity, the consistency of the product and the high efficacy without the risk of a major abdominal incision, TVT eventually became the gold standard to continence surgeons in the USA.[13] The placement of a non-absorbable macroporous polypropylene tension free synthetic sling under the mid-urethra is the current standard for the treatment for female SUI.  The Type 1 polypropylene mesh, and in particular the Prolene polypropylene mesh used in TVT, has the highest biocompatibility when used to treat SUI and its use predominates current clinical practice.[14]

In order to understand the acceptance of TVT as the primary procedure for the cure of urinary incontinence, we need to understand the mechanism of continence, its dearrangement and repair considerations. The urethra is held by a fine arrangement of thin layers of muscle which change as the urethra runs on the anterior wall of the vagina. The urethra is a tubular structure formed by a mucosa and a submucosa. Around the submucosal layer there are two smooth muscle layers, the inner longitudinal and outer circular layers. The inner longitudinal shortens the urethra during micturition while the outer circular maintains the resting tone. Both muscular layers are surrounded by the urogenital sphincter. The striated urogenital sphincter is formed by the urethral sphincter (rhabdomyosphincter), the compressor urethrae and the urethrovaginal sphincter. The rhabdomyosphincter covers 20%-60% of the urethra. The support of the urethra comes from the lateral attachment in its middle portion primarily to the group of muscles and bones formed by the levator muscle groups, the obturator internus muscles and the upper third of the ramus of the pubis. The fibromuscular attachment holding the urethra to the vagina and the fascial support to the arcus tendineous fascia pelvis compresses the urethra during

---

[12] Ogah J, Cody DJ, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women: a short version Cochrane review. Neurourol Urodyn. 2011 Mar; 30(3):284-91.

[13] Serati M, et al. Surgical treatment for female stress urinary incontinence: what is the gold-standard procedure? Int Urogynecol J Pelvic Floor Dysfunct. 2009 Jun; 20(6):619-21.

[14] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database Syst Rev. 2015 Jul 1; 7:CD006375. [Epub ahead of print] PubMed PMID: 26130017.

straining dividing it into two portions. The resultant increase in urethral pressure generated by the hammock of fibromuscular tissue in the middle of the urethra provides continence during increases in intra-abdominal and pelvic pressures.[15,16]

I have dissected this area in cadavers extensively and been able to confirm the support to the urethra in this area. I have also confirmed in my dissections the consequences of disconnecting the urethral support and how it translates in hypermobility, not only at the urethrovesical junction but also at midurethra. It is clear to me that the concept of intra-abdominal urethral positioning during straining is physiologically inaccurate. The concept of a hammock supporting the midurethra is scientifically accurate as demonstrated consistently on dissection and imaging of the anterior pelvis and paraurethral tissue.[17] These anatomical considerations were well documented during the description and design of TVTO.

This fine arrangement of support gets its first test at the first vaginal delivery with lower levels of damage after subsequent deliveries. The damage of a vaginal delivery in this area is permanent and is characterized by a torn fibromuscular support to the urethral support mechanism. With impaired support to the urethra, the resistance used to hold urine in the bladder is lower than the force generated by an increase in intra-abdominal pressure and the transmitted pressure to the pelvic floor. Restoration of this broken hammock by placing a durable prosthesis under the urethra forms the scientific rationale to treat stress urinary incontinence with the placement of a synthetic midurethral sling.

The resulting SUI may be complicated by the activation of urethral wetness receptors in the upper urethra. Under normal circumstances

---

[15] Delancey JOL. Correlative study of paraurethral anatomy. (1986) Obstet and Gynecol: 68;91-97
[16] Brandon CJ, Lewicky-Gaupp C, Larson KA, Delancey JO. Anatomy of the perineal membrane as seen in magnetic resonance images of nulliparous women. Am J Obstet Gynecol. 2009 May;200(5):583
[17] Stein T, DeLancey JOL. Perineal membrane anatomy. (2008). Obstet and Gynecol: 111:3;68-693

these receptors facilitate the micturition process by promoting a bladder contraction. In cases of impaired urethral support the small amount of urine in the upper urethra may promote an uninhibited bladder contraction producing urine loss in larger amounts than typically seen in cases of SUI. Uninhibited bladder muscle activity due to exposure of the receptors in the urethra to urine through a mechanism of stress urinary incontinence may provoke episodes of urgency urinary incontinence, clinically known as mixed urinary incontinence (MUI). Urgency urinary incontinence is seen as part of a continuum of urinary incontinence.  SUI and UUI may have a common neurological denominator that may persist after the anatomic defect is corrected.  The increased functional bladder capacity of cured SUI may precipitate episodes of urgency incontinence. It is not uncommon for patients with MUI to resolve both patterns with a MUS.[18],[19]  This was not confirmed for previous continence procedures that concentrated on urethrovesical support instead of the midurethral support provided by a midurethral sling.[20]  Bladder outlet obstruction as a sequela is significantly lower with tension free TVT slings.

In 1998 the FDA cleared the TVT, the first midurethral sling using Prolene PP without stitching or anchoring to supporting tissue or bone. The technique was novel in the avoidance of the tension provided by an anchoring suture or bony attachments, placement at the midurethra and the use of a synthetic material.   However, the configuration of the sling placement and the passage of needles through the space of Retzius were well established by the use of previous pubourethral slings. The use of a synthetic material was most reasonable as the harvesting of autologous grafts increased operative morbidity, and allografts and xenografts had an unpredictable durability and shelf life. The monofilament macroporous Prolene PP also demonstrated useful attributes, tolerability and had a long history of use as both a mesh and a suture.[21]

---

[18] Cox A, Herschorn S, Lee L. Surgical management of female SUI: is there a gold standard? Nat Rev Urol. 2013 Feb; 10(2):78-89.

[19] Jain P, et al. Effectiveness of midurethral slings in mixed urinary incontinence: a systematic review and meta-analysis. Int Urogynecol J. 2011; 22:923–932.

[20] Tahseen S, Reid P. Effect of transobturator tape on overactive bladder symptoms and urge urinary incontinence in women with mixed urinary incontinence. Obstet Gynecol. 2009 Mar; 113(3):617-2

[21] Falconer C, et al. Influence of different sling materials on connective tissue metabolism in stress urinary incontinent women. Int Urogynecol J Pelvic Floor Dysfunct. 2001; 12 Suppl 2:S19-23; Petros P. Creating a gold standard surgical

Placement of the sling at midurethra conformed to the newly acquired knowledge of the continence mechanism.[22] By 2001 the 5 year data on the use of full length TVT surpassed the cure rates for previously used continence procedures.[23] Studies were carried out in patients with ISD, recurrent prolapse, and mixed urinary incontinence showing effective cure in these various cohorts.[24] Cure rates beyond 80% were consistently reproduced, became commonly reported and when the results of a randomized control trial was reported in 2002, the highest level of scientific evidence showed TVT to be equally effective to Burch procedure.[25] The study design and methodology applied to the studies was consistently robust and exceeded the scientific scrutiny of previous procedures, which had been adopted for decades without being subjected to frequent and surgically sound trials.[26] By 2001 it was reported that with the availability of outpatient surgical procedures for incontinence, the number of women opting for surgical care of stress urinary incontinence increased. Even in the inpatient setting the number of procedures has also increased since 2001. A three-fold increase in the

---

device: scientific discoveries leading to TVT and beyond: Ulf Ulmsten Memorial Lecture 2014. Int Urogynecol J. 2015 Apr; 26(4):471-6.

[22] Petros PE, Ulmsten UI. An integral theory and its method for the diagnosis and management of female urinary incontinence. Scand J Urol Nephrol Suppl. 1993; 153:1-93; Ulmsten U, et al. An ambulatory surgical procedure under local anesthesia for treatment of female urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct. 1996; 7(2):81-5.

[23] Serati M, Bauer R, Cornu JN, Cattoni E, Braga A, Siesto G, Lizée D, Haab F, Torella M, Salvatore S. TVTO for the treatment of pure urodynamic stress incontinence: efficacy, adverse effects and prognostic factors at 5 years follow-up. Eur Urol. 2013 May;63(5):872-8.

[24] Rezapour M, Falconer C, Ulmsten U. Tension-Free vaginal tape (TVT) in stress incontinent women with intrinsic sphincter deficiency (ISD)--a long-term follow-up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S12-14; Rezapour M, Ulmsten U. Tension-Free vaginal tape (TVT) in women with recurrent stress urinary incontinence--a long-term follow up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S9-11; Rezapour M, Ulmsten U. Tension-Free vaginal tape (TVT) in women with mixed urinary incontinence--a long-term follow-up. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S15-18.

[25] Ward K, Hilton P on behalf of the UK and Ireland TVT Trial Group. Prospective multicentre randomised trial of tension-free vaginal tape and colposuspension as primary treatment for stress incontinence. BMJ 2002; 325:67.

[26] Black NA, Downs SH. The effectiveness of surgery for stress incontinence in women: a systematic review. Br J Urol. 1996 Oct; 78(4):497-510.

total number of procedures for stress urinary incontinence was seen after the introduction of TVT.

With the widespread use of TVT as the primary continence procedure, an unprecedented quality and amount of outcome data became available to surgeons. Scrutiny over efficacy and safety became the subject of multiple publications, with confirmation of consistent efficacy and reproducibility over previously used procedures. TVT and TVTO data has been reported at all levels of evidence and to a depth not previously recorded for any known continence procedure. [27,28,29,30,31,32,33,34,35,36,37,38]

---

[27] Nilsson CG, Palva K, Rezapour M, Falconer C. Eleven years prospective follow-up of the tension-free vaginal tape procedure for treatment of stress urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct. 2008 Aug;19(8):1043-7.

[28] Liapis A, Bakas P, Creatsas G. Long-term efficacy of tension-free vaginal tape in the management of stress urinary incontinence in women: efficacy at 5- and 7-year follow-up. Int Urogynecol J Pelvic Floor Dysfunct. 2008 Nov; 19(11):1509-12.

[29] Olsson I, Abrahamsson AK, Kroon UB. Long term efficacy of the tension-free vaginal tape procedure or the treatment of urinary incontinence. A retrospective follow-up 11.5 years post-operatively. Int Urogynecol J (2010) 21:679-683

[30] Aigmueller T, Trutnovsky G, Tamussino K, Kargl J, Wittmann A, Surtov M, Kern P, Frudinger A, Riss P, Bjelic-Radisic V. Ten-year follow-up after the tension-free vaginal tape procedure. Am J Obstet Gynecol. 2011 Nov;205(5):496.e1-5.

[31] Groutz A, Rosen G, Cohen A, Gold R, Lessing JB, Gordon D Ten-year subjective outcome results of the retropubic tension-free vaginal tape for treatment of stress urinary incontinence.. J Minim Invasive Gynecol. 2011 Nov-Dec;18(6):726-9.

[32] Serati M, Ghezzi F, Cattoni E, Braga A, Siesto G, Torella M, Cromi A, Vitobello D, Salvatore S. Tension-free vaginal tape for the treatment of urodynamic stress incontinence: efficacy and adverse effects at 10-year follow-up. Eur Urol. 2012 May;61(5):939-46.

[33] Heinonen P, Ala-Nissilä S, Kiilholma P, Laurikainen E. Tension-free vaginal tape procedure without preoperative urodynamic examination: long-term outcome. Int J Urol. 2012 Nov;19(11):1003-9.

[34] Svenningsen R, Staff AC, Schiøtz HA, Western K, Kulseng-Hanssen S. Long-term follow-up of the retropubic tension-free vaginal tape procedure. Int Urogynecol J. 2013 Aug; 24(8):1271-8.

[35] Nilsson CG, Palva K, Aarnio R, Morcos E, Falconer C. Seventeen years' follow-up of the tension-free vaginal tape procedure for female stress urinary incontinence Int Urogynecol J. 2013 Aug; 24(8):1265-9.

[36] Serati M, Sorice P, Bogani G, Braga A, Cantaluppi S, Uccella S, Caccia G, Salvatore S, Ghezzi F. TVT for the treatment of urodynamic stress incontinence: Efficacy and adverse effects at 13-year follow-up. Neurourol Urodyn. 2015 Oct 19. doi: 10.1002/nau.22914. [Epub ahead of print] PubMed PMID: 26479043.

The clinical experience, types of complications, frequency of adverse events, surgical technique, and even proficiency per surgeon was widely disseminated at conferences, in journals and textbooks, and became part of board exams and in graduate training. Overall there are over 100 randomized controlled trials that have accumulated and countless more cohort studies on the TVT and TVTO. Several Cochrane Reviews,[39] systematic reviews, meta-analyses and practice guidelines[40] have

---

[37] Novara G, Ficarra V, Boscolo-Berto R, Secco S, Cavalleri S, Artibani W. Tension-free midurethral slings in the treatment of female stress urinary incontinence: a systematic review and meta-analysis of randomized controlled trials of effectiveness. Eur Urol. 2007 Sep; 52(3):663-78.

[38] Novara G, Galfano A, Boscolo-Berto R, Secco S, Cavalleri S, Ficarra V, Artibani W. Complication rates of tension-free midurethral slings in the treatment of female stress urinary incontinence: a systematic review and meta-analysis of randomized controlled trials comparing tension-free midurethral tapes to other surgical procedures and different devices. Eur Urol. 2008 Feb; 53(2):288-308.

[39] Ogah J, Cody JD, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women. Cochrane Database Syst Rev. 2009 Oct 7; (4):CD006375. doi: 10.1002/14651858.CD006375.pub2. Review. PubMed PMID: 19821363; Rehman H, Bezerra CC, Bruschini H, Cody JD. Traditional suburethral sling operations for urinary incontinence in women. Cochrane Database Syst Rev. 2011 Jan 19; (1):CD001754. doi: 10.1002/14651858.CD001754.pub3. Review. PubMed PMID: 21249648; Ogah J, Cody DJ, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women: a short version Cochrane review. Neurourol Urodyn. 2011 Mar; 30(3):284-91; Lapitan MC, Cody JD. Open retropubic colposuspension for urinary incontinence in women. Cochrane Database Syst Rev. 2012 Jun 13; 6:CD002912. doi: 10.1002/14651858.CD002912.pub5. Review. PubMed PMID: 22696331;

[40] Novara G, Artibani W, Barber MD, Chapple CR, Costantini E, Ficarra V, Hilton P, Nilsson CG, Waltregny D. Updated systematic review and meta-analysis of the comparative data on colposuspensions, pubovaginal slings, and midurethral tapes in the surgical treatment of female stress urinary incontinence. Eur Urol. 2010 Aug; 58(2):218-38; Dmochowski RR, Blaivas JM, Gormley EA, Juma S, Karram MM, Lightner DJ, Luber KM, Rovner ES, Staskin DR, Winters JC, Appell RA; Female Stress Urinary Incontinence Update Panel of the American Urological Association Education and Research, Inc, Whetter LE. Update of AUA guideline on the surgical management of female stress urinary incontinence. J Urol. 2010 May; 183(5):1906-14. doi: 10.1016/j.juro.2010.02.2369. Epub 2010 Mar 29. Review. PubMed PMID: 20303102; revised 2012 at http://www.auanet.org/common/pdf/education/clinical-guidance/Incontinence.pdf; Lucas MG, Bosch RJ, Burkhard FC, Cruz F, Madden TB, Nambiar AK, Neisius A, de Ridder DJ, Tubaro A, Turner WH, Pickard RS; European Association of Urology. EAU guidelines on surgical treatment of urinary incontinence. Eur Urol. 2012 Dec; 62(6):1118-29, update 2014Apr at http://uroweb.org/wp-

demonstrated that the TVT and TVTO midurethral slings are as effective or more effective than the Burch colposuspensions and pubovaginal slings while having less morbidity, shorter operating time, less hospital stay, less voiding dysfunction and lower complications.

The use of a single use manufactured device allowed for tracking and reporting into FDA sites not previously available to any other continence procedure. Complications well known to surgeons to be associated with previous procedures found their way through reporting with widely available databases. These complications included hematomas, abscesses, vascular injuries, and bladder and bowel perforations. The reporting was based on the device and manufacturer, and was not by type of procedure. Given the number of procedures, the single use of a manufactured device and the availability of reporting, complications were tracked with unprecedented accuracy (and inaccuracy) and frequency. The MAUDE reporting system allowed an early tracking of complications with a single occurrence of a complication being reported multiple times.[41] The tracking and scrutiny of complications with input of manufacturers, public and physicians was beyond the conventional methods of reporting with any type of continence procedure in the past. It should be clear that the reporting and information retrieval for these complications use a device as a search index, not the condition, indications, added procedures or specific type of procedure. No medical certification of these complications or diagnostic confirmation was required on this report.

Surgical experience made clear that patients treated with TVT had less voiding dysfunction, less wound complications and less retention than the historic numbers from patients treated with pubovaginal slings,

---

content/uploads/20-Urinary-Incontinence_LR.pdf; Urinary incontinence: the management of urinary incontinence in women. Clinical guidelines CG171. National Institute for Health and Clinical Excellence, September 2013.
http://guidance.nice.org.uk/CG17; Schimpf MO, Rahn DD, Wheeler TL, Patel M, White AB, Orejuela FJ, El-Nashar SA, Margulies RU, Gleason JL, Aschkenazi SO, Mamik MM, Ward RM, Balk EM, Sung VW; Society of Gynecologic Surgeons Systematic Review Group. Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol. 2014 Jul; 211(1):71.e1-71.
[41] Boyles SH, Edwards R, Gregory W, Clark A. Complications associated with transobturator sling procedures. Int Urogynecol J Pelvic Floor Dysfunct. 2007 Jan; 18(1):19-22.

needle procedures or open retropubic procedures. Even in cases of voiding dysfunction and urinary retention, quality of life assessment showed an improvement when compared to pre-surgical scores. Tape revisions were in the range of .6% to 7.5%, with the median at 1.1%.[42] Postoperative urge incontinence was not higher than with previous other procedures and continence cure and improvement was equal or higher.[43] There were still complications associated with the implantation of TVT, particularly bladder perforation, which was a known risk with any other needle procedure and there was the risk of exposure of the implant due to a vaginal wound dehiscence. In an analysis of data available on the complications after placement of TVT in numerous studies with follow-up longer than 24 months, the cumulative rates were 1.7% for pelvic hematoma, 3.4% for bladder perforations, 1.1% for vaginal erosion, 0.8% for bladder erosion, 9.7% for urinary tract infections, 15.6% for storage LUTS, 16.1% for voiding LUTS, 4% for clean intermittent catheterization, and 3.2% for reoperations.[44]

Additional studies reporting out of databases have had similar results with low rates of reoperation.  For example an analysis of data from US health maintenance organizations reported a nine (9) year rate of urethrolysis or mesh removal of 3.7%[45].  An analysis of data from three Ontario, Canada databases reported a 2.2% rate of sling revision or removal for erosion, fistula, pain, or retention with a cumulative incidence rate of 3.3% at 10 years among women undergoing vaginal mesh-based procedures solely for SUI.[46]  An analysis of Kaiser

---

[42] Vervest HA, Bisseling TM, Heintz AP, Schraffordt Koops SE.  The prevalence of voiding difficulty after TVT, its impact on quality of life, and related risk factors. Int Urogynecol J Pelvic Floor Dysfunct. 2007 Feb;18(2):173-82.
[43] Cox A, Herschorn S, Lee L. Surgical management of female SUI: is there a gold standard? Nat Rev Urol. 2013 Feb;10(2):78-89.
[44] Novara G, Galfano A, Boscolo-Berto R, Secco S, Cavalleri S, Ficarra V, Artibani W. Complication rates of tension-free midurethral slings in the treatment of female stress urinary incontinence: a systematic review and meta-analysis of randomized controlled trials comparing tension-free midurethral tapes to other surgical procedures and different devices. Eur Urol. 2008 Feb;53(2):288-308.
[45] Jonsson Funk M, Siddiqui NY, Pate V, Amundsen CL, Wu JM. Sling revision/removal for mesh erosion and urinary retention: long-term risk and predictors. Am J Obstet Gynecol. 2013 Jan; 208(1):73.e1-7.
[46] Welk B, Al-Hothi H, Winick-Ng J. Removal or Revision of Vaginal Mesh Used for the Treatment of Stress Urinary Incontinence. JAMA Surg. 2015 Sep; 9:1-9.

Permanente data found that sling loosening or excision for voiding symptoms or urinary retention occurred in 1.2% of patients and excision for vaginal mesh erosion occurred in 0.9% of patients.[47]

In an analysis of Medicare beneficiaries undergoing sling surgery from 2006 to 2008 in hospital outpatient departments and hospital-based ambulatory surgery centers, patients undergoing mesh sling procedures were less likely than patients undergoing non-mesh sling procedures to require management for bladder outlet obstruction (13.9% versus 19.3%, adjusted OR 0.66, 95% CI 0.52-0.85) and were less likely to have a subsequent sling removal and revision or urethrolysis (2.7% versus 4.7%, adjusted OR 0.56, 95% CI 0.35-0.89).[48]

A study examining 3,307 MUS placements at the Cleveland Clinic tertiary care center between 2003 – 2013 showed that 89 patients (2.7%) underwent sling revision with the predominate indication being retention and voiding dysfunction. These data are confounded by concomitant apical suspension which was identified as a risk factor for the need for revision in the retention and voiding dysfunction group. Of the 89 patients who underwent revision, indication for vaginal pain and dyspareunia (7.9%, n=7) as well as groin pain (3.4%, n=3) were very rare when considering the overall risk out of 3,307 sling placements – 0.2% for vaginal pain and dyspareunia (n=7/3,307) and 0.09% for groin pain (n=3/3,307). Additionally, all patients with pain complaints had either partial or complete improvement in symptoms after revision. Revision for mesh erosion was the indication in 21.3% of the 89 patients (n=19) translating into an overall rate of 0.57% in the 3,307 patients. There were no patient characteristics or other variables associated with the need for revision surgery for mesh erosion or pain symptoms.[49]

---

[47] Nguyen JN, Jakus-Waldman SM, Walter AJ, White T, Menefee SA. Perioperative complications and reoperations after incontinence and prolapse surgeries using prosthetic implants. Obstet Gynecol. 2012 Mar;119(3):539-46.

[48] Suskind AM, Clemens JQ, Dunn RL, Zhang Y, Stoffel JT, Hollenbeck BK. Effectiveness of mesh compared with nonmesh sling surgery in Medicare beneficiaries. Obstet Gynecol. 2013 Sep; 122(3):546-52.

[49] Unger CA, Rizzo AE, Ridgeway B. Indications and risk factors for midurethral sling revision. Int Urogynecol J. 2015 Jul 2. [Epub ahead of print] PubMed PMID: 26134541.

Vaginal wound dehiscence and wound complications are multifactorial and not infrequently seen by vaginal surgeons even without the use of a synthetic material.[50],[51] Wound dehiscence, abdominal wall incisional herniation and exposure of the suture have been described in pubovaginal sling procedures.  The vagina wound opens at the site of least resistance, the incision line, under a variety of stressors. Although infection has been theorized to be a factor due to the convention of a "clean contaminated environment," the evidence does not support that the separation of the incision edges in the vagina is primarily due to infection as infection rates do not correlate with mesh exposure rates with the TVT and TVTO, which use a macroporous, monofilament polypropylene mesh.

Bacteriological analysis of explants have shown flawed collection methodology, lack of prospective design and lacked an explant of TVT Prolene polypropylene specimen. Single reports of TVT infection have been limited to case reports and skin flora contamination with no specifics of culture technique.[52] Additionally, the presence of bacteria at the surgical site is not equivalent to infection.[53] The low risk for infection has been attributed to the plastic coated sheaths during its insertion and the use of macroporous, monofilament polypropylene mesh.[54],[55]

---

[50] Albo ME, Richter HE, Brubaker L, Norton P, Kraus SR, Zimmern PE, Chai TC, Zyczynski H, Diokno AC, Tennstedt S, Nager C, Lloyd LK, FitzGerald M, Lemack GE, Johnson HW, Leng W, Mallett V, Stoddard AM, Menefee S, Varner RE, Kenton K, Moalli P, Sirls L, Dandreo KJ, Kusek JW, Nyberg LM, Steers W; Urinary Incontinence Treatment Network. Burch colposuspension versus fascial sling to reduce urinary stress incontinence. N Engl J Med. 2007 May 24; 356(21):2143-55.

[51] Schimpf MO, Rahn DD, Wheeler TL, Patel M, White AB, Orejuela FJ, El-Nashar SA, Margulies RU, Gleason JL, Aschkenazi SO, Mamik MM, Ward RM, Balk EM, Sung VW; Society of Gynecologic Surgeons Systematic Review Group. Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol. 2014 Jul; 211(1):71.e1-71.

[52] Boulanger L, Boukerrou M, Rubod C, Collinet P, Fruchard A, Courcol RJ, Cosson M. Bacteriological analysis of meshes removed for complications after surgical management of urinary incontinence or pelvic organ prolapse. Int Urogynecol J Pelvic Floor Dysfunct. 2008 Jun; 19(6):827-31.

[53] Culligan P, Heit M, Blackwell L, Murphy M, Graham CA, Snyder J. Bacterial colony counts during vaginal surgery. Infect Dis Obstet Gynecol. 2003; 11(3):161-5..

[54] Ogah J, Cody JD, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women. Cochrane Database Syst Rev. 2009 Oct 7; (4):CD006375.

Other factors contributing to exposure of the tape include the formation of a hematoma at dissection sites. As a hematoma of significant volume is accumulated under the vaginal epithelium, the volume creates enough pressure to find a course and drain though the incision. The incision is being held by absorbable sutures and progressive loss of tensile strength is expected from the moment the sutures are placed. Once the incision is open the exposure of the implant is evident. The limited dissection required for implantation of these devices decreases the potential risk of wound dehiscence. The role of mechanical disruption of the wound at the suture line, smoking, and deleterious effect of a catheter in the wound healing process are important factors to consider in the etiology of a tape exposure.

The tape used in a single use manufactured device like TVT and TVTO is not placed under the same drag as a needle procedure. The sheath allows for surgical control without stretching or tension at adjustment. When placed per the IFU, the risk of deformation of the tape is reduced. The use of the plastic sheath translates clinically into a limited exposure to the vaginal environment and facilitates the adjustment of the sling. The use of a surgical instrument to act as a spacer between the suburethral tissue and the sling has been advocated universally and has become part of the IFU for TVT and TVTO to avoid uncontrolled tensioning. It is a maneuver that has been used to control adjustment and tensioning in essentially all full length incontinence procedures, and even in periurethral suspension procedures to avoid overcorrection, voiding dysfunction and urinary retention.[56]

While there is a risk of urinary tract infection following incontinence surgery, the rate following TVT and TVTO placement is lower than with the Burch colposuspension. Analysis of the two year results from the UITN SISTER and TOMUS studies show the rates of UTI were highest

---

[55] Cosson M, Debodinance P, Boukerrou M, Chauvet MP, Lobry P, Crépin G, Ego A. Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material? Int Urogynecol J Pelvic Floor Dysfunct. 2003 Aug; 14(3):169-78; discussion 178.

[56] Significance of tension in tension-free mid-urethral sling procedures: a Paick JS, Oh JG, Shin JW, Kim SW, Ku JH. preliminary study. Int Urogynecol J Pelvic Floor Dysfunct. 2007 Feb; 18(2):153-8.

with the pubovaginal sling (48%) and Burch procedure (32%)[57], and lowest with the TVT (17%) and TVTO (11%).[58] And, from a basic epidemiologic standpoint, urinary tract infections are common in women.

The complications of midurethral slings including TVT and TVTO were well studied, disseminated and published independently from Ethicon in numerous cohort series, randomized controlled trials, various meta-analyses and professional organization guidelines and reviews. These complications were comparable to other continence procedures and lower on multiple reports. The one complication that most surgeons feared was a rare but serious bowel perforation at the time of the passage of needles through the retropubic space. As surgeons, we were familiar with the unusual occurrence of bowel perforations during placement of needles for continence procedures as well as the placement of suprapubic catheters. A bowel perforation was rare (less than 0.5%) but always a feared possibility in a retropubic continence procedure. The prevention of adverse events became the subject of articles on expert series and surgical technique bulletins in various professional society journals.

In 2001 Delorme described the placement of a midurethral sling with a transobturator approach by placing insertion needles from the outside in. Dr. de Leval described an approach by inserting the needles from inside out.[59] In both procedures the adjustment of the sling under the midurethra was done by pulling from the inside out. Understandably when both procedures were compared the cure rates were not

---

[57] Albo ME, Richter HE, Brubaker L, Norton P, Kraus SR, Zimmern PE, Chai TC, Zyczynski H, Diokno AC, Tennstedt S, Nager C, Lloyd LK, FitzGerald M, Lemack GE, Johnson HW, Leng W, Mallett V, Stoddard AM, Menefee S, Varner RE, Kenton K, Moalli P, Sirls L, Dandreo KJ, Kusek JW, Nyberg LM, Steers W; Urinary Incontinence Treatment Network. Burch colposuspension versus fascial sling to reduce urinary stress incontinence. N Engl J Med. 2007 May 24;356(21):2143-55. Epub 2007 May 21. PubMed PMID: 17517855.

[58] Albo ME, Litman HJ, Richter HE, Lemack GE, Sirls LT, Chai TC, Norton P, Kraus SR, Zyczynski H, Kenton K, Gormley EA, Kusek JW; Urinary Incontinence Treatment Network. Treatment success of retropubic and transobturator mid urethral slings at 24 months. J Urol. 2012 Dec;188(6):2281-7. doi: 10.1016/j.juro.2012.07.103. Epub 2012 Oct 22. PubMed PMID: 23083653; PubMed Central PMCID: PMC4367868.

[59] ETH.MESH.00823793

18

different.[60] Not only were the cure rates similar, they were not different from the retropubically placed TVT.[61,62]

Statistical and clinical equivalence of the TVTO compared to TVT was demonstrated in a randomized equivalence trial. The overall number of serious adverse effects, voiding dysfunction, bladder perforation, and urinary tract infections was more common after the placement of retropubic sling in comparison to the TVTO. Leg weakness and groin numbness was more frequent after the TVTO procedure but required no intervention.[63]

Complications from the transobturator approach were even lower than with retropubic TVT. The transobturator approach showed a higher frequency of early postoperative pain as the insertion needle went through the superficial muscles of the leg. This complication is most often transient and managed with medication. Several long term TVTO studies showed low rates of complications including leg pain and exposure.[64]  In a recent five year multicenter randomized controlled trial

---

[60] Ogah J, Cody DJ and Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women : a short version Cochrane review. ( 2011) Neurol and Urodyn 30 :284-291

[61] Palva K, Rinne K, Aukee P, Kivelä A, Laurikainen E, Takala T, Valpas A, Nilsson CG A randomized trial comparing tension-free vaginal tape with tension-free vaginal tape-obturator: 36-month results. Int Urogynecol J. 2010 Sep; 21(9):1049-55.

[62] Sung VW, Schleinitz MD, Rardin CR, Ward RM, Myers DL. Comparison of retropubic vs transobturator approach to midurethral slings: a systematic review and meta-analysis. Am J Obstet Gynecol. 2007 Jul; 197(1):3-11.

[63] Richter HE, Albo ME, Zyczynski HM, Kenton K, Norton PA, Sirls LT, Kraus SR, Chai TC, Lemack GE, Dandreo KJ, Varner RE, Menefee S, Ghetti C, Brubaker L, Nygaard I, Khandwala S, Rozanski TA, Johnson H, Schaffer J, Stoddard AM, Holley RL, Nager CW, Moalli P, Mueller E, Arisco AM, Corton M, Tennstedt S, Chang TD, Gormley EA and Litman HJ for the Urinary Incontinence Treatment Network. Retropubic versus Transobturator Midurethral Slings for Stress Incontinence. N Engl  J Med 2010; 362(22); 2066-76.

[64] Tommaselli GA, D'Afiero A, Di Carlo C, Formisano C, Fabozzi A, Nappi C. Tension-free vaginal tape-obturator and tension-free vaginal tape-Secur for the treatment of stress urinary incontinence: a 5-year follow-up randomized study. Eur J Obstet Gynecol Reprod Biol. 2015 Feb; 185:151-5; Tommaselli GA, Di Carlo C, Formisano C, Fabozzi A, Nappi C. Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis. Int Urogynecol J. 2015 May 20. [Epub ahead of print] PubMed PMID: 25990203; Athanasiou S, Grigoriadis T, Zacharakis D, Skampardonis N, Lourantou D,

comparing TVT and TVTO, high cure rates and patient satisfaction were seen with both. The objective cure rate was 84.7% in the TVT group and 86.2% in the TVTO group and subjective treatment satisfaction was 94.2% in the TVT group and 91.7% in the TVTO group, with no difference between groups. Significant improvements were seen in quality of life for both groups. Additionally, 84% of patients were cured of their preoperative urgency symptoms. Complication rates were low, with no difference between groups, and none of the patients had any sign of tissue reaction, erosion, or tape protrusion at their 5-yr follow-up.[65]

It became evident that specialized knowledge of the obturator site and the anatomy and relationship of the vascular, muscular and nerve studies, were required for a reproducible and safe obturator procedure. Cadaveric dissection showed the distance to the obturator neurovascular bundle ranging from 1.2-1.5 cm for TVTO and 2.2cm-2.5 cm for the outside in approach.[66] A neurological explanation for pain from an obturator nerve injury was formulated but not reproduced by objective studies - electromyography or MRI. If injury to the obturator nerve was to be explained, atrophy of the muscles innervated by the obturator nerve would have been expected by MRI imaging. Not only is this confirmation of nerve injury non-existing, electromyographic studies are also lacking. The reports at the MAUDE database were with one out of

---

Antsaklis A. Seven years of objective and subjective outcomes of transobturator (TVT-O) vaginal tape: why do tapes fail? Int Urogynecol J. 2014 Feb; 25(2):219-25. doi: 10.1007/s00192-013-2186-8. Epub 2013 Jul 27; Laurikainen E, Valpas A, Aukee P, Kivelä A, Rinne K, Takala T, Nilsson CG. Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence. Eur Urol. 2014 Jun;65(6):1109-14; Serati M, Bauer R, Cornu JN, Cattoni E, Braga A, Siesto G, Lizée D, Haab F, Torella M, Salvatore S. TVT-O for the treatment of pure urodynamic stress incontinence: efficacy, adverse effects, and prognostic factors at 5-year follow-up. Eur Urol. 2013 May; 63(5):872-8; Cheng D, Liu C. Tension-free vaginal tape-obturator in the treatment of stress urinary incontinence: a prospective study with five-year follow-up. Eur J Obstet Gynecol Reprod Biol. 2012 Apr; 161(2):228-31; Liapis A, Bakas P, Creatsas G. Efficacy of inside-out transobturator vaginal tape (TVTO) at 4 years follow up. Eur J Obstet Gynecol Reprod Biol. 2010 Feb; 148(2):199-201.

[65] Laurikainen E, Valpas A, Aukee P, Kivelä A, Rinne K, Takala T, Nilsson CG. Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence. Eur Urol. 2014 Jun;65(6):1109-14.

[66] Zahn CM, Siddique S, Hernandez S, Lockrow EG. Anatomic comparison of two transobturator tape procedures. Obstet Gynecol. 2007 Mar; 109(3):701-6.

two reported obturator injuries reported to have been confirmed by neurological consultation.[67]

From a surgeon's perspective, the placement of the transobturator sling from the inside out offered a proven efficacious continence procedure, a precise placement at midurethra of a well studied macroporous Prolene polypropylene tape, and a well-tolerated procedure with less blood loss, less urinary retention and no risk for bladder or bowel perforation. The proximity to the obturator neurovascular bundle was most frequently a failure to orient the device from 45 degrees to 90 degrees as specified by the IFU.[68] The change in angle after the entering of the obturator membrane, in close proximity to the posteromedial aspect of the upper third of the descending pubic ramus, is a critical step in inserting the trajectory of the tape through the tendineous attachment of the obturator and adductor muscles and not through the proximity of the neurovascular bundle. A recent systematic review and metaanalysis confirms that transobturator slings are not inferior to retropubic slings and there was not a significant difference seen in postoperative pain.[69]

In 2008, the FDA published a Public Health Notice concerning surgical pelvic mesh. This Public Health Notice discussed both potential complications and counseling of patients. Pelvic floor surgeons using mesh to treat SUI, such as TVT and TVTO, would be aware of and would be expected to know of the Notice, the potential complications, as well as their severity and need for reoperation discussed therein, and recommendations made. In 2013 the FDA published an updated notice concerning the SUI meshes like TVT and TVTO -- Considerations about Surgical Mesh for SUI. This notice identifies that the safety and effectiveness of multi-incision slings like TVT and TVTO is well-established in clinical trials that followed patients for up to one-year and that longer follow-up data is available in the literature.

---

[67] Complications associated with transobturator sling procedures. Boyles SH, Edwards R, Gregory W, Clark A. Int Urogynecol J Pelvic Floor Dysfunct. 2007 Jan; 18(1):19-22.
[68] ETH.MESH.02340905
[69] Tommaselli GA, Di Carlo C, Formisano C, Fabozzi A, Nappi C. Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis. Int Urogynecol J. 2015 May 20. [Epub ahead of print] PubMed PMID: 25990203.

21

There is a high degree of statistically valid evidence on the use of TVT and TVTO demonstrating their efficacy and safety. Hundreds of clinical studies, randomized controlled trials, systematic reviews and meta-analyses, and clinical guidelines, including numerous studies with a duration of 5, 10 and 15 plus years have been published and widely available to all surgeons. The 2013 FDA updated notice reminded surgeons of complications which we were all aware of and would be expected to know. The FDA correctly observed that with the exception of mesh exposure, these complications can occur following a non-mesh surgical repair for SUI. And as earlier stated, wound complications can occur with following a non-mesh surgical repair for SUI.

Each TVT and TVTO device is accompanied by an IFU. I have reviewed the TVT and TVTO IFUs and find them adequate and complete for its use in the operating room by the intended users. As a surgeon, I understand that the IFU is not a comprehensive guide for the surgical treatment of SUI. The IFU builds on the knowledge that we as pelvic floor surgeons have acquired through prior education, instruction and experience. The IFU adequately informs surgeons of the use of the TVT and TVTO and the potential risks and complications.

I have conducted numerous activities for the purpose of professional education including surgical anatomy laboratories with the use of models and cadavers, consensus conferences among experienced users, surgical demonstrations in the operating room and didactic lectures. All these activities offer the opportunity to address the complications and details of the surgery along with the interpretation of the IFU. The professional education activities provided the opportunity to exchange knowledge among surgeons. Ethicon's professional education, which is recommended in the IFU, supplements the IFU.

I use the TVT and TVTO patient brochures in my practice. Both allow a patient to construct a base to be used in the conversation about the procedure. These brochures are not meant to supplant the informed consent process, but rather are a resource for additional information and mention complications inherent to continence procedures. The IFU, patient brochure, professional education, medical literature, and the 2008 FDA Public Health Notification discuss potential complications to

be addressed in the informed consent process for a MUS and were available to surgeons. These instruments have been used and continue to be used by trained pelvic surgeons as a standard of practice in the counseling of their patients.

There have been several claims made by the Plaintiff's experts regarding the mesh and the device which in my opinion are incorrect and lack scientific support. Moreover, the large volume of clinical data on the TVT sling including the highest level of evidence and long term data are inconsistent with these theories.

The biomechanical properties of slings have been studied using a variety of models adapted from the testing of fabrics, textiles and sutures. None of the models have been able to replicate the behavior of the sling in the host with a level of scientific accuracy and validity that could be correlated with outcomes data. The use of dynamometers and standard biomechanical testing place emphasis on the physical characteristics of a Prolene polypropylene sling but leaves the interaction with the host to theoretical assumptions.

The monofilament knitted Prolene polypropylene TVT sling has pores which are macroporous (over 75 microns). A pore size above 75 microns allows for the migration of neutrophils (9-12 microns) and mature inflammatory cells (20 microns), considering that most studies are on explants. The clinical data show that the pore size, weight, and construct of the TVT mesh is optimal for treating urinary incontinence.

Explants from humans get forces well beyond the intended force for a sling procedure; explants are in essence useless in the evaluation of the host-graft interaction. Explanted material is the subject of mechanical stressors beyond its limits and has no clinical predictive value.

A claim has been made that the mechanically cut sling is a defective product. There was no data (and still is none) indicating that modification from mechanical to laser cutting would result in any potential effects on clinical outcomes. A number of parameter measurements were used to compare the physical characteristics of MCM and LCM. Elongation testing analysis and flexural rigidity in machine and cross direction were measured without statistically

significant differences. Review of internal documents from Ethicon regarding the medical interpretation of biomechanical engineering test data shows no difference on the product physical characteristics.[70]

A communication regarding the photographic difference at 50% elongation was circulated to marketing and sales personnel.[71]  Surgically, an elongation at 50% is well beyond the forces used in the operating room. Moreover, when the sling is implanted it is covered by the sheath which distributes the forces across the sheath protecting the sling. Notably the bench top testing does not utilize the tape with the sheath on it.  If it did, the tape would not move or stretch within the protective sheath.  Additionally the trocars are also not included in the bench top testing.  The use of the trocars provides for the smooth placement of the tape and sheath which follow the trocars through the tissue.

Both mechanical cut mesh and laser cut mesh in the TVT and TVTO behave the same in vivo and the data show no significant difference in efficacy or complication rates in studies that were performed before and after 2007 when laser cut mesh was utilized.  Instead, there is a consistency in the data regardless of the type of cutting to the edges of the macroporous Prolene polypropylene tape.  The long term data on TVT and TVTO are also inconsistent with a theory that mechanical cut TVT tape is defective.  This evaluation is in agreement with my clinical observations in the operating room using mechanical cut mesh and laser cut mesh.

 The use of machines to evaluate a mesh implant gives information about the consistency of a product to a manufacturer but it has the limitation of not having a complete assessment of all variables in vivo. The host graft interaction has been previously evaluated and submitted to the FDA; tolerability and safety has been proven by the predicate device and graft, in this case the TVT Prolene polypropylene mesh tape.[72,73]  The in vivo animal model studies with mechanically cut PP show the best tissue

---

[70] ETH.MESH.01784825
[71] ETH.MESH.08334244
[72] ETH.MESH.08476210-6342
[73] Falconer C, Söderberg M, Blomgren B, Ulmsten U. Influence of different sling materials on connective tissue metabolism in stress urinary incontinent women. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S19-23.

integration and mechanical performance when compared to Vicryl, Vypro, Mersilene and Prolene soft. Most importantly, the effect of cicatrization on lengthening and resistance favors the use of mechanically cut PP as a sling material.

Particle loss was found to be higher in MCM than in LCM. The loss of particles is at the edge of the mesh implant. These are minute particles measured independently at 0.179 mm.  Surgically this is of no significance. There is no evidence, published or clinical, that could be associated to differences in efficacy or tolerability. If any particles were seen at placement, the particles would make no difference in the placement or adjustment of the sling.  The size of these particles is significantly smaller when compared to the variety of devices used for hemostasis and suturing.  Overall the data does not show any clinically significant difference between mechanical versus laser cut mesh. Moreover, in the hypothetical visco-hyperelastic model for vaginal tissue with a low vaginal stiffness index, the use of a compliant mesh sling, regardless of its edges, may decrease the rate of obstructive voiding dysfunction.

Surgeons have various preferences and the mechanical cut TVT mesh has been in use and studied for almost two decades.  The mechanical and laser cut TVT and  TVTO are within the standard of care and none of the pertinent SUI guidelines and analyses distinguish efficacy or safety of the devices based on the way the edges of the mesh are cut, nor do they support the theories espoused by the Plaintiff's experts. [74]

The use of Prolene polypropylene in TVTO followed its use in over 500,000 cases of retropubic TVT for suburethral slings.  A Medline search for sarcoma and polypropylene does not yield a single case of sarcoma or malignancy due to the use of polypropylene material in humans. MSDS and rat studies reporting sarcoma formation after implantation of polypropylene discs and powder are not transferable to

---

[74] 2015 Cochrane Review; 2014 AUGS/SUFU Statement; 2014 ACOG Statement; 2014 IUGA Statement; 2014 SGS Guidelines; 2013 AUA Position Statement; 2013 NICE Clinical Guideline 171; 2013 ICS SUI Fact Sheet; 2012 EAU Guideline; 2012 AUA Guideline; Cox 2013 Review; 2011 Cochrane Review; Novara 2010 metaanalysis.

humans.[75]   Raw materials as referenced in MSDS are not implanted in humans.  Instead they are processed and formulated.  The same is true for pharmaceuticals.  The available data does not show any causal link between polypropylene and cancer.[76],[77],[78],[79]

There is no evidence of human cytotoxicity. Cytotoxicity assessment of the Ulmsten Prolene polypropylene sling using the ISO Elution method showed cell lysis and toxicity; however, this was not confirmed by the ISO Agarose Diffusion method.[80],[81]  Cytotoxicity assessment of normal production Prolene polypropylene using the Agarose Overlay Method and Extraction Filter Method showed no cytotoxicity.[82],[83]   An exploratory cytotoxicity assessment of unwashed non-sterile Prolene polypropylene mesh raw material using the ISO Elution method did not show cytotoxicity or cell lysis.[84],[85]  Normal production Prolene polypropylene has not shown cytotoxicity at drug elution, ISO Agarose overlay method, or with the extraction /filter paper method.   All testing methods use a monolayer of  L-929 mouse fibroblast cells.[86],[87]

---

[75] King AB, Goldman HB. Current controversies regarding oncologic risk associated with polypropylene midurethral slings. Curr Urol Rep. 2014 Nov;15(11):453. doi: 10.1007/s11934-014-0453-y. PubMed PMID: 25234187.

[76] Moalli P, Brown B, Reitman M, Nager C. Polypropylene mesh: evidence for lack of carcinogenicity. Int Urogynecol J. 2014 May;25(5):573-6.

[77] March 12, 2014 AUGS-SUFU Frequently Asked Questions by Providers: Mid-urethral slings for Stress Urinary Incontinence.
http://www.augs.org/p/bl/et/blogid=16&blogaid=194

[78] King AB, Zampini A, Vasavada S, Moore C, Rackley RR, Goldman HB. Is there an association between polypropylene midurethral slings and malignancy? Urology. 2014 Oct;84(4):789-92.

[79] Linder BJ, Trabuco EC, Carranza DA, Gebhart JB, Klingele CJ, Occhino JA. Evaluation of the local carcinogenic potential of mesh used in the treatment of female stress urinary incontinence. Int Urogynecol J. 2016 Feb 10. [Epub ahead of print] PubMed PMID: 26864666.

[80] ETH.MESH.08476311

[81] ETH.MESH.08476314

[82] ETH.MESH.08476315

[83] ETH.MESH.08476316

[84] ETH.MESH.08476317

[85] ETH.MESH.08476318

[86] ETH.MESH.08476315

[87] ETH.MESH.08476316

Polypropylene is a stable and well-accepted biomaterial with a history of over five decades of use in mesh implants.[88] In recent years, concerns regarding implanted polypropylene degradation have been raised as a result of very high magnification images that show portions of some explanted synthetic meshes with "cracked" surfaces.[89] These case reports and case series of explants lack reliability and one cannot drawn any causal inference from them or extrapolate their reported SEM findings to the larger population. In the referenced Clave study there were several methodologic flaws. Moreover, only a minority of the explants were reported to have surface cracking and degradation and oxidation were not shown on chemical analyses. While the purported surface changes were hypothesized to lead to adverse clinical outcomes, these hypotheses have not been confirmed. Nor are these hypotheses supported by the extensive peer-reviewed literature related to the TVT and TVTO slings. Prospective studies have followed patients with implanted with TVT at long term as earlier referenced and show excellent durability and safety of TVT and TVTO.

The medical literature including over 1,000 studies, meta-analyses and systematic reviews, and the endorsement of the TVT mesh by the pertinent medical societies do not support that the mesh is cytotoxic, that it degrades or leads to a harmful inflammatory response in humans. To the contrary, the use of macroporous Type 1 Prolene polypropylene in TVT is the most biocompatible for use to treat urinary incontinence and is the preferred material for this intended use.[90],[91],[92],[93] The high degree of efficacy, the low rates of complications and the very low rates

---

[88] AUGS-SUFU FAQs by Providers on Mid-urethral Slings for SUI, 2014.

[89] Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, Clavé H. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J. 2010 Mar;21(3):261-70.

[90] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database Syst Rev. 2015 Jul 1; 7:CD006375. [Epub ahead of print] PubMed PMID: 26130017

[91] NICE Clinical Guideline 171- Urinary Incontinence: The management of urinary incontinence in women. Sept. 2013.

[92] Ogah J, Cody DJ, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women: a short version Cochrane review. Neurourol Urodyn. 2011 Mar; 30(3):284-91.

[93] AUGS-SUFU Position Statement on Mesh Midurethral Slings for SUI. January 3, 2014.

of reoperation based on the highest level of scientific data are inconsistent with and refute the Plaintiff's experts' claims and hypotheses, which in essence are speculation and conjecture based on irrelevant, unreliable and/or low level data.

Overall the data show that the TVT and TVTO slings used to treat urinary incontinence are safe and effective. They are not defective and instead these well studied slings have significant usefulness to surgeons in the field.

Midurethral slings like TVT and TVTO are the standard of care for the surgical management of urinary stress incontinence.[94],[95],[96]   Like the TVT, long term data continues to support the use of TVTO with proven safety and efficacy.[97] Use of the device is the surgery of choice for urologists

---

[94] Schimpf MO, Rahn DD, Wheeler TL, Patel M, White AB, Orejuela FJ, El-Nashar SA, Margulies RU, Gleason JL, Aschkenazi SO, Mamik MM, Ward RM, Balk EM, Sung VW; Society of Gynecologic Surgeons Systematic Review Group. Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol. 2014 Jul; 211(1):71.e1-71; Cox A, Herschorn S, Lee L. Surgical management of female SUI: is there a gold standard? Nat Rev Urol. 2013 Feb; 10(2):78-89; Dmochowski RR, Blaivas JM, Gormley EA, Juma S, Karram MM, Lightner DJ, Luber KM, Rovner ES, Staskin DR, Winters JC, Appell RA; Female Stress Urinary Incontinence Update Panel of the American Urological Association Education and Research, Inc, Whetter LE. Update of AUA guideline on the surgical management of female stress urinary incontinence. J Urol. 2010 May; 183(5):1906-14; Novara G, Artibani W, Barber MD, Chapple CR, Costantini E, Ficarra V, Hilton P, Nilsson CG, Waltregny D. Updated systematic review and meta-analysis of the comparative data on colposuspensions, pubovaginal slings, and midurethral tapes in the surgical treatment of female stress urinary incontinence. Eur Urol. 2010 Aug; 58(2):218-38.
[95] Labrie J, et al. Surgery versus physiotherapy for stress urinary incontinence. N Engl J Med. 2013; 369:1124-33.
[96] NICE Clinical Guideline 171- Urinary Incontinence: The management of urinary incontinence in women. Sept. 2013.
[97] Tommaselli GA, Di Carlo C, Formisano C, Fabozzi A, Nappi C. Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis. Int Urogynecol J. 2015 May 20. [Epub ahead of print]; Athanasiou S, Grigoriadis T, Zacharakis D, Skampardonis N, Lourantou D, Antsaklis A. Seven years of objective and subjective outcomes of transobturator (TVT) vaginal tape: why do tapes fail? Int Urogynecol J. 2014 Feb; 25(2):219-25. doi: 10.1007/s00192-013-2186-8; Laurikainen E, Valpas A, Aukee P, Kivelä A, Rinne K, Takala T, Nilsson CG. Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence.

and urogynecologists.[98],[99],[100] My opinions are supported by the highest degree of medical evidence available to the practicing pelvic surgeon and continence specialists.[101] My surgical practice and professional opinions are based on scientific evidence, experience and a confirmatory consensus of the medical societies representing those dedicated to the care of women with urinary incontinence.[102],[103]

The pertinent societies continue to analyze the voluminous data which support TVT and TVTO. The November 2015 ACOG and AUGS Practice Bulletin 155 Urinary Incontinence in Women recommends the TVT and TVTO because it is safe and effective and less invasive and morbid than alternatives.[104]   The following conclusions and recommendations, with

---

Eur Urol. 2014 Jun; 65(6):1109-14; Serati M, Bauer R, Cornu JN, Cattoni E, Braga A, Siesto G, Lizée D, Haab F, Torella M, Salvatore S. TVTO for the treatment of pure urodynamic stress incontinence: efficacy, adverse effects, and prognostic factors at 5-year follow-up. Eur Urol. 2013 May; 63(5):872-8.

[98] Clemons JL. Impact of the 2011 FDA transvaginal mesh safety update on AUGS members' use of synthetic mesh and biologic grafts in pelvic reconstructive surgery. Female Pelvic Med Reconstr Surg 2013; 19:191-98. (>95% usage of MUS)

[99] Chughtai BI, Midurethral Sling Is the Dominant Procedure for Female Stress Urinary Incontinence: Analysis of Case Logs From Certifying American Urologists. Urology. 2013 Oct 15. (significant increase in MUS usage and significant reduction in older procedures to treat SUI)

[100] Nager, C.W., et al., A randomized trial of urodynamic testing before stress-incontinence surgery. N Engl J Med 2012; 366:1987-97 (full length MUS was the choice procedure for 93% of surgeons in the UITN).

[101] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database Syst Rev. 2015 Jul 1;7:CD006375. [Epub ahead of print] PubMed PMID: 26130017.

[102] AUGS-SUFU Position Statement on Mesh Midurethral Slings for SUI. January 3, 2014;  IUGA Position Statement on Mid-Urethral Slings for Stress Urinary Incontinence, July 2014.  ICS Fact Sheet Stress Urinary Incontinence, July 2013; AUA Position Statement on the Use of Vaginal Mesh for the Surgical Treatment of Stress Urinary Incontinence, October 2013

[103] Lucas MG, EAU Guidelines on Surgical Treatment of Urinary Incontinence. Eur Urol. 2012; 62:1118-29.

[104] American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Gynecology and the American Urogynecologic Society. Practice Bulletin No. 155: Urinary Incontinence in Women. Obstet Gynecol. 2015 Nov;126(5):e66-81. PubMed PMID: 26488524; Practice Bulletin No. 155 Summary: Urinary Incontinence in Women. Obstet Gynecol. 2015 Nov;126(5):1120-2.

which I agree, were determined to be based on good and consistent scientific evidence (Level A):

> • Initial midurethral sling surgery results in higher 1-year subjective and objective cure rates than pelvic floor physical therapy in women with stress urinary incontinence.

> • Synthetic midurethral slings demonstrate efficacy that is similar to traditional suburethral fascial slings, open colposuspension, and laparoscopic colposuspension. Compared with suburethral fascial slings, fewer adverse events have been reported with synthetic midurethral slings. Voiding dysfunction is more common with open colposuspension than with synthetic midurethral slings.

> • There are substantial safety and efficacy data that support the role of synthetic mesh midurethral slings as a primary surgical treatment option for stress urinary incontinence in women.

> •Burch colposuspension at the time of abdominal sacrocolpopexy and retropubic midurethral sling at the time of vaginal surgery for pelvic organ prolapse repair decrease the risk of postoperative stress urinary incontinence in women without preoperative stress urinary incontinence.

In my opinion TVT and TVTO are safe, effective, within the standard of care and are suitable first line surgical options with more support in the medical literature than any other MUS. [105]   The TVT and TVTO devices are not defective and they have significant usefulness to surgeons in the field.  The data does not support the theories that TVT and TVTO are cytotoxic, that they degrade or cause a harmful inflammatory response, that their pore size, weight, mechanical or laser cut or other features were harmful or cause significant clinical outcomes.

---

[105] 2015 Cochrane Review; 2014 AUGS/SUFU Statement; 2014 ACOG Statement; 2014 IUGA Statement; 2014 SGS Guidelines; 2013 AUA Position Statement; 2013 NICE Clinical Guideline 171; 2013 ICS SUI Fact Sheet; 2012 EAU Guideline; 2012 AUA Guideline; Cox 2013 Review; 2011 Cochrane Review; Novara 2010 metaanalysis.

I reserve the right to supplement or modify my expert opinion based on the discovery, disclosure and timely provision of new findings and the depositions of Plaintiffs' experts.

III. Fees & Testimony

My hourly charge is $500.00 per hour.

In the past four years, I have given testimony as an expert in the following cases: Cavness v. Johnson & Johnson, et al., (9/30/2015 trial testimony) and  Sandra Garcia v. Johnson & Johnson, Cameron County, TX Case No. 2013-DCL-3511-D (3/13/2015 deposition testimony).

_____
Jaime L. Sepulveda-Toro, M.D.

February 24, 2016

# EXHIBIT D

## CURRICULUM VITAE

### Jaime L. Sepulveda, M.D.

Date of Birth:          ███████████

Place of Birth:         ███████████

Office Address:         Dr. Jaime L. Sepulveda, LLC

                        ███████████

## EDUCATIONAL DEGREES

| | |
|---|---|
| 1981 | **Bachelor degree in Sciences**<br>University of Puerto Rico<br>Mayaguez Campus |
| 6/1985 | **Doctor in Medicine**<br>University of Puerto Rico<br>Medical Sciences Campus<br>School of Medicine |
| 7/1985-6/1986 | **Post Doctoral Research Fellowship**<br>University of Puerto Rico<br>Department of Pharmacology<br>Tumor Biology Laboratory |
| 7/1986-6/1987 | **Straight Internship**<br>University of Puerto Rico<br>University Hospital<br>Department of Obstetrics & Gynecology |
| 7/1987-6/1990 | **Residency**<br>University of Puerto Rico<br>University Hospital<br>Department of Obstetrics & Gynecology |
| 7/1990-6/1992 | **Fellowship**<br>Assistant Professor<br>Pelvic Surgery<br>University of Miami<br>School of Medicine |
| 7/1992- Present | Private practice |
| 12/2005- Present | Medical Director<br>Medical Arts Surgery Center at South Miami Hospital |

## CERTIFICATION & LICENSES

Subspecialty certification in Female Pelvic Medicine and
Reconstructive Surgery, 2013

Recertified

Annual Board Certification

(ABC) Program- 1998, 1999, 2003, 2004, 2007, 2008, 2009, 2010,

2011, 2012, 2013,2014

Diplomate of the American Board of Obstetrics and Gynecology

Fellow American College of Obstetricians & Gynecologists

Fellow American College of Surgeons

National Board of Medical Examiners
Certification Number 334227

Florida Department of Health
Medical License Number ME0057803

DEA
Number BS 2349339

## HONORS AND AWARDS

The American College of Obstetricians and Gynecologists
Junior Fellow
Puerto Rico Section
Vice-Chairman 1987-88
Chairman 1988-89

The American College of Obstetricians and Gynecologists
Junior Fellow
District IV Advisory Council
Secretary-Treasurer
1989-90

ACOG-Mead Johnson Clinical Meeting Award 1989

Administrative Chief Resident
University of Puerto Rico
University Hospital
Dept. of Obstetrics & Gynecology
March, 1990- June, 1990

ACOG- Burroughs Welcome Junior Fellow
Clinical Meeting Award 1990

Baptist Health-BOS Physician of the year. 2007

MEMBERSHIPS

The American College of Obstetricians & Gynecologists

The American College of Surgeons

American Urogynecologic Society

International Continence Society

International Urogynecological Association

American Urological Association


COMMUNITY SERVICES

Member Board of Directors
Borinquen Health System
1992-1994


COMMITTEES

Medical Arts Surgery Center at South Miami
Chairman- Medical Board

Baptist Health System
Department of OB/GYN
Department Advisory Committee, 2000

Participant on the Education Group
National Institute of Diabetes, Digestive and Kidney Diseases
Issues and Opportunities in Urinary Incontinence
NIH, Bethesda, Maryland, 1998

Urogynecology Ad-Hoc Committee
South Miami Hospital, 1998

Credentials Committee
South Miami Hospital, 1994-1996

Surgical Review Committee
South Miami Hospital, 1993 to 1997

Surgical Review Committee
Health South Doctors Hospital
Chairman 1995

Quality Improvement Committee
Health South Doctors Hospital, 1995 to 1998

Blood transfusions/ Laboratory Committee
Health South Doctor's Hospital, 1993 to 1995

Curriculum Evaluation Committee,
University of Puerto Rico School of Medicine, 1990

<u>COURSES PRESENTED</u>

Gynecologic and Endoscopic Surgical symposium
University of Miami
Miami, FL                    1991

Johnson & Johnson Latin America
International Surgeons Training Course
Miami, FL.                    March 19-20, 1994

Curso de Cirugia Ginecologica por Laparascopia,
(Laparascopic Gynecologic Surgery Course)
Clinica del Country Department
of Obstetrics and gynecology,
Bogota, Colombia.          June 1994

Johnson & Johnson Latin America
International Surgeons Training Course
Miami, Florida.              July 30-31, 1994

Ethicon Endo- Surgery Sales Mastery Course
(Training of Sales Representatives)
Miami, FL.                    September 7, 1994

Primer Curso De Actualizacion en Cirugia
Ginecologica Laparoscopica
(First   symposium on Gynecologic Laparoscopic Surgery)
Clinica Palermo, Department of Obstetrics and Gynecology
Bogota, Columbia.          October 21 & 22, 1994

Ethicon Endo-Surgery Sales Mastery Course
(Training of Sales Representatives)
Miami, FL                    December 5, 1994

Interstitial Cystitis: A Urogynecologic Perspective
Miami, FL                    January 21, 1999

Interstitial Cystitis: A Urogynecologic Perspective
San Juan, P.R.              February 5, 1999

Modern Management of Pelvic Prolapse
Coral Gables, FL            February 24, 1999

Urinary Incontinence for
Allied Health Care   Professionals
Mercy Hospital
Miami, FL                    April 10, 1999

Modern Management of Urinary Incontinence
San Juan, Puerto Rico   April 29, 1999

Issues in Urogynecology
University of Puerto Rico
School of Medicine          April 29, 1999

Urinary Incontinence
A Primary Care Perspective
Coral Gables, FL          May 20, 1999

Interstitial Cystitis
A Urogynecology Perspective
Tampa, FL          June 16, 1999

Update in the Diagnosis and Treatment of Urinary   Incontinence
North Carolina          July 21, 1999

Urinary Incontinence, A Primary Care Perspective
Fort Lauderdale, FL          July 22, 1999

Overactive and Painful Bladder
Miami, FL          August 23, 1999

Urinary Incontinence, A Primary Care Perspective
Family Medicine Residency Program
San Pablo Hospital
Bayamon, P.R.          September 2, 1999

Modern Management of Urinary Incontinence
San Juan, P.R.          September 2, 1999

Modern Management of Urinary Incontinence
Pan American Hospital House Staff Physicians
Miami, FL          September 20, 1999

Pelvic Prolapse and Urinary Incontinence
Baptist Health Systems
OB/GYN Department Meeting
CME Activity
Miami, FL          October 1999

Urodynamics Workshop for Ob-Gyn Residents
Ponce University Hospital
Ob-Gyn Residency Program
Ponce, P.R          December 16, 1999

Overactive and Painful Bladder
Round table and educational activity
Ponce, P.R.          December 16, 1999

Pelvic Floor and Incontinence Course
Ethicon Womens Health & Incontinence
Course didactic content and cadaver dissection (aprox. 20)
Surgical preceptorships. (aprox. 40)
2005- 2010

The Use of Synthetic Grafts in the Augmented Repair of Pelvic Organ
Prolapse
Miami Ob-Gyn Symposium          September 25, 2010

Is Robotic Sacrocolpopexy the Answer? Incontinence and other concerns
Miami Robotics Symposium     October, 13-16, 2010


The Repair of Advanced Pelvic Organ Prolapse
Second annual women health international oncology symposium
February, 2010

Surgical treatment of post hysterectomy vaginal vault prolapse
Miami Ob-Gyn Symposium
September 17, 2011

Robotic Sacrocolpopexy- Tecnique and mesh debate
Second Miami Robotics Symposium
February 16-18, 2012

What to do when Continence Surgery Fails
Miami Ob-Gyn Symposium
September 22, 2012

Urinary and Fecal Incontinence after Childbirth
Baptist Hospital
February 8, 2013


RESEARCH EXPERIENCE

Epidemiologic Analysis of the Seroprevalence of Dengue in the
South of Puerto Rico
Center for Disease Control (CDC)
San Juan, Puerto Rico 1985

Quantitative Determination of DNA by Flow Cytometry
for the Analysis of the Cell Cycle in  HL-60 Cells
(Promyelocytic Leukemia cells). 1985

Optimization of Culture Media for Primary Culture of Hairy Cell
Leukemia cells. 1986

Induction of Morphological and Functional Cell Differentiation     with
NBQ (Nitrobenzathiazoloquinolinium) in HL-60 cells. 1986

Research Experience with the Use of Titrated Purine and Pyrimidine
Analogs for the Evaluation  of  Cytotoxicity   ofAntineoplastic
drugs. 1986

Research Experience with Indirect Immuno- florescence technique in
the evaluation of the levels of PRA (Percentage of
Reactive Antibodies) and its Affinity to Normal Human Parathyroid
Tissue. 1986

Clinical Research on Expansion of Intra-Vascular Volume with
Oncotically Stable Particles in Patients with Severe Pre-eclampsia.
1988

Clinical research on respiratory physiology in response to intra-vascular volume expansion with Human Serum Albumin in Patients with severe pre-eclampsia 1989

Epidemiological research on seasonal variability of birth rates. 1990
Clinical research on the etiology of Chronic Pelvic Pain evaluated by pathologic findings. 1990

Clinical research on the identification of risk factors for cervical dysplasia in patients with ASCUS cytology. 1994

Clinical research on the influence of Pelvic Prolapse on the rate and pattern of bladder emptying.  1999

Surgical video reviewer
American Urogynecologic Society
33rd Annual Scientific Meeting
Chicago, 2012

Fibroid Registry – Center for Research and Grants
Baptist Health South Florida
South Miami Hospital
Principal Investigator
2012

## PRESENTATIONS AND PUBLICATIONS AS AUTHOR OR CO-AUTHOR

Baez A., Sepulveda J.
Induction of Myeloid differentiation   of   HL-60  cells   by antitumor drug NBQ.
Proceedings of the fifth International Congress on Scientific Investigation. 1987

Sepulveda J., De la Vega A., Adamsons K.
Conservative management of severe pre-eclampsia with albumin in a patient with HEELP Syndrome.
Proceedings of the UPR Tenth Annual Research Forum.
Page 50,  1988

De la Vega, A., Sepulveda, J., Adamsons K.
Albumin use in the treatment of pre-eclampsia.
Proceedings of UPR Tenth Annual Research Forum.
Page 50,  1988

Sepulveda J., Carrodeguas J., Ramirez E, Adamsons K.
Sweat gland carcinoma of vulva.
Case study and review of the literature.
Proceedings of the UPR Tenth Annual Research Forum.
Page 49., 1988

Sepulveda J., De la Vega A.
Albumin use in pre-eclampsia.
Presented at the Junior  Fellow District  IV
Annual  Clinical Meeting. 1989

Sepulveda J., De la Vega A., Carrodeguas J.
Limited usefulness of laparoscopy in the diagnosis of causes of  Chronic Pelvic
Pain.
Proceedings of the UPR Eleventh Annual Research Forum.
Page 41. 1989

De la Vega A., Sepulveda J., Caiseda D. Adamsons K.
Safety of albumin in the expectant management of severe pre-
eclampsia.
Proceedings of the VII World Congress of Hypertension in
Pregnancy.
Page 193. 1990

Caiseda D., De la Vega A., Sepulveda J.
Martin D., Romaguera J. Adamsons K.
Variability of the L/S ratio of amniotic fluid of  hypertensive  patients.
Proceedings of the VII World Congress of  Hypertension in
Pregnancy.
Page 113. , 1990

Sepulveda J., Alvarez P.J., and Hernandez, Aile
Bladder emptying Rate and Pattern in Patients with Symptomatic
Pelvic Organ Prolapse.
Presented at ACOG District IV meeting in
Fajardo, Puerto Rico              October 17, 1999

# EXHIBIT E

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 71 of 429 PageID 21751
Case 2:12-md-02327 Document 4049-1 Filed 11/15/16 Page 3 of 305 PageID 142652
Jaime Sepulveda, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                      CHARLESTON DIVISION


 3   _____
     IN RE:  ETHICON, INC.,              Master File No.
     PELVIC REPAIR SYSTEM PRODUCTS         2:12-MD-02327
 4   LIABILITY LITIGATION,               MDL No. 2327
     _____/   JOSEPH R. GOODWIN
 5   THIS DOCUMENT RELATES TO            U.S. DISTRICT JUDGE
     PLAINTIFFS:
 6   Joplin, Deborah Lynn      2:12-cv-00787
     Wheeler, Pamela Gray      2:12-cv-00455
 7   Collins, Fran             2:12-cv-00931
     Frye, Jackie              2:12-cv-01004
 8   Bennett, Dina Sanders     2:12-cv-00497
     Miracle, Charlene         2:12-cv-00510
 9   Adams, Joan               2:12-cv-001203
     Grabowski, Louise         2:12-cv-00683
10   Vignos-Ware, Barbara      2:12-cv-00761
     Harter, Beth                 12-cv-00737
11   Scholl, Sheri                12-cv-00738
     Stubblefield, Margaret       12-cv-00842
12   Warmack, Roberta             12-cv-01150
     Smith, Carrie             2:12-cv-00258
13   Thomas (Wyatt), Kimberly  2:12-cv-00499
     Georgilakis, Teresa       2:12-cv-00829
14   Cone, Mary                2:12-cv-00261
     Destefano-Raston, Dina    2:12-cv-01299
15   Hooper, Nancy             2:12-cv-00493
     Lee, Alfreda              2:12-cv-01013
16   Reyes, Jennifer           2:12-cv-00939
     Fisk, Paula               2:12-cv-00848
17   Sikes, Jennifer           2:12-cv-00501
     Swint, Isabel             2:12-cv-00786
18   Teasley, Krystal          2:12-cv-00500
     Thaman(Reeves), Susan     2:12-cv-00279
19   Warlick, Cathy            2:12-cv-00276
     Sheperd, Donna            2:12-cv-00967
20

21

              DEPOSITION OF JAIME SEPULVEDA, M.D.
22
                    Wednesday, March 30, 2016
23                     8:12 a.m. - 4:33 p.m.
                    200 South Biscayne Blvd.
24                     Miami Beach, Florida
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 72 of 429 PageID 21752
Case 2:12-md-02327-MRM Document 94-1 Filed 10/25/20 Page 3 of 305 PageID #:32658
Jaime Sepulveda, M.D.

```
 1    APPEARANCES:

 2    On behalf of Plaintiffs:

 3         EDWARDS & DE LA CERDA

           3031 Allen Street, Suite 100

 4         Dallas, Texas 75204

           888.795.3352

 5         BY:  PETER DE LA CERDA, ESQUIRE

                peter@edwardsdelacerda.com

 6

           MOSTYN LAW

 7         6280 Delaware Street

           Beaumont, Texas  77706

 8         800.400.4000

           BY:  MARK C. SPARKS, ESQUIRE

 9              mark@mostynlaw.com

10

      On behalf of Defendant:

11

           BUTLER SNOW, LLP

12         500 Office Center Drive

           Suite 400

13         Fort Washington, Pennsylvania  19034

           267.513.1884

14         BY:  NILS B. SNELL, ESQUIRE

                burt.snell@butlersnow.com

15

16

17

18

19

20

21

22

23

24
```

Jaime Sepulveda, M.D.

```
 1

 2                    I N D E X

 3  Examination                                  Page

 4  Direct         By Mr. De La Cerda               5

    Cross          By Mr. Snell                   269

 5

 6  Certificate of Oath                          302

    Certificate of Reporter                      303

 7

 8

 9

10                    EXHIBITS

11  No.                                          Page

12  Exhibit 1    Gynecare Prolift and Gynecare    43
                 Gynemesh PS Preceptor
13               Presentation Kit

14  Exhibit 2    Surgeon's Resource Monograph     43

15  Exhibit 3    Medical Literature               44

16  Exhibit 4    Book: Biomechanics:  Mechanical  46
                 Properties of Living Tissues,
17               Chapter 7

18  Exhibit 5    Book:  Introductory              46
                 Biomechanics From Cells to
19               Organisms, Chapter 9

20  Exhibit 6    Book:  Introductory              47
                 Biomechanics From Cells to
21               Organisms, Chapter 12

22  Exhibit 7    Thumb Drive with Materials       49
                 Related to TVT and TVT-O
23

    Exhibit 8    Thumb Drive with Materials       49
24               Relating to TVT-S
```

| | | | |
|---|---|---|---|
| 1 | Exhibit 9 | Thumb Drive with Materials Relating to Prolift | 49 |
| 2 | | | |
| | Exhibit 10 | Thumb Drive with Materials Relating to RVT-S | 50 |
| 3 | | | |
| 4 | Exhibit 11 | Medical Literature | 51 |
| 5 | Exhibit 12 | Article:  Randomized controlled trial comparing TVT-O and TVT-S for the treatment of stress urinary incontinence:  2-year results | 52 |
| 6 | | | |
| 7 | | | |
| 8 | Exhibit 13 | Curriculum Vitae | 53 |
| 9 | Exhibit 14 | Reliance List | 54 |
| 10 | Exhibit 15 | General Expert Opinion Report on Gynemesh PS, Prolift and Prosima | 55 |
| 11 | | | |
| 12 | Exhibit 16 | General Expert Opinion Report on TVT and TVT-O | 55 |
| 13 | | | |
| | Exhibit 17 | Invoices | 60 |
| 14 | | | |
| | Exhibit 18 | Thumb Drive with Presentation Material | 71 |
| 15 | | | |

16

17

18

19

20

21

22

23

24

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 75 of 429 PageID 21755
Case 2:12-md-02327-Document 4044-18 Filed 04/25/18 Page 75 of 305 PageID #:32656
Jaime Sepulveda, M.D.

1                    P R O C E E D I N G S

2                         -   -   -

3    Thereupon:

4                    JAIME SEPULVEDA, M.D.,

5    having been first duly sworn, was examined and

6    testified as follows:

7                    THE WITNESS:  I do.

8                      DIRECT EXAMINATION

9    BY MR. DE LA CERDA:

10       Q.   Okay.  Doctor, could you please state your

11   full name for the record?

12       A.   Jaime L. Sepulveda.

13       Q.   You're a urogynecologist hired by Johnson &

14   Johnson and Ethicon, Inc. to provide opinions in

15   support of TVT, TVT-O, Gynemesh, Prolift and Prosima;

16   correct?

17                MR. SNELL:  Form.

18       A.   I have -- I have been subpoenaed to provide

19   expert testimony about these products.

20       Q.   (By Mr. De La Cerda)  My name is Peter

21   de al Cerda, I'm one of the attorneys who represents

22   the plaintiffs' group.

23                Do you understand who I am and who I

24   represent?

1    A.    Yes, I do.

2    Q.    A couple of deposition rules.  As we begin,

3    first of all, we want to try to let each other finish,

4    so allow my question to get out fully before you begin

5    your answer and then I'll allow your answer to get out

6    fully before I begin my next question.  Is that fair?

7    A.    Yes.

8    Q.    And also when you're responding to

9    questions, please do so verbally as opposed to an

10   "uh-huh" or "uh-uh" or a head nod so it is clear on

11   the record.  Okay?

12   A.    Yes.

13   Q.    Also, if you don't understand my question,

14   please ask me to repeat or rephrase it, otherwise,

15   I'll assume that you understood my question.  Is that

16   fair?

17   A.    Yes.

18   Q.    And, of course, if you need a break at any

19   time, please let me know and we'll take a break.  The

20   only thing is if there's a question pending, I ask the

21   question be responded to before we take the break.

22   Okay?

23   A.    I -- I understand.

24   Q.    All right.  This is not the first deposition

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 77 of 429  PageID 21757
Case 2:12-md-02327-MDM  Document 40198  Page 3 of 305  PageID #3P058
Jaime Sepulveda, M.D.

1    you've given; correct?

2        A.    That's correct.

3        Q.    What other depositions have you given?

4        A.    I have given depositions on Garcia versus

5    Ethicon.

6        Q.    Okay.  Anything else?

7        A.    Yes, I have given deposition in local cases

8    against a physician.

9        Q.    Okay.  So any other mesh cases where you've

10    given a deposition other than Garcia?

11        A.    Only Garcia.

12        Q.    Okay.  And then you've also given

13    depositions, I guess, in medical malpractice cases?

14        A.    Yes.

15        Q.    Okay.  How many of those have you given?

16        A.    I have given two.

17        Q.    Two.  And have you acted as a treater or as

18    an expert in those cases?

19        A.    One was as a treater and the other one was

20    as an expert.

21        Q.    Okay.  And when you acted as the expert,

22    were you for the plaintiff or for the defense?

23        A.    I was for the defense.

24        Q.    And generally speaking, in the case where

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 78 of 429 PageID 21758
Case 2:12-md-02327-MRM Document 94-1 Filed 04/04/08 Page 78 of 305 PageID #: 32659
Jaime Sepulveda, M.D.

1    you were the treater, what type of case was that?  I

2    know it's medical malpractice, but what was the

3    subject of that case?

4        A.    That -- that was in 1994, a pelvic mass,

5    specifically a sacral mass.

6        Q.    Okay.  And then how about the one where you

7    acted as the expert for the defense?

8        A.    It was a case of urinary incontinence after

9    a vaginal delivery.

10       Q.    And do you recall approximately when that

11   one was?

12       A.    That may have been three to four years ago.

13       Q.    Did either of those cases involve Butler

14   Snow?

15       A.    No.

16       Q.    Okay.  And then in the Garcia versus

17   Ethicon, you acted as an expert on behalf of Johnson &

18   Johnson and Ethicon; correct?

19       A.    That's correct.

20       Q.    All right.  Any other depos other than the

21   ones you already mentioned?

22       A.    No other depos.

23       Q.    Okay.  A few questions here.  I assume the

24   answers to these are all no, but have you ever had

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 79 of 429 PageID# 24759
Case 2:12-md-02327 Document 2014-3 Filed 04/24/16 Page 80 of 305 PageID#: 32660
Jaime Sepulveda, M.D.

1    your privileges at a hospital revoked, suspended or

2    limited in any way?

3         A.    No.

4         Q.    Have you ever personally been sued for

5    medical malpractice?

6         A.    Yes.

7         Q.    Okay.  And what was the subject of that

8    particular case?

9         A.    It -- it was, again, a chordoma,

10   c-h-o-r-d-o-m-a, a chordoma, which is a tumor on the

11   sacrum.

12        Q.    I see.  Okay.

13        A.    And the other one was an injury to the

14   ureter during the excision of a 20-centimeter pelvic

15   mass.

16        Q.    Okay.  So these are two separate cases;

17   correct?

18        A.    Yes.

19        Q.    In the first case that involved the

20   chordoma, so you were the defendant in that case?

21        A.    Yes.

22        Q.    And was this the one from 1994?

23        A.    Yes.

24        Q.    Okay.  So you actually gave a deposition in

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 80 of 429 PageID 24760
Case 2:12-md-02327 Document 7041-1 Filed 04/24/18 Page 306 of 305 PageID 52661
Jaime Sepulveda, M.D.

1    that case; right?  Is that right?

2         A.    Yes.

3         Q.    And in the second case, the injury to ureter

4    with the pelvic mass, did you end up not giving a

5    deposition in that case?

6         A.    There was no deposition.

7         Q.    Okay.  Without revealing -- I know

8    settlements many times can be confidential.  Without

9    revealing any confidentiality, can you tell us

10   anything about the resolution of those two cases?

11        A.    They were both settled.

12        Q.    Settled, okay.

13              Okay.  So no trial; right?

14        A.    There -- there was no trial and it was for a

15   fully disclosed amount.

16        Q.    Okay.  Any other litigation against you

17   other than those two cases that we talked about, any

18   litigation of any type?

19        A.    No.

20        Q.    Have you ever had a disciplinary action

21   against you by any medical board?

22        A.    No.

23        Q.    Have you ever been arrested or convicted of

24   a crime?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 81 of 429 PageID 24761
Case 2:12-md-02327 Document 9441-1 Filed 02/12/20 Page 31 of 305 PageID 232062
Jaime Sepulveda, M.D.

1    A.    No.

2    Q.    Okay.  We discussed -- okay.  Other than

3    being retained in the Garcia case as an expert and in

4    this -- in the case where you were retained as an

5    expert that you mentioned before where you did a

6    deposition, have you ever been retained as an expert

7    in litigation, other than those two instances you've

8    already mentioned?

9          MR. SNELL:  Hold on, hold on.  I'm going to

10         instruct you.  To the extent you have not been

11         disclosed, you should be mindful of that and not

12         identify those cases.  To the extent you have not

13         been disclosed, either by deposition, expert

14         report, doing an IME of the plaintiff, under the

15         rules, depending upon where you may have been

16         retained, that is confidential information.

17   A.    I gave testimony on Cavness.

18   Q.    (By Mr. De La Cerda)  Okay.  Other than

19   Cavness, Garcia and then this other case involving

20   urinary incontinence after vaginal delivery, any

21   other cases where you've been designated as an

22   expert?

23   A.    On -- on Ramirez.

24   Q.    Right.  Is there a name to the case where

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 82 of 429 PageID 24762
Case 2:12-md-02327 Document 9041-5 Filed 04/24/19 Page 83 of 305 PageID 213663
Jaime Sepulveda, M.D.

1   you were the expert for the defense on the urinary

2   incontinence after the vaginal delivery?  Do you

3   remember a name?

4        A.   I cannot recall.

5        Q.   Okay.  That would just make it easier to

6   reference, but ...

7             Okay.  In all four of these cases, the

8   Cavness case, the Garcia case, the Ramirez case and

9   the case involving urinary incontinence after vaginal

10  delivery, all four of those cases you were retained by

11  the defense; correct?

12       A.   That's correct.

13       Q.   You've never testified for the plaintiff as

14  an expert; is that right?

15       A.   I have not testified for the -- for a

16  plaintiff.  I have given opinions as part of the State

17  of Florida Prosecution Unit, which is actually known

18  as the Department of Health, Department of Health now.

19  It's work that I have done for years for the

20  Department of Health.

21       Q.   Are these like criminal investigations into

22  doctors or what -- what is it?

23       A.   You know, that's why they eliminated the

24  Prosecution Unit name because it sounds criminal, so

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 83 of 429 PageID# 4763
Case 2:12-md-02327-C   Document 2014-16   Filed 04/10/16   Page 84 of 305 PageID#: 32664
Jaime Sepulveda, M.D.

1  now we all understand that it's -- it's any complaints

2  that have been brought against a physician in my -- in

3  my specialty, I and the board feels that needs to be

4  reviewed, I review.

5      Q.   Okay.  And how long have you been doing

6  that?

7      A.   Close to 15 years.

8      Q.   15 years.  Okay.

9           Let's talk briefly about your role as a

10  consultant for Ethicon outside of litigation.  Okay?

11  So this word "litigation" is not contemplated, this is

12  just your role as a consultant in what -- helping out

13  what Ethicon does in its normal business.  Okay?

14          So, first of all, in the past, you have been

15  hired as a consultant for Ethicon; correct?

16      A.   Yes.

17      Q.   Okay.  And do you recall when you were first

18  hired as a consultant for Ethicon?

19      A.   It may have been just after the year 2000,

20  2002.  I don't recall the specific year.

21      Q.   Okay.  But early 2000s?

22      A.   About -- about that time.

23      Q.   Okay.  And what was the purpose of you being

24  hired on as a consultant when you first started?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 84 of 429 PageID 24764
Case 2:12-md-02327-C Document 994-1 Filed 11/25/20 Page 305 of 305 PageID 32603
Jaime Sepulveda, M.D.

1    A.    Initially, I was given the opportunity to --

2    to dissect cadavers and to put together the anatomy

3    for the dissection in specimens as it would apply to

4    the use of products.

5    Q.    Okay.  So I'm having a little trouble

6    understanding what that might be.  Explain to me what

7    you would do, then, on a typical day involving that

8    particular role.

9    A.    It changed.  It changed over the -- over the

10   years.  I started dissecting and teaching and being

11   involved with my peers on how to use the different

12   products and it was just an interest that I -- that I

13   had very early in my career about surgical anatomy.

14   So I just expanded that and I was given the

15   opportunity while -- I was given instruments to work

16   in the gallery.

17   Q.    Okay.  Did you have a title when you first

18   began as a consultant for Ethicon?

19   A.    No.

20   Q.    Okay.  Were there defined duties that you

21   had when you first started out as a consultant?

22          MR. SNELL:  Form.

23   A.    No, nothing -- nothing that was defined as

24   different task.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 85 of 429 PageID 24765
Case 2:12-md-02327 Document 9441 Filed 02/10/20 Page 85 of 309 PageID 32000

Jaime Sepulveda, M.D.

1   Q.   (By Mr. De La Cerda)  Okay.  They didn't

2   have, like, a job description that was given to you

3   when you first started?

4   A.   No.

5   Q.   Okay.  And so in this role involving

6   dissecting cadavers, where you were teaching other

7   peers about how to use the Ethicon products, was that

8   a role that remained consistent throughout your time

9   as a consultant for Ethicon or did it change over

10  time?

11  A.   It changed based on the needs that they had,

12  for what -- what they understood was my expertise.

13  Q.   Okay.  So let's do this.  So the beginning

14  is approximately the beginning of the 2000s.  Has that

15  con- -- has that role as a consultant for Ethicon

16  ended or do you continue to be a consultant for

17  Ethicon?

18  A.   No, I don't consult with them anymore beyond

19  the legal.

20  Q.   And so when did your role as a consultant

21  end?

22  A.   Just -- just about the time that the

23  products -- the prolapse products were

24  decommercialized.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 86 of 429 PageID #: 34766
Case 2:12-md-02327-C   Document 9414-1   Filed 04/21/20   Page 86 of 305   PageID #: 32667
Jaime Sepulveda, M.D.

1    Q.    Okay.  So is that 2012, approximately?

2    A.    Yes.

3    Q.    Okay.  So I guess that's about ten years of

4    acting as a consultant; is that fair?

5    A.    Yes.

6    Q.    Okay.  So the manner in which your role as a

7    consultant changed, was it really in -- in regard to

8    the products themselves, what kind of product you were

9    teaching, or is there some other way in which it

10   changed?

11   A.    It changed.  It changed based on what --

12   whatever was understood that there was a need.

13   Q.    Okay.  Can you give me some examples?

14   A.    Initially, it was seeing the products, how

15   they would work, and nothing -- nothing in terms of

16   experiment or research and development.  It was more

17   on how -- how to reproduce their use in the -- in the

18   operating room.

19   Q.    Mm-hmm.

20   A.    And then I was able to -- to see -- to see

21   how -- how the products were actually implemented

22   in -- in the surgical environment.  And there was a

23   time in which I would just see other surgeons that

24   were consultants.  And then there was a time in which

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 87 of 429 PageID #: 4767
Case 2:12-md-02327-C   Document 94-1   Filed 10/25/20   Page 305 of 309 PageID #: 32663

Jaime Sepúlveda, M.D.

1    I would go to and meet with -- with a group at Ethicon

2    and give a conference on anatomy or I would take them

3    to the lab and show them the anatomy.

4         Q.    Mm-hmm.

5         A.    And then there was a time in which I

6    actually wrote a manual of how to dissect -- dissect a

7    specimen, make the best of that dissection.

8         Q.    Okay.  But tell me about this manual.  What

9    is it that you'd be dissecting -- so tell me, what was

10   the content of this manual?

11        A.    The labs -- the labs using specimens are

12   very unique and they're very -- they're very

13   expensive.

14        Q.    Okay.

15        A.    And the whole setup of getting a good

16   specimen.  And what we call "specimens" is a portion

17   of a person and there -- there are certain things that

18   we have to follow over the years, over the last 25

19   years that I have learned dissecting and understanding

20   the anatomy.  One of the most complex anatomies that

21   you can have in any other -- other part of the body.

22   So when we -- when we did this and there's -- my

23   interest was that, and I verbalized that, that we

24   could make the best use of these specimens in the lab.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 88 of 429 PageID 24768
Case 2:12-md-02327 Document 6091-1 Filed 04/24/18 Page 89 of 305 PageID 32663
Jaime Sepulveda, M.D.

1      Q.    Mm-hmm.

2      A.    And not only that it would be -- it would be

3    the best use, but also that it would be a systematic

4    approach in the same way that first-year medical

5    students are taught anatomy.

6      Q.    Mm-hmm.  Okay.

7      A.    So to get -- to make that organized and to

8    make that systematic and to make that consistent, then

9    there was -- there was a proposal for a manual.  That

10   was just one part of -- of what could be done in -- in

11   the lab- -- laboratory.

12     Q.    And this was a manual that was done for

13   Ethicon; right?

14     A.    It was done for -- for them, but I think it

15   was -- there were other -- other considerations

16   beyond -- beyond anatomy and probably did not get

17   developed, but I got the -- I got the opportunity to

18   take my pictures and actually put it in -- on my thumb

19   drive with presentations, which you're going to be

20   requesting.

21     Q.    Okay.  Are these cadaver specimens, they're

22   reused for purposes of teaching doctors how to do --

23   how to, for example, implant Ethicon's products;

24   right?

Case 2:20-cv-00865-SPC-MRM Document 9-1 Filed 10/25/20 Page 89 of 429 PageID 21769
Case 2:12-md-02327-C Document 2041-5 Filed 04/26/20 Page 305 of 305 PageID 52670
Jaime Sepulveda, M.D.

1        A.    Well, cadavers are used in sections and,

2    obviously, we're going to -- we're going to use a

3    section that pertains to the procedure that we're

4    doing and they -- they form the basis of teaching

5    anatomy from the first year of medical school.

6        Q.    Do they -- do the cadaver -- I guess the

7    portions of the cadaver that are used to present how

8    to implant products, do they eventually get used, to a

9    certain extent, to where, okay, we can't use this

10   cadaver anymore, like it's been used too much for this

11   particular presentation?

12       A.    You can -- you can always make -- make the

13   best of what you're examining.  So, yeah, if there is

14   a portion that is used, you can always go to different

15   things that you can teach from the -- from the

16   cadaver.  That's highly dependent on the condition of

17   the cadaver.

18       Q.    Yeah.

19       A.    It's highly dependent on how it was

20   prepared.  It's highly dependent on how those

21   individuals that are doing the dissection know how to

22   do it.

23       Q.    Okay.  Okay.  So going back to your role as

24   a consultant for Ethicon and what it is that you did,

1    have you now explained all the various things that you

2    did as a consultant on behalf of Ethicon?

3              MR. SNELL:  Form.

4         A.   I -- I actually look at presentations.  In

5    addition to, I look at presentations.  I would make a

6    presentation to -- to different groups within Ethicon.

7         Q.   (By Mr. De La Cerda)  You would do

8    presentations for other physicians about Ethicon's

9    products; is that correct?

10        A.   About Ethicon products and about the

11   condition itself.

12        Q.   Okay.  And did the presentations that you do

13   to other doctors for Ethicon include TVT, TVT-O,

14   Gynemesh, Prolift and Prosima?

15        A.   It was TVT-O, TVT-Secur, Gynemesh, Prosima,

16   and Prolift.

17        Q.   Any reason why you didn't do presentations

18   on regular TVT or TVT-R?

19        A.   I had a -- I had a preference for the

20   transobturator slings.

21        Q.   Had you used in the past a TVT Retropubic

22   for your patients?

23        A.   Yes.

24        Q.   And why is it that you preferred the TVT-O

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 91 of 429 PageID 21771
Case 2:12-md-02327 Document 4414-1 Filed 08/22/17 Page 291 of 309 PageID 152671
Jaime Sepulveda, M.D.

1    over the TVT?

2         A.    I felt I could do the same with less risk.

3         Q.    And what risk are you specifically talking

4    about?

5         A.    Getting to the bladder.  Very rare, but

6    potential getting to the bowel and getting to a major

7    blood vessel.

8         Q.    You've testified before that you've made --

9    you've made about $100,000 a year as a consultant for

10   Ethicon; is that right?

11        A.    That -- I may have testified to that number,

12   yes.

13        Q.    Okay.  And so if we're talking about ten

14   years, we're talking about approximately a million

15   dollars you made as a consultant for Ethicon; correct?

16             MR. SNELL:  Form.

17        A.    No, it doesn't -- doesn't get to that

18   because it wasn't -- it wasn't like a salary.  It was

19   in a -- in a need and there were years that it was

20   $3,000.

21        Q.    (By Mr. De La Cerda)  Do you have an

22   approximation of how much you made total as a

23   consultant for Ethicon?

24        A.    I -- I think the largest and the best year,

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 92 of 429 PageID #: 1372
Case 2:12-md-02327   Document 4414   Filed 08/22/17   Page 92 of 309 PageID #: 32673

Jaime Sepúlveda, M.D.

1    most active year, I may have done about 100.  But

2    that -- that's probably one or two years.

3        Q.   Do you have a range, total, for all the

4    years that you acted as a consultant for Ethicon?

5        A.   Never -- never really counted.

6        Q.   Do you have any documentation of that, of

7    what the numbers might be?

8        A.   My 1099s that I receive or my tax returns.

9        Q.   Okay.  And if Ethicon has records of that,

10   you'd, of course, defer to whatever those records say;

11   right?

12            MR. SNELL:  Objection, form, foundation.

13       A.   As -- as long as they correlate with my

14   1099.

15       Q.   (By Mr. De La Cerda)  Right.  So if they

16   had records of the 1099s, which I assume they do,

17   you would defer to whatever those numbers are;

18   right?

19       A.   I -- I would defer to that.

20       Q.   When you've presented on Ethicon's products,

21   where have those presentations occurred,

22   geographically?

23       A.   You know, it happened mostly here either in

24   Florida or in New Jersey.  Occasionally, I would go

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 93 of 429 PageID 21773
Case 2:12-md-02327   Document 4144-4   Filed 10/25/20   Page 93 of 305 PageID 32674
Jaime Sepulveda, M.D.

1   to -- to other cities, Austin, Toronto, Dallas,

2   Boston.  Never -- never too -- never too far.  I -- I

3   made that decision that I wasn't going to go, let's

4   say, to the Northwest or California maybe once because

5   I have a practice that I have to take care of.

6       Q.   Right.  I guess you have the advantage, too,

7   of being in Miami, doctors would want to come to you

8   for the -- were there many presentations here in

9   Miami, too?

10      A.   There -- there were -- yeah, there were some

11  in Miami, absolutely.

12      Q.   Okay.  When the presentations were out of

13  town, Ethicon, of course, covered your -- your meals,

14  your lodging, your transportation; right?

15      A.   With- -- within the -- within the range that

16  was specified for that kind of traveling.

17      Q.   How was that done?  How was the range

18  specified?

19      A.   We -- we were required to take a course on

20  guidelines for -- as consultants for any kind of

21  industry.

22      Q.   Mm-hmm.  And do you recall any of what those

23  guidelines were?

24      A.   I -- I do recall there was -- there were

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 94 of 429 PageID #21574
Case 2:12-md-02327 Document 5901-5 Filed 06/10/21 Page 305 of 305 PageID #: 52675

Jaime Sepulveda, M.D.

1    specifics on which hotel we could stay and -- and no

2    first class traveling, and there was compensation, if

3    we would drive, for the miles --

4         Q.   Okay.

5         A.   -- and there were also some -- some limits

6    on what we could spend on food, although most of the

7    time food was provided there.

8         Q.   Do you know whether Ethicon believed you to

9    be a good preceptor or teacher on its TVT products?

10        A.   I -- I think that they visualized me as a

11   good surgeon with good common surgical sense.

12        Q.   And I just used the term "preceptor," I need

13   to make sure that's understood.  Could you explain to

14   us what the term -- what your understanding of the

15   term "preceptor" is?

16        A.   The preceptor is -- is a term that was, I

17   believe, from mostly the marketing people.  I never

18   really saw myself as a preceptor.

19        Q.   Mm-hmm.

20        A.   I saw myself as a surgeon.  And if you ask

21   any of my colleagues, they don't see me as a

22   preceptor.  Through the course -- through the years, I

23   have seen doctors that have seen me for every single

24   product and we always ended up talking about the same

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 95 of 429 PageID# 21775
Case 2:12-md-02327 Document 9041-1 Filed 11/05/20 Page 95 of 309 PageID#: 326473
Jaime Sepúlveda, M.D.

1    thing, the anatomy and the surgery.

2        Q.    Mm-hmm.  And so preceptor, I guess that's

3    used as some version of saying that someone's a

4    teacher; is that right?

5        A.    I -- I think it was an internal term for --

6    for them, preceptor, and it's -- it doesn't get to the

7    level of a teacher or a professor, it doesn't have

8    that -- that responsibility.  It doesn't have -- it

9    has mostly the role of showing something, of

10   demonstrating.

11       Q.    Okay.  Do you know whether Ethicon ever

12   criticized the way in which you taught other

13   physicians in preceptorships?

14       A.    They -- they did not have a specific

15   criticism and they -- they would ask, whenever they

16   would bring someone to see me operating, that they had

17   a -- that the doctors could get to see as much as they

18   could see in terms of the variety of procedures, but,

19   obviously, that -- the cases are what the cases are.

20       Q.    Yeah.

21       A.    You show what you have.

22       Q.    Ethicon -- I guess, in other words, Ethicon

23   never said -- made you personally aware of any

24   specific criticisms of any type of the manner in which

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 96 of 429 PageID 31776
Case 2:12-md-02327-C   Document 244-1   Filed 10/25/20   Page 96 of 305   Page ID #: 32647
Jaime Sepulveda, M.D.

1   you were teaching other doctors how to perform these

2   procedures; right?

3            MR. SNELL:   Form.

4       A.   There -- there was -- it was a relationship

5   with -- with a lot of respect for what I did, for what

6   I brought to the -- to their table.

7       Q.   (By Mr. De La Cerda)   Okay.   So the answer

8   is no, you never became aware of any criticisms;

9   right?

10      A.   No.

11      Q.   In August of 2011, you decided to stop

12   preceptorships due to the FDA situation; correct?

13      A.   I -- I -- there was a communication that

14   said we -- we need to look at this and we need to look

15   at what the FDA is saying, and everybody needs to be

16   on the same wavelength.

17      Q.   Mm-hmm.   And so what -- how long did that

18   last, that decision to suspend or interrupt your

19   preceptorships?

20      A.   I don't -- I don't remember exactly how --

21   how long did it last or if I ever went back and did a

22   consultation in other -- other regards.   It's -- it

23   was just a gen- -- probably a general concern from all

24   sides.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 97 of 429 PageID 21777
Case 2:12-md-02327  Document 9041-1  Filed 11/24/20  Page 305 of 309 PageID 32673
Jaime Sepulveda, M.D.

1    Q.   Okay.  Just to make sure.  So you're unsure

2    whether, in August of 2011 when you decided to stop

3    the preceptorships due to the FDA concern, you're

4    unsure whether you went back to consulting for Ethicon

5    after that point?

6    A.   Yeah, I --

7         MR. SNELL:  Objection to form.

8         Go ahead.

9    A.   -- I did -- I did not cut completely at that

10   time and actually it was -- it was me relating, I

11   believe, to Bob Zipfel, who was the professional

12   education manager --

13   Q.   (By Mr. De La Cerda)  You said Bob Zipfel?

14   A.   Zipfel, Z-i-p-f-e-l.

15        -- relating that we -- we need to get clear

16   on the -- on the message and we need to include

17   whatever is out there and be transpiring about it.

18   Q.   And so what was it that you decided, along

19   with Ethicon, to make clear about the message

20   involving this issue?

21        MR. SNELL:  Objection, form, Ethicon.

22   A.   As far as I remember from my side, it was

23   let's -- let's look at this.  It was -- that's more of

24   the attitude that I can recall.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 98 of 429 PageID 21778
Case 2:12-md-02327 Document 4401-1 Filed 08/14/17 Page 99 of 305 PageID 148267
Jaime Sepulveda, M.D.

1    Q.    (By Mr. De La Cerda)  Do you remember ever

2    discussing this FDA issue with doctors during a

3    consultation on behalf of Ethicon?

4    A.    I -- I don't remember that.

5    Q.    Okay.  Do you remember discussing this issue

6    at all with any doctors in regard to Ethicon products?

7         MR. SNELL:  Objection, form.

8         Go ahead.

9    A.    I don't -- I don't remember specifics of

10   talking to a specific doctor or being at a conference

11   just talking about -- about this.

12        I don't even remember if it was 2007, 2008,

13   or -- I don't remember which time frame it was.  I

14   am -- you know, I became aware of this, that I say at

15   one point we need to stop or we need to review, we

16   need to revise it, or we need to look at it, but it

17   was never like, oh, no, I'm not teaching anymore, I'm

18   not demonstrating anymore for you.

19   Q.    (By Mr. De La Cerda)  Mm-hmm.

20   A.    That's what I can recall.  That's the best

21   of my recollection right now.

22   Q.    Why is it important when the FDA puts out a

23   warning, like they did in 2011, to investigate and

24   look into what -- the reason behind the warning?

Case 2:20-cv-00865-SPC-MRM Document 9-1 Filed 10/25/20 Page 99 of 429 PageID 21779
Case 2:12-md-02327 Document 9041-1 Filed 10/25/20 Page 99 of 309 PageID 32630
Jaime Sepulveda, M.D.

1          MR. SNELL:  Form.

2      A.   It's because the results and the clinical

3   experience that we're getting was different from what

4   we were seeing in those -- in those reports.

5      Q.   (By Mr. De La Cerda)  Okay.  So the FDA

6   warning came out in July of 2011, was that a

7   surprise to you?

8      A.   It was -- it was a surprise in 2008 and it

9   was in 2011.  What I -- what I thought is evidence is

10  going to come in and is going to show -- it's going to

11  solve this difference that a group of doctors may have

12  with other group of doctors.

13     Q.   You're familiar with the Abbott study that

14  came out -- it came out probably in 2014, I think.

15  Abbott -- the lead author is Abbott, Mickey Karram is

16  one of the authors as well.  And one of the

17  discussions they have is that many times when -- I

18  think about half the time, at least -- when a patient

19  has a complication involving a mesh implant, whether

20  it be a sling or a pelvic organ prolapse mesh, they do

21  not return to the physician that implanted it.

22          Are you aware of that phenomenon?

23          MR. SNELL:  I'm going to object to the

24      foundation on that.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 100 of 429 PageID 21780
Case 2:12-md-02327-Document 494-1 Sealed 12/06/19 Page 300 of 905 PageID #32681
Jaime Sepulveda, M.D.

```
 1              Go ahead.

 2       A.    I -- I've heard about that.  I never

 3   believed that that's the case.

 4       Q.    (By Mr. De La Cerda)  Okay.  And why is

 5   that?

 6       A.    Because of my own experience, because of

 7   my -- the experience that I have heard from my

 8   colleagues.  That's -- that's not what our experience

 9   is.

10              You -- you may have a small percentage that

11   may not come back, but in my community, for example,

12   we all know, we all communicate.  There are four, five

13   board-certified female pelvic medicine in the whole

14   stretch all the way to Boca from here.  We know each

15   other and -- and the doctors also communicate with us,

16   so there is a lot of communication there.

17              If there is a loss to follow up, it might be

18   on the clinic setting, when you have these clinics,

19   other -- other types of settings, but not in the

20   private-practice setting.

21       Q.    If a patient went to go receive treatment

22   for a complication in a different city that's

23   something like Dallas, for example, would you

24   necessarily find out about that?
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 101 of 429 PageID 21781
Case 2:12-md-02327-Document 94-1 Filed 10/25/20 Page 101 of 429 PageID 32662
Jaime Sepulveda, M.D.

1       A.    I may not -- I may not find out, but I know

2    that most of the time it's not even dependent on the

3    patient.  They -- they come and they communicate with

4    me.  I've had patients that have gone to New York,

5    they come back and tell me this was my experience.

6       Q.    You mentioned something interesting because

7    you're -- and I hear this from physicians every time.

8    I think this is our natural inclination.

9             You mentioned in your experience you haven't

10   seen that happen.  Ultimately, you would agree that

11   your personal experience on that issue, on whether

12   people come back to the primary physician or not, is,

13   at best, only anecdotal.  Do you agree with that?

14      A.    It's -- it is definitely a portion that is

15   anecdotal.  I do talk to so many of my colleagues and

16   if it's anecdotal, it repeats a lot.

17      Q.    Yeah, I get that.  I mean, here you are in a

18   community where you do actually know all these

19   physicians that do this thing and if the general

20   consensus is that this is what's happening, it can

21   certainly feel like this is the reality of it.  But

22   ultimately we've got a study that was done that looked

23   at many people -- by the way -- strike that.

24            Are you familiar with this study, the Abbott

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 102 of 429 PageID 21782
Case 2:12-md-02327 Document 4014-1 Filed 11/26/19 Page 103 of 905 PageID 132683
Jaime Sepulveda, M.D.

1    study?  Like have you actually reviewed it?

2        A.   I -- I did not read that study complete, no.

3        Q.   Okay.  Then I'm going to move on to another

4    subject then.

5        Going back to acting as a consultant, have

6    you ever acted as a consultant for any other

7    pharmaceutical or medical device company?

8        A.   For pharmaceuticals, I work for ALZA

9    Pharmaceuticals.

10        Q.   Is that --

11        A.   A-L-Z-A.  When they came -- they came in

12    with a new anticholinergic.

13        Q.   I'm sorry, what is that?

14        A.   ALZA, A-L-Z-A, Pharmaceuticals.

15        Q.   And the drug?

16        A.   It was Ditropan XL.

17        Q.   Ditropan XL.

18        And what was that drug for?

19        A.   For overactive bladder.

20        Q.   How long did you work as a consultant for

21    ALZA Pharmaceutical?

22        A.   About two years.

23        Q.   And do you recall approximately when that

24    was?

1    A.   It was when I was starting the urogyne

2   center here, so it may have been '96, '97.

3    Q.   Any other medical device or pharmaceutical

4   companies that you've acted as a consultant for, other

5   than ALZA and Ethicon?

6    A.   I -- oh, I worked for Ethicon on the

7   laparoscopy area around 1994, internationally.

8    Q.   Was that just for one year?

9    A.   A year, year and a half, yes.

10    Q.   Any other consulting work for pharmaceutical

11   or medical device companies?

12    A.   You know, I may have -- I may have had

13   representatives from one or two companies that say I

14   want you to go ahead and teach me how my product works

15   and -- and teach me how -- how is it that urge

16   incontinence is managed.

17        And I may say, okay, and some of them may

18   give me a check, which I ended up either giving to the

19   Residents Fund in Puerto Rico or did something with

20   it, but it was something sporadic.

21    Q.   Would these be some of the other mesh

22   manufacturers, like Boston Scientific or American

23   Medical Systems, companies like that?

24    A.   No, I did not -- I -- I never did consulting

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 104 of 429 PageID 21784
Case 2:12-md-02327-Document94-1   Filed 10/25/20   Page 104 of 905 PageID 32685
Jaime Sepulveda, M.D.

1   for any other company on mesh but Ethicon.

2        Q.   Do you remem- -- do you recall the names of

3   the companies that you did this urge incontinence work

4   for?

5        A.   I think it may have been Detrol or --

6        Q.   Detrol?

7        A.   -- Enablex.  I don't remember the name of

8   the company.

9        Q.   Okay.  And do you recall the approximate

10  years that would have happened?

11       A.   No.

12       Q.   Okay.  Now let's get to the part that's

13  always the most tedious.  What is it that you brought

14  here today with you?

15       A.   I brought here in compliance with the papers

16  served for the subpoena, I brought my CV --

17            You have a copy?

18       Q.   Yes.

19       A.   -- and a USB, in which I have any file that

20  I had on my computer that when I -- when I was at

21  Ethicon, I just downloaded my presentations.

22       Q.   Okay.

23       A.   And there were some videos of surgeries

24  here.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 105 of 429 PageID 21785
Case 2:12-md-02327-Document 4041-1   Filed 04/25/20   Page 90 of 905   PageID 132686
Jaime Sepulveda, M.D.

1    Q.    Okay.

2    A.    And I brought my biomechanics books and the

3    book that Ethicon put together for -- about Gynemesh

4    and Prolift, and I did -- the one on Gynemesh is about

5    my slides.

6          And I -- but all the materials that were

7    cited in my report and materials for prolapse, my

8    materials for case specifics for tomorrow,

9    depositions, and the Prolift monograph.

10   Q.    Okay.  And that's it?

11   A.    I am missing the white paper on

12   hydrodissection.  That I could not find at all.  I

13   will make it my business to provide to you.

14         MR. SNELL:  Peter, I think we provided --

15         there's thumb drives that my office did, too.

16         MR. DE LA CERDA:  Are those all -- those are

17         the case-specific ones?

18         MR. SNELL:  Case and general.

19   Q   (By Mr. De La Cerda)  Okay.  So that we're

20   not taxing the court reporter too much on copying

21   and the like -- first of all, are the materials that

22   you brought, other than the books, are those all

23   copies?

24   A.    Yes.

Case 2:20-cv-00855-SPC-MRM Document 94-1 Filed 10/25/20 Page 106 of 429 PageID 21786
Case 2:12-md-02327-Document 2411-1 Sealed Page 106 of 905 PageID 32687
Jaime Sepulveda, M.D.

1    Q.   Okay.  What -- I guess what I would be most

2    interested in is what you brought that is not on the

3    Reliance List.  Because most of -- just about

4    everything on the Reliance List we can find.

5         And so, first of all, these book chapters,

6    are those referenced in the Reliance List, these books

7    that you have listed here in -- here in front of us?

8    A.   No, they're not.

9    Q.   Okay.  So are there particular portions of

10   those books that are relevant to your opinions or is

11   it the whole book?

12   A.   I -- I -- there are portions that are

13   relevant to the way I see slings and meshes work.

14   Q.   Okay.  Okay.  And can you tell us what -- is

15   it a chapter?  Is it a particular passage or --

16   A.   They're -- they're chapters.

17   Q.   Okay.  And as far as you know, they are not

18   referenced in the Reliance List at all?

19   A.   They're -- they're not, that's why I brought

20   them, and the same with the -- with the USB.

21   Q.   Okay.  So, again, first of all, let's do

22   this.  Let's separate out the items that are not on

23   the Reliance List so we can make sure and mark and

24   identify those and -- so let's do that.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 107 of 429 PageID 21787
Case 2:12-md-02327-Document 2041-1 Sealed 02/25/20   Page 190 of 905 PageID 4132688
Jaime Sepulveda, M.D.

1          So the books that are here, these are the

2     ones not on the Reliance List; right?

3          A.    Yes, sir.

4          Q.    And then you've got -- and I'm going to mark

5     each of these in a second-- the USB that you brought;

6     correct?

7          A.    Yes.

8          Q.    Okay.  Anything else, other than those and

9     other than the case-specific USBs that you brought,

10    anything else that is not on the Reliance List?

11         A.    The only one missing that I -- that I didn't

12    bring today that I'm -- I made my best effort to bring

13    you is the white paper that I wrote on hydrodissection

14    along with Dr. Lucente and -- yeah.

15         MR. DE LA CERDA:  Okay.  So as far as

16         marking these, anything -- any particular way you

17         want to -- you want to do this, Burt?

18         MR. SNELL:  It doesn't matter.  This stuff

19         here is like all general stuff, from his general

20         reports and the Reliance List, and I think it's

21         probably duplicative of the hard copies and also

22         specific citations in the materials.  I was just

23         trying to sort out --

24         MR. DE LA CERDA:  The case-specific --

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 108 of 429 PageID 21788
Case 2:12-md-02327-Document 94-1 Filed 10/25/20 Page 108 of 429 PageID 32689
Jaime Sepulveda, M.D.

```
 1          MR. SNELL:  We sent so many cases to the

 2      thumb drives and stuff like that over time.  This

 3      is general.  If you want a copy -- I don't even

 4      know what's on these.  I know they reproduced --

 5      I think they were supposed to reproduce the

 6      materials list, but I haven't checked them to

 7      see.

 8          MR. DE LA CERDA:  Okay.

 9          MR. SNELL:  I mean, I agree, I think you

10      ought to mark definitely the stuff that was just

11      kind of general -- general impression, the

12      general stuff that he brought.

13          MR. DE LA CERDA:  Yeah.

14          MR. SNELL:  And if you want to -- mark

15      whatever you want, you know.

16          MR. DE LA CERDA:  Yeah.

17          MR. SNELL:  These just have his reports and,

18      like he said, everything that he cited -- here's

19      some articles in here.  You can tell him, those

20      are probably cited within there.

21          THE WITNESS:  This is cited and this is

22      cited, this is cited, too.  This is a monograph.

23      These two are new.  These two are new.

24          MR. SNELL:  Is there anything in this?
```

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 109 of 429 PageID 21789
Case 2:12-md-02327-  Document 4941-6  Filed 08/01/05  Page 109 of 5  PageID 32690

Jaime Sepulveda, M.D.

```
 1        Here.

 2            THE WITNESS:  This is not cited.  Cited,

 3        cited.

 4            MR. DE LA CERDA:  I think we're going to

 5        have to do this the long way.

 6        Q.  (By Mr. De La Cerda)  Okay.  All right.

 7    So here's what I want to do.  Just to make --

 8    because I don't want to miss anything, because it

 9    looks like you might have some newer stuff.  Maybe

10    you looked at some additional research or something

11    and found some newer stuff, but what I want to do

12    is, let's just -- I want to stack it by category and

13    then I'll mark each stack.

14            So the easiest way to do it, for me, at

15    least, is do it by -- you know, we do ours like this,

16    too.  We're going to do it by stacks that involve

17    certain subject matters, like, for example, everything

18    you've brought today that is a medical literature,

19    let's put that all into one stack and I'm going to

20    mark that.  Okay?  And then everything you brought

21    today that would be Ethicon documents, internal

22    documents, we'll -- we'll mark that.  And then

23    everything you brought today that would be depositions

24    or testimony that you reviewed and relied on, we'll
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 110 of 429 PageID 21790
Case 2:12-md-02327   Document 2014-1   Filed 04/12/20   Page 40 of 305   PageID 632691

Jaime Sepulveda, M.D.

1    mark that.

2         A.   This -- this is all medical literature.

3         Q.   Okay.  So of the stuff that we've got here,

4    what -- we have a stack here that's medical

5    literature.

6         A.   Yes.

7         Q.   Are any of the binders medical literature?

8         A.   All of it.

9              MR. SNELL:  It's all literature.  It's the

10             stuff cited directly in his reports.

11             MR. DE LA CERDA:  Okay.

12             MR. SNELL:  Do you use footnotes or --

13             THE WITNESS:  Yes, I did.  Every footnote --

14             MR. SNELL:  It should correspond in here.

15             MR. DE LA CERDA:  And then this stack here

16             that I've got is all not in the Reliance List;

17             right?

18             MR. SNELL:  I will say with the -- I'm about

19             99 percent sure that this would have been.  The

20             Prolift monograph, surgeons' monograph is

21             definitely on his materials list and he's

22             referenced that before.  This is his actual --

23             this is your actual preceptor book.  I don't know

24             what you called it.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 111 of 429 PageID 21791
Case 2:12-md-02327-Document 2044-1   Filed 04/24/16   Page 42 of 305 PageID# 32692
Jaime Sepulveda, M.D.

```
 1              THE WITNESS:  It's the book that Ethicon

 2         made on Gynemesh and Prolift and they -- and I

 3         put together the first one.

 4              MR. SNELL:  I think that that's on his

 5         materials list, too, but just in case, I mean he

 6         brought that.  That's his actual one.

 7              The Surgeons' Resource Monograph, I know for

 8         a fact, has got to be on there.

 9              MR. DE LA CERDA:  So what I'm going to do

10         is --

11              MR. SNELL:  He brought that.  That's

12         obviously his originals.

13         Q.   (By Mr. De La Cerda)  I'm not going to

14    mark these, I'm just going to identify them.

15              So today you brought with you the Gynecare

16    Prolift and the Gynecare Gynemesh Preceptor

17    Presentation Kit; correct?

18         A.   Yes.

19         Q.   And these are your -- this is your original?

20         A.   Yes.

21         Q.   Now, do you have this available at all

22    electronically?

23         A.   No.

24              MR. DE LA CERDA:  Okay.  Do you know if
```

Case 3:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 113 of 429 PageID 21792
Case 2:12-md-02327-Document 4044-1  Filed 10/45/20  Page 49 of 305 PageID 132698
Jaime Sepulveda, M.D.

1      these are available electronically?

2           THE WITNESS:  There might be a CD.

3           MR. SNELL:  I think if you open the inside

4      cover, there are CDs.

5           THE WITNESS:  There might be a CD there,

6      yes.

7           MR. DE LA CERDA:  Because what I would like

8      to do is get a copy of this, just electronically,

9      because this -- so it's not copied -- so the

10     court reporter doesn't have to copy it.

11          So how do you want to do that?

12          MR. SNELL:  Do you want -- can I take it?

13          THE WITNESS:  Yeah.  Send it back because

14     it's the only one I have.

15          MR. SNELL:  I mean, there's two ways.  We

16     can either have the court reporter do it and then

17     it's going through multiple people's hands or if

18     you give it to me, I'll make color copies of

19     everything, the cover, the back, the pages, and

20     then I'll burn the CDs.

21          MR. DE LA CERDA:  Okay.

22          MR. SNELL:  I'll basically give you an exact

23     copy of what you're holding and then I'll

24     actually make a copy for myself, because I don't

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 113 of 429 PageID 24793
Case 2:12-md-02327-Document 4041-1   Filed 10/25/20   Page 114 of 305   PageID 132694
Jaime Sepulveda, M.D.

1          have a copy of that exact one, and then I'll give

2          it back to the doctor.

3               MR. DE LA CERDA:  Okay.  So then that --

4               MR. SNELL:  Let's make a record for that, a

5          note for that.

6               MR. DE LA CERDA:  So for the record, then,

7          that will be Exhibit 1.  I'm just going to put

8          this here for now.

9               MR. SNELL:  I will make a note I need to

10         take that and copy it.

11              MR. DE LA CERDA:  So for the record,

12         Exhibit 1 is the Gynecare Prolift and Gynecare

13         Gynemesh PS Preceptor Presentation Kit.

14              (Plaintiff's Exhibit No. 1 was marked for

15         identification.)

16              MR. DE LA CERDA:  Exhibit 2 is going to be

17         Dr. Sepulveda's original Prolift Surgeon's

18         Resource Monograph.

19              (Plaintiff's Exhibit No. 2 was marked for

20         identification.)

21         Q.   (By Mr. De La Cerda)  Now, Exhibit 3, I'm

22    going to mark, these are -- this is medical

23    literature that you've gathered, Dr. Sepulveda;

24    correct?

Case 3:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 114 of 429 PageID 21794
Case 2:12-md-02327   Document 4041-1   Filed 12/05/16   Page 115 of 305 PageID 132695
Jaime Sepulveda, M.D.

1      A.    Yes.

2      Q.    And this is medical literature that happens

3    not to be on the Reliance List; correct?

4      A.    That's correct.

5            MR. DE LA CERDA:  So I'm marking that as

6      Exhibit 3.

7            (Plaintiff's Exhibit No. 3 was marked for

8      identification.)

9            MR. SNELL:  Just for the record, since,

10     obviously, my firm was the one who made the

11     Reliance List, I do believe that one of those may

12     be on there.

13           MR. DE LA CERDA:  Okay.

14           MR. SNELL:  Like the ACOG committee opinion

15     on vaginal prolapse mesh, I'm pretty sure that's

16     on the materials list, if I even have his

17     materials list.

18           You can keep doing that.

19           MR. DE LA CERDA:  Okay.

20           MR. SNELL:  But I'm pretty sure that would

21     have been sent.

22           MR. DE LA CERDA:  Prosima IFU, I'm sure that

23     was on the Reliance List.

24           MR. SNELL:  All that stuff is on the

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 115 of 429 PageID 31795
Case 2:12-md-02327   Document 4914-1   Filed 11/08/19   Page 115 of 305   PageID 163696
Jaime Sepulveda, M.D.

```
 1          Reliance List.

 2               THE WITNESS:  I can take that back.

 3               MR. SNELL:  All the professional education

 4          slides, those are on there.

 5          Q.   (By Mr. De La Cerda)  All of these are

 6     also on the Reliance List; right?  Okay.  So I'm not

 7     going to mark those.

 8               And then, now, books.  Let's go through each

 9     of these.

10               First of all, I'm looking at a book called

11     "Biomechanics:  Mechanical Properties of Living

12     Tissues," the Second Edition, published by Springer

13     and the author is Y.C. Fung, F-u-n-g.

14               Do you have specific chapters that you can

15     identify within this book that you rely on?

16          A.   Yes.  Chapter 7.

17          Q.   Okay.  Any others?

18          A.   No, 7.

19               MR. DE LA CERDA:  Okay.  So I'm going to

20          mark this book as Exhibit 4 and then if we can

21          just get a copy of chapter 7, just chapter 7,

22          then the book can be returned.

23

24
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 116 of 429 PageID 21796
Case 2:12-md-02327-Document 94-1-Filed 10/25/20   Page 116 of 305 PageID 32697
Jaime Sepulveda, M.D.

```
 1              (Plaintiff's Exhibit No. 4 was marked for

 2         identification.)

 3         Q.    (By Mr. De La Cerda)  You've also brought

 4    a book entitled "Introductory Biomechanics From

 5    Cells to Organisms."  The author is -- or authors

 6    are C. Ross Ethier, E-t-h-i-e-r, and Craig A.

 7    Simmons.  It looks like this is published by

 8    Cambridge University Press.

 9              Are there any chapters or passages within

10    this book --

11         A.    Yes.

12         Q.    -- that supports your opinions?

13         A.    Chapter 9.

14         Q.    Okay.  Great.  I'll mark this book,

15    "Introductory Biomechanics," as Exhibit 5 and then

16    we'll just get a copy of that particular chapter you

17    referenced, chapter 9.

18              (Plaintiff's Exhibit No. 5 was marked for

19         identification.)

20              MR. DE LA CERDA:  Another book you brought

21         is called "Biomaterials and Biomedical

22         Engineering" published by Trans, T-r-a-n-s, Tech,

23         T-e-c-h, Publications.  This one is edited by W.

24         Ahmed, A-h-m-e-d, N. Ali, A-l-i, and A. Öchsner.
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 117 of 429 PageID 21797
Case 2:12-md-02327-Document 4941-1 Filed 12/05/18 Page 118 of 305 PageID 162698
Jaime Sepulveda, M.D.

1        It's O-umlaut-c-h-s-n-e-r.

2              And I'm marking this book as Exhibit 6.

3              (Plaintiff's Exhibit No. 6 was marked for

4        identification.)

5        Q.    (By Mr. De La Cerda)  Are there any

6    chapters or passages in that book that you rely on?

7        A.    Yes.

8        Q.    What are they?

9        A.    Chapter 12.

10        Q.    Okay.  Thank you.  And then we'll get a copy

11    of that and return the original book to you.

12              Okay.  Now, you've also -- the other

13    material other than the case-specific materials, the

14    other material -- materials you've brought with you

15    have all been cited either in your report or in your

16    Reliance List; correct?

17        A.    That's correct.

18        Q.    Okay.  Great.  Now the last thing I'm going

19    to do --

20              MR. SNELL:  Peter, one thing --

21              MR. DE LA CERDA:  Yes.

22              MR. SNELL:  -- for clarification.  I had

23        mentioned I thought the ACOG physician statement

24        from 2011 on transvaginal POP mesh was in.  It's

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 118 of 429 PageID 21798
Case 2:12-md-02327   Document 4204-1   Filed 10/13/05   Page 119 of 305   PageID 143699

Jaime Sepulveda, M.D.

1        on his materials list.  For some reason these

2        don't have page numbers, but it's under "other

3        materials."

4                MR. DE LA CERDA:  Okay.

5                MR. SNELL:  I put a check next to it.

6                MR. DE LA CERDA:  Okay.  Great.  All right.

7        Q.   (By Mr. De La Cerda)  Now, the last bit of

8   materials that you brought with you are various

9   thumb drives.  What are these thumb drives?

10       A.   These are the thumb drives that have the

11  articles that you see in these binders.

12       Q.   Oh, I see.  Okay.  So actually, it would be

13  nice to go ahead and mark these.  So we have four

14  different thumb drives.  Each of these thumb drives is

15  actually labeled with a product, as well.  So there is

16  Sepulveda TVT - TVT-O, Sepulveda TVT-S, Sepulveda

17  Prolift, and then there's another Sepulveda TVT-S, I

18  don't know if that's just a repeat, but I'll mark each

19  of these with its own sticker.  We're on 6.

20            So I'm marking as Exhibit 7 to your

21  deposition the thumb drive that has Sepulveda TVT and

22  TVT-O and this thumb drive contains reliance materials

23  and materials cited in your report; correct?

24       A.   Yes.

Case 2:20-cv-00885-SPC-MRM   Document 94-1   Filed 10/25/20   Page 119 of 429 PageID 21799
Case 2:12-md-02327-  Document 4914-9   Filed 11/24/  Page 120 of 305 PageID 163700
Jaime Sepulveda, M.D.

```
 1              (Plaintiff's Exhibit No. 7 was marked for

 2       identification.)

 3       Q    (By Mr. De La Cerda)   Then I'm marking as

 4  Exhibit 8, Sepulveda TVT-S, and these are also

 5  documents referenced in your Reliance List and your

 6  report relating to TVT-S; correct?

 7       A.   Yes.

 8              (Plaintiff's Exhibit No. 8 was marked for

 9       identification.)

10       Q    (By Mr. De La Cerda)   Then I'm marking as

11  Exhibit 9 to your deposition the thumb drive that

12  has -- that's marked Sepulveda Prolift, and these

13  are materials referenced in your Reliance List and

14  your report for Prolift; correct?

15       A.   Yes.

16              (Plaintiff's Exhibit No. 9 was marked for

17       identification.)

18              MR. DE LA CERDA:  Do you know why there is a

19       second TVT-S one?

20              MR. SNELL:  I have no idea.

21              MR. DE LA CERDA:  I'll just mark it as

22       another one.

23              MR. SNELL:  Somebody might have just made

24       two copies.  I can open it up and look at it real
```

Case 3:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 120 of 429 PageID 21800
Case 2:12-md-02327   Document 4914-4   Filed 10/05/20   Page 120 of 305 PageID 32701
Jaime Sepulveda, M.D.

```
1    quick.

2         MR. DE LA CERDA:  I'll just mark it.

3         Then I'm also marking as Exhibit 10 to your

4    deposition a second thumb drive labeled

5    "Sepulveda TVT-S," which I assume is also

6    reliance materials and documents referenced

7    within your report; correct?

8    A.   Yes.

9         (Plaintiff's Exhibit No. 10 was marked for

10   identification.)

11        MR. DE LA CERDA:  Case-specific, they can

12   deal with that.

13        THE WITNESS:  I need to -- to -- I did not

14   remember seeing the Bianchi-Ferraro --

15        THE COURT REPORTER:  I'm sorry, the --

16        THE WITNESS:  I do not remember seeing the

17   Bianchi-Ferraro paper on TVT-Secur and TVT-O.

18        MR. SNELL:  Is it in this pile?

19        THE WITNESS:  I want to double-check that

20   because I --

21        MR. SNELL:  Bianchi-Ferraro?

22        THE WITNESS:  Bianchi-Ferraro, which I

23   referred to in the Garcia deposition.

24        MR. SNELL:  Okay.  This is other literature.
```

Case 3:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 121 of 429 PageID 21801
Case 2:12-md-02327-TDM-MRM   Document 4914-1   Filed 12/05/19   Page 121 of 305 PageID 432702
Jaime Sepulveda, M.D.

1      You want to give that to him.  That's additional.

2             THE WITNESS:  Additional.

3             MR. DE LA CERDA:  Oh, okay.  All right.  I'm

4      also marking as Exhibit 11 medical literature

5      that you've handed to me.

6             (Plaintiff's Exhibit No. 11 was marked for

7      identification.)

8      Q    (By Mr. De La Cerda)  What is this medical

9   literature?

10      A.   That is -- this is medical literature about

11   the -- one case report of clear cell carcinoma of the

12   vagina and there's -- in a patient that has had a

13   midurethral sling.  This is the response to that

14   article.

15      Q.   (By Mr. De La Cerda)  Okay.  So this is

16   all within Exhibit 11.  So the second article within

17   Exhibit 11 is?

18      A.   The response to this article.

19      Q.   Okay.  And the third article within

20   Exhibit 11?

21      A.   This is vaginal -- these are different

22   papers, but they're not directly related to this one.

23      Q.   That's okay.  So these are all -- I guess

24   just to make sure just for purposes of the record,

1    Exhibit 11 contains additional medical literature that

2    you're relying on for your opinions; is that right?

3         A.   Yes.

4         Q.   Okay.  We'll just leave it at that and then,

5    of course, if you need to refer to any of it during

6    your deposition --

7         A.   And this is the paper that I was just

8    referring about the Bianchi-Ferraro on TVT-O and

9    TVT-S.

10             MR. DE LA CERDA:  Okay.  So I'll mark this

11        one separately as Exhibit 12.

12             MR. SNELL:  Is that one in your report, do

13        you know?

14             THE WITNESS:  No, but I refer to it on the

15        Garcia deposition.

16             (Plaintiff's Exhibit No. 12 was marked for

17        identification.)

18             MR. DE LA CERDA:  For purposes of the

19        record, Exhibit 12 is a article entitled

20        "Randomized controlled trial comparing TVT-O and

21        TVT-S for the treatment of stress urinary

22        incontinence:  2-year results."

23             Is it okay if I clip --

24        A.   Yes.

Jaime Sepulveda, M.D.

1     Q.   (By Mr. De La Cerda)  Just for now, and

2   then if you need to look at them, of course.

3     A.   And I gave you a copy of my CV --

4     Q.   Yes.

5     A.   -- without my home address.

6     Q.   Okay.  I've got one here and if you like, I

7   can use this one for the record.

8     A.   Yes, I just made it available to you in

9   case ...

10          MR. SNELL:  Is that the same thing?

11          THE WITNESS:  Yes, that's the one.  The

12       Bianchi-Ferraro has been referred already on

13       this.

14          MR. SNELL:  Footnote 117.

15     Q.   (By Mr. De La Cerda)  Okay.  What I'm

16   going to do is I'm going to mark as Exhibit 13 to

17   your deposition your CV.

18          (Plaintiff's Exhibit No. 13 was marked for

19       identification.)

20     Q   (By Mr. De La Cerda)  So I'm marking as

21   Exhibit 13, that's your -- is that your current

22   curriculum vitae?

23     A.   Yes.

24     Q.   And is that, to the best of your knowledge,

Case 2:20-cv-00855-SPC-MRM Document 94-1 Filed 10/25/20 Page 124 of 429 PageID 21804
Case 2:12-md-02327-Document-234-1 Filed 04/25/20 Page 35 of 305 PageID 4432705
Jaime Sepulveda, M.D.

1   current?

2       A.   It is -- it is current.

3       Q.   Okay.  Anything else -- anything on it that

4   you know of that needs to be updated, corrected,

5   edited, anything like that?

6       A.   On my report that I'm the principal

7   investigator at the Fibroid Registry research project,

8   that project was completed and closed.

9       Q.   Okay.  And is that the only thing on your CV

10  that you know of that would need to be corrected?

11      A.   It was the only research project that was

12  open.

13           (Plaintiff's Exhibit No. 14 was marked for

14           identification.)

15      Q.   (By Mr. De La Cerda)  Okay.  I'm also

16  marking as Exhibit 14 to your deposition your

17  Reliance List for the general report.

18           This is what I've received as your Reliance

19  List.  Does that appear to be a true and correct copy

20  of it?

21           MR. SNELL:  Is this Exhibit 14?

22           MR. DE LA CERDA:  Yeah.

23      A.   I don't see any discrepancies overall in

24  this list from what I have here.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 125 of 429 PageID 21805
Case 2:12-md-02327 Document 4914 Filed 12/12/18 Page 55 of 305 PageID 163706
Jaime Sepulveda, M.D.

1      Q.    (By Mr. De La Cerda)  Okay.  Great.  Now

2    I'm going to show you what I've marked as Exhibit 15

3    to your deposition.

4            (Plaintiff's Exhibit No. 15 was marked for

5        identification.)

6      Q.    (By Mr. De La Cerda)  Does this appear to

7    be a true and correct copy of your expert report,

8    your general expert report, on Gynemesh, Prolift and

9    Prosima?

10     A.    This is accurate and correct.

11           (Plaintiff's Exhibit No. 16 was marked for

12       identification.)

13     Q    (By Mr. De La Cerda)  Okay.  And now I'm

14   showing you what I've marked as Exhibit 16 to your

15   deposition.  Does this appear to be a true and

16   correct copy of your general expert report on TVT

17   and TVT-O?

18     A.    It is a correct copy.

19           MR. DE LA CERDA:  We've been going now for

20       about an hour.  Are you okay to continue or do

21       you want to take a break?

22           THE WITNESS:  Let's take a bladder break and

23       we'll come back in five.

24           MR. DE LA CERDA:  Sounds good.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 126 of 429 PageID# 21806
Case 2:12-md-02327-   Document 2014-1   Filed   Page 126 of 305 PageID# 32707
Jaime Sepulveda, M.D.

```
 1            (Thereupon, a recess was taken from

 2       9:24 a.m. until 9:26 a.m., after which the

 3       following proceedings were held:)

 4       Q.   (By Mr. De La Cerda)  All right.  Doctor,

 5   we're back on the record.

 6            When -- when was it that you were first

 7   contacted regarding the general opinions that you have

 8   as to these products that we're here today for?

 9       A.   For -- for the -- for the MDL, around

10   September.  We spoke around September.

11       Q.   September --

12       A.   Last year.

13       Q.   -- of last year, 2015?

14       A.   Yes.

15       Q.   And do you recall who you talked to first?

16       A.   I -- I spoke to Burt.

17       Q.   Okay.  And was the topic discussed that you

18   would be providing general opinions as to these

19   specific products: TVT, TVT-O, Prosima, Prolift and

20   Gynemesh?

21       A.   That's correct.

22       Q.   And what was the scope of your assignment

23   for this particular -- for your opinions in this case,

24   to your understanding?
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 127 of 429 PageID 21807
Case 2:12-md-02327-Document 4141-1 Filed 12/08/17 Page 130 of 305 PageID 43708
Jaime Sepúlveda, M.D.

1    A.   Yes, I understand the scope is to -- to

2  review the literature and -- and go over things that I

3  have read for -- throughout the years.

4    Q.   Were there certain things that you were to

5  focus on within the context of your opinions?

6    A.   The --

7         THE COURT REPORTER:  I'm sorry, did you --

8         MR. SNELL:  Objection, form.  I just say

9    "form," but that means objection, form.  I try to

10   cut down your typing on the record.

11   A.   The randomized controlled trials concentrate

12  in the evidence.

13   Q.   (By Mr. De La Cerda)  What about internal

14  documents, was there any focus that you were to

15  place on the substance or the significance of

16  Ethicon's internal documents in forming your

17  opinions?

18   A.   No.  It's -- I have received -- just to be

19  accurate in my response, I received, probably a year

20  ago, internal documents, but not as part of this.

21   Q.   Okay.  So your focus really was and your

22  opinions here was to provide those opinions based on

23  literature as opposed to what was found in the

24  internal documents; is that fair?

Case 3:20-cv-00385-SPC-MRM   Document 94-1   Filed 10/25/20   Page 128 of 429 PageID 21808
Case 2:12-md-02327-   Document 2041-1   Filed 04/29/ on   Page 1 of 305   Page ID 32709
Jaime Sepulveda, M.D.

```
 1              MR. SNELL:  Form.

 2        A.   Based on the -- on the evidence, on the

 3   scientific evidence.

 4        Q.   (By Mr. De La Cerda)  As opposed to the

 5   internal documents; right?

 6        A.   The internal documents are not -- are not

 7   included on -- on this review or -- because it's a

 8   scientific review.

 9        Q.   I guess you haven't completed all -- well,

10   let me just ask.

11             Have you completed all of your work on this

12   case?

13        A.   Yes.  So far from my Reliance List and this

14   is -- this is the product.

15        Q.   Do you currently have any further work

16   planned?

17        A.   As -- as information may be required,

18   I'll -- I'll review the papers, I'll review scientific

19   literature, and everything that is coming up.

20        Q.   So -- but as far as anything specific

21   planned, is there any additional -- is there any

22   additional task that you have planned?  Other than,

23   you know, tomorrow we have depositions for the

24   case-specific, but other than the depositions coming
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 129 of 429 PageID 21809
Case 2:12-md-02327-DOCUMENT Document 94-1 Filed 10/25/20 Page 60 of 305 PageID 21810
Jaime Sepulveda, M.D.

1    up tomorrow, are there any specific tasks that you

2    have planned relating to your opinions in this case?

3         A.   No, this is -- this is my -- my product.

4              MR. SNELL:  I'll make a note for the record.

5         As plaintiff's experts' depositions are coming

6         in, I know there are still depositions going on

7         today, tomorrow, we'll send those to him, and if

8         he has commentary or his opinions are changed,

9         then, obviously, I'll let you know.

10        Q.   (By Mr. De La Cerda)  How much have you

11   billed thus far for your general opinions involving

12   TVT, TVT-O, Prosima, Prolift and Gynemesh?

13        A.   I have -- I have copies of the invoices that

14   I have submitted.

15             Is it okay if he has other -- other hours

16   from another case, or should I just say the number of

17   hours?

18             MR. SNELL:  Let me see what you're talking

19        about.  The invoices -- let me look at them real

20        quick.

21             MR. DE LA CERDA:  Do you want to go off the

22        record for a second?  Let's go off the record.

23             (Discussion held off the record.)

24             (Mr. Sparks entered the room.)

Case 3:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 130 of 429 PageID 21810
Case 2:12-md-02327-Document 94-1  Filed 10/25/20  Page 130 of 305  PageID 21811
Jaime Sepulveda, M.D.

1    A.    I can make copies again of it, but I did

2   prepare your invoices.  My invoices to -- I put it in

3   a folder, they were neatly organized, the hours.  I --

4   I just cannot find it, honestly cannot find it.

5    Q.    (By Mr. De La Cerda)  Okay.  So what we'll

6   do is when you do find it, you'll agree to provide

7   that to us?

8    A.    Absolutely.

9    Q.    Okay.  And so --

10        MR. SNELL:  Why don't we save an exhibit

11        number on the record, and I'll produce that, but

12        I think he probably has a good idea as to how

13        many hours he spent.

14        MR. DE LA CERDA:  Okay.  So what I'm going

15        to do is, I'm reserving Exhibit 17 for the

16        invoices that Dr. Sepulveda has prepared

17        reflecting his work and his opinions for this

18        case.

19        (Plaintiff's Exhibit No. 17 was marked for

20        identification.)

21    Q.    (By Mr. De La Cerda)  First of all, do you

22   have an idea of approximately how many hours you've

23   spent preparing your opinions?

24    A.    It's -- an approximate is about 120 hours.

Jaime Sepúlveda, M.D.

```
  1        Q.   And your report mentions that you bill at

  2   $500 an hour; right?

  3        A.   Yes.

  4        Q.   And so was it -- was that rate the same for

  5   all 120 hours that you performed --

  6        A.   Yes.

  7        Q.   And was -- do you know whether your invoice,

  8   did it break down the tasks that you were performing,

  9   did it break it down by product?

 10        A.   No, it's all MDL.

 11        Q.   Okay.  Was it broken down by, for example,

 12   reviewing documents, meeting -- meetings with defense

 13   counsel, deposition time?  Was it broken down in any

 14   way like that?

 15        A.   No, it's just for MDL, all the time that

 16   I've spent in putting -- putting together -- putting

 17   the reports together, putting -- for all the different

 18   products all into one MDL.

 19        Q.   Okay.  So one block bill of 120 hours --

 20        A.   Right.

 21        Q.   -- approximately?

 22        A.   That's correct.  Around -- approximately.

 23        Q.   Okay.  Now, the types of tasks you would

 24   perform in developing your opinions, what did those
```

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 132 of 429 PageID 21812
Case 2:12-md-02327-  Document 4047-1  Filed 05/25/20  Page 305 of 305  PageID 32743

Jaime Sepulveda, M.D.

1    include?

2        A.   I have to write the report, I have to

3    proofread -- proofread it, and I update it with the --

4    with the Reliance List.  I -- I do research and

5    whatever papers I -- I find that are relevant, I just

6    submit it and it gets added to the Reliance List.

7        Q.   Okay.

8        A.   I also -- I review the case specifics and

9    that included seven -- seven cases in which -- in

10   which depositions and medical records and summaries

11   were reviewed.

12       Q.   Okay.

13       A.   And then the time, getting together, getting

14   prepared for this.

15       Q.   Anything else that you can think of?

16       A.   That would be at a later time because we got

17   ready yesterday and the time today.

18       Q.   Let's talk a little about what you just

19   mentioned.  Does the 120 -- approximately 120 hours

20   that you mentioned, does that include all of your work

21   for the case-specific?

22       A.   Yes.

23       Q.   Okay.  Do you know approximately how much

24   you spent -- how much time you spent as to each

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 133 of 429 PageID 21813
Case 2:12-md-02327 Document 4041-1 Filed 04/12/17 Page 134 of 305 PageID 142744
Jaime Sepulveda, M.D.

1    case-specific report that you prepared?

2        A.   I -- I probably spend about, just -- just a

3    rough, rough estimate, it's ten hours per each one,

4    each one of them.

5        Q.   And do you know how many case-specific

6    reports you prepared?

7        A.   Seven.

8        Q.   Seven.  Okay.  I know these are rough

9    numbers here, but so seven case-specific reports at

10   about ten hours a piece, it's about 70 hours.  So the

11   balance, the rest of that, would that be dedicated

12   towards your general opinions as to the products

13   involved here?

14       A.   Yes.

15       Q.   Okay.  And you mentioned preparation for

16   your deposition.  When is it that you prepared for

17   your deposition today?

18       A.   Yesterday.

19       Q.   And how long did you prepare?

20       A.   We -- we spend eight, ten hours.

21       Q.   And that's eight to ten hours that you spent

22   with Burt Snell?

23       A.   Yes.

24       Q.   Counsel for Ethicon; right?

1    A.    Yes.

2    Q.    Anybody else?

3    A.    No.

4    Q.    In your deposition preparation, you reviewed

5    documents; is that right?

6    A.    Yes.

7    Q.    Okay.  Are those the documents that we have

8    here that we've marked today?

9    A.    Yes.

10   Q.    Okay.

11   A.    And -- yeah, all this has been marked.

12   Q.    Do you have any rough estimate of how much

13   more you anticipate billing before trial?

14   A.    I -- I don't know when it's going to trial.

15   It's -- as they -- as they require, I just -- I'll

16   just review.

17   Q.    Okay.  Have you ever rendered an opinion in

18   litigation that was adverse to Johnson & Johnson or

19   Ethicon, Inc.?

20   A.    No.

21   Q.    Did you take any notes while you were doing

22   your preparation for your opinions?

23   A.    I -- I'm a better highlighter than note

24   taker.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 135 of 429 PageID 21815
Case 2:12-md-02327-Document-94-1   Filed 10/25/20   Page 60 of 305 PageID 21815
Jaime Sepúlveda, M.D.

1      Q.   Okay.  I can never read my own notes, so I

2   don't -- I don't even take notes.

3           Okay.  So you don't have any handwritten

4   notes regarding your opinions; is that right?

5      A.   No, not on this.

6      Q.   You mentioned the Reliance List.  Was the

7   Reliance List originally prepared and provided to you

8   by Ethicon counsel?

9      A.   It -- it was given by counsel, but I can

10   tell you that most of that Reliance List is trials

11   that are relevant enough that I have read it over

12   time.

13      Q.   Okay.  So then as you performed your own

14   research and found additional articles, you would then

15   submit them to Ethicon's counsel and then they would

16   get added to the Reliance List; is that right?

17      A.   Right.  That's -- whatever I want to add up,

18   I just submit.

19      Q.   And that Reliance List is exhaustive other

20   than a few of the articles that we've identified

21   today, is that right, that have been marked?

22      A.   Right, that's -- this is what includes it.

23      Q.   Does your Reliance --

24           MR. SNELL:  Could I make -- let me just make

Case 3:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 136 of 429 PageID 21816
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 136 of 305 PageID 21817
Jaime Sepulveda, M.D.

1    a note on the record.  He did bring another thumb

2    drive with a lot of Ethicon documents and

3    materials that he had in his possession and,

4    obviously, those would go and make up part and

5    parcel of his knowledge base as well.

6        MR. DE LA CERDA:  I'm glad you brought that

7    up because I forgot to mark this thumb drive.

8        THE WITNESS:  Can you just take a look

9    because I want to make sure I brought the right

10   thumb drive.

11       MR. SNELL:  Okay.

12       THE WITNESS:  I just dump it and I really

13   never review it.

14       I'm seeing one of the slides have the name

15   of a patient.

16       MR. SNELL:  How do we deal with that?

17   because it looks like an image.

18       THE WITNESS:  It's an image, yeah, it has a

19   name of a patient.

20       MR. SNELL:  It has to be redacted.

21       THE WITNESS:  Yeah.

22       MR. SNELL:  Why don't we take it off the

23   thumb drive and we can figure out how to redact

24   it.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 137 of 429 PageID 21817
Case 2:12-md-02327-Document 494-1  Filed 04/28/26 of 305  PageID 32718
Jaime Sepulveda, M.D.

```
 1              So Peter, just for your reference, we're
 2        looking at the thumb drive Dr. Sepulveda brought.
 3        There is a PowerPoint titled "Pillowing,
 4        P-i-l-l-o-w-i-n-g, .ppxt, and it's got patient
 5        identification information, so we'll take that
 6        off the thumb drive and figure out how to redact
 7        that.  It looks like it's images.  I can't even
 8        read the name, but obviously once you open up the
 9        file in realtime you can see it.
10            MR. DE LA CERDA:  Okay.  So for purposes of
11        the record, we're going to reserve --
12            Did we already reserve 17?
13            THE COURT REPORTER:  Yes, for --
14            MR. SNELL:  I think 17 was invoices.
15            MR. DE LA CERDA:  Okay.  So for purposes of
16        the record, we're going to reserve Exhibit No. 18
17        for a thumb drive that Dr. Sepulveda has brought
18        here today.
19        Q   (By Mr. De La Cerda)  And, for the record,
20   Dr. Sepulveda, can you tell us, generally speaking,
21   what is on the thumb drive that will be marked as
22   Exhibit 18?
23        A.   It -- it has the presentations that I have
24   used for Prolift throughout the years, and it has the
```

1   presentation on Gynemesh, and it has the surgical

2   videos, and it has pictures of surgery that I have

3   included in those presentations.

4           MR. SNELL:  Did you mention this product?

5           THE WITNESS:  TVT-Secur.

6       Q.   (By Mr. De La Cerda)  And, apparently,

7   there are patient-identifying information on that

8   thumb drive and so that information is going to be

9   redacted and then the thumb drive will be provided

10  at a later date; correct?

11      A.    There is one slide that has the patient ID.

12          MR. SNELL:  What I was going to do is take

13          the file titled "Pillowing" with the

14          patient-protected information off the thumb

15          drive, put it on my local computer, and figure

16          out some time today if this law firm can redact

17          that.

18          MR. DE LA CERDA:  That would be perfect.

19          MR. SNELL:  But you'll have -- I mean, but

20          we'll mark the thumb drive, because I want a copy

21          of it, too.

22          MR. DE LA CERDA:  Okay.

23          MR. SNELL:  I'm just looking for -- is that

24          your data?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 139 of 429 PageID 21819
Case 2:12-md-02327-Document 94-1 Filed 10/25/20   Page 139 of 305 PageID 21820

Jaime Sepúlveda, M.D.

1          THE WITNESS:  Yes, that's my own data.

2          MR. SNELL:  Tell him about that.

3     A.   I also included data of my own

4   complications.

5     Q.   (By Mr. De La Cerda)  Let's discuss them.

6   Actually, you know what, we'll come to that shortly.

7          MR. SNELL:  Is that the same as the earlier

8          stuff without the patient identifying --

9          THE WITNESS:  No, that's -- I put all the

10         files that have to do with it, so I had the files

11         that I use to prepare the presentation, and I

12         have the actual file slides with the

13         presentation.

14         MR. SNELL:  Did you mention this product?

15         THE WITNESS:  That's TVT-Secur.

16         MR. SNELL:  This one?

17         THE WITNESS:  And there's another

18         presentation on TVT-O.

19         MR. SNELL:  Okay.  Let me pull that one off.

20    Q.   (By Mr. De La Cerda)  Okay.  And we'll

21   come back to the data on your own complications,

22   too.  We'll discuss that in a moment.

23         Okay.  Directing your attention back to

24   Exhibit 16 -- oh, wait.  Is this report -- in

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 140 of 429 PageID 21820
Case 2:12-md-02327 Document 2014 Filed 04/22/15 Page 1 of 305 PageID 32721

Jaime Sepúlveda, M.D.

1  Exhibit 16 is your general report on TVT and TVT-O;

2  correct?

3       A.   That's correct.

4       Q.   Is this report a complete statement of all

5  general opinions that you'll express as to the TVT and

6  the TVT-O and the reasons for those opinions?

7       A.   That report includes that, up to -- up to

8  today.

9       Q.   So up to today, that report is a complete

10  statement of all general opinions you'll express as to

11  the TVT and TVT-O and the reasons for those opinions;

12  correct?

13            MR. SNELL:  Form.

14            Go ahead.

15       A.   That's correct.

16       Q.   (By Mr. De La Cerda)  Does this report,

17  your Reliance List, and the materials you've brought

18  today include all facts or data considered by you as

19  of today in forming your general opinions about the

20  TVT and the TVT-O?

21       A.   Yes.

22            MR. SNELL:  I took the one file off so you

23       can go ahead and mark that.

24            MR. DE LA CERDA:  All right.  So I am, for

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 141 of 429 PageID 21821
Case 2:12-md-02327-Document 4948-1 Filed 12/04/2 Page 2 of 305 PageID 163721

Jaime Sepulveda, M.D.

1       the record, marking the thumb drive that we've

2       just discussed that Dr. Sepulveda brought as

3       Exhibit 18.

4           (Plaintiff's Exhibit No. 18 was marked for

5       identification.)

6       Q.   (By Mr. De La Cerda)  Okay.  Now, Doctor,

7   directing your attention to Exhibit 15 and that's

8   your report on the Gynemesh, Prolift and Prosima;

9   correct?

10      A.   Yes.

11      Q.   Now, is this report a complete statement of

12  all general opinions you will express as to the

13  Gynemesh, Prolift, and Prosima and the reasons for

14  those opinions as of today?

15      A.   Yes.

16      Q.   And does this report, your Reliance List,

17  and the materials you brought today include all facts

18  or data considered by you in forming your general

19  opinions about the TVT and the TVT-O as of today?

20      A.   Yes.

21      Q.   Okay.  Let's talk a little bit about your

22  practice.  Where do you currently have privileges?

23      A.   At South Miami Hospital, Baptist Hospital,

24  and South Miami Medical Arts Surgery Center.

1    Q.    And do you currently perform surgeries to

2    correct stress urinary incontinence?

3    A.    Yes.

4    Q.    Now let's focus over the last ten years.

5          Over the last ten years, what surgeries have

6    you performed to correct stress urinary incontinence?

7    A.    I have performed Burch procedures, TVT,

8    retropubic, and transobturator inside-out.

9    Q.    Is that TVT-O?

10   A.    That's correct, that's TVT-O.

11         And TVT-Secur, TVT-ABBREVO.

12   Q.    Okay.  Any others that you can recall

13   sitting here today?

14   A.    I -- I recall doing 50 outside-in slings.

15   Q.    Fifty outside-in slings.

16   A.    Slings.

17   Q.    Okay.  Do you recall the brand of those?

18   A.    That was from AMS.

19   Q.    AMS.  Is that the Monarc?

20   A.    Monarc.

21   Q.    You mentioned that you performed Burch as a

22   surgery to correct stress urinary incontinence.  What

23   to you would be an indication to perform a Burch as

24   opposed to a synthetic midurethral sling?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 143 of 429 PageID 24823
Case 2:12-md-02327 Document 4419-1 Filed 08/28/17 Page 73 of 305 PageID 147724

Jaime Sepulveda, M.D.

1     A.    I perform Burches rarely and I cannot -- I

2    cannot really remember off my head my last Burch.

3     Q.    Why do you perform them rarely?

4     A.    Because midurethral synthetic slings work

5    very well.

6     Q.    Performing a synthetic midurethral sling,

7    it's a quicker procedure than a Burch; right?

8     A.    It's just more than -- than quicker.  It

9    performs -- short term and a long term, it performs

10   better than a Burch and it's -- that has been -- has

11   been my experience and that's what's supported by

12   data.

13    Q.    Okay.  So -- but are there any indications

14   to you -- when a patient comes into your office and

15   you're going to perform a surgery to correct the

16   stress urinary incontinence, what indications do you

17   say, I'm going to perform a Burch instead of a

18   synthetic midurethral sling?

19    A.    My first option is a synthetic midurethral

20   sling and I counsel the patients on it.  There may --

21   I may have a patient that may say I want a Burch for

22   one or other reason.

23    Q.    Okay.  So it's the patient making the

24   decision that they prefer a Burch over a synthetic

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 144 of 429 PageID 21824
Case 2:12-md-02327 Document 4914-1 Filed 10/25/20 Page 145 of 305 PageID 32725
Jaime Sepúlveda, M.D.

1  midurethral sling as opposed to you recommending the

2  Burch as the first option?

3      A.   My patients are -- I have a well-educated

4  practice and they -- they actually may -- may bring

5  great questions about one or the other.  My experience

6  is that they will follow my -- my recommendations.

7      Q.   Right.  Do you recall any instance where

8  you've recommended a Burch over a synthetic

9  midurethral sling?

10     A.   There -- there was a time about when TVT

11  came in and for one or two years that we spoke in

12  those terms, but once randomized controlled trials

13  came in, it was -- I tell them that that's

14  basically -- is the best evidence that I have.

15     Q.   Your understanding was that at least at one

16  time the Burch was the gold standard for correcting

17  stress urinary incontinence surgically; correct?

18     A.   I -- I'm going to take exception to the

19  "gold standard" term, but there was a time in which

20  the Burch was the correct clinical -- clinical

21  practice.

22     Q.   Would you use the gold standard term to

23  describe a synthetic midurethral sling?

24     A.   I -- I just try to shy away from "gold

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 145 of 429 PageID 21825
Case 2:12-md-02327  Document 4914-1  Filed 11/04/16  Page 145 of 365  PageID 163726

Jaime Sepulveda, M.D.

1    standard."  I think that clinically, it's -- the

2    current clinical standard is probably a better -- a

3    better term.

4         Q.   So a current clinical standard is a better

5    term to use than the term "gold standard"; right?

6         A.   I -- I agree.

7         Q.   Did you -- in the last ten years, have you

8    ever used slings using biologic materials?

9         A.   I -- I don't know if it's within the last

10   ten years, but I -- I have used slings using

11   autologous, I have done slings using dermis cadaver

12   material.  I may have used them one time posing, but

13   this is so -- so remote that -- that I cannot tell you

14   how many or which brand did I use.

15        Q.   Do you remember any reasons why you would

16   have used those biologic slings?

17        A.   If I had some- -- if I had someone that --

18   that was -- the person that comes to mind is my -- the

19   last pubovaginal sling and it was a smoker with --

20   with bad pressures in the urethra and I used the

21   pubovaginal sling in that patient at that time.

22        Q.   What do you mean by "bad pressures"?

23        A.   Very, very low pressures in the urethra.

24        Q.   Okay.

1     A.   It took very little for her to leak.

2     Q.   Okay.  And so why would it be that you would

3  use a biologic sling under those circumstances?

4     A.   I use actually her own fascia and it -- it

5  was -- we didn't have anything -- anything -- we have

6  things that were synthetic but that were not

7  well-studied at that time.

8     Q.   So this would have been, I assume, in either

9  the late '90s or early 2000s?

10     A.   That's a wide range, yes.

11     Q.   Okay.  You mentioned TVT Retropubic, TVT-O,

12  TVT-S, and TVT-ABBREVO that you performed in the last

13  ten years.

14          Do you know approximately how many of each

15  of those you performed?

16     A.   I -- I counted about -- at one time it was

17  about 300 slings a year.

18     Q.   Okay.  And do you know what the breakdown

19  was of those 300 per year as to the TVT Retropubic,

20  TVT-O, TVT-S, and TVT-ABBREVO?

21     A.   It was an evolution from TVT Retropubic to

22  TVT-O and to TVT-Secur and then ABBREVO.

23     Q.   Okay.  So over -- over time, you might --

24  you know, you started with a TVT Retropubic, then

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 147 of 429 PageID 21827
Case 2:12-md-02327 Document 4048-1 Filed 12/05/16 Page 305 of 305 PageID 132728
Jaime Sepúlveda, M.D.

1  you -- then you preferred the TVT-O, so you would

2  switch to that; is that right?

3      A.   Yes.

4      Q.   And then you would prefer the TVT-S and you

5  would switch to that?

6      A.   Yes.

7      Q.   And then later you preferred the TVT-ABBREVO

8  and switched to that; is that right?

9      A.   Right.

10     Q.   Do you still perform TVT-Os, though, or do

11 you just kind of stick with the TVT-ABBREVO?

12     A.   I do it at the surgery center so we choose

13 one.  And since I do most of the slings, and I'm the

14 medical director for the surgery center, I decide I'm

15 going to use this or that one.  We still have TVT-O on

16 the shelf, but we -- we use TVT -- TVT-ABBREVO.

17     Q.   Okay.  Why would you prefer a TVT-ABBREVO

18 over a TVT-O?

19     MR. SNELL:  Form.

20     A.   I have not found a scientific -- a

21 scientific reason for it except for the fact that --

22 that it's the most recent product and it's -- it's a

23 12-centimeter sling instead of a longer sling.

24     Q.   (By Mr. De La Cerda)  What's the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 148 of 429 PageID 21828
Case 2:12-md-02327 Document 2014 Filed 04/25/19 Page 90 of 305 PageID 43729
Jaime Sepulveda, M.D.

1   significance of it being a shorter sling as opposed

2   to a longer sling?

3      A.   It's -- I decided that if I can do it with

4   12 centimeters, I'm not going to use 19 centimeters

5   when the evidence is good in my practice.

6      Q.   Is -- you agree with the general theory that

7   less foreign body is better when it comes to these

8   types of procedures?

9          MR. SNELL:  Form.

10      A.   No, I think that there are physicians that

11   have a level of comfort with TVT-O or, for that sake,

12   with TVT Retropubic, and that being with a

13   5-millimeter needle, a 3-millimeter needle.

14          Each physician has his own level of comfort

15   and they're going to use what works well for them.  I

16   have not found any scientific evidence that points out

17   to one being better than the other based on that.

18      Q.   (By Mr. De La Cerda)  What about the

19   general -- do you agree with the general

20   proposition, though, that more foreign body will

21   cause more foreign body reaction within the human

22   body?

23          MR. SNELL:  Objection, asked and answered.

24      A.   It assumes -- it assumes that there's -- the

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 149 of 429 PageID 21829
Case 2:12-md-02327-MRM   Document 2014-4   Filed 04/24/19   Page 90 of 305 PageID 43272680

Jaime Sepulveda, M.D.

1  term "foreign body" probably is the same -- in the

2  same area as "gold standard."  They're -- they're very

3  wide, very unscientific.  They -- in terms of the

4  material that you leave in the area, if a physician

5  would come and ask me, "Do you think I should do this

6  because it leaves less material," I could not tell him

7  with certainty, "Yes, you definitely need to move from

8  one to the other."  I have no evidence to support

9  that.

10      Q.   (By Mr. De La Cerda)  And so, ultimately,

11  you switched to the TVT-ABBREVO just because of your

12  personal experience with it?

13      A.   It's easier -- easier to keep on the shelf,

14  the TVT-ABBREVO.  If -- I guess, right now, if there

15  would be -- there would be only TVT-O, I would be

16  perfectly comfortable with it.

17      Q.   Okay.  Do you know whether TVT-ABBREVO comes

18  in laser cut or mechanically cut?

19      A.   Laser -- it comes in laser cut.

20      Q.   TVT-ABBREVO is only laser cut; right?

21      A.   Right.

22      Q.   Do you know whether the Burch procedure is

23  still taught in medical school?

24      A.   I don't know.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 150 of 429 PageID 21830
Case 2:12-md-02327  Document 4941-1  Filed 10/25/20  Page 3 of 305  PageID 132731
Jaime Sepúlveda, M.D.

1    Q.   Is the Burch procedure within the standard

2    of care?

3    A.   I think that for a physician that wants to

4    do Burch procedures, that may apply.

5    Q.   You wouldn't criticize another doctor for

6    doing a Burch procedure over a synthetic midurethral

7    sling; right?

8    A.   I would not be -- be critical.  I can share

9    it, the evidence, but there's -- there's no reason for

10   being critical over the Burch procedure.

11   Q.   Are pubovaginal slings using native tissue

12   still taught in medical school, to your knowledge?

13   A.   No, I don't think they are taught -- I

14   probably don't know, but I don't think they are.

15   Q.   And if a physician performed a pubovaginal

16   sling using native tissue, would you criticize him or

17   her for doing that?

18   A.   That's -- I have to say that's an excellent

19   question because it's -- it probably is the procedure

20   that would prompt me to say, "Listen, you need to

21   reevaluate on how you're taking care of these

22   patients," because that can be a morbid procedure.

23   Q.   So that one is a little more borderline for

24   you?

Case 2:20-cv-00855-SPC-MRM Document 94-1 Filed 10/25/20 Page 151 of 429 PageID 21831
Case 2:12-md-02327 Document 4914-1 Filed 11/04/19 Page 32 of 305 PageID 163732
Jaime Sepulveda, M.D.

1    A.    Yes.

2    Q.    Yeah.

3    A.    And I can -- I can do that well -- I want to

4    think that I can do it well because I did it well at

5    one time, it's just that it's -- in terms of morbidity

6    and seroma and wound complications and obstruction,

7    it's -- it's a different -- different surgery.

8    Q.    Would you consider it to be within the

9    standard of care or no?

10    A.    I -- I think that in certain areas, probably

11    if that's -- we go to areas where they don't have what

12    we have, that could be considered standard of care.

13    Q.    You've never done a study to determine what

14    percentage of medical schools are teaching Burch or

15    pubovaginal slings using native tissue; right?

16    A.    No, I don't know that.

17    Q.    In your career, how many revision or

18    excision surgeries involving synthetic midurethral

19    slings have you performed?

20    A.    I -- I think I have done three.  I may have

21    done more than that.  Just in my mind it's -- it's

22    infrequent enough that I actually -- one of the

23    presentations on the thumb drive is me excising a

24    sling, the pictures.  That's how infrequent it is.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 152 of 429 PageID 21832
Case 2:12-md-02327-Document 2041-1   Filed 04/24/18   Page 152 of 305 PageID 34 32723
Jaime Sepulveda, M.D.

1    Q.   So to -- I'm sorry, I didn't want to cut you

2    off.

3    A.   So I actually consent to the patient and I

4    said, "This is unusual."  I consent to the patient to

5    have it removed.

6    Q.   Okay.  So to your recollection, you've done

7    three revision or excision surgeries involving

8    synthetic midurethral slings?

9    A.   I don't want to come into a fault -- faulty

10   memory, but I can recall about three.

11   Q.   Okay.  Of those three, how many were you

12   able to remove the entire sling?

13        MR. SNELL:  Form.

14   A.   On the -- it's probably two of them, the

15   entire -- the entire sling being up -- up to the

16   descending pubic ramus in that area.  I remove the

17   entirety of it.

18   Q.   (By Mr. De La Cerda)  And so that was --

19   that's the portion that is actually under the

20   urethra but not the portion that goes into the pubic

21   ramus; is that right?

22   A.   The portion that gets about -- to about

23   1 centimeter from the obturator internus muscle.

24   Q.   Okay.

1      A.   So anything that is beyond the obturator

2   internus muscle, I -- I stay away from that.

3      Q.   Is that because the risk outweighs the

4   benefit of removing that mesh that's beyond the

5   obturator internus muscle?

6      A.   It's -- there are three factors to it.

7      Q.   Okay.

8      A.   The first one is that the orientation of the

9   tape is very misleading to the surgeon.  It comes

10  forward to you and many surgeons, if they're

11  inexperienced, they'll keep digging into the area and

12  cause harm to the lateral side.  That's one -- one of

13  the other reasons.

14         The second reason is that I haven't found

15  any -- anything convincing, and I keep looking for

16  anything that has been written about excising that --

17  that portion of the -- of the tape.

18         And number three is that most of the time,

19  2, 3 percent of the time that we're going to revise a

20  sling for avoiding this function, it makes no -- no --

21  there's no justification, I should say, there's no

22  justification to go beyond that area.

23     Q.   Okay.

24     A.   Beyond the area within the obturator

Jaime Sepulveda, M.D.

```
 1    internus muscle.

 2        Q.   And of these three revisionary excisions --

 3    let me first clarify.

 4             Are the three revision or excision

 5    surgeries, are they all three excision surgeries or

 6    revision or both?  How would you characterize them?

 7        A.   They are excisions.  I was speaking about

 8    removing the whole thing.

 9        Q.   So those three were excision surgeries.

10             Were those three patients, patients you had

11    implanted the sling or someone else?

12        A.   I had one that I implanted the sling and two

13    that came from -- came referred to me.

14        Q.   Okay.  So to your recollection, and you've

15    implanted 300 synthetic midurethral slings for the

16    last -- per year for approximately the last ten years;

17    right?

18        A.   Lately, they're -- the number of slings is

19    less.

20        Q.   Okay.  So would a fair estimation be that

21    somewhere between 2- and 3,000 synthetic midurethral

22    slings is what you've implanted?

23        A.   Yes.

24        Q.   Okay.  In the last ten years; right?
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 155 of 429 PageID 21835
Case 2:12-md-02327 Document 4041-1 Filed 04/12/18 Page 305 of 305 PageID 143720

Jaime Sepulveda, M.D.

1    A.   Yeah, over the last ten years, yeah, that

2  would be accurate.

3    Q.   And of those 2- to 3,000 synthetic

4  midurethral slings, your testimony is that you've only

5  excised one of -- you've only, personally, excised one

6  of the slings that you've put in; is that right?

7    A.   Yes.  That I remember, one.  I may -- may

8  have taken a segment or a fiber from another sling

9  that I might have placed.  I haven't kept track of it

10  because the reality is that it's extremely rare.  I'm

11  going to tell you, what happens most of the time is

12  you put the sling, the patient comes in, she's dry,

13  she's happy, she moves on.

14    Q.   What were the reasons why you performed the

15  three excision surgeries that you can recall?

16    A.   One of them was -- was just a tight sling on

17  the patient.  A young patient with a tight sling and

18  she was having difficulty urinating.

19       I recall one -- another one was someone with

20  a sling that was not a mid-urethra, it was higher.

21  The sling was placed higher than the urethra and it

22  wasn't working and I took that one and put one in the

23  urethra.

24    Q.   Any other reason that you can recall?

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 156 of 429 PageID 21836
Case 2:12-md-02327-Document 4044-1  Filed 04/26/17  Page 3 of 305  PageID 132737
Jaime Sepulveda, M.D.

1    A.   No.  I had -- I had one that came in because

2  she had -- she had pain on the area of the insertion

3  of the sling.

4    Q.   Okay.  So you had one with pain -- have you

5  ever removed a synthetic midurethral sling because of

6  an erosion?

7    A.   Yes, I have.  I have removed that erosion

8  and I actually had one that I didn't put in -- put in

9  those three.  Now I recall one that she broke the

10  incision and when I saw the patient coming on the

11  third week, on the third week, I asked her, "How is it

12  working?"  She said, "Well, it's working."

13         And I examine her and she -- she had an

14  exposure on the -- on the sling.  She was honest --

15  honest enough to tell me, "Doctor, I was at home

16  eating, I was choking on food and I threw myself over

17  a chair and I felt -- I felt something."  So she broke

18  the incision line, and I saw it and I said, "Okay,

19  well, I'll -- I recommend that you have this removed."

20    Q.   So is that the -- is your testimony that's

21  the only exposure -- or that circumstance you just

22  mentioned, is that the only exposure where erosion of

23  a synthetic midurethral slings that you had to treat?

24    A.   No, I had a couple of exposures in the -- in

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 157 of 429 PageID 21837
Case 2:12-md-02327 Document 4141-1 Filed 09/01/30 Page 413 of 305 PageID 135728
Jaime Sepulveda, M.D.

1    the past, but it's something that either you give

2    estrogen or you just take the fibers with a tenotomy

3    scissors, which are using in reconstructive surgery,

4    actually they're used in the eye and they have --

5    they're just perfect for this.

6         Q.   I guess my crude understanding of that is

7    it's like an in-office trimming of the exposed mesh;

8    is that right?

9         A.   It's -- you may have a few segments.  In

10   other words, you have not seen the whole incision open

11   up.

12        Q.   Okay.

13        A.   And I -- I do remember a long time ago I saw

14   a patient with a segment on one side.  That's the only

15   one I remember that the exposure was not in the

16   midline on the incision.  And that patient, I tried to

17   convince her to let me take it and she said, "No,

18   you're not going to take anything because it's not

19   bothering me."

20        Q.   So these are -- these are done -- this

21   procedure you just mentioned, this trimming of the

22   sling is done in-office, not under general anesthesia

23   in surgery; right?

24        A.   Right.

1    Q.   Have you ever performed an excision surgery

2  or revision surgery because the patient was suffering

3  from dyspareunia?

4         MR. SNELL:   Form.

5    A.   I -- I did one, same one that was having --

6    Q.   (By Mr. De La Cerda)   Pain?

7    A.   -- the pain, yeah.

8    Q.   Got it.   Okay.

9         All right.   The TVTs and the TVT-Os that

10  you've placed, those have involved -- or have been

11  mesh that is mechanically cut mesh and mesh that is

12  laser cut mesh; right?

13   A.   Both.

14   Q.   Did that have anything to do with the time

15  period in which you were implanting it or do you

16  just -- did you stock both or what did that have to

17  do -- any factors that that had to do with?

18   A.   No, I did not have any specific reason to

19  choose one over the other.

20   Q.   Okay.   Over the last ten years you performed

21  surgeries to correct pelvic organ prolapse; right?

22   A.   Yes.

23   Q.   What types of surgeries have you performed?

24   A.   I have performed anterior repairs, posterior

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 159 of 429 PageID 21839
Case 2:12-md-02327-Document Filed Page 159 of 305 PageID 32740
Jaime Sepulveda, M.D.

1    repairs, enterocele repairs, iliococcygeal suspension,

2    sacral spinous ligamentous suspension, abdominal

3    sacrocolpopexies, robotic sacrocolpopexies, Prolift,

4    graft reinforced repair with biologicals, augmented

5    repairs with Gynemesh, perineoplasty.

6          I think I have mentioned probably all of

7    them.

8    Q.   The anterior and posterior repairs, did

9    those include colporrhaphies?

10   A.   Yes.

11   Q.   Are those synonymous or --

12   A.   Pretty much, yes.

13   Q.   Okay.  Now, all the repairs that you just

14   mentioned, those are all within the standard of care;

15   right?

16   A.   Yes.

17   Q.   Is implanting transvaginal mesh -- strike

18   that.

19          Is implanting synthetic polypropylene mesh

20   transvaginally still within the standard of care?

21          MR. SNELL:  Form.

22   A.   It's still within the standard of care if it

23   will have the product available.

24   Q.   (By Mr. De La Cerda)  As of now, from the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 160 of 429 PageID 21840
Case 2:12-md-02327-Document 20414 Filed 04/25/20 Page 160 of 305 PageID 32741
Jaime Sepúlveda, M.D.

1   Ethicon products, Gynemesh is still available;

2   right?

3       A.   Gynemesh is still available.

4       Q.   And do you -- is it your opinion that it's

5   still within the standard of care to implant Gynemesh

6   transvaginally for the treatment of pelvic organ

7   prolapse?

8       A.   I believe it changed, the actual indication

9   or clearance.  I may have read that.

10      Q.   So the indication now is to use it for

11  abdominal sacrocolpopexies; right?

12      A.   Yes.

13      Q.   So is it within the standard of care,

14  though, to implant Gynemesh -- I'm talking about

15  today -- so is it as of today within the standard of

16  care to implant Gynemesh transvaginally for the

17  treatment of pelvic organ prolapse?

18      A.   Not -- not today.

19      Q.   Okay.

20      A.   Based on what I just stated.

21      Q.   Okay.  What was -- what was for you an

22  indication in the past to implant synthetic mesh

23  transvaginally for the treatment of pelvic organ

24  prolapse as opposed to doing one of the other non-mesh

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 161 of 429 PageID 21841
Case 2:12-md-02327 Document 4941-1 Filed 11/09/17 Page 165 of 305 PageID 162742
Jaime Sepulveda, M.D.

1    procedures that you've mentioned?

2         A.    I -- I came to the clinical appreciation

3    that patients that have had a hysterectomy, patients

4    that have had recurrent prolapse, patients that had a

5    high degree of exertion, and patients that have a

6    recurrent compartment or a contralateral compartment

7    defect, those patients benefit from it.

8              I -- that's the general.  I knew that I had

9    patients that have -- I had one shot to take to the

10   operating room and I -- for whatever reason, and those

11   are the most difficult ones because they were more

12   complicated, but on the other side, you wanted to give

13   her the durability of the repair.

14             That's -- that's in general what I -- what I

15   use when I counsel someone on the -- on the use of

16   this synthetic graft.  We started -- we started

17   reading then, around the time that we had Gynemesh,

18   more and more about durability and the repairs,

19   specifically for those apical -- apical defects, so it

20   became very attractive to treat patients on the

21   apical, with apical defects, and when we didn't have

22   to do an incision.

23        Q.    Have you ever performed revision or excision

24   surgeries involving synthetic polypropylene

Case 3:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 162 of 429 PageID 21842
Case 2:12-md-02327 Document 204-18 Filed 04/12/20 Page 390 of 505 PageID 32748
Jaime Sepulveda, M.D.

1    transvaginal mesh for pelvic organ prolapse?

2         A.    Yes, I have.

3         Q.    And how many have you done of that?

4         A.    I look at those and they may be in the -- in

5    the 10, 20, may be right -- right there based on what

6    I saw the last time.

7         Q.    So approximately 10 to 20 in your career

8    revision or excision surgeries involving synthetic

9    polypropylene transvaginal mesh?

10        A.    That's -- that's a ballpark figure, yes.

11   That's a very general figure.

12        Q.    And of those 10 to 20, how many were you

13   able to remove the entire mesh device?

14             MR. SNELL:  Form, foundation.

15        A.    In most of them -- most of them you can

16   dissect the space -- the same space where you place it

17   and you can -- you can remove it.  It's -- if you have

18   it in the muscle, obviously that's -- I already stated

19   that there is no benefit of doing that.  But if you

20   dissect that area, you bring it up and you

21   hydrodissect your segments, you're -- you can remove

22   most of it.

23        Q.    (By Mr. De La Cerda)  Have you ever

24   performed a revision or excision surgery because the

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 163 of 429 PageID 21843
Case 2:12-md-02327-Document 2014-1   Filed 04/20   Page 165 of 305   PageID 32744
Jaime Sepulveda, M.D.

1    patient was reporting pain and this is, again, I'm

2    talking about patients with transvaginal mesh for

3    pelvic organ prolapse?

4         A.   You know, pain -- pain is rare after this

5    kind of repair.  What most frequently happen is that

6    you would get in to have -- to remove an exposure, and

7    then you end up -- you ended up removing more than

8    what you thought you were going to remove because you

9    had the plane and you were just dissecting the area

10   and remove it.  Then you ended up reinforcing the area

11   with sutures.

12        There are times in which I -- I -- I say I

13   have to do something to support it and it becomes such

14   a subjective thing that I wish I could have explained

15   this not now, but even when doctors would ask me the

16   same questions and -- and be accurate and precise

17   about it, but no, it's a general -- it's a general

18   idea.  What I'm explaining now is a general idea of

19   what happens in the operating room when you're going

20   to remove it.  So you start small, but you start

21   extending yourself on the dissection.

22        Q.   So of the 10 to 20, though, how many of

23   those did you remove for the reason of that they

24   had -- they were experiencing pain?

Case 2:20-cv-00885-SPC-MRM Document 94-1 Filed 10/25/20 Page 164 of 429 PageID 21844
Case 2:12-md-02327 Document 4914-1 Filed 11/02/18 Page 35 of 305 PageID 162745
Jaime Sepulveda, M.D.

1    A.   It's -- I think it's rare.  I can't give you

2    a specific number without -- okay, I want to be

3    accurate and precise, but it was rare.  The most

4    recurring reason was an exposure.

5    Q.   Okay.  And did they report exposure with

6    pain or no?

7    A.   No.  No.  They -- most frequent complaint

8    with the exposure was vaginal discharge.

9    Q.   So were the 10 to 20 excision surgeries,

10   were those primarily because of exposures?

11   A.   It's -- it's -- mostly exposure and

12   symptomatic exposures, exposures in which you saw

13   granulation tissue.

14   Q.   Of granulation tissue, okay.

15       Were any of the excision procedures

16   performed specifically because of dyspareunia?

17   A.   No, I don't remember anyone specific on

18   dyspareunia.  I remember taking one Prolift that was

19   dyspareunia and pain.

20   Q.   Have you ever -- have you ever had a patient

21   come to you reporting dyspareunia or pain after having

22   had a transvaginal mesh or pelvic organ prolapse where

23   you believed it was the transvaginal mesh causing the

24   pain or dyspareunia?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 165 of 429   PageID 21845
Case 2:12-md-02327-Document 2014-1 Filed 04/24/15 Page 30 of 365 PageID 32746
Jaime Sepulveda, M.D.

1      A.   No.  Most of the patients that we see with

2   dyspareunia, in a busy vaginal surgery practice, is

3   without mesh.

4      Q.   So you've never had that happen where you

5   believed the dyspareunia was being caused by the

6   transvaginal mesh; right?

7      A.   By -- specifically by transvaginal mesh, no.

8      Q.   Same question for the -- I don't know if I

9   asked you for the slings, but have you ever had a

10   patient come to you reporting pelvic pain or

11   dyspareunia after having had a synthetic midurethral

12   sling where you believed that it was the sling causing

13   that pain or dyspareunia?

14      A.   No, I -- I saw one sling that was low enough

15   that I -- it could -- that could have been the source

16   of dyspareunia.

17      Q.   Okay.  And I guess really you're thinking

18   it's more the positioning of the sling as opposed to

19   the actual sling; right?

20      A.   Yes.

21      Q.   Okay.  How many Gynemesh PS's have you

22   implanted in your practice, in your career?

23      A.   Over a hundred.

24      Q.   And how many Prolifts have you implanted in

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 166 of 429 PageID 21846
Case 2:12-md-02327-Document 2044-3 Filed 04/12/45 Page 165 of 305 PageID 3747
Jaime Sepulveda, M.D.

```
1    your career?

2         A.    Definitely more than 100.

3         Q.    Between 100 and 200?

4         A.    Easily.

5         Q.    How many Prosimas have you implanted in your

6    career?

7         A.    I did about 50.

8         Q.    Okay.  Turning -- we've now been going

9    another hour.  Would you like to take a break?

10        A.    Yes, just quick as before.

11              (Thereupon, a recess was taken from

12        10:21 a.m. until 10:29 a.m., after which the

13        following proceedings were held:)

14        Q.    (By Mr. De La Cerda)  Okay.  We are back

15   on the record.

16              Doctor, I wanted to direct your attention

17   back to your CV, please, which is Exhibit 13.  Just a

18   couple quick things.  If you'll turn to the fourth

19   page, the section which is "Courses Presented."

20        A.    Yes.

21        Q.    The entities that I've seen -- well, the

22   entities that are mentioned within this section where

23   you've presented a course, the only entities I've seen

24   mentioned are Johnson & Johnson, Ethicon Endo and
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 167 of 429 PageID 21847
Case 2:12-md-02327-Document 4944-1 Filed 09/06/2019 Page 166 of 305 PageID 32749
Jaime Sepulveda, M.D.

1    Ethicon.

2              Are there any other entities mentioned here

3    or no?

4         A.   No, I never worked outside of Ethicon for

5    any another company.

6         Q.   Then under "Research Experience," which is,

7    I guess, a couple pages later, is there -- do you have

8    listed here any research on transvaginal polypropylene

9    midurethral slings or transvaginal polypropylene

10   pelvic organ prolapse mesh?

11        A.   No, I did not do research on transvaginal

12   sling.  I rely on the randomized control trials.

13        Q.   And then under "Presentations and

14   Publications as Author or Coauthor," I didn't see any

15   presentations or publications that involve

16   transvaginal polypropylene midurethral slings or

17   transvaginal polypropylene mesh for pelvic organ

18   prolapse; is that right?

19        A.   Yes, I did not -- I did not publish on

20   transvaginal slings.

21        Q.   We can set that aside for a second.

22             Okay.  You're not a biomedical engineer;

23   correct?

24        A.   I -- I have a very good understanding of

Jaime Sepulveda, M.D.

1    biomedical engineering.

2         Q.   Okay.  Would you consider yourself a

3    biomedical engineer?

4         A.   I do not get compensated for doing

5    biomedical engineering.

6         Q.   Okay.

7         A.   And I did not graduate from -- with a degree

8    of biomedical engineering.  I do -- I do understand

9    biomedical engineering well.

10        Q.   I saw that you brought some books here that

11   would relate to that, I believe.  What is it that

12   would provide the basis for your belief that you have

13   expertise in biomedical engineering?

14        A.   I have devoted years to understand it, to

15   read about it beyond what any other physician that I

16   ever met have done.

17        Q.   Anything else?

18        A.   I have studied, I have spoken to biomedical

19   engineers, but specifically it's a passion and a

20   dedication that I have had to understand it.

21        Q.   Would you consider yourself an expert on the

22   design of medical devices?

23        A.   It goes right along with the biomedical

24   engineering, with the surgical expertise that allows

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 169 of 429 PageID 24849
Case 2:12-md-02327 Document 94-1 Filed 04/20/20 Page 100 of 305 PageID #: 32730
Jaime Sepúlveda, M.D.

 1    me to see what -- what can save in terms of efficiency

 2    in the operating room, what can I do better for my

 3    patients.  That's what I use this for.  This allows me

 4    to understand the design better.

 5        Q.   Have you ever, personally, designed a

 6    medical device?

 7        A.   I -- not -- not a medical device, but I have

 8    my own set of needles that I actually had made.

 9        Q.   What were those needles for?

10        A.   For -- to approach the deep space in the

11    pelvis.

12        Q.   Were those used in connection with

13    implanting mesh at all?

14        A.   No, I use them for sutures.

15        Q.   Okay.  Have you ever been involved in the

16    design of a medical device?

17        A.   I -- I did give input to the design.  It was

18    not -- it was not my own patent.

19        Q.   And what device was that?

20        A.   Staplers for -- for -- staplers, a

21    retractor, again, a circumferential needle.

22        Q.   And these are all devices that are used in

23    connection with surgery?

24        A.   Yes.

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 170 of 429 PageID 24850
Case 2:12-md-02327   Document 2911-9   Filed 09/13/19   Page 101 of 305 PageID# 82751
Jaime Sepúlveda, M.D.

1    Q.   Were you ever designed -- were you ever

2    involved in the design of any transvaginal mesh

3    devices?

4    A.   Not in the devices of the ones that I use.

5    Q.   Do you have any patents on medical devices?

6    A.   No.

7    Q.   Do you know what the standard is for a --

8    that a manufacturer must follow in designing mesh

9    products?

10   A.   I'm -- I became very familiarized with --

11   when I was with Ethicon by my own inquiries.

12   Q.   What standards did Ethicon employ in the

13   design of its mesh products?

14   A.   It's -- it was from the initiation, from

15   what they had an idea of what the device was, what the

16   need was, and then there were -- I know there was a

17   structure for research and development with the

18   running of different -- different trials at different

19   levels.  And I get that information and submit it,

20   along with other information that I was -- in which --

21   that had nothing to do with surgery, but cytotoxicity,

22   paragenicity assays, cell cultures assays, and all

23   this information submitted to the FDA, who would then

24   review it and -- and within its own division for the

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 171 of 429 PageID 24251
Case 2:12-md-02327  Document 2007-1  Filed 04/18/05  Page 130 of 305  PageID #: 32732
Jaime Sepulveda, M.D.

1    device and then get back to them.

2        Q.   Do you know what a manufacturer researches

3    before a product is designed or released?

4            MR. SNELL:  Form, overbroad.

5        A.   The --

6        Q.   (By Mr. De La Cerda)  Let's take it a

7    little more specific to the mesh products.

8            What did -- what, to your knowledge, did

9    Ethicon research in regard to its mesh products before

10   they were released?

11       A.   I know that they -- they went through their

12   suture -- suture research and -- and I know that they

13   did experiments short term and long term with sutures.

14           I know that there was an opinion acquired

15   from the field on the use of different sutures.  Then

16   there was a -- there was a use on the type of mesh

17   that was used for prolapse on the different types of

18   meshes.  That wasn't done in the United States, that

19   was done in France.

20           And there was also -- the materials were

21   even evaluated in the same -- in the same way that

22   sutures are evaluated, but also in the operating room.

23   I'm aware of that one, too.

24           I'm aware that the needles and the approach

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 172 of 429 PageID 24852
Case 2:12-md-02327 Document 2914-1 Filed 04/10/16 Page 103 of 305 PageID 82733
Jaime Sepúlveda, M.D.

1    that was used was evaluated by them before it was even

2    used in the United States.  And I know the packaging,

3    the packaging was evaluated.  I was able to see how

4    they design the package for the operating room.

5           So all those lines never got to the place

6    where they actually do the knitting of the material,

7    never -- never got to see that, but I know there was a

8    facility for that.

9           So there was a step of -- actually quite an

10   elaborate chain that ended up giving the product.

11   Q.   Do you know what types of experts were

12   involved in the design of Ethicon's mesh products?

13   A.   I spoke to materials engineers.  I actually

14   enjoy very much when I interacted with one of the

15   biomechanical engineers over there that had a doctor's

16   degree on biomaterials and I actually -- and I enjoyed

17   that.  I look at different -- they asked me for

18   different types of materials.  We look at -- they got

19   my input on fibers.

20          I know that there was another group in

21   France that was using those materials.  One thing that

22   I observed is that it would not just go with just one

23   opinion, it was a consensus of different surgeons and

24   different -- different settings.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 173 of 429 PageID 21853
Case 2:12-md-02327 Document 2901-12 Filed 10/25/20 Page 104 of 305 PageID #: 92734
Jaime Sepúlveda, M.D.

1    Q.   Do you remember the names of any of the

2  folks that you interacted with on those issues?

3    A.   I can't -- I can't remember because it's

4  over -- over five years and, you know, it's -- it

5  wasn't a friendship that would continue beyond that.

6  It was a work relationship.

7    Q.   Do you know what a "design history file" is?

8    A.   No.

9    Q.   Are you familiar with industry standards

10  that govern medical device design?

11    A.   I read at one time, I read that.  I read

12  about ISO testing.  I read about ISO testing.  I read

13  about the different toxicity assays and, actually, at

14  one time I even may have read about the testing that

15  was done for -- for meshes that was using sutures,

16  i.e., I actually research it and read about it.

17    Q.   Anything else that you can recall?

18    A.   No.

19    Q.   I'm sorry, is that --

20    A.   I'm sorry.  Not at this moment.

21    Q.   Are you familiar with regulatory standards

22  that govern medical devices?

23    A.   I became -- I became aware of the regulatory

24  standards.  I knew about the classifications of

Case 2:20-cv-00065-SPC-MRM  Document 94-1  Filed 10/25/20  Page 174 of 429 PageID 24854
Case 2:12-md-02327  Document 291  Filed 11/19  Page 4 of 305  PageID 52735
Jaime Sepúlveda, M.D.

1    devices.  I had an idea of the classification of the

2    devices and I had an idea, because I use other types

3    of -- of devices that have nothing to do with mesh.

4         Q.   What's your understanding of the

5    classifications of devices?

6         A.   I knew that heart -- heart monitors and

7    nerve stimulators and intermittent nerve stimulator

8    had a different classification than our meshes had and

9    that surgical instruments would have and that sutures

10   would have.  You can -- you can just open -- you go to

11   the operating room and get into one of the boxes of

12   the sutures and you can pull that paper that gives all

13   these different things about the sutures.  So it's --

14   I knew I had -- I had an idea of the different -- at

15   least three classifications that were used.

16        Q.   Some requiring testing before they go out on

17   the market, some perhaps not; right?

18             MR. SNELL:  Form.

19        A.   Some methods -- some methods did require

20   different type -- different types of testing,

21   different -- each one had different requirements.

22        Q.   (By Mr. De La Cerda)  Do you know how

23   pelvic organ prolapse, transvaginal synthetic

24   polypropylene mesh is currently classified?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 175 of 429 PageID# 24855
Case 2:12-md-02327 Document 2943-2 Filed 10/16/16 Page 106 of 305 PageID#: 82736
Jaime Sepúlveda, M.D.

1      A.    It's -- I read, recently, the classification

2  for prolapse meshes and for -- they went up to

3  Class 3.

4      Q.    And what does that mean to your

5  understanding?

6      A.    They are classified as high-risk devices.

7      Q.    Do you agree with that?

8      A.    I -- I'll -- I agree with the approval that

9  the FDA has and I'm not going to challenge the FDA or

10  their panel on that one.

11      Q.    Fair enough.  Would you -- are you an expert

12  in polymer chemistry?

13      A.    I -- I don't design polymer chemicals.  I do

14  understand certain -- the polymers that are used in my

15  specialty.

16      Q.    And what polymers would those be?

17      A.    When it comes down to polymers used in my

18  specialty, it's polypropylene.

19      Q.    Are you an expert in surgical pathology?

20      A.    That -- that's an average over the last 25

21  years, I do look at slides.

22      Q.    And that would -- that would be the basis

23  for you stating that you had expertise in surgical

24  pathology; is that right?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 176 of 429 PageID 24856
Case 2:12-md-02327-C Document eq p1-qr ed 10/25/20 Page 175 of 305 Page ID 82783

Jaime Sepulveda, M.D.

1      A.   I think that everyone that is a surgeon

2    needs to have an expertise in surgical pathology.

3      Q.   Okay.  So that would be your basis for

4    saying that; right?

5      A.   That's correct.

6      Q.   I didn't ask you this.  What would be your

7    basis for saying you have expertise in polymer

8    chemistry, is it your experience?

9      A.   My experience and what I read, the time that

10   I devote, the time that I have devoted over the years

11   to look at sutures and specifically polypropylene.

12     Q.   Have you ever personally done chemical tests

13   to determine if polypropylene mesh degrades?

14     A.   I have not personally done -- done that

15   testing.  I did -- I did -- I have -- I read about it

16   and have considered that hypothesis.

17     Q.   Have you ever done a microscopic analysis of

18   explanted polypropylene mesh to determine if the mesh

19   degraded personally?

20     A.   Not -- not with the purpose of degradation

21   because I still -- I still looking for what -- what

22   does degradation really mean in the pathology

23   specimen.

24     Q.   Okay.  I'm going to shift gears a little

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 177 of 429 PageID 24857
Case 2:12-md-02327 Document 94 Filed 10/25/20 Page 177 of 805 PageID 32735
Jaime Sepulveda, M.D.

1    bit.

2           Would it be fair to say that before a

3    physician decides to utilize a transvaginal

4    polypropylene mesh or sling to treat a patient, that

5    it's necessary for the physician to warn the patient

6    of all known side effects of the product, including

7    severe ones?

8           MR. SNELL:  Objection, form, speculation.

9      A.    I think that before any -- any surgery,

10   there has to be -- there has to be a full

11   understanding of the -- as part of the informed

12   consent.  And when -- when that's happening, there --

13   there are factors that are going to play into it.

14          Yes, ideally, we should be able to clear our

15   patients and get -- get a full understanding of it.

16   There are times in which the patient cannot understand

17   it and we have to find, as physicians and surgeons, a

18   way to get them through the most relevance.  But that

19   including -- includes surgery with or without mesh.

20     Q.    (By Mr. De La Cerda)  Okay.  So do you

21   think that all the known side effects, including

22   severe ones, should be disclosed to patients?

23          MR. SNELL:  Same objection, form.

24     A.    It's all known -- not only side effects, but

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 178 of 429 PageID 24858
Case 2:12-md-02327 Document 2911 Filed 04/06/17 Page 109 of 305 PageID 82759
Jaime Sepúlveda, M.D.

1 essentially what -- what could happen that is within

2 my control that is -- and what's not in my control and

3 patients appreciate that we do that.

4     Q. (By Mr. De La Cerda) A physician should

5 warn his patient -- his or her patient of

6 characteristics of the transvaginal mesh or sling

7 product that can significantly increase their risk

8 of severe complications; correct?

9        MR. SNELL: Form, foundation.

10     A. On that counseling, the counseling should

11 involve what has been tested. In other words, the

12 last thing that you want as a patient is to be

13 overwhelmed by just a wealth of data that is not

14 clinically relevant, and we -- we have studies that

15 actually address that.

16     Q. (By Mr. De La Cerda) So I think we might

17 be getting to something there. If -- if a

18 characteristic of a transvaginal mesh or sling

19 product is clinically relevant, should that be

20 disclosed to a patient during the informed consent

21 process?

22        MR. SNELL: Same objection, foundation.

23     A. The informed consent addresses that.

24     Q. (By Mr. De La Cerda) So is that a "yes"?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 179 of 429   PageID 24859
Case 2:12-md-02327   Document 2114-1   Filed 05/01/15   Page 179 of 305   PageID 32740
Jaime Sepúlveda, M.D.

1      A.    That would be in general a yes within --

2    within the parameters of that conversation between the

3    physician and the -- and the patient.  So it would be

4    a yes with a condition that with knowing that that's

5    very unique.  That's a very unique interaction.

6      Q.    Okay.  Do you agree that a physician has a

7    duty to inform his or her patients of the material

8    risks associated with a transvaginal mesh or sling

9    product before it's implanted in the patient?

10          MR. SNELL:  Form, foundation, overbroad.

11     A.    I -- I -- my opinion is that the patient

12   should be informed not only of -- of the mesh, but

13   if -- if surgery is being done with sutures, the

14   patient should know that, too.

15     Q.    (By Mr. De La Cerda)  I mean, what I'm

16   trying to do is use different terms for the risks or

17   complications and in this one I'm using material

18   risks associated with transvaginal mesh or sling

19   product.  Do you think that material risks should be

20   disclosed to the patient?

21          MR. SNELL:  Same objection, vague,

22         immaterial.

23     A.    Just to clarify, are you talking about the

24   material or the material risk?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 180 of 429   PageID 24860
Case 2:12-md-02327   Document 9041   Filed 10/25/20   Page 180 of 805   PageID 32763
Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  That's a good

2   question.

3           Material, that term I'm using -- because

4   there's different ways that we've seen risks and

5   complications associated with mesh products described

6   by physicians.  Sometimes they describe those risks as

7   material risks, not as the material polypropylene, but

8   as being relevant risks.

9      A.   Oh.

10     Q.   They're using that word.

11     A.   I understand.

12     Q.   That's a good question.  Some doctors have

13  used the term "material risk, "Yeah, I disclose it if

14  it was a material risk."

15          Now with that explanation, do you believe

16  that material risks associated with these products

17  should be disclosed during the informed consent

18  process?

19          MR. SNELL:  Same objection.

20     A.   The material risk associated with the whole

21  extent of the procedure should be -- should be

22  disclosed.

23     Q.   (By Mr. De La Cerda)  Okay.  You mentioned

24  the term "clinically relevant."  Is that the same

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 181 of 429 PageID 24861
Case 2:12-md-02327-C Document 94-1 Filed 10/25/20 Page 181 of 305 PageID #: 32742
Jaime Sepulveda, M.D.

 1  thing as clinically significant?

 2      A.   Um, clinically relevant is statistically

 3  significant.

 4      Q.   Could you explain what that means, what your

 5  understanding is of that?

 6      A.   It's -- with the best level of evidence that

 7  we have for what we're doing, explain to the patient

 8  this is -- we're going to translate it from the

 9  statistically significant to what's common and what's

10  relevant in the surgery.

11      Q.   Okay.  I'm going to try and ask this

12  properly.

13          Do you agree that a physician should warn

14  his or her patients of risks or complications

15  associated with the transvaginal mesh or sling

16  products that are clinically relevant or statistically

17  significant?

18          MR. SNELL:  Form.

19      A.   For the whole extent of the procedure.

20      Q.   (By Mr. De La Cerda)  Including the

21  products, though; right?

22      A.   Including the products.

23      Q.   Okay.  Now, the purpose of warning a patient

24  during the informed consent process is to allow that

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 182 of 429   PageID 24862
Case 2:12-md-02327   Document 2916-1   Filed 305   Page 182 of 429   PageID 82763
Jaime Sepúlveda, M.D.

1    patient to make a determination of whether she wants

2    to undergo the surgery; right?

3        A.   It's -- patients are going -- are going to

4    eventually follow your -- the -- the doctor, the

5    doctor's advice.  But the reason why you do the

6    informed consent is, more than the patient deciding,

7    which many times they -- they cannot decide, it's to

8    empower that patient with the information of this is

9    what I use for my decision, the decision that I

10   recommended to you.

11       Q.   Okay.  Ultimately, though, it is -- the

12   patient has the right to decide one way or another

13   what they want to do; right?

14           MR. SNELL:  Form, overbroad.

15       A.   Patient -- patients may -- may ask more

16   questions or may -- say "I will have a preference,"

17   but in 25 years seeing patients, patients will tell --

18   will ask you, "Doctor, tell me what you -- you think

19   is the best way of doing it and tell me why and how

20   you come to that decision."

21       Q.   (By Mr. De La Cerda)  Okay.  So have you

22   ever had a patient say, after being consented or

23   receiving informed consent, saying, "No, I don't

24   want to have that procedure," as to mesh?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 183 of 429 PageID# 24863
Case 2:12-md-02327-C Document 2341-1 Filed 10/25/20 Page 184 of 305 PageID# 82764
Jaime Sepulveda, M.D.

1    A.   No, I -- I have not had that experience.

2    Q.   Do you agree it's important for the

3  physician to have as much information about the risks

4  associated with transvaginal mesh or sling product so

5  that the physician can make an informed decision on

6  whether to recommend those products?

7    A.   I think it's important that the physician

8  gets accurate and makes a reasonable effort to get

9  better on what they use and what they do every single

10  day.

11    Q.   Including the information that they are

12  going to communicate to the patient; right?

13    A.   It's especially if you're going to

14  communicate to the patient and -- especially when it

15  has to do with you making a clinical decision.

16    Q.   Do you agree that physicians rely on a

17  transvaginal mesh manufacturer to provide them with

18  information about the risks and complications

19  associated with their transvaginal mesh products?

20        MR. SNELL:  Objection, overbroad and

21        requires speculation.

22    A.   I can't -- I cannot think for all the

23  physicians, but I -- I can tell you that their

24  responsibility is within ourselves before we use any

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 184 of 429 PageID 24864
Case 2:12-md-02327   Document 4285-1   Filed 08/09/17   Page 185 of 305   PageID 32745
Jaime Sepúlveda, M.D.

1    product.

2         Q.   (By Mr. De La Cerda)  Do you agree the

3    transvaginal mesh manufacturers are at least one

4    source of information that a physician can rely on

5    in obtaining information about their risks and

6    complications of transvaginal mesh products?

7              MR. SNELL:  Objection, speculation.

8         A.   It might be at the low end of the -- of the

9    evidence that we gather.

10        Q.   (By Mr. De La Cerda)  You're not saying

11   that a physician shouldn't rely on information from

12   a transvaginal mesh manufacturer about the risks and

13   complications of those products; right?

14             MR. SNELL:  Form, overbroad.

15        A.   I think that a physician needs to rely on

16   the best evidence, best clinical evidence, not just in

17   any sort of marketing communication or sales

18   communication.  They need to know that the decision to

19   do surgery is a scientific process and they need to

20   read that.

21        Q.   (By Mr. De La Cerda)  If -- but certainly

22   if a transvaginal mesh manufacturer is providing a

23   serious warning about its products, even if that

24   warning hasn't played out in the scientific

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 185 of 429 PageID 24865
Case 2:12-md-02327-JFC   Document 94-1   Filed 10/25/20   Page 185 of 305   PageID #: 32746
Jaime Sepúlveda, M.D.

1   literature, I mean, that's still something that

2   needs to be considered; right?

3           MR. SNELL:  Form, overbroad.

4       A.   There's a degree of information that you

5   need to consider.  You -- you have -- you're a doctor

6   and you have the scientific information because that

7   allows you to analyze information better.  So in that

8   regard, what we're going to see is information that is

9   relevant because they're at the highest level of

10  evidence, information that is less relevant because

11  they are the lowest one, but there's a -- there's a

12  hierarchy -- did I say that word okay? -- there is a

13  hierarchy of information and we're going to go for the

14  highest one.

15      Q.   (By Mr. De La Cerda)  Okay.  Let's take a

16  silly example for a second.  If the manufacturer of

17  transvaginal mesh knows that there's a

18  one-in-a-million chance that it explodes inside a

19  human body, but that is never played out in the

20  RCTs, never, ever been seen by anyone other than the

21  manufacturer, does that information need to be put

22  out to the public and told to physicians?

23          MR. SNELL:  Objection.  I'm going to have to

24      object, incomplete, purely speculative,

1      hypothetical.

2          Q.   (By Mr. De La Cerda)  The answer is of

3      course; right?

4              MR. SNELL:  I don't know about that.  I

5          mean, that's the doctor's answer, but my

6          objection is incomplete hypothetical, purely

7          speculative.

8              Go ahead.

9          A.   The explosion thing is a little out there.

10     It's -- we have not seen any devices that actually

11     explode for prolapse or incontinence.  I don't know

12     for the other ones.

13             The point I'm trying to come across is, to

14     answer your question, when we look at information, we

15     look at randomized control trials.  Now, randomized

16     control trials in cohort studies, even case control

17     studies, you can go down to a list and you're going --

18     the methodology is what allows you to give

19     recommendations and form your counseling.

20         Q.   (By Mr. De La Cerda)  So even if the

21     manufacturer knows of severe life-altering

22     complications associated with its products, if that

23     severe life-altering complication hasn't played out

24     in the randomized control trials, you believe that

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 187 of 429 PageID 24867
Case 2:12-md-02327 Document 2916 Filed 09/29/14 Page 189 of 305 PageID #: 82748

Jaime Sepulveda, M.D.

1    physicians shouldn't place much weight on that?

2        A.    I think as humans -- as humans, if we see

3    that there is any -- any danger for anyone, for any

4    other human being, we'll just go and say it,

5    regardless of who we work for.  And at the end it's

6    not a company, it's a group of people working.  So the

7    human -- the human nature is to -- the human thing is

8    to actually do that, and that's our nature.  But

9    that's different from having -- making a clinical

10   decision.

11       Q.    Okay.  So, ultimately, should information

12   like that, if it's known to manufacturer, but it

13   hasn't played out in the randomized control trials,

14   should information like that about severe

15   life-altering complications be communicated to a

16   patient during the informed consent process?

17            MR. SNELL:  Form, asked and answered.

18       A.    What we're going to use to counsel patients

19   is randomized control trials.  And if -- if the

20   question is if the manufacturer should disclose it,

21   I -- I -- my opinion is probably most people would go

22   ahead and disclose it, but in terms of making a

23   clinical decision, we're going to use for the best

24   evidence that we have.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 188 of 429 PageID 24868
Case 2:12-md-02327 Document 2299 Filed 05/19/16 Page 119 of 305 PageID 82749
Jaime Sepúlveda, M.D.

1    Q.   (By Mr. De La Cerda)  And I understand, I

2    definitely understand.  I guess what I'm trying to

3    get at, though, is:  Should that information be

4    communicated to the patient during the informed

5    consent process or not?

6    A.   Only the information that is backed by good

7    science.

8    Q.   Okay.  So the answer is; no, right?

9         MR. SNELL:  Objection, asked and answered.

10   A.   If it's not -- if it's not backed by

11   science, it plays no role in the counseling of a

12   patient.

13   Q.   (By Mr. De La Cerda)  Including if the

14   manufacturer has discovered severe life-altering

15   complications that it knows of, even though it

16   hasn't been played out in the randomized control

17   trials and the medical literature; right?

18   A.   Our counseling --

19        MR. SNELL:  Same objection.

20   A.   Our clinical counseling is evidence-based.

21   Q.   (By Mr. De La Cerda)  Okay.  And evidence

22   from the manufacturer wouldn't necessarily count --

23   well, the finding of a manufacturer as to a severe

24   life-altering complication wouldn't count as

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 189 of 429 PageID 21869
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 189 of 429 PageID 32770
Jaime Sepúlveda, M.D.

1    evidence under the framework that you're using;

2    right?

3         A.   The -- the findings, whatever findings, that

4    being from a physician, that being from a patient,

5    that being from -- from a manufacturer or anybody

6    else, a group -- whatever findings needs to be

7    corroborated by evidence, that's why we have studies,

8    that's why we have a well-placed methodology for

9    evidence.

10        Q.   And so the medical -- well, the studies are

11   going to be the foundation of that evidence, not some

12   information from the manufacturer; right?

13        A.   Any -- any -- any radical information, that

14   being of things being too good or too bad need to be

15   evaluated on the light of a randomized control trial,

16   needs to be evaluated on if there is no randomized

17   control trial, needs to be evaluated based on the type

18   of the study that we have and the clinical experience.

19        Q.   Do you consider a permanent injury a severe

20   side effect?

21        A.   A permanent injury is different from a side

22   effect.

23        Q.   Okay.  So what -- so you don't believe that

24   a permanent injury is a severe side effect or they're

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 190 of 429 PageID# 21870
Case 2:12-md-02327 Document 9214-1 Filed 05/10/20 Page 191 of 305 PageID# 32713
Jaime Sepúlveda, M.D.

1   just totally different?

2       A.   They're -- there's side effects and there's

3   injuries.

4       Q.   Okay.

5       A.   And the side effect has more to do with what

6   pertains to one particular product and an injury could

7   be from anything that is used in surgery.

8       Q.   Do you consider a permanent injury a severe

9   injury?

10          MR. SNELL:  Form, incomplete hypothetical.

11      A.   I apologize for that.

12          Can you please repeat that?

13          (The requested portion of the record was

14      read back by the reporter.)

15      A.   There could be permanent effects of surgery

16   that are not necessarily severe and severe that are

17   not exactly permanent.

18      Q.   (By Mr. De La Cerda)  Do you consider a

19   risk or complication that requires additional

20   surgeries a severe side effect?

21      A.   Based on the -- on the -- on the evidence on

22   which -- which has a classification is not considered

23   severe, is not considered severe if he needs just to

24   go back to the operating room.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 191 of 429 PageID 21871
Case 2:12-md-02327 Document 2914-1 Filed 04/22 Page 122 of 305 PageID #: 82712
Jaime Sepúlveda, M.D.

1    Q.   So that's not severe in your eyes.

2    A.   Yeah.

3    Q.   Do you consider risk or complication that

4    seriously alters a patient's quality of life a severe

5    side effect?

6    A.   It could be -- that side effect could be for

7    improvement of a quality of life, that could be --

8    that's an effect on the side or a side effect, the way

9    we usually recognize it, can be deteriorating to the

10   quality of life.  I will have to look at the specific

11   situation and look at the specific data on it.

12   Q.   Okay.  Let's shift gears.  The content and

13   substance of the professional education sponsored by

14   Ethicon on it's TVT, TVT-O, Gynemesh, Prolift and

15   Prosima did not and does not contradict the content

16   and substance of the IFUs for these products; correct?

17        MR. SNELL:  Form, overbroad.

18   A.   The content of the -- of these programs use

19   the IFU.

20   Q.   (By Mr. De La Cerda)  They don't

21   contradict it; right?

22   A.   No, there is -- there is actually -- in the

23   presentations that you're going to see, they -- they

24   work -- they work together.

1    Q.   Okay.  Now, I figured the most efficient way

2    to do this, because now we'll get into the substance

3    of the various issues that you've opined on, there are

4    many of these issues that can be grouped together as

5    to all the products and I think that will be the

6    fastest way to get through it, so that's what I'm

7    going to do.

8         So, for example, I'm about to ask you about

9    the IFU.  I'm going to ask you about -- these are

10   general questions about the IFUs of the TVT, TVT-O,

11   Gynemesh, Prolift and Prosima. I think we can do it

12   all at once.

13   A.   Yes.

14   Q.   First of all, are you familiar with the

15   contents of the various versions of the IFUs for the

16   TVT, TVT-O, Gynemesh, Prolift and Prosima?

17   A.   I'm aware that they're -- they have changed

18   in 2015.

19   Q.   And you're generally aware of the contents,

20   right, of those -- of those various IFUs?

21   A.   Yes, there are IFUs that actually might be

22   able to tell you separate steps.

23   Q.   Okay.  Do you intend to offer an opinion as

24   to whether the warnings in the IFUs for the TVT,

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 193 of 429 PageID 21873
Case 2:12-md-02327   Document 2813-4   Filed 09/11/16   Page 194 of 305   PageID 82774
Jaime Sepúlveda, M.D.

```
1    TVT-O, Gynemesh, Prolift and Prosima were sufficient

2    to apprize doctors of the risks of those products?

3         A.   Yes, I will -- I will give an opinion on

4    that.

5         Q.   And your opinion will be that they were

6    sufficient warnings; right?

7         A.   Yes, that will be my opinion.

8         Q.   Do you know what standards Ethicon applied

9    in terms of what needed to be included in the warnings

10   in the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

11   Prosima?

12        A.   That's the standards apply?

13        Q.   Yes.

14        A.   I'm aware of certain standards that were

15   used for the IFU.

16        Q.   Okay.  And what were those?

17        A.   The area on side effects, on warnings,

18   procedure steps, and the specifics on informing about

19   the need for specialized training to perform these

20   procedures.

21        Q.   Do you know what -- do you know whether

22   there's any -- are there specific, like, written

23   standards, though, that you're aware of that Ethicon

24   used in deciding exactly what warnings would go in
```

Case 2:20-cv-00863-SPC-MRM   Document 94-1   Filed 10/25/20   Page 194 of 429 PageID 21874
Case 2:12-md-02327   Document 9341 Filed... Page 129 of 305 PageID #: 52773
Jaime Sepúlveda, M.D.

1    there, what adverse reactions would go in there, and

2    what procedure steps would go in there?  Do you know

3    if there's any written standards that Ethicon relied

4    on?

5         A.   I'm -- I'm aware of that.  As for many

6    products, they -- the ones that are disclosed are the

7    ones that are specific to that product.

8         Q.   Okay.

9         A.   In other words, they're not comprehensive

10   guides on incontinence or -- or prolapse care.

11        Q.   Okay.  Have you ever, in your career, been

12   involved in writing or preparing an IFU for a medical

13   device?

14        A.   I have not written an IFU.  I read -- I read

15   IFUs through most of my career.

16        Q.   Have you ever studied the question of what

17   risks and complications were known to doctors across

18   the country with various background and levels of

19   experience with regard to the use of the TVT, TVT-O,

20   Gynemesh, Prolift and Prosima?  Did you ever study

21   that question?

22        A.   The risk with mesh were, with these

23   procedures in general, were addressed in a variety of

24   ways.  And those were -- there were communications

1  from the American College of OB/GYN, there were

2  meetings that -- there were journals, there were so

3  many different -- different venues that we have grown

4  used to read and understand.

5      The IFU, we -- we all expected that it was

6  going to give us one specific set, but the other set

7  on the evidence, we expected that from our -- our

8  scientific data.

9      Q.  So back to the question, though:  Did you

10  ever study -- ever perform a study or ever study or do

11  questionnaires that determine what doctors actually

12  knew about these products, about the risks and

13  complications of those products?  Did you ever perform

14  a study like that?

15      A.  There was -- to my -- to my knowledge,

16  there's no -- not a study that have address -- address

17  it.

18      Q.  And you, personally, haven't done a study

19  either; right?

20      A.  No, I have not done -- done a study.  I have

21  examined forms on evaluation of surgical skills that

22  at one time I use.

23      Q.  Okay.  But on this specific question, you

24  haven't actually performed a specific study looking at

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 196 of 429 PageID 21876
Case 2:12-md-02327   Document 4441-4   Filed 12/29   Page 129 of 305   PageID 32717

Jaime Sepulveda, M.D.

1  what doctors actually knew about the risks and

2  complications associated with transvaginal mesh

3  products?

4       A.   I have not performed such study.

5       Q.   Do you agree that a surgeon should be able

6  to solely rely on the warnings and description of risk

7  and complications in the IFUs for the TVT, TVT-O,

8  Gynemesh, Prolift and Prosima?

9            MR. SNELL:  Form, incomplete.

10      A.   We -- we don't rely just on the IFU.

11      Q.   (By Mr. De La Cerda)  Do you agree that a

12  surgeon should be able to just rely on the IFU or do

13  you disagree?

14           MR. SNELL:  Same objection, asked and

15           answered.

16      A.   I -- I disagree that a surgeon should be --

17  rely just on the IFU.

18      Q.   (By Mr. De La Cerda)  Should the IFUs for

19  the TVT, TVT-O, Gynemesh, Prolift and Prosima

20  include the frequency, duration and severity of

21  risks associated with those devices?

22           MR. SNELL:  Same objection, lacks

23           foundation.

24      A.   No.  As complete as an IFU could be, as

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 197 of 429 PageID 21877
Case 2:12-md-02327 Document 1 Filed 11/21/12 Page 199 of 305 PageID #: 32778
Jaime Sepulveda, M.D.

 1    complete as an IFU may want to be, it would not be

 2    able to address all of them.  It may comply with what

 3    we expect from the IFU, but it will not be able to

 4    address every single -- every single risk that has to

 5    do with a surgery that is much more complicated than

 6    what an IFU can address.

 7        Q.   (By Mr. De La Cerda)  The IFUs for the TVT

 8    TVT-O, Gynemesh, Prolift and Prosima should include

 9    all known material risks associated with these

10    products; right?

11             MR. SNELL:  Form, asked and answered.

12        A.   It should -- it should include all -- all

13    unknown risks about the material, but not necessarily

14    will address all known material risk.

15        Q.   (By Mr. De La Cerda)  The IFUs for the

16    TVT, TVT-O, Gynemesh, Prolift and Prosima should

17    include all characteristics of these products that

18    can significantly increase the risk of severe

19    complications; right?

20             MR. SNELL:  Object to form, lacks

21             foundation.  This was asked and answered earlier.

22        A.   Is the -- the instructions for use for the

23    device, it addresses one area.  The -- the rest is

24    based on the data.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 198 of 429 PageID 21678
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 199 of 305 PageID#: 32779
Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  So is that a no?

2      A.   No, that's not necessarily a no.  Actually,

3  that's -- that's exactly -- the IFU cannot -- cannot

4  be a comprehensive guide.

5      Q.   So what -- what characteristics of these

6  products -- strike that.

7           Do you believe that the IFUs for the TVT,

8  TVT-O, Gynemesh, Prolift and Prosima sufficiently

9  address any characteristics of those products that

10  could significantly increase their risk of severe

11  complication?

12           MR. SNELL:  Objection.

13      A.   As it pertains to the product, yes.

14      Q.   (By Mr. De La Cerda)  The information in

15  the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

16  Prosima should be truthful; correct?

17      A.   Yes.

18      Q.   The information in the IFUs for the TVT,

19  TVT-O, Gynemesh, Prolift and Prosima should be

20  accurate; correct?

21      A.   Yes.

22      Q.   The information in the IFUs for the TVT,

23  TVT-O, Gynemesh, Prolift and Prosima should be

24  complete; correct?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 199 of 429   PageID 24879
Case 2:12-md-02327-CDB   Document 94-1   Filed 10/25/20   Page 199 of 305   PageID #: 32730
Jaime Sepúlveda, M.D.

1          MR. SNELL:  Objection, form.  Prior

2     testimony.

3     A.    It is complete -- it is complete for the

4     product.  That's my -- my opinion.

5     Q.    (By Mr. De La Cerda)  The information in

6     the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

7     Prosima should be fair and balanced about the risks

8     and benefits of these products?

9          MR. SNELL:  Same objection.

10    A.    It -- it should be fair and balanced for

11    what pertains to the product.

12    Q.    (By Mr. De La Cerda)  Once an IFU is out

13    there and -- for physicians to review, if Ethicon

14    learned of a risk or complication that was not

15    previously warned about in the IFU and it was a

16    significant risk or complication in terms of the

17    harm it caused to women, do you know whether or not

18    Ethicon had an obligation to get that information in

19    the IFU?

20         MR. SNELL:  Objection, hypothetical, legal

21    standard.

22    A.    As long as it's evidence-based, yes.

23    Q.    (By Mr. De La Cerda)  Have you compared

24    the differences between the IFUs for the TVT, TVT-O,

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 200 of 429 PageID 24880
Case 2:12-md-02327 Document 2991 Filed 05/14/20 Page 130 of 305 PageID 52731
Jaime Sepúlveda, M.D.

1  Gynemesh, Prolift and Prosima, are you aware of the

2  differences between them?

3       A.   I have -- I have read those -- read those --

4  and I have read them many times and I have use it to

5  explain the procedure.

6       Q.   And so you've seen that over time there's

7  been some updates to the IFUs; right?

8       A.   Yes, I have seen that.

9       Q.   Is there a single long-term randomized

10  control trial for TVT, TVT-O, Gynemesh, Prolift or

11  Prosima with safety as a primary end point?

12       A.   I -- I -- they don't -- they're not all

13  included.  There is a randomized control trial that

14  explains about safety of Gynemesh, there is a

15  randomized control trial that explains for Prolift.

16            For each one of them, there's -- safety have

17  been included.  Not only have those randomized control

18  trials explain about safety, they have -- it has

19  spoken specifically about the percentage and the

20  clinical significance of each one of the

21  complications.

22       Q.   Are any of the studies that you're

23  referencing there, has the primary end point, though,

24  been safety in the study?

1    A.   The safety -- the safety was evaluated on --

2  on Gynemesh.

3    Q.   Do you know what the name of that study was?

4    A.   Yes, yes.

5    Q.   There is another one over here too.

6    A.   Gynemesh.  Gynemesh on the -- okay.  So --

7  so on the -- to begin with the mesh, we have the

8  Flood, F-l-o-o-d, paper on the use of Marlex.

9    Q.   And what does that study show?

10    A.   That's for the anterior colporrhaphy

11  reinforced with Marlex mesh for treatment of

12  cystocele.

13    Q.   Is this one of the studies that shows it has

14  a primary end point of safety?

15    A.   It's not titled "safety," but they -- they

16  conclude on that study that this is safe to use.  And

17  then there's Nicita, Giulia.

18    Q.   How do you spell that?

19    A.   Giulia Nicita, N-i-c-i-t-a.

20    Q.   And what is that study?

21    A.   And it shows exactly applications in terms

22  of they were able to save -- to do it with safety.

23         So to be accurate to the response to your

24  question, there's no study that says safety of

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 202 of 429 PageID 24882
Case 2:12-md-02327-C   Document 2907   Filed   Page 133 of 205   PageID #: 32733
Jaime Sepúlveda, M.D.

1   Gynemesh on -- or safety of Marlex in the use -- use

2   on -- for cystocele repair.

3          There's -- there are multiple studies -- I

4   can go on with the list -- that cites safety as one of

5   the -- of the things that they study.

6     Q.   So the point of this -- by the way, this is

7   not my question.  I never -- this question, to me,

8   never really gets me anywhere.

9          But the point is that all the studies that

10  have been done on any of these mesh products, the

11  number one end point is, is it effective; right?  Is

12  it effective and then, by the way, was it safe, too?

13         None of these studies is like number one

14  thing safety; right?

15         MR. SNELL:  Objection, overbroad.

16    A.   The -- there's even a better level of

17  evidence that speaks about safety and is when you

18  compare the use of any of these products with what

19  has -- with the -- with the safety profile when you

20  don't use the product.  And that's where the

21  randomized control trial comes into -- into play.

22         The randomized control trials has the

23  capability of evaluating something that I have use

24  without mesh and compare it with something with mesh.

1    And that has been used -- that has been reported for

2    Gynemesh, it has been reported for Prolift, it has

3    been -- was reported for -- for TVT and TVT-O, and it

4    was so -- so consistently demonstrated that when it

5    came to Prosima, it became a cohort study.

6        Q.   (By Mr. De La Cerda)  Is it -- is it your

7    opinion that the studies show that any time that

8    mesh products have been compared to whatever the

9    alternative was, a non-mesh alternative, that the

10   mesh products have been shown to be safer than the

11   non-mesh alternative?

12       A.   It's -- it has been shown not to have

13   statistically significantly increased in the number of

14   complications or the frequency of these complications.

15       Q.   Right.  But that's a good point.  So it's

16   been shown to be as safe; right?  And really, the

17   differentiating factor is whether it's more effective;

18   is that fair?

19       A.   It has been shown to be as safe and in some

20   situations, it has been shown -- it has shown to be

21   even safer.

22            Take, for example, the use in the initial

23   study of Marcus Carey on mesh, on Prosima, and

24   straight -- and the known use of an implant.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 204 of 429   PageID 24684
Case 2:12-md-02327   Document 9419   Page 139 of 305   PageID #: 32735
Jaime Sepúlveda, M.D.

1        When you compare, you see that the three

2    patients that he had to operate for vaginal stenosis

3    were the ones that did not have a mesh.  So there you

4    have an instance in which there was more complications

5    with -- by not using mesh than by using the mesh.

6        Is that directly related to the mesh?  And

7    that's something that could be addressed with a

8    randomized control trial.

9        When we do sutures, suture repairs, and we

10   call them "native tissue repairs," in a randomized

11   control trial or even when we do a cohort of sutures,

12   we see complications on sutures in 36% of uterosacral

13   ligament suspension, we see suture complications in

14   sacrospinous ligament fixations, and when they're

15   compared with mesh, there is -- there is much less.

16   Q.   So on the issue of whether -- you know, the

17   FDA came out with an opinion about -- they actually

18   described that repairs with pelvic organ prolapse mesh

19   are no more effective and might be more dangerous than

20   the alternative non-mesh repairs; right?

21       MR. SNELL:  Objection to foundation.

22   A.   That -- that was the -- that was an opinion

23   that they came in, in the small panel, analyzing the

24   data, I don't know, for two, three days, but that's

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 205 of 429 PageID 24685
Case 2:12-md-02327 Document 9341-1 Filed 02/04/20 Page 136 of 305 PageID #: 232736
Jaime Sepulveda, M.D.

1    not -- I don't know for how many days they analyze it.

2    I don't even know what papers they consider.

3              But the preponderance of the evidence in the

4    randomized control trial is that it's not more

5    dangerous.

6         Q.   (By Mr. De La Cerda)  Okay.  So on that

7    particular -- I'm sorry.

8         A.   I apologize.  I'll just turn it off.

9         Q.   So on that particular issue, you disagree

10   with the FDA; right?

11             MR. SNELL:  Form, foundation.

12             I think that's misleading because there's

13        two different time periods, Counsel.

14        A.   I -- I disagree -- I disagree with -- with

15   the FDA opinion based on everything else that I review

16   and that I present on my report.

17        Q.   (By Mr. De La Cerda)  All right.  Let's

18   shift gears a little bit and talk some about this is

19   a TVT and TVT-O issue.

20             You're aware that the TVT and the TVT-O can

21   either be mechanically cut into its sling shape or

22   laser cut into its sling shape; right?

23        A.   It can -- the edges can be mechanically cut

24   or laser cut or personically cut.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 206 of 429 PageID 21886
Case 2:12-md-02327-JC   Document 2321   Filed 11/14/19   Page 139 of 305 PageID #: 32737
Jaime Sepúlveda, M.D.

1    Q.   You're aware that Ethicon had evidence as

2    early as 2006 that after elongation, mechanically cut

3    mesh has a greater tendency than laser cut mesh to

4    degrade, lose particles, lose structure, rope, fray

5    and curl; right?

6              MR. SNELL:   Form.   Form, foundation.

7              Go ahead.

8    A.   What -- what I saw in a picture was an

9    uniaxial test done in a sling beyond the capabilities

10   of a sling and beyond any forces that could be placed

11   on a sling when used properly.

12   Q.   (By Mr. De La Cerda)   But you also saw in

13   those pictures that at least under those

14   circumstances, the mechanically cut mesh as compared

15   to the laser cut mesh had a tendency to lose

16   particles, lose structure, rope, fray and curl;

17   correct?

18   A.   They -- they show particles that we -- we

19   have seen over -- over time, not only on that, but

20   also in sutures.   They -- in a picture, I saw a

21   picture of it, and I saw the pictures of uniaxial

22   testing and I saw the communications about it, but

23   that's as much as I can say, I saw it.

24   Q.   And you know that that information was in

1   the files of Ethicon at least as of 2006; right?

2       A.   I -- I don't know the time when the

3   information was.

4       Q.   Have you personally seen a TVT or TVT-O that

5   has lost particles, lost structure, roped, frayed or

6   curled in your practice?

7       A.   The only time that I have seen it stretch

8   like that is when I'm actually -- one that I was

9   removing that I put a lot of force into it.  That's --

10  that's a way much force that any patient could ever

11  generate with a sneeze or cough.

12      Q.   You mentioned the one patient that you had

13  that you're removing the sling where it's too tight?

14      A.   Right.

15      Q.   Is this the person you were talking about?

16      A.   That might be the same person; I cannot tell

17  you with certainty.

18      Q.   So when the mesh was placed too tightly, you

19  saw -- would you call that roping or what was it that

20  you actually saw?

21      A.   I -- I -- I started dissecting it and I saw

22  that she still had some -- and the only way I can -- I

23  can recall it is because I actually saw those pictures

24  yesterday in one of the -- of the slide sets.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 208 of 429 PageID 21688
Case 2:12-md-02327-C Document 94-1 Filed 10/25/20 Page 208 of 905 PageID #: 32739
Jaime Sepúlveda, M.D.

```
 1              And all I could -- all I could see was that
 2      I actually had to -- had to pull on it from inside,
 3      normal attachment.  This was not roped, this was not
 4      curled, this not -- there's no such thing that I could
 5      describe in telling in general terms or in scientific
 6      terms.  I -- this was one -- one anecdotal case in
 7      which I -- that's the only one that looks like the
 8      dimensions stretch -- stretch on that device.
 9          Q.   So would your testimony be that you've never
10      seen a TVT or TVT-O mechanically cut, lose particles,
11      lose structure, rope, fray or curl in your own
12      practice?
13          A.   No, because it has a plastic sheath.
14          Q.   So you've never seen that yourself?
15          A.   No.
16          Q.   Should the mechanically cuts -- strike that.
17      Excuse me.
18              Should mechanically cut meshes tendency
19      to -- in comparison to laser cut mesh -- so should
20      that tendency to degrade, lose particles, lose
21      structure, rope, fray or curl be included in the IFU
22      for the TVT and TVT-O or no?
23              MR. SNELL:  Objection, foundation.
24          A.   I don't find a need to include that because
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 209 of 429   PageID 24689
Case 2:12-md-02327-C   Document   Filed   Page 209 of 805   Page ID #: 32730
Jaime Sepulveda, M.D.

1     that's something that has not been demonstrated

2     consistently.

3          Q.   (By Mr. De La Cerda)  Is that -- is that

4     your basis for that opinion or are there

5     additional -- is there additional information that

6     provides a basis for that opinion?

7          A.   I have not seen any scientific evidence that

8     the mesh curls or ropes or -- or -- or frays.  Nothing

9     that I can -- I can tell you that, okay, this is --

10    we -- we saw this observation on this patient and we

11    have reported it consistently or out of this number of

12    procedures that we did, this number actually showed

13    that.  And if it happened, what is -- how does that

14    translate into the clinical -- and I keep talking with

15    my hands because -- that will never get into the

16    deposition, but the -- on the -- I have not seen that

17    be reported or how that can translate into clinical --

18    into clinical behavior.

19         Q.   So on this issue, the basis for your opinion

20    is really the absence of information supporting this

21    information should be in the IFU; right?

22         A.   And the fact that there are multiple

23    randomized control trials well -- well-designed

24    control trials, surgical trials by good surgeons

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 210 of 429 PageID #: 24890
Case 2:12-md-02327-C   Document   Filed   Page   of 305   PageID #: 32731
Jaime Sepúlveda, M.D.

1    within groups that are well-respected within my

2    specialty, that have not describe, not in a single

3    time, not in any of these papers, that there is such a

4    thing happening.

5        Q.   If mechanically cut mesh's tendency in

6    comparison to laser cut mesh to degrade, lose

7    particles, lose structure, rope, fray and curl is

8    clinically significant or clinically relevant, should

9    it be included in the IFU for the TVT and TVT-O?

10       A.   It --

11            MR. SNELL:  Objection.  Hold on, give me a

12       minute.

13            Objection, improper hypothetical based on

14       the particle.

15       A.   It would have -- it would have to be

16    reported.  It would have to be reported by

17    something -- by something dependent by randomized

18    control trial.

19            If -- any attributes that being on any of

20    the polar sides of things -- things working at one

21    level or another in both sides of the spectrum needs

22    to be validated by scientific testing.

23       Q.   (By Mr. De La Cerda)  This is a question

24    that I'll have throughout several of these opinions.

Case 2:20-cv-00065-SPC-MRM  Document 94-1  Filed 10/25/20  Page 211 of 429  PageID 24891
Case 2:12-md-02327-DCO  Document 94-1  Filed 10/25/20  Page 2 of 305  Page ID #: 32792
Jaime Sepulveda, M.D.

1    I want to make sure to say it in a way that you

2    would agree with, because I want you to define for

3    me what it would require for this information to

4    suddenly be required to be in the IFU.

5              And so what -- what would be required from

6    your perspective for the information about the

7    differences between a mechanically cut and laser cut

8    mesh on the issue of degradation, loss of particles,

9    loss of structure, roping, fraying, curling, what

10   would it take for that information to suddenly be

11   information that needs to be in the IFU?

12             MR. SNELL:  Objection, same objection as

13        before.

14        A.   To make it to the -- to the IFU, needs to be

15   something that is independent of -- of just -- just

16   the technique beyond what's described in the IFU.  If

17   you see something like a device or a suture breaking,

18   it needs -- the IFU should say, do not make it so

19   tight or place a spacer under the urethra in the case

20   of slings.  The IFU says that.

21             So -- so -- and the insertion of the needle

22   or the removal of the plastic sheath is being done,

23   there needs to be instructions in the IFU for the

24   appropriate placement.  So this -- this is not about

Jaime Sepulveda, M.D.

1    saying this mesh curls or ropes or -- that's not --

2    that's not what the -- what I expect from IFU.  What I

3    expect is give me the proper technique so I don't put

4    this material to this extremes that would cause it to

5    behave this way.

6         Q.   (By Mr. De La Cerda)  So I understand

7    the -- first it would need to be independent of the

8    technique, but if the roping, fraying, curling, loss

9    of structure, if it's clinically relevant and

10   statistically significant, that would need to be in

11   the IFU; right?

12        MR. SNELL:  Objection, improper

13        hypothetical, vague.

14        A.   And to the -- and to the level that it would

15   say, okay, this is -- this is how it happens in the

16   clinical setting, not just in a machine.

17        Q.   (By Mr. De La Cerda)  And I guess that

18   would be encompassed though -- I mean, if it's

19   statistically significant through randomized control

20   trials -- let me think about that.  So it would need

21   to be shown through randomized control trials that

22   actually involve human implants, not just benched-up

23   testing or whatever it is in the lab; right?

24        A.   If you blind -- if you blind this study in a

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 213 of 429 PageID 24893
Case 2:12-md-02327 Document 2946 Filed 04/04/14 Page 14 of 505 PageID #: 82794
Jaime Sepúlveda, M.D.

1    way that physicians don't know which type of mesh

2    they're -- they're using, you could -- that would be a

3    good start.

4        Q.   Okay.  Do you know if Ethicon ever performed

5    a test like that, where they compared laser cut mesh

6    versus mechanically cut mesh actually implanted in

7    women?

8        A.   I -- I don't see anyone placing any human

9    through the stress that a machine could do -- could do

10   that.

11       Q.   But Ethicon never performed a study like

12   that; right?

13       A.   I'm going to give you a better -- that was a

14   very unclear answer what I just gave you.

15            I don't see -- I don't see an implant being

16   stressed to the forces that could be done in uniaxial

17   testing.  Uniaxial testing doesn't always translate

18   into the behavior in the human body.

19            The IFU was good in addressing the area that

20   was most important on the urethra and the design was

21   good in addressing the placement and the -- and the

22   confirmation of the mesh with the minimum of the

23   formation.

24       Q.   But back to the question.  Ethicon never

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 214 of 429 PageID 24894
Case 2:12-md-02327 Document 3004-1 Filed 04/19/20 Page 149 of 305 PageID 82735
Jaime Sepúlveda, M.D.

1   performed a study comparing mechanically cut mesh

2   versus laser cut mesh in -- actually in women; right?

3        A.   It's --

4             MR. SNELL:  Foundation.

5             Go ahead.

6        A.   It's -- I'm not aware of any study that was

7   performed like that, in that model.

8        Q.   (By Mr. De La Cerda)  If mechanically cut

9   mesh, TVT or TVT-O, loses particles when its

10  implanted in a woman, is there potential for those

11  lost particles to migrate into the woman's vaginal

12  wall and cause pain?

13       A.   That's a hypothesis.  It has never been

14  demonstrated.

15       Q.   Do you know if it's possible or no?

16       A.   It's medically -- it's medically --

17  medically possible, which is way below that within

18  the -- within the settings of certain medical

19  probability.

20       Q.   Okay.  Still on this mechanically cut versus

21  laser cut issue.  You agree that mesh -- that mesh and

22  polypropylene slings that is too stiff or rigid can

23  increase the risk of complications like erosion,

24  voiding dysfunction, and urethral obstruction; right?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 215 of 429 PageID 24895
Case 2:12-md-02327-C Document 294 Filed Page 145 of 305 PageID #: 32796

Jaime Sepulveda, M.D.

1           MR. SNELL:  Form.

2      A.   No -- no study has been able to corroborate

3   that.

4      Q.   (By Mr. De La Cerda)  So would you

5   disagree with that statement?

6      A.   I -- I would disagree to that statement

7   based on the fact that there's no evidence confirming

8   it.

9      Q.   You know that in 2004, Ethicon tested laser

10  cut mesh and found it to be more rigid or stiffer than

11  mechanically cut mesh; right?

12     A.   Regardless of the findings that Ethicon may

13  have found, I'm not aware that they found one way or

14  the other, and with all the research, it would not

15  surprise me that they may have found one way or the

16  other.  The question is if that has any -- any

17  translation to clinical symptoms and the ans- -- of

18  the ones you described, and my answer to that is no

19  evidence of it.

20     Q.   Okay.  So that leads to the next question

21  and this is a question I'm going to have with all

22  these opinions, but should laser cut mesh's greater

23  stiffness or rigidity in comparison to mechanically

24  cut mesh be included in the IFUs for the TVT and

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 216 of 429 PageID 24896
Case 2:12-md-02327   Document 2923   Filed 09/24/19   Page 4 of 305   PageID #: 82737
Jaime Sepulveda, M.D.

1    TVT-O?

2          MR. SNELL:  Objection, lacks foundation.

3      A.    No -- no -- there's no evidence that it

4    could work one way or the other.  Why would they

5    include it in the IFU?

6      Q.    (By Mr. De La Cerda)  Okay.  So let's talk

7    about the bases for why it doesn't need to be

8    included in the IFU.  What is your basis for that?

9      A.    It's a -- the use of a laser cut or

10   mechanical cut meshes do not translate into your

11   procedure being performed any differently and they --

12   with laser cut or without or with mechanical cut, what

13   you need to be aware is not to place a sling under

14   excessive tension, which is something that we have

15   learned even before there was mesh, not to place a

16   sling under excessive tension, follow good surgical

17   principles.  And if there was any question about that,

18   then doctors could have -- could have requested to be

19   trained on it, but I would not include something on

20   the IFU that would just confuse the issue on how to --

21   how to perform the procedure.

22     Q.    Okay.  If laser cut mesh has greater

23   stiffness or rigidity in comparison to mechanically

24   cut mesh, is clinically relative and statistically

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 217 of 429 PageID 24897
Case 2:12-md-02327   Document 3201   Filed 11/04/19   Page 218 of 305   PageID# 32798
Jaime Sepúlveda, M.D.

1  significant, should it be included in the IFUs for the

2  TVT and TVT-O?

3       MR. SNELL:  Objection, lacks foundation,

4       improper hypothetical.

5    A.   There's -- there's no correlate it

6  clinically.  So my answer to that is no, I would not

7  expect them to write in the IFU.

8    Q.   (By Mr. De La Cerda)  So this is a

9  hypothetical.  I'm saying assume that it's

10  discovered to be clinically relevant and

11  statistically significant, under those circumstances

12  would it then be proper to put it in the IFU?

13       MR. SNELL:  Same objection.

14    A.   If it's clinically -- clinically relevant or

15  statistically significant, then it may have been

16  included on the IFU if it pertains to the performance

17  of the procedure.

18    Q.   (By Mr. De La Cerda)  Now, you're aware

19  that -- you know Ulmsten is the original -- one of

20  the original inventors of the TVT; right?

21    A.   Yes.

22    Q.   You know a couple of the guys that studied

23  TVT with him were Nilsson and Falconer, you remember

24  those names being mentioned in the studies?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 218 of 429 PageID 21898
Case 2:12-md-02327   Document 2 Filed 10/25/20   Page 149 of 305   PageID 32799
Jaime Sepulveda, M.D.

1      A.   Yes.

2      Q.   And you're aware that Nilsson and Falconer

3   opposed the use of laser cut mesh because it did not

4   have the same stretch profile of mechanically cut

5   mesh.  Are you aware of that?

6           MR. SNELL:  Form.

7           Go ahead.

8      A.   I am not aware of their internal

9   conversations about it.

10      Q.   (By Mr. De La Cerda)  And does that have

11   any effect on your opinion one way or the other?

12      A.   It doesn't.  Whatever -- whatever

13   interaction they had, I would consider just a healthy

14   scientific exercise, but until there's data supporting

15   its use and there's data showing that there is a

16   difference in performance, there is no need to make a

17   difference -- to make a different recommendation.

18      Q.   What is the proper way to tension the TVT

19   device?

20      A.   It's -- it's to do it tension-free and

21   tension-free means that there is preservation of the

22   width of the sling up to 75 percent.

23      Q.   I think I missed something.  What did you

24   mean -- can you explain that again?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 219 of 429 PageID #:21899
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 130 of 305 PageID #:32800
Jaime Sepulveda, M.D.

```
1        A.   By the time that I finish doing my

2   procedure, the width on my TVT needs to be at least

3   1.1 -- at least 75 percent of 1.1-centimeter, that's

4   not just with TVT --

5        Q.   Okay.

6        A.   -- that's with any sling that I may place.

7        Q.   Where is that information in the IFU?

8        A.   That's not going to be in the IFU because

9   that's an observation of Jaime Sepulveda.

10       Q.   Do you believe that Ethicon is responsible

11  to tell physicians how to properly tension the TVT?

12       A.   There's -- there's -- there's information on

13  the IFU about not overtensioning.

14       Q.   There's information about that, but is there

15  information, like an exact measurement on how to

16  tension?  For example, I liked your example of

17  75 percent of 1.1 centimeters.

18            Does Ethicon have a responsibility to

19  communicate to physicians an exact way in tensioning

20  the TVT?

21            MR. SNELL:  Form.

22       A.   I think that Ethicon make every possible

23  effort through their -- through their education

24  programs to -- to emphasize good practices in doing a
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 220 of 429 PageID 21900
Case 2:12-md-02327   Document 4291   Filed 08/07/17   Page 141 of 305   PageID #: 52801
Jaime Sepulveda, M.D.

1  sling.  Ethicon is not re-inventing our technique to

2  do a continence procedure.

3      Q.   (By Mr. De La Cerda)  When you taught on

4  behalf of Ethicon regarding slings, did you discuss

5  this issue of the 75 percent of 1.1 centimeters

6  indicating proper tensioning?

7      A.   That's a concept that we all have -- have --

8  we, as surgeons, we know we don't want to bring it

9  tighter than that.  But we learned that with the

10  pubourethral slings.

11      Q.   Okay.  So are you saying no, you didn't

12  personally discuss that issue or because everyone

13  already knew it anyway?

14      A.   Right.  This is -- this is a common surgical

15  knowledge, which Ethicon may or may not have known.  I

16  don't know if they -- if they knew it.  This is just a

17  personal observation.

18      Q.   So you believe that Ethicon properly

19  instructs physicians on how to tension the TVT; right?

20      A.   They -- they cover that in the IFU.

21      Q.   Do you agree that the strongest unmet need

22  with the TVT is the ability to adjust tension both

23  intraoperatively and post-operatively?

24          MR. SNELL:  Form.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 221 of 429 PageID 21901
Case 2:12-md-02327   Document 4991-9   Filed 11/16/18   Page 152 of 305 PageID 32802
Jaime Sepulveda, M.D.

1    A.   Well, there's no -- no way to assess

2   post-operatively.  You're going to close and there's

3   no -- no study that says how you're going to tension

4   it.  We try to make an inference with biomechanics.

5    Q.   (By Mr. De La Cerda)  But do you agree

6   with that statement?  That the strongest unmet need

7   of the TVT's ability to adjust tension both

8   intraoperatively or post-operatively, do you agree

9   or disagree with that statement?

10    A.   I --

11         MR. SNELL:  Form.

12         Go ahead.

13    A.   I would agree to an extent, but it's so --

14   so vague that I cannot tell you that I agree

15   completely with it.

16    Q.   (By Mr. De La Cerda)  Do you agree that

17   the mesh and TVT may be too wide?

18         MR. SNELL:  Form.

19    A.   I don't -- no, I think it has shown to be of

20   the -- of the right -- of the right width to work

21   clinically.

22    Q.   (By Mr. De La Cerda)  Do you agree that

23   there is no calibration to let you know when you

24   have the tension right?

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 222 of 429 PageID 21902
Case 2:12-md-02327 Document 4921-5 Filed 10/30/20 Page 222 of 305 PageID 32803
Jaime Sepúlveda, M.D.

1  A.  That's -- that's part of the art of surgery

2  that I described before.

3  Q.  So you do agree with that; right?

4  A.  Repeat that.

5  Q.  So do you agree with, quote, there is no

6  calibration to let you know when you have the tension

7  right, close quote?

8  A.  No, we know -- we know when the tension is

9  right.  We have experience -- enough experience to

10  know when the tension is right.

11  It's extremely subjective, but I can tell

12  you if you, at the end of your surgery, you see that

13  width that goes underneath, that width that has been

14  shown study after study, that is effective, if you

15  know that is not the width you have at the end of your

16  surgery, you overtensioned it.

17  Q.  But there's not like a general calibration

18  for that; right?  Or is there?  I mean, is the general

19  calibration the 75 percent of 1.1 centimeters, is that

20  the general calibration for everybody or no?

21  MR. SNELL:  Form.

22  A.  It's a visual inspection.

23  Q.  (By Mr. De La Cerda)  So is that a yes?

24  MR. SNELL:  Objection, asked and answered.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 223 of 429   PageID 21903
Case 2:12-md-02327   Document 2915   Filed 04/11/16   Page 154 of 305   PageID #: 32804
Jaime Sepulveda, M.D.

1    A.    Yeah, that's a general calibration that is

2    been used -- I'm sorry, Burt.

3         MR. SNELL:  I said, objection, asked and

4         answered.

5         Go ahead and answer it.

6    Q.   (By Mr. De La Cerda)  Do you agree that

7    there is no -- quote, there is no consensus on the

8    amount of tension needed and many feel that the

9    tension will vary based on patient presentation and

10   patient anatomy?  Do you agree with that?

11        MR. SNELL:  Form.

12   A.    It's -- I would have to agree that it

13   changes from patient to patient and that's one of the

14   biggest challenges not only in this proceeding, any

15   surgery.

16   Q.   (By Mr. De La Cerda)  Are you going to

17   offer the opinion that tensioning of the TVT sling

18   is the same regardless of whether the sling is made

19   of mechanically cut mesh or laser cut mesh?

20   A.    You're going to visually see at the end of

21   your procedure and you know if you tensioned it right

22   when you look at it.

23   Q.    So tensioning might change as long as the

24   width that you're looking for is correct?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 224 of 429 PageID 21904
Case 2:12-md-02327-C Document 9415 Filed 03/15/19 Page 199 of 305 PageID #: 32805
Jaime Sepulveda, M.D.

1    A.   I just say visually see.  I don't know how

2    another way you're going to see if it's not visually.

3    Q.   Right.

4    A.   But it's -- what I -- my opinion is that

5    once you -- once you place a sling, that being laser

6    cut or mechanically cut, at the end of your procedure,

7    that sling needs to look the way -- in a way that it

8    covers the mid urethra to an extent of at least .75 to

9    1-centimeter.

10   Q.   Do you agree that a responsible medical

11   device company would determine the proper way to place

12   a device before putting that product on the market?

13       MR. SNELL:  Form.

14   A.   They -- they have no way -- we have no way

15   to -- to -- to communicate that to each other.  That

16   is -- that is the hard part of surgery.

17       I think that when they say, "Do not

18   overtension it," and when they say, "You need to have

19   experience in continence procedures," and when they

20   say, "This is not a comprehensive guide for continence

21   care," I think that's accurate and fair and as a

22   surgeon you understand that.

23   Q.   (By Mr. De La Cerda)  And so this question

24   is really more of a general proposition, though.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 225 of 429   PageID 21905
Case 2:12-md-02327   Document 94-1   Filed 06/25/20   Page 155 of 305   PageID 52805
Jaime Sepulveda, M.D.

1    Would you agree that a responsible medical device

2    company would determine the proper way to place a

3    device before putting that product on the market?

4             MR. SNELL:  Same objection, asked and

5         answered.

6         A.    That's where -- that's where all the studies

7    with cadavers come in.

8         Q.    (By Mr. De La Cerda)  So the answer is

9    yes; right?

10        A.    Yes, the device company does that.

11        Q.    Okay.  Shifting gears to a new issue.

12             Before I do that, are you okay?  Do you want

13   to take a break at all?

14        A.    No, I'm okay, if you guys are okay.

15             MR. SNELL:  What time are we going to have

16        lunch?

17             MR. DE LA CERDA:  Yeah, it's almost noon.

18        Do you want to do it now.

19             MR. SNELL:  If he's fine, I'm fine.

20             (Thereupon, a recess was taken from

21        11:47 a.m. until 12:00 p.m., after which the

22        following proceedings were held:)

23        Q.    (By Mr. De La Cerda)  So we're back on the

24   record.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 226 of 429 PageID 21906
Case 2:12-md-02327-DJC   Document 94-1   Filed 10/25/20   Page 10 of 305 PageID #: 3287
Jaime Sepúlveda, M.D.

1          There's a fault question on -- earlier we

2     discussed your work as a consultant for Ethicon and we

3     briefly discussed what you estimated to be what you

4     had received from Ethicon in compensation for that.

5          In another case, the Raviola case, which you

6     may recall, there was actually a production of the

7     payments and it was produced in a -- in hard copy --

8     and this question is probably really for Burt.

9          MR. DE LA CERDA:  If I forward that to you,

10          can you send that to us in like an Excel or

11          whatever it originally came in because the print

12          is tiny?

13          MR. SNELL:  Okay.  Yeah, I mean -- well, I

14          can do my best.

15          MR. DE LA CERDA:  Okay.

16          MR. SNELL:  I've been trying to send

17          e-mails.  My e-mail is not working.  It's not

18          letting me send stuff.  I have something

19          important to send.  It's not related to this

20          deposition.  I've been trying all morning.  Is

21          the Internet --

22          MR. DE LA CERDA:  It's coming off and on for

23          me.

24          I'm forwarding this to you and then if we

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 227 of 429 PageID 21907
Case 2:12-md-02327 Document 2911-1 Filed 04/06/16 Page 399 of 305 PageID #: 32809
Jaime Sepulveda, M.D.

1     can get the native version.  It looks like it was

2     an Excel that was then printed off, but the type

3     on it is really small and then that will

4     provide -- this is what Ethicon shows its records

5     of payments and then that can kind of settle that

6     issue.

7          THE WITNESS:  Yeah, it was actually

8     presented on the Cavness trial.

9          MR. DE LA CERDA:  Oh, okay.

10         THE WITNESS:  It was in very small -- very

11    small letters.

12         MR. DE LA CERDA:  Okay.

13         THE WITNESS:  And just as clarifying that

14    number, what was allocated to pay me, not actual

15    payments.

16         MR. DE LA CERDA:  Okay.  So we'll have to

17    clear that up, but if, Burt, you can take a look

18    at getting us that version, thanks.

19    Q.    (By Mr. De La Cerda)  Okay.  All right.

20    The issues that I'm about to discuss will relate to

21    TVT, TVT-O, Gynemesh, Prolift and Prosima, so I'm

22    going to do it all at once.

23         First, you're aware that the TVT and TVT-O

24    are made of Prolene mesh, which is constructed of

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 228 of 429   PageID 21908
Case 2:12-md-02327   Document 2021   Filed 04/23/14   Page 159 of 305   PageID 52809
Jaime Sepúlveda, M.D.

```
 1    knitted filaments of extruded polypropylene strands,

 2    identical in composition to that used in Prolene

 3    polypropylene nonabsorbable surgical suture; correct?

 4        A.    I agree with that.

 5        Q.    You're also aware that the mesh in Gynemesh,

 6    Prolift, and Prosima is Prolene Soft, which is also

 7    constructed of knitted filaments of extruded

 8    polypropylene identical in composition to Prolene

 9    polypropylene suture; correct?

10        A.    To a -- to a -- identical in composition,

11    yes.

12        Q.    And the IFUs for the TVT, the TVT-O,

13    Gynemesh, Prolift and Prosima all characterize Prolene

14    as inert; correct?

15        A.    They -- they characterize it as that word

16    inert, yeah.

17        Q.    They state:  "This material, when used as a

18    suture, has reported to be nonreactive and retain its

19    strength indefinitely in clinical use"; right?

20        A.    I -- I'm aware of that statement, yes.

21        Q.    They also -- the IFUs for those products

22    also state:  "The material is not absorbed nor is it

23    subject to degradation or weakening by the action of

24    tissues enzymes"; right?
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 229 of 429 PageID 21909
Case 2:12-md-02327-C   Document 94-1   Filed 04/24/14   Page 160 of 305 PageID #: 32810
Jaime Sepúlveda, M.D.

1      A.   That's a statement on the IFU.

2      Q.   The mesh in these products not being -- or

3   strike that.

4          The mesh in these products being nonreactive

5   or inert or not subject to degradation, that's a

6   property or those are properties that are desirable

7   for an implant designed for a human body; right?

8          MR. SNELL:  Form, overbroad.

9      A.   That -- that is -- that is a characteristic

10   that we did not see in other types of materials and

11   that we're pursuing when we placed those sutures.

12      Q.   (By Mr. De La Cerda)  Okay.  Why would you

13   want a human -- an implant designed to be implanted

14   in humans to be inert or nonreactive or not subject

15   to degradation?

16          MR. SNELL:  Objection, overbroad.

17          Go ahead.

18      A.   The degradation has to -- has to do with --

19   the way we interpret degradation has to do with

20   absorbables or partially absorbable sutures.

21          The way that non- -- nonreactive means that

22   there's no reaction to hydrolysis.

23          And the way that it was described as non- --

24   nondegraded is it was that there was no loss on the

Case 2:20-cv-00065-SPC-MRM  Document 94-1  Filed 10/25/20  Page 230 of 429  PageID 21910
Case 2:12-md-02327-JMC  Document  Filed 10/25/20  Page 300 of 305  PageID 32811
Jaime Sepulveda, M.D.

1   strength of the suture on testing that was done before

2   placing it on a patient.

3        Q.   (By Mr. De La Cerda)  Okay.  So why would

4   it be desirable for a human implant to have those

5   characteristics that it doesn't degrade, that it's

6   inert, that's it's nonreactive?

7             MR. SNELL:  Same objection.

8             Go ahead.

9        A.   It is -- it translates, theoretically, on

10  the durability of the repair.

11       Q.   (By Mr. De La Cerda)  Because these mesh

12  implants are intended to be permanent implants;

13  correct?

14       A.   They're intended to -- to last a lifetime if

15  you can make it interact in a way that it can last a

16  lifetime.  In other words, if the host doesn't change,

17  you'll want that implant to work and give you

18  durability.

19       Q.   Now you're aware that as early at 1987,

20  Ethicon had evidence of degradation of Prolene in the

21  human body; correct?

22       A.   I -- I don't believe that they call it

23  degradation in the sense that we interpret

24  degradation.  There's -- there's degradation from the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 231 of 429 PageID 21911
Case 2:12-md-02327 Document 7962 Filed 05/14/19 Page 232 of 305 PageID 231912
Jaime Sepulveda, M.D.

1  biomechanical point of view and there's degradation

2  from what we see in normal life of degradation.

3      Q.   Okay.  So what is it that you believe that

4  Ethicon saw in terms of degradation in 1987?

5      A.   Well, what they saw -- what they saw is

6  purely a microscopic study.  If there will be

7  degradation, there will be a significant impact on the

8  durability of the effect of the sling or in the

9  durability of the repair.

10      Q.   In the context of safety, though -- strike

11  that.

12          If Prolene has a tendency to degrade in a

13  human body, would that indicate that it's not inert?

14          MR. SNELL:  Form, improper hypothetical.

15      A.   If it would degrade, it would dissolve.  And

16  if it would dissolve, it would just lose all its

17  effect.  So whatever -- whatever conclusion is met of

18  degradation is on hypothetical grounds and not based

19  on the evidence that we have.

20      Q.   (By Mr. De La Cerda)  What evidence are

21  you referencing?

22      A.   The durability of a procedure for

23  incontinence on prolapse.

24      (Brief interruption and off the record discussion.)

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 232 of 429 PageID 21912
Case 2:12-md-02327   Document 2997-1   Filed 03/05/17   Page 163 of 305 PageID 82813
Jaime Sepúlveda, M.D.

1    Q.   I can't remember if you were finished with

2    your response.  If you could read it back.

3         (The requested portion of the record was

4         read back by the reporter.)

5    A.   Let me clarify this.  The reason why I

6    generalize it on incontinence on prolapse is because

7    we're talking about more than one product here.

8    Q.   (By Mr. De La Cerda)  Yes, yes.

9         And all these products have, within their

10   mesh -- one mesh is called regular Prolene or just

11   Prolene and the other one is called Prolene Soft, but

12   both meshes are made of essentially woven Prolene

13   suture.  It's the same material as Prolene; right?

14        MR. SNELL:  Objection.

15   A.   No, it's not woven.

16   Q.   (By Mr. De La Cerda)  How is it made then?

17   A.   It's knitted.

18   Q.   Knitted, okay.

19        But it's all made of knitted polypropylene

20   that's identical in composition to Prolene; correct?

21   A.   It's knitted -- it's knitted extruded

22   polypropylene.

23   Q.   It's identical in composition to Prolene

24   suture; right?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 233 of 429 PageID 21913
Case 2:12-md-02327 Document 2041 Filed 04/24/14 Page 234 of 305 PageID 52814
Jaime Sepúlveda, M.D.

```
 1        A.   It is -- it has been shown to have the same

 2   level of crystallinity as Prolene suture.

 3        Q.   If there were findings as to Prolene suture,

 4   would those findings, the characteristics of Prolene

 5   suture, have relevance to meshes that are also made of

 6   extruded polypropylene that's identical in composition

 7   to Prolene suture?

 8             MR. SNELL:  Form, vague.

 9        A.   I did not get that one.  Sorry.

10             (The requested portion of the record was

11        read back by the reporter.)

12        A.   As it pertains to composition, the evidence

13   shows that TVT-O and Prolene sutures, that's the

14   extent of the evidence, has -- has the same

15   crystallinity.  When we define crystallinity, is the

16   most accurate way to evaluate that one material is

17   like the other.

18        Q.   (By Mr. De La Cerda)  Well, what I'm

19   saying, though, is if there is a finding about a

20   characteristic of Prolene sutures like, for example,

21   degradation, if Prolene sutures degrade in the human

22   body, can we also say or is that evidence of that

23   Prolene mesh would also degrade in the human body?

24             MR. SNELL:  Form.
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 234 of 429 PageID 21914
Case 2:12-md-02327 Document 1234 Filed 10/25/20 Page 4 of 305 PageID# 32815
Jaime Sepúlveda, M.D.

1      A.   And there is -- first of all, there is

2  more -- there are three -- there are three parts to

3  that question.  The first one is the concept of

4  degradation.  And if Prolene would degrade, all the

5  Burches that we did with polypropylene would

6  eventually fail.  And all the -- and most of the

7  slings that we did with polypropylene would eventually

8  fail clinically.

9           And we know that the evidence points out

10  that that's -- that's not the case.  That's the first

11  part of degradation.

12           Number two is polypropylene, the way it

13  defines degradation on a dog or in a rabbit or in a

14  Himalayan or a Wistar rat or a Himalayan -- Himalayan

15  rabbit, the way it's defined cannot be translated

16  to -- to a -- to a person because they're completely

17  different hosts and the stresses that are placed on --

18  on those implants are completely different.

19           The immunologic reaction is different and

20  the cellular level is different, cellular findings are

21  different.  And, finally, is the concept that -- that

22  Prolene and -- would -- would degrade and create

23  anything beyond what the sling would create.  No, they

24  stay -- they're both exactly the same, the same.  Not

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 235 of 429 PageID 21015
Case 2:12-md-02327 Document 2974-1 Filed 04/24/17 Page 100 of 305 PageID #: 82810
Jaime Sepulveda, M.D.

1    exactly, but they're both very similar implants.

2             So those are the three -- three aspects to

3    your question, and I know it's an extremely elaborate

4    answer for probably a much more straightforward

5    question.  But there's -- the concept of degradation,

6    I would have to accept that concept to agree with

7    your -- with what you just presented.

8        Q.   (By Mr. De La Cerda)  I think step one is

9    we need to define what we're talking about by

10   degradation.

11            We know that in 1987 there was a study done

12   by Ethicon on explanted Prolene suture from humans;

13   right?

14       A.   On explanted and not -- I believe it's from

15   the dog study.

16       Q.   There is one of humans, too.  Have you seen

17   that one?

18       A.   No, I haven't -- haven't.  I'm not aware of

19   that one.

20       Q.   Okay.  If there's a study from 1987 on --

21   and these are Prolene sutures explanted from humans,

22   if those show the cracking and degrading that's

23   indicative of degraded polypropylene, that's the kind

24   of degradation that I'm talking about.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 236 of 429 PageID 21916
Case 2:12-md-02327   Document 9241-1   Filed 01/21/19   Page 167 of 305   PageID #: 218191

Jaime Sepúlveda, M.D.

```
 1       A.    Are you referring to the eye study?

 2       Q.    I'm sorry?

 3       A.    To the eye study.  Are you referring to the

 4  polypropylene being removed from the eye?

 5       Q.    Vascular -- I believe they were implanted in

 6  the heart.  Unfortunately, I didn't bring that study

 7  with me.  I assumed you would already be aware of it.

 8            My understanding is they were explanted from

 9  the hearts of the patients.  They were Prolene sutures

10  explanted from the heart of human patients.

11            Are you aware of that one?

12       A.    No, I'm not aware.  I know there is a study

13  on blood vessels and I know that there is a study

14  of -- on the eye and I know about the dog study.

15       Q.    Okay.

16            MR. SNELL:  For clarification purposes, you

17       have -- maybe if you knew -- I can tell you -- I

18       know what the name of it is.  I mean, if that

19       would ring a bell with him.

20            MR. DE LA CERDA:  Professor --

21            MR. SNELL:  Gudion, blood vessels.

22            THE COURT REPORTER:  Can you spell that one?

23            MR. DE LA CERDA:  I think it's G-u-d-o-i-n

24       or something like that.  That's the professor's
```

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 237 of 429 PageID 21917
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 237 of 305 PageID #: 32819
Jaime Sepulveda, M.D.

1      last name.

2          Q.   (By Mr. De La Cerda)  Does that ring a

3   bell?

4          A.   It's -- I am -- I read that.  I do recall

5   reading it and I do recall that it was a very thin

6   polypropylene suture that was hand tied, but

7   there's -- I don't know how that translate to

8   degradation.

9          Q.   (By Mr. De La Cerda)  Okay.  So the

10   finding in that study was at the surface, that there

11   was cracking on the surface of the suture; right?

12   And that when they tested the material from the

13   cracking, that it was indicative of oxidative

14   degradation to polypropylene; right?

15             MR. SNELL:  I'm going to object on

16        foundation.

17             Go ahead.

18          A.   I cannot confirm that, no.

19          Q.   (By Mr. De La Cerda)  Okay.  Well, what

20   I'm trying to do is define the degradation I'm

21   talking about.  And I think this is even in the

22   studies that discuss it, degradation, and there have

23   been in the studies discussion of the surface of

24   polypropylene has some sort of cracking that's going

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 238 of 429 PageID 21918
Case 2:12-md-02327 Document 2918 Filed 10/04/16 Page 109 of 305 PageID 82819
Jaime Sepúlveda, M.D.

1    on and when they look at that cracking, it's

2    believed to be polypropylene that's cracking and

3    degrading.

4              Now you've seen studies that have discussed

5    that issue; right?

6        A.   I'm -- I'm aware of the paper by Clavé.

7        Q.   Okay.

8        A.   By one of the Clavés, by the way, not --

9        Q.   Is there a brother, like an evil twin?

10       A.   So I am aware of that paper and in that same

11   paper they cite the UV -- ultraviolet degradation, but

12   I am also aware that that paper was about normal

13   samples.

14             I'm also aware that the number of

15   low-density polypropylene study was less than -- I

16   believe it was a quarter of the sample and -- I don't

17   have to believe it, I actually have it here.

18       Q.   You're welcome to pull out anything you'd

19   like to review.

20             What I'm trying to get at -- I'm just trying

21   to get us to agree at least on a definition of

22   degradation that I'm going to ask you about.  And what

23   I'm trying to say is that's the version of degradation

24   I'd like to ask you about.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 239 of 429   PageID 21919
Case 2:12-md-02327   Document 2943   Filed 09/27/19   Page 239 of 305   PageID 32820
Jaime Sepúlveda, M.D.

 1              Now, I know you're already going to tell me

 2     that's not clinically significant.  I know you're

 3     going to tell me it's not going to matter.  I know

 4     that.  What I'm trying to first get is let's get an

 5     agreement on that's the degradation I'm talking about

 6     and then we can go through the -- to kind of finish up

 7     the questions because you'll end up telling me that it

 8     doesn't need to be in the IFU.

 9              So focusing, first, on the degradation, the

10     version that I'm talking about is the cracking, the

11     surface cracking that happens of the polypropylene

12     that's at least been seen and reported on in some of

13     the studies.  Is that version of degradation, is that

14     clinically significant or clinically relevant such

15     that it needs to be in the IFU for the TVT, TVT-O,

16     Gynemesh, Prolift and Prosima?

17              MR. SNELL:  Objection, lacks foundation.

18              Go ahead.

19        A.   The way it stands right now, with the

20     studies that I have seen, specifically the ones on --

21     in general polypropylene -- the ones on the eye, I

22     believe I saw that.  The way it stands right now, that

23     type of degradation has not been shown on the -- on

24     actual samples of slings.  It has been shown in

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 240 of 429 PageID 21920
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 240 of 305 PageID 82821
Jaime Sepúlveda, M.D.

1    abnormal samples, not in slings that work or come --

2    or have the clinical results that we have seen on

3    reports and it have -- it have not been shown in

4    any -- any studies having a clinical impact.

5         Q.   (By Mr. De La Cerda)  Okay.  What do you

6    mean by "abnormal slings"?

7         A.   If there is a sling that has an exposure,

8    and especially slings that are exposed to a surface,

9    then that will be abnormal sample.

10        Q.   Okay.  Exposed to what kind of surface?

11        A.   To the vagina or the bladder or the bowel.

12        Q.   Okay.  So is there something that's

13   happening during that exposure that -- that your

14   belief is causing this phenomenon of degradation?

15        MR. SNELL:  Objection.  Hold on.

16        Misstates -- I don't think he testified, Counsel,

17        that he believes in degradation.  I think you're

18        taking what he said -- I think you're misstating

19        his answer.

20        Go ahead.

21        A.   The -- what we see in abnormal slings is

22   that a biofilm is created and this biofilm is -- has

23   been seen in catheters, it has been seen in IUDs, it

24   has been seen in other implants that are exposed to

Jaime Sepulveda, M.D.

 1    air.

 2        Q.    (By Mr. De La Cerda)  Okay.  So is that --

 3    is that your explanation of what you believe is

 4    actually being seen when we see this cracking?

 5        A.    That -- that is -- that is actually what --

 6    what I see, the only correlation that I can put

 7    together with the cracking.

 8             There's no other explanation based on what I

 9    know and what I have researched that mechanical stress

10    retrieval or a biofilm.

11        Q.    Okay.  We know -- well, you know that raw

12    polypropylene without any antioxidants would degrade

13    in the human body.  Do you know that or no?  Or do you

14    believe that or no?

15        A.    No, there's no evidence that there's

16    degradation.

17        Q.    Okay.  Do strong oxidizers like peroxide, do

18    those affect raw polypropylene or no?

19        A.    The only report that I was able to find on

20    it was in containers, which is different from this --

21    it's the same hydrocarbon, but different containers on

22    a surface outside.

23        Q.    Okay.

24        A.    Actual containers that were used for

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 242 of 429 PageID 21922
Case 2:12-md-02327 Document 2019 Filed Page 179 of 305 PageID #: 82823
Jaime Sepúlveda, M.D.

1    storage.  This is completely different from -- from

2    what is used in slings in prolapse.  So there's --

3    it's a hypothesis.  That's probably upgrading it to a

4    hypothesis.

5        Q.   Ultimately you believe, though, that the

6    cracking that's seen when the studies are discussing

7    degradation is really a biofilm and not the

8    polypropylene itself; right?

9        A.   I -- I don't know if it's the biofilm or

10   it's a matter of technique or if it's a stressor that

11   was placed on the sample on retrieval.  We -- we don't

12   know that.  And most -- most importantly, we know that

13   probably any -- regardless of the reason why it

14   happens, it doesn't translate in any physical outcome,

15   in a clinical significant outcome.

16       Q.   What about the erosions, though?  So you

17   mentioned that they were abnormal meshes that had

18   eroded and were exposed to air, isn't the fact there

19   is an erosion, isn't that some sort of clinical --

20   clinically significant event?

21            MR. SNELL:  Form.

22       A.   No, the exposed segment of the sling doesn't

23   mean that it eroded.  The most frequently -- the

24   most -- normally, the most frequent reason why you see

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 243 of 429 PageID 21923
Case 2:12-md-02327-C Document 2311 Filed 10/25/20 Page 94 of 305 PageID 82824

Jaime Sepulveda, M.D.

1    an exposed sling or a mesh is because there's a bone

2    healing that -- the dehiscence of the wound, there is

3    a dehiscence of the wound, there is a disorder of the

4    wound healing.

5         So we have seen disorders of wound healing

6    in patients that have prolapse even before we place --

7    we replace it, and we actually have seen it with

8    sutures.  Not only with polypropylene sutures, we have

9    seen it with polyester sutures, specifically, and we

10   have seen it with GORE-TEX sutures.

11        And there's actual clinical evidence that

12   shows these abnormal wound healing occurring on the

13   presence of these sutures, and also with native

14   tissue.  So this is not that the sling work itself

15   around and erode.  This is an incision that has been

16   open.

17        Q.   (By Mr. De La Cerda)  And is there any --

18   and what's responsible for the poor wound healing or

19   the wound healing issue?

20        A.   There are a variety of factors.  These are

21   defects in the fibromuscular layer, specifically, as I

22   place -- as I wrote in my report, loss of tensile

23   strength in the abdominal sutures that put the wound

24   together.

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 244 of 429 PageID 21024
Case 2:12-md-02327-JGC   Document 9991-1   Filed 09/05/15   Page 6 of 305 PageID# 32829
Jaime Sepulveda, M.D.

1              Number two, there are mechanical factors.

2              Number three, there are actual wound-healing

3      factors, such as immune disorders, poor tissue

4      healing, cigarette smoking, and finally hematomas,

5      just to mention a few.

6              And these conditions may predispose a wound

7      to open and expose the graft.  It may predispose the

8      wound not to heal properly over a suture and it may

9      predispose the wound not to heal properly just over

10     native tissue.

11     Q.   Have you -- are you aware of an exposure and

12     erosion ever happening not related to a wound healing

13     issue?

14     A.   No, that's -- that's -- is a problem of

15     wound healing.

16     Q.   And that's it?

17     A.   And that's what I see consistently.

18     Q.   But it's your belief that that's the only

19     reason why there might be an exposure or erosion is

20     because of wound healing; right?

21     A.   It is the most viable factor of the three

22     fact- -- of the three -- of the interaction between a

23     graft on a host, is the most viable factor is the

24     host.  And the -- the sling's consistent.  Or the --

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 245 of 429 PageID 21025
Case 2:12-md-02327 Document 9381 Filed 02/13/19 Page 9 of 505 PageID 582820
Jaime Sepúlveda, M.D.

1    or the polypropylene is a consistent material.  And

2    there's obviously the third one, which is the

3    insertion, the technique, but if you really look at

4    technique being constant, it's always a wound healing

5    issue.

6        Q.   So one of the problems could be the doctor's

7    fault, the other problem could be the patient's fault

8    because of their body and their wound healing, but

9    third issue can't be the implant because it is what it

10   is and it's --

11       A.   I would not simplify just with it being a

12   fault.  We -- this is not -- these are not issues that

13   are just -- that just happened with -- with mesh.

14   We -- we know that these issues go way -- for any

15   prosthetic material, way back before any prosthetic

16   material.  We know that these issues happen with

17   polyester sutures in uterosacral ligament suspensions.

18   We know that there are instances in which there has

19   been no mesh, there being a suture and the suture had

20   to be removed.  And we know there are instances in

21   which we don't use a mesh at all and that incision

22   opens up.  The most viable aspect is the host.

23   There's definitely a variation on the insertion

24   technique and I think that by now we all have evidence

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 246 of 429 PageID 21926
Case 2:12-md-02327  Document 9419-11  Filed 00/00/00  Page 1 of 305  PageID #: 3282

Jaime Sepúlveda, M.D.

1    that those with the most experience have the lowest

2    rate of -- lowest rate of problems.  Not only this

3    surgery, any other surgery, but the most consistent

4    part is the prosthesis, the polypropylene.

5        Q.   Do you believe that mesh degrading or

6    breaking down can lead to an erosion or exposure or

7    no?

8            MR. SNELL:  Foundation.

9        A.   There's -- there's no evidence that that's

10   the case.

11       Q.   (By Mr. De La Cerda)  Do you believe that

12   polypropylene can become brittle?

13       A.   How -- how do we define brittle?

14       Q.   That's a good question.

15       A.   You're going to probably --

16       Q.   What's your understanding of the term

17   "brittle"?

18       A.   Brittle is weak.  Brittle could be friable.

19   Decreased tensile strength to put it in exact terms.

20       Q.   So using that explanation of what brittle

21   means to you, do you believe that polypropylene can

22   become brittle?

23       A.   No.

24       Q.   Okay.  So now let's get to the question

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 247 of 429 PageID 21927
Case 2:12-md-02327 Document 2022-1 Filed 04/23/16 Page 139 of 305 PageID 32829
Jaime Sepulveda, M.D.

1    about your opinion.  Should Prolene's tendency to

2    degrade in the human body be included in the IFUs for

3    the TVT, TVT-O, Gynemesh, Prolift and Prosima?

4            MR. SNELL:  Lacks foundation, misstates,

5        opinion testimony.

6        A.   There's -- there's nothing to place the

7    result of degradation.

8        Q.   (By Mr. De La Cerda)  And your basis for

9    that opinion is what?

10           MR. SNELL:  Asked and answered.

11       A.   That degradation has not been defined in a

12   reproducible scientific way to have -- to be present

13   or, if present, to have any consequences in clinical

14   outcomes.

15           MR. DE LA CERDA:  All right.  I think that's

16       a good break point.  It's 12:30.

17           (Thereupon, a lunch recess was taken from

18       12:30 p.m. until 1:20 p.m., after which the

19       following proceedings were held:).

20       Q.   (By Mr. De La Cerda)  All right.  Doctor,

21   we're back on the record.  There is one question I

22   wanted to ask you on the degradation issue.

23           If Prolene's tendency to degrade the human

24   body is clinically significant, clinically relevant

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 248 of 429 PageID 21928
Case 2:12-md-02327-CU Document 94-1 Filed 10/25/20 Page 199 of 505 PageID 32829
Jaime Sepulveda, M.D.

1   and statistically significant, should that information

2   be included in the IFUs for the TVT, TVT-O, Gynemesh,

3   Prolift and Prosima?

4           MR. SNELL:  Objection, foundation, form.

5           Go ahead.

6       A.   Any -- any significant clinical response

7   that deviates from what's reported in randomized

8   control trials should be -- should be a matter of

9   addressing it, regardless if there is a degradation

10  there underneath or not.  And there -- there are

11  systems in place that allows for that reporting, more

12  than one system, actually.

13      Q.   (By Mr. De La Cerda)  So any risk or

14  complication that's clinically significant,

15  clinically relevant and statistically significant,

16  any risk or complication that's like that should be

17  included in the IFU, do you agree with that?

18          MR. SNELL:  Form, foundation, misstates.

19      A.   If there's -- anything that is clinically

20  significant, statistically significant, let's say we

21  have a voiding dysfunction that is higher than would

22  happen with a Burch procedure, if we have pain, any

23  type of an incidence of urge incontinence or urge

24  incontinence, incidents of any -- that should be

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 249 of 429 PageID 21029
Case 2:12-md-02327   Document 3021   Filed 04/02/21   Page 180 of 305 PageID #: 82830
Jaime Sepulveda, M.D.

1    addressed.  If it's different from the RCTs.  But if

2    you're going to challenge what's reported on RCTs,

3    then you need to come up with a similar number of

4    patients and you need to have some statistical

5    validity to it.

6         Q.   (By Mr. De La Cerda)  Okay.  Moving on to

7    a new issue and this one involves TVT and TVT-O.

8              What does cytotoxicity mean?

9         A.   It means in the -- in experiment, the number

10   of cells that are not viable after exposure to an

11   agent is lower than the expected of the benchmark we

12   established.

13        Q.   The definition you gave me, which, by the

14   way, is very accurate in a certain sense.  It's funny,

15   so you told me exactly what the scientific definition

16   is.  The other thing I was asking -- that I was

17   thinking in my mind is cytotoxicity, what does that

18   word mean, literally?

19             MR. SNELL:  Form.

20        A.   It means it will -- it means toxicity to the

21   cell.

22        Q.   (By Mr. De La Cerda)  Right.  And you're

23   aware that the cytotoxicity assessment of the

24   Ulmsten Prolene polypropylene sling, using the ISO

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 250 of 429 PageID 21930
Case 2:12-md-02327 Document 2974-1 Filed 04/05/17 Page 1 of 505 PageID #: 82831
Jaime Sepúlveda, M.D.

1    elution method showed cell lysis and toxicity;

2    correct?

3         A.   There was one other place, and I was able to

4    see that on company documents.  There was one other

5    place in which they saw that there was a little

6    cytotoxicity, but when it was -- it could never be

7    reproduced, actually, when it was redone in the

8    agarose, in the agarose form, there was -- in the

9    agarose overlay method, it was not -- it was not

10   cytotoxicity.

11            And this is significant because the -- when

12   you do a drug elution test, essentially, you're

13   immersing the cells on a pool of this -- of this

14   polypropylene.  It will be -- it's a huge amount.

15   It's an amount that you, on purpose, make it -- make

16   it toxic.  The toxicity -- the toxicity is -- is

17   supposed to affect a lot more than this.

18            One of the biggest drawbacks of cytotoxicity

19   assays is that you cannot have a positive control.  So

20   when you put agarose on it, you neutralize and you

21   make it more real.  You neutralize it and make it more

22   real.

23        Q.   In one of those two testing methods

24   cytotoxicity was shown; right?

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 251 of 429 PageID 21931
Case 2:12-md-02327 Document 4291-1 Filed 08/08/17 Page 252 of 305 PageID 82832
Jaime Sepúlveda, M.D.

```
 1       A.    It was in one plate.  It was not

 2  scientifically significant to it.  When normal

 3  polypropylene was -- was examined on L929 mouse

 4  fibroblast cells, there was no cytotoxicity.

 5       Q.    Have you studied what happens to tissues

 6  when it's exposed to a cytotoxic substance?

 7       A.    Yes, I have.

 8       Q.    And can you explain what those studies were?

 9       A.    Before going to OB/GYN, I did a fellowship

10  on molecular pharmacology, and I did a flow cytometry

11  and cytotoxicity assays, that's what I did every day.

12       Q.    Okay.

13       A.    And we use different agents.  So there's --

14  one thing that we know that tissue configures a

15  protection different from cells.  Tissue makes --

16  makes the viability of cells coming -- mediating by

17  whatever response that you may have to a cytotoxic

18  agent.

19             So far, and there has not been any evidence

20  that polypropylene is a cytotoxic in the muscle that

21  been by biopsy or by any other -- other test.

22       Q.    Would you agree that necrotized tissue

23  surrounding mesh could lead to erosion or exposure of

24  the mesh?
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 252 of 429 PageID 21932
Case 2:12-md-02327   Document 4925   Filed 11/04/19   Page 189 of 305 PageID 32833

Jaime Sepúlveda, M.D.

1    A.   If you see a necrotic tissue in an incision,

2    it's a wound dehiscence.

3    Q.   So do you agree or disagree with that

4    statement -- or that question?

5         MR. SNELL:  Form.

6    A.   That -- you will have to repeat it.  I'm

7    sorry.

8    Q.   (By Mr. De La Cerda)  Would you agree that

9    necrotized tissue surrounding the mesh could lead to

10   an erosion or exposure of the mesh?

11   A.   If it's at the wound, yes, it can lead to

12   that.

13   Q.   Should the cytotoxicity assessment of the

14   Ulmsten polypropylene sling showing cytotoxicity be

15   included in the TVT or TVT-O IFUs?

16        MR. SNELL:  Form, misstates.

17   A.   Once you have a pyrogenicity assays and once

18   you have a drug elution and agarose test, if your

19   testing is negative, you just submit it to the FDA.

20   It doesn't have to be included as cytotoxic because it

21   will be -- it will be inaccurate.

22   Q.   (By Mr. De La Cerda)  So the answer is no;

23   right?

24   A.   No.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 253 of 429 PageID 21933
Case 2:12-md-02327 Document 9211-1 Filed 12/21 Page 134 of 305 PageID 32834
Jaime Sepúlveda, M.D.

1    Q.   And what would be your basis for that

2    opinion?

3    A.   My -- the review of the -- the review of the

4    cytotoxicity assays that were made available to me

5    through company documents.

6    Q.   Okay.  And which ones were those?

7    A.   The ones on TVT.

8    Q.   And those included the ISO agarose diffusion

9    method?

10   A.   That includes -- there are two types of

11   tests that were done.  There was the agarose, the drug

12   elution, and pyrogenicity and to check for the

13   inflammatory reaction also of injected polypropylene.

14   Q.   Any other bases for this opinion?

15   A.   This is -- this is the basis for the

16   opinions.

17   Q.   Do you know what the significance is of mesh

18   being heavyweight as opposed to lightweight?

19   A.   There's -- there's -- the difference --

20   difference in weight -- in the weight, essentially.

21   Q.   And it's really a description of density,

22   right, not actual mass?

23   A.   It has -- it has to do with how much per a

24   square -- square millimeter is, how much does it weigh

1    in terms of grams per square millimeters.

2        Q.   And so do you have an understanding of what

3    the significance in terms of risks and

4    complications --

5        A.   I -- I misspoke.

6        Q.   Okay.

7        A.   I misspoke.  It's not per square millimeter.

8    It is per square meter.

9        Q.   Okay.

10       A.   I can double-check that.

11       Q.   Do you have any understanding of what the

12   significance is in terms of risks and complications

13   when you look at lightweight mesh versus heavyweight

14   mesh?

15            MR. SNELL:  Form.

16            Go ahead.

17       A.   The heavy -- heavyweight meshes with -- not

18   only just with the weight, but with all the other --

19   the other factors, including fiber size, pore -- pore

20   diameter, and method of coming together, either being

21   knitted or woven, had to do with the tolerability and

22   biocompatibility of the implant.

23       Q.   (By Mr. De La Cerda)  So let's get back to

24   my question, though.  Is there a difference in terms

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 255 of 429 PageID 21035
Case 2:12-md-02327-C Document 94-1 Filed 09/16 Page 180 of 305 PageID #: 32830
Jaime Sepúlveda, M.D.

1   of risks and complications for a patient between

2   lightweight and heavyweight mesh?

3           MR. SNELL:  Form.

4       A.   Not to the point that has been clinically

5   demonstrated.

6           In theory, we could -- in theory, there is a

7   difference.  In the lab, when we use large portions we

8   can infer that, but that has not been shown in the

9   clinical arena of incontinence.

10      Q.   (By Mr. De La Cerda)  Okay.  So now --

11  okay.

12          First of all, let's discuss, what is the

13  theory of the difference -- the theory of the

14  significance as to risks and complications when you

15  compare lightweight versus heavyweight mesh?

16      A.   It's the biomechanical behavior is

17  different.  The biomechanical behavior is different

18  not only for that type of preparation, but it's also

19  different for the caliber of the sutures.

20          In other words, if I use a thinner suture,

21  that being polypropylene or any other material, it

22  will -- it can behave differently.  It has a tendency

23  to behave differently than a lightweight mesh or a

24  heavyweight mesh.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 256 of 429  PageID 21936
Case 2:12-md-02327  Document 9451-1  Filed 05/31/19  Page 139 of 305  PageID #: 3283
Jaime Sepúlveda, M.D.

1     Q.    Okay.  In what ways?

2     A.    In the testing, when you stretch it, when

3  you fold it, when you place it and have fibroblast

4  growing along the lines of stress of the implant.

5     Q.    Okay.  What about in terms of foreign body

6  reaction, is there a difference between lightweight

7  and heavyweight mesh?

8     A.    We used to believe that there was much more

9  on the heavyweight meshes, much more foreign body

10  reaction.  But has been found is that that initial

11  reaction of the acute inflammatory -- of the acute

12  inflammatory process and eventually of the chronic

13  inflammatory process leads to the creation of

14  fibroblast.

15         What biomechanically has been concluded is

16  that that level of stress, the level of stress in

17  these implants, the level of tension or forces that

18  are applied to these implants, behave differently and

19  that seems to determine how fibroblasts grow.

20         So the heavyweight and the lightweight

21  behave differently.  There has not been a single study

22  that shows, at a microscopic level, 80,000, 100,000

23  samples, but we do have clinical studies that show

24  that number of women.  So in terms of the clinical

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 257 of 429 PageID 21937
Case 2:12-md-02327 Document 4429-1 Filed 10/25/20 Page 189 of 305 PageID 32839
Jaime Sepúlveda, M.D.

1 behavior, it's probably less difference than what we

2 could see microscopically.  In terms of the acute

3 inflammatory reaction, the difference between

4 200-micron of fiber and a 300-micron fiber is probably

5 not that much.

6    Q.   So do you disagree with the theory that

7 lightweight mesh is safer for patients than

8 heavyweight mesh for use in the pelvic floor?

9        MR. SNELL:  Form.

10       Go ahead.

11    A.   I think that's a very broad statement to say

12 lightweight meshes for sure are safer.  That is a very

13 elementary statement that -- for much more complicated

14 issue.

15    Q.   (By Mr. De La Cerda)  Okay.  Are you

16 familiar with Closterhofen, Clinga?  Are you

17 familiar with Todd Heniford?  Are you familiar with

18 these physicians' and scientists' opinions about the

19 safety of lightweight mesh versus heavyweight mesh?

20    A.   I am familiar with their work.

21    Q.   Okay.  Do you disagree with their

22 conclusions about lightweight mesh being safer for a

23 patient as compared to heavyweight mesh?

24    A.   I think that their --

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 258 of 429 PageID 21938
Case 2:12-md-02327 Document 4312-5 Filed 04/12/17 Page 139 of 305 PageID 82839
Jaime Sepulveda, M.D.

1           MR. SNELL:  Form, foundation.

2           Go ahead.

3       A.   I think that their conclusions are very,

4   very hypothetical at best.

5       Q.   (By Mr. De La Cerda)  Okay.  Would you use

6   standard Prolene in the correction of pelvic organ

7   prolapse?

8       A.   We did.  Actually, we didn't just use

9   Prolene, we use Mersilene.  We used Marlex.  We used a

10  variety of materials before this, before we actually

11  use it for slings.

12          We didn't use it for slings because by the

13  time that midurethral slings came in, we have that

14  200-micron -- actually 196-micron fiber with a pore

15  size of 1500, and it was -- it was something -- it was

16  something that we knew that would match the thinnest

17  sutures that we could use for a Burch.

18      Q.   To be sure I've got an answer to that

19  particular question, though, the answer is yes, you

20  would use standard Prolene mesh in the surgical

21  correction of pelvic organ prolapse; is that right?

22      A.   Yes.

23      Q.   Okay.

24      A.   I could consider using it.  There are other

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 259 of 429 PageID 28039
Case 2:12-md-02327 Document 3173-1 Filed 09/27/15 Page 190 of 305 PageID 5840
Jaime Sepúlveda, M.D.

1  factors that may not lead me to use it, but the weight

2  of the mesh is not the only factor.

3      Q.   So you would disagree with anyone that would

4  say that using Prolene mesh in the treatment of pelvic

5  organ prolapse is too dangerous and risky.  You

6  disagree with that; right?

7      A.   I would disagree with that, yes.

8      Q.   Have you ever read the deposition of Jorge

9  Holste?

10      A.   I may have read it and if I did, I probably

11  read it over a year ago.

12      Q.   Head of the preclinical department of

13  Ethicon for 30 years, german guy, he opined that

14  Prolene mesh is heavyweight mesh.

15          Does that ring any bells?

16          MR. SNELL:  Foundation on that one.

17      A.   Prolene mesh, the way they classify is

18  heavy -- heavyweight mesh.  There were a number of

19  materials that I'm aware that they work with and they

20  classify according to weight.  From the engineering

21  point of view, that might be accurate.  From a

22  surgical point of view, there are a lot of other

23  factors that have to be considered.

24      Q.   (By Mr. De La Cerda)  Okay.  Do you agree

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 260 of 429 PageID 21940
Case 2:12-md-02327  Document 9041-1  Filed 12/04/19  Page 190 of 305  PageID 523419
Jaime Sepúlveda, M.D.

1  or disagree that heavyweight mesh causes greater

2  foreign body reaction than lightweight mesh?

3        MR. SNELL:  Form.

4        A.   There might have -- there could be in

5  existence something that says that increases the

6  number of neutrophils, but I have not found any -- any

7  utility on clinical care on predicting the behavior of

8  TVT.

9        Q.   (By Mr. De La Cerda)  So do you agree or

10 disagree with that statement?

11        A.   I -- I could not agree or disagree with

12 that.  That's so general and I would be speculating on

13 it.

14        Q.   Okay.  Do you agree or disagree that leaving

15 less mesh material in the patient's body is important

16 because it will reduce the amount of inflammation and

17 foreign body reaction?

18        A.   That's --

19        MR. SNELL:  Hold on.  You have to give me a

20 chance to object.

21        Overbroad and incomplete hypothetical.

22        A.   That's more than a scientific approach.

23 That's a very attractive approach.  And that's -- as

24 surgeons, we don't always base what we do on -- on

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 261 of 429 PageID# 24941
Case 2:12-md-02327-JFC Document 9411 Filed 02/14/20 Page 192 of 305 PageID#: 32842
Jaime Sepúlveda, M.D.

1    science, but also on common sense backed by science.

2            And, yeah, if I can take care of something

3    with less mesh, I probably would be attracted to it.

4    On the other side, you need to respect as surgeons

5    that say, "Well, you know, I will use the full-length

6    sling because it has the longest evidence behind it."

7    So in that regard, you're using more material, but you

8    have more evidence behind it.

9        Q.   (By Mr. De La Cerda)  Do you agree or

10   disagree that reducing the inflammatory reaction of

11   the body will also reduce the risk of contraction or

12   shrinkage of the mesh?

13           MR. SNELL:  Same objection.

14       A.   We don't -- we don't know that and I could

15   not agree with something that, in general, as a

16   specialty, we don't -- we don't know.

17           The reduced inflammatory reaction may not

18   work for the best.  There's a chain of events that

19   happens during the inflammatory process and that leads

20   ultimately to the creation of a fibroblast angle that

21   is what gives the support beyond the implant.

22       Q.   (By Mr. De La Cerda)  It's scarring;

23   right?

24       A.   It is -- it is not a scar.  Scar is the most

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 262 of 429 PageID 21942
Case 2:12-md-02327  Document 9114  Filed 11/22/19  Page 193 of 305 PageID 32843
Jaime Sepúlveda, M.D.

1   simplistic way of looking at it because a scar does

2   not have the same viscoelastic capabilities of tissue.

3   So you have to -- when you say a scar, it's not

4   necessarily a scar in the way that we see scars.  It's

5   viscoelastically it's different.

6           That's why someone can urinate after they

7   have a sling placed and they don't have retention.

8   That's how someone can have normal flows, someone can

9   be continent, at the same time also can go and

10  urinate.

11      Q.   Are you familiar with the term "fibrotic

12  bridging"?

13      A.   I've heard the term "fibrotic bridging,"

14  yes.

15      Q.   What's your understanding of that term?

16      A.   It's the growth of a fibroblast from one

17  segment to the next.

18      Q.   Do you agree or disagree that heavyweight

19  meshes induce more fibrotic bridging tissue reaction

20  causing more shrinkage during maturing of the

21  collagenous tissue?

22           MR. SNELL:  Form, foundation.

23      A.   I saw it described at one time.  I didn't

24  see anything that could conclude it.  I did not see a

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 263 of 429 PageID 21043
Case 2:12-md-02327 Document 9404 Filed 02/24/20 Page 194 of 305 PageID 32844
Jaime Sepúlveda, M.D.

1  paper that could conclude it.  I'm welcome to look at

2  anything that says that fibrotic bridging is

3  significantly more.  The first thing I would like to

4  know is how you're going to measure it.

5       Q.   (By Mr. De La Cerda)  Okay.  So I guess

6  you don't have enough information to either agree or

7  disagree; is that right?

8            MR. SNELL:  Object, misstates.

9       A.   I have -- I have enough information to -- to

10  not agree or disagree with it.  And that -- the

11  information that I have is that from one segment to

12  the other, just looking at two segments and the

13  fibroblast that grow between, at one point in time

14  that's not enough to make that conclusion, that

15  fibrotic bridging would cause contraction or

16  anything -- or anything similar like that.

17            There's -- in one of the papers that I gave,

18  there are two papers that I submitted today about the

19  effect of stress on fibroblast growth, and I think

20  that's more complete than fibrotic bridging.

21       Q.   (By Mr. De La Cerda)  So is it fair to say

22  that you disagree with that statement then?

23       A.   I -- I cannot say one way or the other

24  fibrotic bridging.  If I would have to commit to

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 264 of 429  PageID 21944
Case 2:12-md-02327-C  Document 2949  Filed 10/25/20  Page 199 of 905  PageID 32849
Jaime Sepulveda, M.D.

1   agreeing or disagreeing with it, I think that fibrotic

2   bridging is, again, very hypothetical -- hypothetical

3   statement.  I also believe that I can change my

4   opinion based on what I read.

5       Q.   Okay.  So as you sit here today, though, I

6   think -- I think what you're saying, as you sit here

7   today, is you would have to disagree because you

8   believe there's not enough evidence to support the

9   statement?  I mean, is that what you're saying?

10      A.   There's not enough evidence to support

11  fibrotic bridging.  It's a concept that is

12  interesting.  It's a concept that can be studied.

13  It's a concept that has to be taken into the context

14  of what -- how fibroblast grow under stress.

15      Q.   Are you aware that Ethicon's own scientists

16  and consultants have opined that Prolene mesh, the

17  same mesh in the TVT and TVT-O, is heavyweight as

18  opposed to being lightweight?

19           MR. SNELL:  Lacks foundation.

20      A.   I -- I -- I haven't seen the opinion of each

21  one of them.

22      Q.   (By Mr. De La Cerda)  Okay.  So you're not

23  aware?

24      A.   I'm not aware.

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 265 of 429   PageID 21945
Case 2:12-md-02327-SPC   Document 2915   Filed 10/... Page 195 of 305   PageID 32846
Jaime Sepulveda, M.D.

1    Q.   Should a discussion of whether Prolene mesh

2    is heavyweight be included in the IFUs for the TVT and

3    the TVT-O?

4         MR. SNELL:  Form, foundation.

5    A.   No, I don't think that -- I actually believe

6    that most doctors, if you tell them heavyweight --

7    about heavyweight and lightweight meshes, they have

8    had to be educated on it.

9         I know that the great majority of them are

10   probably going to look at me and say, "Okay, Jaime, so

11   you're telling me about heavyweight and lightweight

12   and all these different aspects, tell me how does this

13   translate in the care of my patients?"  And I would

14   disagree with -- with any statement that makes

15   anything firm about heavyweights or lightweights

16   because the fact is that the model to a study have not

17   been found.

18   Q.   (By Mr. De La Cerda)  Okay.  And so your

19   opinion is that it doesn't need to be included in

20   the IFU; right?

21   A.   No, I don't think that has any -- any place

22   in the IFU.

23   Q.   And your basis for that is what?  I don't

24   want to put words in your mouth.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 266 of 429 PageID 21946
Case 2:12-md-02327-C   Document 2921-1   Filed 10/14/20   Page 197 of 305   PageID 83847
Jaime Sepúlveda, M.D.

1          What would be your basis for not having to

2    include it in the IFU?

3          A.    Number one, it's not evidence -- the concept

4    of whatever implications they may have clinically is

5    not evidence-based and, number two, there are no

6    clinical implications that you can attribute to it.

7          Q.    Okay.  Part of your report discusses the

8    MSDS.  So you've reviewed the MSDS for the raw

9    polypropylene that goes into making the Prolene and

10   the TVT, TVT-O, Gynemesh, Prolift and Prosima?

11         A.    I saw the MSDS about raw -- raw material.

12         Q.    Right.  You're familiar with what a Material

13   Safety Data Sheet is?

14         A.    I learned about Material Safety Data Sheet

15   along the lines of this -- of this litigation.

16         Q.    Okay.  So you know that the Material Safety

17   Data Sheet states that raw polypropylene is

18   incompatible with strong oxidizers, such as peroxides;

19   correct?

20         A.    I read that in the MSDS.

21         Q.    And as a physician, you know that peroxides

22   are present in the human body; right?

23         MR. SNELL:  Form.

24         A.    I am not aware of anyone measuring the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 267 of 429 PageID 2947
Case 2:12-md-02327 Document 2914-1 Filed 09/11/15 Page 199 of 305 PageID #: 82849
Jaime Sepúlveda, M.D.

1    levels of peroxide.

2         Q.   (By Mr. De La Cerda)  Well, as a physician

3    you know that the human body produces hydrogen

4    peroxide as part of the inflammatory process; right?

5         A.   I just have not seen a quantitative assay of

6    it.

7         Q.   Okay.  So you know it happens, you just

8    don't know what quantitatively it amounts to; right?

9         A.   I'm not aware of any quantitative study.

10        Q.   And the implantation of the TVT, TVT-O,

11   Gynemesh, Prolift and Prosima causes an inflammatory

12   process; correct?

13        A.   The inflammatory process being defined as a

14   cellular process.

15        Q.   Should the fact that raw polypropylene that

16   goes into making the Prolene, the TVT, the TVT-O,

17   Gynemesh, Prolift and Prosima is incompatible with

18   peroxides according to the MSDS, should that

19   information be included in the IFU?

20             MR. SNELL:  Form.

21        A.   No, it should not be included and based --

22   no, it shouldn't be included.

23        Q.   (By Mr. De La Cerda)  You already know my

24   next question.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 268 of 429 PageID 84948
Case 2:12-md-02327   Document 9441   Filed 11/24/20   Page 199 of 905 PageID 32849
Jaime Sepúlveda, M.D.

1           What's the basis for not including that

2    information?

3           A.   No raw material is being asserted on humans.

4           Q.   Okay.  Anything else?

5           A.   No.

6           Q.   Okay.  You're also -- you addressed this in

7    your report.  You're also aware that the MSDS states:

8    "Polypropylene has been tested in laboratory rats by

9    subcutaneous implantation of disks or powder, local

10   sarcomas were induced at the site of implantation."

11          Do you recall that verbiage that's from the

12   MSDS?

13          A.   From the MSDS.

14          Q.   What does -- what does that verbiage mean?

15          A.   It's a disk, it's a disk of basically raw

16   polypropylene.  And the way I see it is there are two

17   factors to it.  Number one, the size and the volume of

18   the polypropylene that's being inserted, in addition

19   to the nature of this polypropylene.  I cannot speak

20   about this being even remotely similar to what we use

21   on -- on TVT-O and what we use in Prolene sutures

22   because there is not -- there has been no

23   chromatography, no crystallinity assays, no

24   temperature assays on any of this disk.  So I don't

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 269 of 429 PageID 21949
Case 2:12-md-02327 Document 9440-1 Filed 09/19/19 Page 200 of 805 PageID 82230
Jaime Sepúlveda, M.D.

1  have that information available.

2          That being said, you can also consider --

3  you should also consider the host in which most of the

4  time is Wistar rats, Wistar rats or Himalayan rabbits.

5  I had the opportunity to work with Wistar rats.  They

6  have a very, very peculiar immune system.

7      Q.   When there is an indication that a substance

8  can cause cancer in animals, like rats, what does that

9  possibly indicate for humans?

10          MR. SNELL:  Form, speculation.

11      A.   It has very, very little implications unless

12  you are consistently prove that these causes -- causes

13  cancer.

14          Now, this is -- these are -- it's very

15  important to define that these are two different

16  materials.  The raw preparations are different from

17  the preparations used in -- in sutures.  They're two

18  different things.

19      Q.   (By Mr. De La Cerda)  Chronic inflammation

20  has been linked to cancer; hasn't it?

21      A.   That's -- that's not even a theory.  That's

22  a hypothesis, actually.

23      Q.   Okay.  If mesh -- strike that.

24          Ethicon -- I need to go back for just a

Jaime Sepulveda, M.D.

1    second.

2         You're aware of no test performed by Ethicon

3    to determine whether the surface cracking or

4    degradation, or whatever you want to call it, that's

5    been -- that is seen under -- under microscope of the

6    mesh, whether it's biofilm or whatever you believe it

7    is, you've never seen a test by Ethicon to determine

8    whether that particular characteristic is clinically

9    significant to patients; right?

10        A.   No, there are only three reports that I'm --

11   that I'm aware of.

12        Q.   Okay.  And you're aware of no test by

13   Ethicon to determine whether the weight of Prolene

14   mesh causes more complications in patients in

15   comparison to lightweight mesh; correct?

16        MR. SNELL:  Form, foundation.

17        A.   There's no -- no basis to generate that --

18   that study.

19        Q.   (By Mr. De La Cerda)  What do you mean by

20   that?

21        A.   No one has come out with the actual question

22   in terms -- in the question on the hypothesis of it or

23   the theory of it.

24        Q.   Okay.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 271 of 429   PageID 24951
Case 2:12-md-02327   Document 2814-4   Filed 09/08/16   Page 272 of 305   PageID 82832

Jaime Sepúlveda, M.D.

 1      A.   In other words, just because we think that

 2  there's a scientific study that we can do doesn't mean

 3  that that needs to be done.

 4      Q.   Okay.  But Ethicon -- Ethicon, itself,

 5  hasn't performed that study; right?

 6      A.   I -- I am -- I am not familiar with the

 7  specific studies that they have performed on that

 8  specific area.

 9      Q.   You're aware of no study performed by

10  Ethicon to determine whether polypropylene could be

11  linked to cancer; right?

12      A.   I -- I am not familiar of that, but I know

13  about the dog study that -- in which they -- sutures

14  were evaluated at about eight years and there was

15  no -- no reported cancer that I'm aware of.

16      Q.   Okay.  You brought one study with you here.

17  I think it was a case report of cancer and

18  polypropylene.  What was it?  You mentioned it briefly

19  when we were looking through your materials.

20      A.   It is -- the first case reported of a clear

21  cell carcinoma in the surrounding area to the -- to

22  the incision for the midurethral sling.

23           I also brought the response from two experts

24  to that specific case report.

Case 2:20-cv-00965-SPC-MRM   Document 94-1   Filed 10/25/20   Page 272 of 429   PageID 24952
Case 2:12-md-02327   Document 9474-1   Filed 02/05/21   Page 6 of 605   PageID 82833
Jaime Sepúlveda, M.D.

1    Q.   What did that study -- did that study have

2    some sort of conclusion about what might be causing

3    that clear cell carcinoma?

4    A.   No, it does not have a conclusion.  There's

5    a hypothesis and that's as far as they can get about a

6    hypothesis about inflammation, I believe.

7    Q.   And so that's one discussion of inflammatory

8    process being at least hypothesized as being

9    responsible for this particular cancer; right?

10   A.   Yeah, unfort- -- I don't want to say

11   unfortunately, it's not unfortunate.  It's -- this is

12   not an actual study.  This is a case report.

13   Q.   Case report.

14   A.   One case report.  And as we have gone

15   through so many times today, the overwhelming data --

16   there are papers that -- there are articles that

17   describe the continued use of polypropylene in

18   midurethral sling with the incidence of cancer in that

19   population or the frequency of cancer in that

20   population being actually zero.

21   Q.   Okay.  So then the question about your

22   opinion, should this warning that's included in the

23   MSDS -- or this verbiage that's included in the MSDS

24   regarding the subcutaneous implant of disk or powder

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 273 of 429 PageID 21953
Case 2:12-md-02327-JC Document 2914 Filed 10/25/20 Page 204 of 305 PageID #: 32834
Jaime Sepúlveda, M.D.

1    where local carcinomas were induced at the site of

2    implantation, should that information be included in

3    the IFUs for the TVT, the TVT-O, Gynemesh, Prolift and

4    Prosima?

5         A.   The answer is no, and the basis of that is

6    that is not relevant to the product that is being

7    implanted.

8         Q.   Has -- are you aware of any studies that

9    Ethicon's done comparing the raw polypropylene with

10   the manufactured version that is actually implanted in

11   humans, any test of any kind?

12        A.   Raw -- raw polypropylene is not used in

13   humans.  Raw polypropylene is actually not even used

14   on containers.  It has very -- it doesn't have an

15   actual use.  It's raw material.

16        Q.   And so you're aware of no studies, though,

17   where Ethicon's tested raw polypropylene versus the

18   finished manufactured product of any type; right?

19        A.   No, I'm not familiar with any studies using

20   raw polypropylene.

21        Q.   Okay.  Shifting gears a little bit.

22             You agree that as a scien- -- a scientist or

23   a physician should not go into a research study with a

24   desire to achieve a specific result; correct?

1    A.   I -- I -- I'll have to read that.  If you

2    can be blinded to your study, that would be optimal,

3    but that's not possible in every -- in every design.

4    Q.   So are you saying that a scientist in a

5    re- -- scientist and a physician -- it's okay for

6    that -- strike that.

7         It's okay for a scientist and a physician to

8    go into a research study with the desire to achieve a

9    specific result?

10   A.   No, I think that the design of the study

11   would actually protect the study from any desire that

12   anyone could have.

13   Q.   So should or should not the scientist and

14   the physician go into a study with the desire to

15   achieve a specific result?

16        MR. SNELL:  Form, overbroad.

17   A.   I don't -- I don't believe that anyone

18   should go into any study hoping or wishing for a

19   specific result.  That's not what the methodology of a

20   science is for.

21   Q.   (By Mr. De La Cerda)  You agree that a

22   scientist and a physician should not design a

23   research project for medical publication with the

24   specific purpose of a single result; correct?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 275 of 429 PageID 21055
Case 2:12-md-02327 Document 20414 Filed 10/25/20 Page 300 of 305 PageID #: 32839
Jaime Sepúlveda, M.D.

1          MR. SNELL:  Form.

2      A.   It's -- there's no science if you are trying

3  to get it or achieve a specific result.

4      Q.   (By Mr. De La Cerda)  You can't go into a

5  medical scientific research trying to answer a

6  question with any preconceived biases; right?

7          MR. SNELL:  Form, overbroad.

8      A.   There's -- we -- we have seen that there --

9  there's some preconceived biases, but they become

10 clearly evident.

11     Q.   (By Mr. De La Cerda)  But you shouldn't go

12 in with any preconceived biases, that's what you

13 shouldn't do; right?

14     A.   You don't -- you don't do that as a

15 scientist.

16     Q.   Right.  Do you agree it's not ethical for

17 researchers performing clinical trials to be paid if

18 and only if the clinical trials have certain results?

19         MR. SNELL:  Form, overbroad.

20         Go ahead.

21     A.   I have no basis to judge anyone that has

22 good science, good knowledge, and to be compensated

23 for it.

24     Q.   (By Mr. De La Cerda)  No, and I -- well,

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 276 of 429 PageID 21956
Case 2:12-md-02327 Document 2911-4 Filed 04/05/16 Page 276 of 505 PageID 83237
Jaime Sepúlveda, M.D.

1    that's excellent, but my question is a little

2    different.

3            What I'm saying is whether you believe it's

4    ethical for researchers performing clinical trials to

5    be paid if and only if they produce a study with

6    specific results.

7            MR. SNELL:  Same objection.

8        Q.   (By Mr. De La Cerda)  So not the fact

9    they're being paid, just the fact they only get paid

10   if you give me these results?

11       A.   Well, it's -- you're going -- if I'm going

12   to acquire a product from you, and I'm going to make

13   an investment on that product, I'm going to pay you

14   based on what you show me with your -- with your

15   product.

16           Now, you can -- you can actually do that.

17   You can sell me a product that may not perform as I

18   expect, but if I try that product and I see that

19   consistently works in ways that are the same or better

20   as you present it, you can go back and say that was

21   not an issue there.

22       Q.   Okay.  So you can go back in time and say it

23   was okay, it wasn't unethical to do that?

24       A.   It's -- you can go back in time and say it's

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 277 of 429 PageID 21957
Case 2:12-md-02327 Document 9009 Filed 10/25/20 Page 105 of 805 PageID 32839
Jaime Sepúlveda, M.D.

 1    not a matter of ethical or not ethical.  I know that

 2    there was a truth -- a truthful interaction and that

 3    what this physician or anyone in that calculating

 4    innovation shows me was -- was real, was actually

 5    accurate.

 6         Q.   Okay.  You mean that you can at least agree

 7    that that has a potential to create bias, doesn't it,

 8    in the study?

 9         A.   I -- but you can -- you cannot put that on

10    the person that is trying to bring it in.  There has

11    to be a level of -- of understanding and backtracking.

12              In other words, if you -- and I'm going to

13    allow myself to place an example.  If you try to sell

14    me a medical device, I will have a hard time buying it

15    from you.  But when -- if you try to sell me a legal

16    product, I might be more attracted to buy from you and

17    I might believe that you may deliver that legal

18    product.

19              That has nothing to do with science.  I

20    deviated into what -- just to illustrate a point just

21    to answer your question.

22         Q.   You're aware, of course, that Ulmsten was

23    the inventor of original TVT; right?

24         A.   Yes.

1    Q.   And you've seen the Ulmsten and Nilsson

2    studies that Ethicon tauts as long-term support for

3    their TVT line of slings; right?

4            MR. SNELL:  Form.

5    A.   They also wasn't just the inventor of the

6    TVT.  At that time he brought the most innovative kind

7    of approach to incontinence.  I mean, we -- we were --

8    until that time, we were doing continence procedures

9    in the urethrovesical junction, we were using sutures,

10   we were placing things under tension, we were using

11   absorbable materials that didn't work long term,

12   materials that were not pliable and they came up and

13   changed the way we were thinking about continence

14   care.  Continence care became different because of

15   Ulmsten and Petros.

16   Q.   (By Mr. De La Cerda)  Getting back to the

17   question.  You've seen the studies that Ethicon

18   touts as support for their TVT line of slings;

19   right?  You've seen those, the Ulmsten/Nilsson

20   studies; right?

21           MR. SNELL:  Form.

22           Go ahead.

23   A.   I've seen the Ulmsten studies, I've seen

24   Nilsson, I've seen Falconer, I've seen Petros.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 279 of 429 PageID 24059
Case 2:12-md-02327 Document 5051 Filed 00 Page 00 of 005 PageID 32860
Jaime Sepulveda, M.D.

1    Q.    (By Mr. De La Cerda)  You've seen it in

2    the marketing materials for Ethicon that they

3    frequently site to those studies as being support

4    for the use of their slings; right?

5    A.    For that -- for that specific use, yes.

6    Q.    And you've relied on these studies to

7    support your practice of using the TVT line of

8    products; right?

9    A.    I rely on that and I rely more than that on

10    large studies.  And the fact is that it has been

11    reproduced over and over again.

12    Q.    Did Ethicon ever inform you that Professor

13    Ulmsten's company, MedScan, the company that owned the

14    rights to the TVT, was promised $400,000 if and only

15    if it produced a study with the TVT showing certain

16    results?

17         MR. SNELL:  Form.

18    A.    There's my interaction with -- or any

19    surgeon's interaction for that sake at that time,

20    would never get into that.

21    Q.    (By Mr. De La Cerda)  So you haven't heard

22    that?

23    A.    No, I -- I saw -- I saw that as one of the

24    claims, through all these documents, but really

Jaime Sepulveda, M.D.

1    didn't -- didn't matter much to me.

2         Q.   Okay.  So that particular fact doesn't

3    matter to you?

4         A.   No.

5         Q.   Okay.  Shifting gears a little bit.  Should

6    a medical device company put profits above patient

7    safety?

8              MR. SNELL:  Form, speculation.

9              THE COURT REPORTER:  I'm sorry, form --

10             MR. SNELL:  Form, speculation.  Put

11        overbroad in there, too.

12        A.   Safety and results bring you profits.

13        Q.   (By Mr. De La Cerda)  So is the answer no?

14        A.   No.

15        Q.   Should a medical device company rush a

16   product to market with the primary purpose being to

17   defend its market share?

18        A.   There's -- when you have a good product and

19   you have enough market share, yeah, you want to make

20   sure that you keep it and you keep it with quality.

21        Q.   So the answer is yes to that one?

22             MR. SNELL:  Form.

23        A.   On that one -- on that regard, on the

24   general form of that question, yes.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 281 of 429 PageID 24961
Case 2:12-md-02327 Document 9341 Filed 02/14/20 Page 282 of 305 PageID 32862
Jaime Sepulveda, M.D.

```
 1          Q.    (By Mr. De La Cerda)  What clinical
 2    studies were done of the TVT-O before it was
 3    released onto the market?
 4          A.    There was -- there were a variety of
 5    studies.  There was the Mulberry study --
 6                THE COURT REPORTER:  The --
 7                THE WITNESS:  The Mulberry.
 8          A.    -- and there was -- there were cadaver
 9    studies, and there were studies on outside-in
10    transobturator slings.
11          Q.    Was one of the studies by de Leval?
12          A.    By Delorme first and then de Leval.
13          Q.    Delorme was outside-in; right?
14          A.    Right.
15          Q.    And then de Leval was inside-out?
16          A.    Right.
17          Q.    De Leval is considered the inventor of the
18    TVT-O; is that right?
19          A.    Yes.
20          Q.    And do you know whether the results of
21    de Leval's clinical studies were included in the
22    application for clearance submitted to the FDA for the
23    TVT-O?
24          A.    I'm not familiar with what was exactly
```

1    submitted.  I cannot recall it right now.  I can go

2    back and check what was submitted, but I'm not

3    familiar with it.

4         Q.   If he had performed a study, do you believe

5    that that study should have been submitted along with

6    the information about the TVT-O to the FDA?

7              MR. SNELL:  Form, calls for regulatory

8         opinion, outside the regulatory scope.

9         A.   I think it goes to whatever -- whatever the

10   FDA feels that it requires from the company or

11   whatever the company fulfills in its obligations to

12   the FDA.

13        Q.   (By Mr. De La Cerda)  How about you as a

14   physician, before you're going to use a product,

15   would you want to know all the clinical studies that

16   are out there about that product before you start

17   implanting it?

18        A.   I actually gave -- I have given testimony

19   today that I trust that the FDA is going to do what's

20   best in that regard.

21        Q.   Do you have any understanding of what the

22   clearance process involves, 510(k) clearance?

23        A.   Yes.  I do have an understanding of it.

24        Q.   Do you know whether the FDA requires

1    clinical studies before a product is 510(k) cleared?

2         A.   I think that they have made -- I don't

3    think, I'm aware that they have made a decision to put

4    in place a mechanism that works exactly with a 510(k).

5              Now, am I someone to criticize or favor --

6    or favor that?  I probably could sit in my big chair

7    and decide that, but the reality is that there's

8    people with expertise in regulatory affairs at the FDA

9    and people with expertise on regulatory affairs at

10   Ethicon, and they're the ones that need to come

11   together on that.

12        Q.   I guess the issue that I'm really asking

13   about is what you want to know as a doctor.  Before

14   you ever implant a product, do you want to know that

15   if there are clinical studies on that product before

16   you've implanted it, do you want to know what those

17   clinical -- what the findings were of those clinical

18   studies before you implant the product?

19        A.   I'm aware of clinical products and design.

20   I'm aware of these studies, but you can present all

21   these studies and one final part is going to be what

22   the FDA regulatory process comes -- comes and tells

23   me.

24        Q.   What I'm saying, though, is you, as an

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 284 of 429 PageID 24964
Case 2:12-md-02327 Document 2020-1 Filed 04/16/15 Page 39 of 305 PageID #: 32843
Jaime Sepúlveda, M.D.

1    implanting physician, okay, a product is presented to

2    you by a medical device company and there are clinical

3    studies out there that are about this particular

4    product.  You're going to want to know all the

5    clinical studies that are out there about that product

6    before you implant it; right?

7         MR. SNELL:  Form, asked and answered.

8         Go ahead.

9    A.   I want to know -- I want to know the studies

10   and I want to know -- obviously, I want to know more

11   than just the studies.  I want to know the

12   biomechanics of it, I want to know all these things.

13   But that's -- ultimately, it comes down to that

14   process between the -- between Ethicon and the FDA.

15   Q.   (By Mr. De La Cerda)  Okay.

16   A.   And I'm going to trust the product that

17   comes out from it.

18   Q.   Okay.  Let's shift gears a little bit.

19        You're aware that the IFUs for the Gynemesh,

20   Prolift and Prosima state:  "The mesh remains soft and

21   pliable and normal wound healing is not noticeably

22   impaired"; right?

23        MR. SNELL:  Foundation on that.

24        Do you have that IFU?  I'm not sure if you

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 285 of 429 PageID 24065
Case 2:12-md-02327   Document 2941   Filed 10/25/20   Page 285 of 305   PageID #: 82869
Jaime Sepúlveda, M.D.

1        made a correct statement across all those IFUs.

2                Do you mind taking a break?

3                MR. DE LA CERDA:  That's fine.  Let's do

4        that.

5                (Thereupon, a recess was taken from

6        2:11 p.m. until 2:18 p.m., after which the

7        following proceedings were held:)

8        Q.   (By Mr. De La Cerda)  Doctor, just for the

9    sake of showing you, this is the Gynemesh -- sorry,

10   I didn't bring a copy of it -- so that's the

11   Gynemesh IFU.  The part that I'm referencing is at

12   the bottom, I think it's the second-to-last

13   sentence.  It starts with "the mesh remains

14   pliable."

15               MR. SNELL:  Soft and pliable.

16               Why don't you ask him to read it just so the

17       record is clear.

18               MR. DE LA CERDA:  Yeah, sure.

19       Q.   (By Mr. De La Cerda)  Can you read that,

20   Doctor?

21       A.   "The mesh remains soft and pliable and

22   normal wound healing is not noticeably impaired.  The

23   material is not absorbed, nor is subject to

24   degradation or weakening by the action of tissue

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 286 of 429 PageID 24966
Case 2:12-md-02327   Document 4918-5   Filed 11/15/17   Page 39 of 305   PageID 228766
Jaime Sepulveda, M.D.

1    enzymes."

2        Q.   (By Mr. De La Cerda)  So that statement is

3    included, of course, in the Gynemesh IFU and the

4    Prolift and Prosima IFUs, which also use Gynemesh;

5    right?

6        A.   Yes.

7        Q.   Now, you're aware that Gynemesh PS is

8    Prolene Soft, except for it's used in the pelvic

9    application as opposed to hernia application; right?

10       A.   It's -- Pro- -- Prolene Soft, yes.

11       Q.   Are you aware that in 2001, Ethicon had in

12   its files a conclusion that Gynemesh PS was too stiff

13   for use in vaginal tissues?

14           MR. SNELL:  Form, foundation.

15       A.   It's -- I read something about that from

16   some investigator, but it was -- it was an opinion

17   about being too stiff.  I think it was at the -- at

18   the risk of -- I'm not remembering well or -- I'm not

19   speaking accurately, may have been an investigator's

20   opinion.

21       Q.   (By Mr. De La Cerda)  Okay.  Are you aware

22   that Ethicon also had in its files a conclusion that

23   Prolene Soft should not be pursued as a mesh used in

24   pelvic floor repair because it was too stiff for use

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 287 of 429 PageID 24967
Case 2:12-md-02327 Document 4993 Filed 12/30/19 Page 39 of 305 PageID# 328869
Jaime Sepulveda, M.D.

1    in vaginal tissues?

2         MR. SNELL:  Same objection.

3         A.   No, I'm not -- I'm not aware of that and

4    that's not what was eventually done.

5         Q.   (By Mr. De La Cerda)  Do you know whether

6    scar contracture around the mesh can occur with the

7    Gynemesh?

8         A.   There's -- there's -- there's this -- again,

9    hypothesis that scar contraction could happen around

10   the mesh.  So to that -- to that specific issue, I ask

11   what is the objective measurement of a scar

12   contraction or the mesh contraction.  I wanted to see

13   where -- where's the evidence to it?

14        Because when we repair these -- repair these

15   patients with permanent sutures, when we place

16   polypropylene in the uterosacral ligaments or in the

17   sacrospinous ligament, we didn't see any contraction

18   of those fibers.  So where is the evidence?  No one

19   could ever bring me evidence of a contraction on the

20   mesh.

21        Q.   Okay.  Do you know if that -- if this scar

22   contracture around Gynemesh was a problem that Ethicon

23   engineers were trying to solve?

24        A.   I -- I don't even know if they try to solve

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 288 of 429 PageID 24968
Case 2:12-md-02327 Document 2291 Filed 05/22/12 Page 39 of 305 PageID 32869
Jaime Sepúlveda, M.D.

1    it because I did not see a problem with contraction.

2       Q.   Okay.  So you're also not sure, though,

3    whether Ethicon was trying to solve this problem?  You

4    probably don't believe it's a problem.  That's what it

5    sounds like you're saying, that it's not a problem,

6    but my question is really are you aware whether

7    Ethicon was trying to solve what it perceived to be a

8    problem with contracture of scar tissue around

9    Gynemesh?

10          MR. SNELL:  Foundation.

11      A.   I don't -- I don't see in which model they

12   would try to solve it.

13      Q.   (By Mr. De La Cerda)  Okay.  But are you

14   aware if they were trying to solve this or not?

15      A.   No, I'm not aware of them trying to solve

16   contractions of any -- any type, any type of implants.

17      Q.   If scar contracture exists around Gynemesh,

18   would that translate into complications for a patient?

19          MR. SNELL:  Form.

20      A.   More than a complication for a patient.  The

21   contraction would just tell me that I have to -- I

22   have to make adjustments in my surgery and that brings

23   a whole new set of variables in my -- in my surgery.

24      Q.   (By Mr. De La Cerda)  Do you know whether

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 289 of 429 PageID 21969
Case 2:12-md-02327 Document 2974 Filed 05/15/18 Page 290 of 305 PageID #: 32870
Jaime Sepúlveda, M.D.

1    or not physicians were asking Ethicon for a mesh

2    which would be better than Gynemesh on the issue of

3    scar contracture?

4         A.   I -- I believe that there was always the --

5    the idea that we could always have innovation on the

6    type of implants that we would have.  Although

7    Gynemesh had more evidence than any other implant.

8    There was more evidence, there are more papers

9    published on Gynemesh than native tissue for specific

10   compartments.  We have that.  We all -- we all did

11   have an understanding that there was going to be a

12   progression on the innovation of the product.  So if

13   there is a course to do that, that's -- that's

14   something that I think every physician would want to

15   see.

16        Q.   And Ethicon did that -- they did just that,

17   didn't they?

18        A.   They -- they actually invited me and give

19   me -- with other doctors, tell me what -- what this --

20   what would you like to see in -- in the next

21   generation.

22        Q.   They innovated so well that they even

23   developed a mesh, other than Gynemesh, that they

24   thought was safer than Gynemesh; right?

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 290 of 429 PageID 21970
Case 2:12-md-02327 Document 0000 Filed 00/00/00 Page 00 of 305 Page ID #: 5287
Jaime Sepulveda, M.D.

```
 1              MR. SNELL:  Actually, hold on.  Objection,

 2        foundation, misstates company intent.

 3        A.   I don't -- I don't think that that's what

 4   they concluded, that it was safer.  I don't think that

 5   there is anyone that actually came and say, "Okay,

 6   this is safer," or, "We have more evidence to say that

 7   it's safer, but you may have to adjust it," or "It may

 8   not contract or they will contract."  I don't -- I

 9   don't think it got to that point.  I think that we had

10   what we had with Gynemesh.

11        Q.   (By Mr. De La Cerda)  Okay.  Did you ever

12   do a presentation on the benefits of lightweight

13   mesh over heavyweight mesh?

14        A.   I did make presen- -- many presentations on

15   how -- on the benefits of lightweight mesh, and that

16   was a prevailing -- the prevailing thought at that

17   time and I still would make a presentation and say

18   there are some benefits on lightweight mesh.  There

19   are -- there's some benefits on having less implant,

20   in having less mesh.

21              The question is when we have all this -- all

22   these different -- different things that we wish for,

23   how much science do I have behind it?  And during

24   those -- those presentations, there's always the
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 291 of 429 PageID 21971
Case 2:12-md-02327-C Document Complainant Page 2 of 305 Page ID #: 82872
Jaime Sepúlveda, M.D.

1    discussion of:  Is this really what we want?  Do we

2    want bigger pores?  Do we want a lighter --

3    lightweight meshes?  Do we want lighter meshes?

4            I'm not saying that it's going to be a bad

5    thing.  It's probably going to be a good thing, but I

6    don't have the science to back it up.

7        Q.   You mentioned that you did present on some

8    of the benefits of lightweight mesh or using less

9    mesh.  What would those benefits be?

10       A.   It's a -- the benefits is that you have less

11   inflammatory response, you have less cellular

12   response, you have a better layout of fibroblast and

13   that's the hypothesis behind all this.

14           But none of those things that we, as a

15   group, thought as -- as physicians thought that was

16   going to be better, wasn't necessarily going to be

17   better.  These were things that were not statements.

18   These were things that we have it here and we have

19   this product and it's worth looking to it and it's

20   worth using it and, you know, if I'm going to have --

21   use something heavier or something light, I probably

22   go with something light because it's more innovative.

23       Q.   It's a reasonable theory to believe that the

24   lightweight mesh is safer for a patient than the

Case 2:20-cv-00265-SPC-MRM Document 94-1 Filed 10/25/20 Page 292 of 429 PageID 21972
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 293 of 305 PageID 82873
Jaime Sepúlveda, M.D.

1    heavyweight mesh; right?

2         A.    No.   That's not --

3               MR. SNELL:   Lacks foundation.

4               Go ahead.

5         A.    No.   That's not what we can conclude with

6    it.  We're not talking -- Gynemesh proved to be safe.

7    Gynemesh proved to be effective.   This is a totally

8    different set of considerations, scientifically it's a

9    totally different set of considerations.

10        Q.    (By Mr. De La Cerda)   Let's do it this

11   way.  What I want to do is work from possibility all

12   the way up to truth.   Okay?

13              Possibility, hypothesis, theory and we'll

14   just say reality or truth.   Okay?

15              Is it possible -- do you agree it's possible

16   that lightweight mesh is safer for patients than

17   heavyweight mesh?

18              MR. SNELL:   Calls for speculation.

19        A.    That's -- that's possible.

20        Q.    (By Mr. De La Cerda)   Okay.   Now let's

21   take the next step.

22              Would it be a fair hypothesis that

23   lightweight mesh is safer than heavyweight mesh?

24        A.    That's a hypothesis, period.   Not fair, not

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 293 of 429 PageID 21973
Case 2:12-md-02327 Document 9241 Filed 11/25/20 Page 294 of 305 PageID 82874
Jaime Sepúlveda, M.D.

1    unfair, it's just a hypothesis that we would have to

2    test.

3         Q.    Okay.  Is it a fair -- based on what you

4    know, is that a hypothesis that could be confirmed?

5         A.    Well, that's a hypothesis that has much less

6    evidence behind it than -- than using Gynemesh.

7         Q.    The step where you would stop the

8    progression, though, would be a theory.  You don't

9    believe there's enough to support the theory that

10   lightweight mesh is safer for patients than

11   heavyweight mesh; is that right?

12        A.    These were -- these were considerations that

13   were entertained not at that time.  They still

14   entertain a scientific meeting.  It doesn't mean that

15   we're going to go -- go out and start using the

16   lightest weight mesh.  It doesn't mean -- because we

17   understand meshes a lot better now as -- as

18   physicians.  As surgeons, as scientists, we understand

19   it better.

20        Now, we knew that what we had would -- would

21   give durability.  We knew that what we had would

22   give -- would be a good product to use for

23   reinforcement on augmented repairs.  There was --

24   there was some concept along the lines that were not

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 294 of 429 PageID 21974
Case 2:12-md-02327 Document 9464 Filed 10/25/20 Page 295 of 305 PageID 328479
Jaime Sepulveda, M.D.

1    as explored as is being explored now.  And based on --

2    on those concepts that were unexplored, we made

3    inferences on how we would like the next mesh to be.

4         That doesn't take the fact that what we had

5    behind us was data from Gynemesh.

6    Q.   Do you agree that scar contracture can cause

7    recurrence of prolapse?  This is in terms of if scar

8    contracture is happening around Gynemesh, can that

9    cause recurrence of prolapse?

10        MR. SNELL:  Foundation.

11   A.   Are you talking about the same side or

12   opposite side or just in general?

13   Q.   (By Mr. De La Cerda)  In general.

14   A.   No, that's not the biggest factor on a

15   recurrence of a prolapse.

16   Q.   I'm just going to go through a little list

17   right here.

18        Do you agree that scar contracture around

19   Gynemesh can cause pain?

20   A.   Contractions of scarring always have the

21   potential to decrease the pliability of not only a

22   mesh augmented repair but of any -- any repair.

23   Q.   That was actually going to be my next

24   question.

1          First of all, the pliability can lead to

2     pain?  Like reduced pliability can lead to pain in a

3     patient; is that right?

4          A.   If there's less pliability and there are a

5     number of factors to -- for a repair being less

6     pliable, but if there is less pliability and the

7     tissue is placed under -- under stress, yeah, you

8     would -- you would feel more that it would be more

9     pliable.

10         Q.   Could the scar contracture lead to erosion?

11         A.   No.

12         Q.   How about discomfort during sex?

13         A.   Less, less pliability could make things feel

14    not -- not as soft, not as elastic.

15         Q.   Would you agree that for a mesh to be

16    successfully used for the treatment of pelvic organ

17    prolapse it should be soft and compliant with a

18    woman's vaginal tissues?

19         A.   And that is -- that is an excellent question

20    because I would like to define, which I didn't have to

21    define before in the medical arena, I didn't have to

22    define as much what soft and pliable and elastic is.

23         I have tried to come to -- to the conclusion

24    that there is a level of the formation of stress that

Case 2:20-cv-00065-SPC-MRM  Document 94-1  Filed 10/25/20  Page 296 of 429  PageID 21976
Case 2:12-md-02327-JFC  Document 2979-11  Filed 10/05/16  Page 29 of 305  PageID 82877
Jaime Sepúlveda, M.D.

1    is required.  You cannot have so much deformation that

2    the prolapse comes out, but you still have to have

3    some firmness to your repair.  In other words, you

4    drive your car, you need your shock absorbers to give

5    some give, to give some, but you don't want your shock

6    absorbers to be bouncing all over the place.  It would

7    be as uncomfortable as no bouncing at all.

8         So when I -- when I take my car for a shock

9    absorbers check, they have something that actually

10   measures it and they can adjust it.  They can adjust

11   the damper and give.  We don't have that in the

12   vagina.

13        Q.   Ethicon certainly never tested that issue;

14   did they?

15        MR. SNELL:  Objection, lacks foundation.

16        A.   The vaginal pliability, I think that there

17   was some papers about designing a device -- there was

18   a paper, actually, Dr. Willy Davila, I believe, was

19   testing a device for vaginal pliability; and that

20   would be very useful in getting an actual number,

21   getting an actual measurement that we can take from.

22        Q.   (By Mr. De La Cerda)  Is that something

23   that Ethicon did?

24        A.   No, I think -- I don't think -- I'm not

Case 2:20-cv-00365-SPC-MRM  Document 94-1  Filed 10/25/20  Page 297 of 429 PageID 21977
Case 2:12-md-02327  Document 2934-1  Filed 04/12/20  Page 299 of 305 PageID# 92879
Jaime Sepúlveda, M.D.

1   aware of Ethicon doing that.

2       Q.   Would you agree that clinically there may be

3   an impact of increased rigidity with any given mesh as

4   it may increase vaginal stiffness post-operatively

5   with a potential to impair sexual function?

6       A.   I -- I misspoke on my last answer.  I want

7   to correct that.

8            When I say Ethicon never -- never did that,

9   I cannot conclude that because I'm not aware if they

10  did or if they didn't, but I'm just -- that's what I'm

11  aware of, that I don't know if they did or didn't.

12      Q.   That's fair.

13           Let me go back to my question, the next

14  question.  Would you agree that clinically there may

15  be an impact of increased rigidity with any given mesh

16  as it may increase vaginal stiffness post-operatively

17  with a potential to impair sexual function?

18           MR. SNELL:  Form, speculation, incomplete

19       hypothetical.

20      A.   There's -- the papers that we have does

21  not -- does not suggest or indicate rigidity.  If

22  there is a shrinkage or rigidity, it was not

23  demonstrated on the measurements of total vaginal

24  length.  When you measure total vaginal length, not on

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 298 of 429 PageID 21978
Case 2:12-md-02327   Document 2911   Filed 09/27/20   Page 299 of 305 PageID 32879
Jaime Sepulveda, M.D.

1   one but in two, three studies with comparing different

2   repairs and native tissue repairs to mesh augmented

3   repairs, the vaginal length stays exactly at the

4   same -- at the same length.

5       Q.   (By Mr. De La Cerda)  Should Ethicon's

6   conclusion -- strike that.

7           Should information about the concerns of

8   physicians and at least some within Ethicon that

9   Gynemesh was too stiff or too rigid for vaginal

10  tissues, should that information be included in the

11  IFU or no?

12          MR. SNELL:  Form, asked and answered.

13      A.   No, I don't think that it needed to be

14  included and the fact is that surgeons have the

15  options of doing augmented repairs or doing --

16  continue doing native tissue repairs.  And they will

17  have whatever concern they may have with one or the

18  other, they have the option of doing one or the other.

19  No one mandated to do a mesh repair or a native tissue

20  repair at a certain time.  But if you went by the data

21  and went by the durability and went by the evidence

22  about -- with Gynemesh, you have -- you were empowered

23  with information to decide one way or the other.

24          Ethicon does not tell surgeons who --

1    actually, they never told me, I can tell you that, and

2    they would never tell anyone, "You have to do this

3    repair with this type of material."  And I don't think

4    they would include that in the IFU and they would not

5    include that on any communication because it's up to

6    the surgeon to decide that.

7        Q.   (By Mr. De La Cerda)  So would that be the

8    basis for why that information is not -- does not

9    need to be included in the IFU, according to your

10   opinion?

11       A.   If the information on the -- on the IFU has

12   to do with the product itself and if there's no

13   evidence of the product performing one way or the

14   other, I would not expect anyone to misrepresent it

15   one way or the other.  In other words, I don't --

16   don't misrepresent it saying that it performs better,

17   don't misrepresent it saying that it performs worse.

18   Just give me what the evidence shows.

19       Q.   Would you agree that any future meshes

20   developed by Ethicon for pelvic organ prolapse should

21   be less rigid than Gynemesh?

22       A.   I don't -- I don't know if it's going to be

23   any development, I don't know if it's -- it's going to

24   be on the same rate of damage.  I think that --

Jaime Sepulveda, M.D.

```
 1            THE COURT REPORTER:  On the same?

 2       A.   On the same rate of -- on the same rate

 3   of -- when I say "rate," on the same elasticity or

 4   pliability of Gynemesh.

 5            I don't know if it's going to be the same

 6   stiffness or not.  I just don't know what they're

 7   going to do with the next generation.

 8       Q.   But my question is, though, is:  If they are

 9   going to develop the next generation, do you agree

10   that that next generation should be less rigid than

11   Gynemesh?

12            MR. SNELL:  Objection, foundation.

13       A.   I think we will have to first establish a

14   way of rigidity in -- once in the vagina and not just

15   on the testing that we have, biomechanical testing.

16            We know that biomechanical testing as

17   accurate and as elaborate and as complicated as it can

18   be, it doesn't always predict the -- the rigidity in

19   the vagina, because we don't know how to measure

20   rigidity in the vagina.  We don't know how you're

21   going to measure it.

22       Q.   Let me shift gears a little bit.

23            Okay.  You understand before a medical

24   device can be marketed in the United States, the FDA
```

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 301 of 429 PageID 24981
Case 2:12-md-02327   Document ...   Filed ...   Page 302 of 305 PageID 32832
Jaime Sepulveda, M.D.

1   requires that the device receive some level of

2   clearance or approval before that marketing happens;

3   right?

4        A.   Yes.

5        Q.   You're aware that Prolift wasn't cleared for

6   marketing in the United States by the FDA until

7   May 15, 2008; right?

8             MR. SNELL:  Form.

9        A.   There were some -- some dates in there, but

10  I don't have the dates complete.

11       Q.   (By Mr. De La Cerda)  You understand that

12  Prolift was marketed in the United States for

13  approximately three years before it received

14  clearance.  Do you understand that?

15            MR. SNELL:  Form, foundation.

16       A.   Yeah, it's -- it may have been marketed,

17  yes.  I don't -- I don't know -- I cannot give you an

18  accurate answer on that.

19       Q.   (By Mr. De La Cerda)  Should the fact that

20  Prolift wasn't cleared for marketing in the United

21  States been included in the Prolift IFUs in place

22  prior to May 15, 2008?

23            MR. SNELL:  Form, foundation, misstates the

24       regulatory --

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 302 of 429   PageID 24982
Case 2:12-md-02327   Document 2917   Filed 10/11/16   Page 233 of 305   PageID 82833
Jaime Sepulveda, M.D.

1      A.   Marketing -- marketing a device -- marketing

2   a device doesn't mean that you cannot -- you cannot

3   sell it.  I don't think it has the relationship of one

4   with the other.  If you -- if marketing means someone

5   visited me and giving me a brochure and telling me all

6   these things about the product, I really want to look

7   at the evidence.  I will be courteous and I will

8   listen to it, but I will go to -- with the evidence.

9           And the evidence was, at that time and still

10   today, that -- that the materials used were as good as

11   a native tissue and was more durable.

12      Q.   (By Mr. De La Cerda)  So you're telling me

13   that doctors didn't need to know before they put in

14   a Prolift if it hadn't even been cleared by the FDA

15   until May 15, 2008?

16           MR. SNELL:  Same objections.

17      Q.   (By Mr. De La Cerda)  Because there

18   were -- there were hundreds, if not thousands, of

19   Prolifts put in before it was ever cleared.  Do you

20   understand that?

21           MR. SNELL:  Same foundation, objection.

22      A.   I'm not -- I'm not aware of that specific --

23      Q.   (By Mr. De La Cerda)  We can -- we don't

24   even have to have a number.  If one was put in

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 303 of 429 PageID 21983
Case 2:12-md-02327 Document 2914 Filed 05/07/20 Page 334 of 505 PageID #: 82834
Jaime Sepúlveda, M.D.

 1  before it was ever cleared by the FDA, do you think

 2  it's okay for a doctor to not know that it wasn't

 3  cleared by the FDA before he puts it in to a

 4  patient?

 5           MR. SNELL:  Same objection.

 6      A.   It had a 510(k) approval; correct?

 7      Q.   (By Mr. De La Cerda)  May 15, 2008.  So

 8  for three years it didn't.

 9           Have you ever seen the correspondence

10  between Ethicon and the FDA about that clearance

11  issue?

12           MR. SNELL:  Same objection, foundation.

13      A.   I'm not aware of that, no.

14      Q.   (By Mr. De La Cerda)  Are you aware of the

15  510(k) being rejected a couple times?

16           MR. SNELL:  Actually misstates the evidence,

17      foundation as well.

18      Q.   (By Mr. De La Cerda)  You haven't seen any

19  of that correspondence?

20      A.   Not -- not on that specific issue, no, I

21  have not seen it.

22      Q.   All right.

23      A.   But if you give it to me, I'll check it out.

24  I'll give an opinion on it.  That's -- that's ...

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 304 of 429 PageID 21984
Case 2:12-md-02327  Document 9413  Filed 04/12/19  Page 239 of 305 PageID# 52839
Jaime Sepulveda, M.D.

1     Q.   So let's take the simple fact this product

2     was marketed in the United States before it ever had

3     clearance.  Now, before a doctor ever implants the

4     product, do you think it's fair for him not to know

5     that the product he's implanting hasn't even been

6     cleared by the FDA?

7          MR. SNELL:  Same objection, misstates the

8          evidence and the foundation as to the clearance.

9     A.   If it's -- I don't want to give you an

10    opinion on something that I haven't seen.

11    Q.   (By Mr. De La Cerda)  As you sit here

12    today, you have not reviewed any of the

13    correspondence between the FDA and Ethicon regarding

14    the clearance of the Prolift under the 510(k)

15    process; right?

16    A.   I -- I know that Prolift was cleared and I

17    know that there was -- the product had been sold.  I

18    just don't know the specifics of when was it cleared

19    and the dates as you're referring to.

20    Q.   What I want to try to get at now is, as you

21    sit here today, are you going to provide any opinions

22    about the Prolift and the timing of its clearance and

23    what effect that might have on warnings to doctors?

24    A.   As we sit here today, I cannot give you an

Case 2:20-cv-00265-SPC-MRM Document 94-1 Filed 10/25/20 Page 305 of 429 PageID# 24085
Case 2:12-md-02327 Document 1 Filed 04/04/12 Page 305 of 305 PageID #: 32830
Jaime Sepúlveda, M.D.

1    opinion about something that I have not read.

2         Q.    Okay.  And so you know today is my

3    opportunity to question you about this issue.  This

4    isn't a new issue, it's been around since 2008.  So if

5    you're telling me today that you don't have -- you're

6    not prepared to provide an opinion on that issue,

7    that's great.  That sends me down one road.

8              If you're telling me today that you do have

9    an opinion, then that's why -- then I would like to

10   ask questions about it.  But if you're not going to

11   opine -- if you don't intend to opine on the effect of

12   the timing of the clearance of the Prolift through the

13   510(k) process and that effect on what should be

14   warned or what should be told to doctors about the

15   Prolift, then that's fine and we can move on to the

16   next subject.

17        A.    No, I can -- I can look at those papers and

18   I cannot give you an opinion at this time about papers

19   that I have not seen.

20        Q.    Are those papers in your Reliance List?

21        A.    No, I don't think they're in my Reliance

22   List.  If they would be, I would have read it.

23              THE WITNESS:  Oh, you didn't --

24              MR. DE LA CERDA:  I'm actually the nice one.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 306 of 429 PageID 24986
Case 2:12-md-02327   Document 94-1   Filed 10/25/20   Page 139 of 305   PageID 5283786
Jaime Sepulveda, M.D.

1          Out of all the plaintiff's guys you meet, I'm the

2     nice one.

3                MR. SPARKS:  Hey.

4                MR. DE LA CERDA:  He's a nice one, too.

5     Q    (By Mr. De La Cerda)  Let's switch gears a

6     little bit.

7                Do you agree with the FDA's viewpoint that

8     there is a need for more rigorous studies regarding

9     the safety and efficacy of transvaginal mesh kits?

10    A.   The --

11               MR. SNELL:  Hold on.  You said -- can you

12          read that last -- he said transvaginal --

13               THE COURT REPORTER:  Mesh kits.

14               MR. SNELL:  I'm going to object, overbroad,

15          to the extent you're including Prolift

16          midurethral slings.

17               MR. DE LA CERDA:  And I'm not, so I do want

18          to be clear about that.

19               When I'm using this term "transvaginal mesh

20          kits," it's transvaginal mesh for the correction

21          of pelvic organ prolapse.

22               So let me go back.  Let me read the question

23          one more time.

24    Q.   (By Mr. De La Cerda)  Do you agree with

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 307 of 429 PageID 24987
Case 2:12-md-02327 Document 5327 Filed 09/29/20 Page 309 of 305 PageID 32839
Jaime Sepúlveda, M.D.

1    the FDA's viewpoint that there is a need for more

2    rigorous studies regarding the safety and efficacy

3    of transvaginal mesh kits, meaning transvaginal mesh

4    for the correction of pelvic organ prolapse?

5         A.   No, I disagree with that recommendation.

6         Q.   (By Mr. De La Cerda)  Okay.  And why is it

7    that you disagree?

8         A.   I disagree because there was a wealth of

9    data on -- on the use of transvaginal mesh that has

10   been determined by more than 400 surgeons -- 400

11   active surgeons that it was adequate.

12            The decision of the FDA, with all due

13   respect to the organization or to whoever put the time

14   and put their effort in sitting on that committee, did

15   not -- did not translate on or did not convey the

16   experience of all the surgeons.

17        Q.   Did you ever actually see the FDA's 522

18   orders that were issued with regard to Gynemesh,

19   Prolift and Prosima?

20        A.   I did -- I did read about those, yes.

21        Q.   Do you know what these orders required of

22   Ethicon?

23        A.   Yes.  I -- I read about the requirements and

24   I also read at one time the response of Ethicon to the

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 308 of 429   PageID 24988
Case 2:12-md-02327   Document 9051-5   Filed 10/25/20   Page 309 of 905   PageID 52839
Jaime Sepúlveda, M.D.

1    FDA.

2        Q.   That was my next question.  Do you know what

3    is it that Ethicon did in response to the 522 orders?

4        A.    They -- they made a statement along the

5    lines of what I just mentioned, that there were

6    studies, not only RCTs, not only -- but also cohort

7    studies that show the benefits in durability, it

8    showed the safety profile, it showed risk and

9    complications, very well delineated in ways that no

10   other repair had been addressed.

11       Q.   Did you also see any information regarding

12   Ethicon's estimate on the cost to have complied with

13   the 522 orders?

14       A.   I did not see the exact cost, but I know

15   that any -- any study is costly.

16       Q.   And Ethicon ultimately decided not to

17   perform what was discussed within the 522 orders;

18   correct?

19       A.    That's -- that's what I -- I -- I saw from

20   the -- from that process, from that specific process.

21       Q.   Ultimately, Ethicon decided to pull those

22   products from the market; right?  Prolift and Prosima

23   were pulled from the market; correct?

24       A.   Yes.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 309 of 429 PageID 24989
Case 2:12-md-02327   Document 9178-1   Filed 04/04/19   Page 309 of 805 PageID 32890
Jaime Sepulveda, M.D.

1    Q.   And then Gynemesh, the indication was

2    changed from -- well, I guess before there were two

3    indications, then they changed it to just one.  So now

4    the indication for transvaginal implant was removed

5    and now it's just abdominal sacrocolpopexy; is that

6    right?

7        A.   That's correct.

8             MR. SNELL:  I'm going to object.  Wait.

9        Wait.

10            THE WITNESS:  Okay.

11            MR. SNELL:  Objection, foundation, misstates

12       the evidence and the clearance.

13            So go ahead.

14       Q.   (By Mr. De La Cerda)  So that's -- is that

15   your understanding of what was done is that Prolift

16   and Prosima were pulled from the market but Gynemesh

17   wasn't, just its indication was changed?

18            MR. SNELL:  I'm going to have to object.  I

19       didn't hear "pulled from the market."  Same

20       objection, misstates the evidence.

21            If you take my basis, I'm sure you can get a

22       clean question and answer.

23       Q.   (By Mr. De La Cerda)  What I'll do is I'll

24   ask it this way:  When Ethicon invented a word

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 310 of 429 PageID# 24090
Case 2:12-md-02327  Document 9641  Filed 04/06/20  Page 310 of 505 PageID#: 32891
Jaime Sepulveda, M.D.

 1   called "decommercialization" and labeled that as

 2   what it did for the Prolift and the Prosima, point

 3   is ultimately Prolift and Prosima they stopped

 4   selling; right?

 5           MR. SNELL:  Form, predicate.

 6       A.   Yes.

 7       Q.   (By Mr. De La Cerda)  Gynemesh they

 8   changed the indication; right?

 9       A.   That's -- yeah, I became aware of that.

10       Q.   And that avoided Ethicon having to comply

11   with the studies required in the 522 orders; correct?

12           MR. SNELL:  Objection, speculation.

13       A.   I don't agree with that --

14       Q.   (By Mr. De La Cerda)  Why not?

15       A.   -- last statement.  Because I'm not -- I'm

16   disagreeing on the basis that there's -- they could

17   not continue without doing the 5- -- the 522s.  I

18   think that a fair trial of this would have been to at

19   least be on the committee that the FDA had.  And there

20   was actually the voice of surgeons saying these are --

21   this is the evidence and part of the evidence was

22   presented on a communication.  It was signed by over

23   400 surgeons and still that was ignored.

24           And that has less to do with what Ethicon

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 311 of 429 PageID# 24991
Case 2:12-md-02327-C Document 91 Filed 12/12/21 Page 2 of 805 PageID #: 32892
Jaime Sepulveda, M.D.

1    could do, the way I look at it, the way I appreciate

2    it, and more to the fact that the FDA decided no, this

3    is the way it's going to be, 522s or -- or not.  So

4    what could they do?

5        Q.   This is an interesting point that's come up

6    in my mind.  Why is it that the physicians didn't

7    petition Ethicon to comply with the 522 orders?  If

8    the product was so good, why don't the physicians say,

9    "Hey, Ethicon, this stuff is great, do the 522 orders,

10   we know it's going to turn out great, we all win"?

11            Why was there no petition for Ethicon to do

12   that?

13            MR. SNELL:  Calls for speculation.

14       A.   I -- I don't know.  That's exactly -- I'm

15   going to -- I'm going to probably answer it that way

16   because it calls for speculation.

17       Q.   (By Mr. De La Cerda)  Ultimately, if the

18   product's great, why didn't Ethicon do the studies?

19            Have you ever been provided a rationale as

20   to why Ethicon decided not to do the 522 studies?

21       A.   No, there was no -- no rationale and we

22   still cannot find a rationale for that, for not

23   complying with the 522.  I think that you can -- you

24   cannot tell a company how they're going to go about

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 312 of 429 PageID 24992
Case 2:12-md-02327-C Document 9914 Filed 10/25/20 Page 312 of 805 PageID 82893
Jaime Sepúlveda, M.D.

1    their -- running their business.  Although I would

2    like, yeah, to have that power to tell everyone to run

3    their business, it's not like I'm going to be listened

4    on that.  And there are other considerations that they

5    may have.

6            I can tell you that from a surgeons'

7    perspective, yeah, we could have been compelled --

8    going along the statement that you just made, we could

9    have been compelled to go to Ethicon and I think that

10   that was conveyed at some point, but there's no -- no

11   way to go about it when you're imposed a 522 just off

12   like that.

13           And I think that part of it -- just to

14   elab- -- elaborate on that -- part of it was that we

15   saw -- we signed that petition, we signed that letter,

16   we say, "Please reconsider this.  Let's find another

17   method to do this.  There has to be a better method to

18   do this."  And I think ten years from now we're going

19   to look back on this and we're going to say that was

20   an inadequate method.  It was too rigid and we have to

21   find other methods to have these devices available to

22   surgeons.

23       Q.  Is it necessarily a bad thing, though, for

24   clinical studies to be required before another

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 313 of 429 PageID 21993
Case 2:12-md-02327 Document 2911 Filed 09/25/20 Page 314 of 305 PageID #: 52894
Jaime Sepulveda, M.D.

1  transvaginal pelvic organ prolapse mesh is put on the

2  market?  I mean, is that a bad thing?  Isn't that a

3  good thing because it can ensure safety for patients?

4          MR. SNELL:  Form.

5      A.   I could -- let me tell you, I'm -- by now,

6  you know that I have done research in one way or

7  another for 25 years and I sponsor individuals to do

8  research and I believe in research and I believe in

9  evidence.

10         I can -- I will never be able to say, "Oh,

11  no, we don't need another study."  I think that

12  everybody wants another study, but the fact is that

13  are we going to put individuals through a study when

14  we have evidence from -- from before, multiple

15  randomized control trials, how fair is that to do

16  another study with women when we have evidence of how

17  it works?

18      Q.   (By Mr. De La Cerda)  Do you know if any

19  of the hospitals that you have privileges at had any

20  Prolift or Prosima devices leftover after Ethicon

21  stopped selling those products?

22      A.   No, that's -- in my -- my hospital, there

23  was -- it was not there.  Basically the communication

24  came in and the communication is clear and that was

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 314 of 429 PageID 21994
Case 2:12-md-02327 Document 294 Filed 04/14 Page 19 of 305 PageID #: 32893
Jaime Sepúlveda, M.D.

1    it.

2         Q.    What do you mean by the "communication"?

3    Did Ethicon say, "Hey, take it off your shelves"?

4         A.    No, we have a product manager in the

5    operating room and any of us that have -- any surgeon

6    that receives a letter would go and send it right away

7    to the product manager.

8         Q.    And what did the letter say?

9         A.    That's the decommercialization letter.

10        Q.    Okay.

11        A.    And that was it.

12        Q.    And so at the time it was decommercialized

13   did those products then get pulled from the shelves of

14   the hospital?

15        A.    Yeah, that's it, they're in a separate cart

16   and the cart doesn't work anymore.  I actually tried

17   to find one a few -- a few months later, I couldn't

18   find it.  No, that goes to a facility, gets destroyed,

19   that's it.

20        Q.    Okay.  Here's a few statements, I want to

21   see if you agree with them.

22             Do you agree serious complications

23   associated with surgical mesh for transvaginal repair

24   of pelvic organ prolapse are not rare?

Case 2:20-cv-00365-SPC-MRM Document 94-1 Filed 10/25/20 Page 315 of 429 PageID 20095
Case 2:12-md-02327 Document 4913-1 Filed 11/05/13 Page 315 of 305 PageID #: 32890
Jaime Sepúlveda, M.D.

```
 1       A.   They are rare.

 2       Q.   They are rare?

 3       A.   They are rare.

 4       Q.   So you disagree with that statement?

 5       A.   I disagree with the statement that they are

 6   not rare.

 7       Q.   Do you agree that there is no evidence that

 8   transvaginal repair with mesh provides any added

 9   benefit compared to traditional surgery without mesh?

10       A.   That's inaccurate and it's not supported by

11   evidence.

12       Q.   So you disagree with that one?

13       A.   I do.

14       Q.   Do you agree that it's not clear that

15   transvaginal repair with mesh is more effective than

16   traditional non-mesh repair in all patients with

17   pelvic organ prolapse and it may expose patients to

18   greater risk?  Do you agree or disagree with that?

19       A.   I disagree with that.

20       Q.   Do you agree that mesh used in transvaginal

21   pelvic organ prolapse repair introduces risks not

22   present in traditional non-mesh surgery for pelvic

23   organ prolapse repair?

24       A.   I -- in a general sense, I disagree with
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 316 of 429   PageID 21996
Case 2:12-md-02327-C   Document 00 Filed 12/12    Page 49 of 305   Page ID #: 3283

Jaime Sepulveda, M.D.

 1   that except with a fact that the risk is inherent to

 2   the implant only.

 3       Q.   Which would be exposure; right?

 4       A.   Which would be mesh exposure.

 5       Q.   Mesh exposure.  Mesh exposure.

 6            Okay.  Do you agree mesh placed abdominally

 7   for a pelvic organ prolapse repair results in lower

 8   rates of mesh complications compared to transvaginal

 9   pelvic organ prolapse surgery with mesh?

10       A.   I don't agree -- I don't agree with that.

11   And the basis for my disagreement with it isn't only

12   the clinical -- the clinical evidence, but also my

13   experience.

14       Q.   Do you agree that native tissue repairs have

15   similar outcomes to synthetic mesh without the risks

16   inherent in mesh use?

17            MR. SNELL:  Form, vague.

18       A.   They -- the evidence shows in randomized

19   control trials that native tissue repairs have

20   other -- other risks.

21       Q.   (By Mr. De La Cerda)  So you would

22   disagree with this statement; right?

23       A.   Yes, I would.

24       Q.   Do you agree or disagree the native

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 317 of 429 PageID 24997
Case 2:12-md-02327 Document 2911-1 Filed 04/11/16 Page 249 of 305 PageID 82898
Jaime Sepúlveda, M.D.

1    tissue -- strike that.

2          Do you believe it would be a reasonable

3    decision for a doctor to stop using the Prosima device

4    following the July, 2011, FDA warning?

5          MR. SNELL:  Incomplete hypothetical,

6       speculation.

7    A.    I think that there's a -- I mean, I will

8    have to think for all the other surgeons, but I think

9    it's reasonable whenever you have a letter from an

10   organization like the FDA and you -- all of us not

11   being completely -- completely aware of that process

12   on how it came through, it comes as a surprise that we

13   don't have a problem.  I think it comes as a surprise

14   not only for us, it comes as a surprise for the

15   patients.

16   Q.    (By Mr. De La Cerda)  So it would be

17   reasonable for a doctor to do that?

18   A.    I think it's reasonable for anyone to think

19   that there's something wrong and it requires a lot of

20   reading and a lot of research to really be in tune

21   with the reality.

22   Q.    And so it would also be reasonable for a

23   doctor to stop using the Prolift and the Gynemesh

24   transvaginally after that July, 2011, FDA warning;

1    correct?

2         MR. SNELL:  Same objection, speculation,

3    incomplete hypothetical.

4    A.   It's a -- it's reasonable on the basis of

5    human nature.

6    Q.   (By Mr. De La Cerda)  At any point after

7    the July, 2011, FDA warning, did you decide to stop

8    using Prosima, Prolift or Gynemesh transvaginally?

9    A.   I think that everyone look at it and

10   everyone stop using it for the wrong reasons, less

11   because of evidence, and more because of the -- of the

12   fear of being involved in litigation, which is real,

13   and being involved in a situation having to explain

14   themselves when there is not a clear -- a clear

15   picture about the reality of it.

16   Q.   But you did stop using Prosima, Prolift and

17   Gynemesh transvaginally at some point after the July,

18   2011, FDA warning; right?

19   A.   I -- I think I continue using what -- what

20   it did, it did happen is that I communicated, "Listen,

21   we need to take a look at this," but I continued using

22   it.

23   Q.   You continued implanting it?

24   A.   Yes.

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 319 of 429   PageID 24099
Case 2:12-md-02327   Document 9032-1   Filed 12/22/20   Page 320 of 805   PageID 329300
Jaime Sepúlveda, M.D.

1      Q.   Until they were pulled from the market or

2  stopped, they were stopped selling or

3  decommercialized; right?

4      A.   Yes, once you have -- you have that, I

5  don't -- I don't want to use it.

6      Q.   Do you agree -- do you agree that surgical

7  mesh to repair pelvic organ prolapse is a high-risk

8  device?

9      A.   It's a --

10          MR. SNELL:  Foundation.

11          Go ahead.

12      A.   It's a game like talking about 522, some

13  510(k)s, high risk, low risk, it's not -- it's not

14  scientifically accurate.

15          I do agree that if you're going -- if you're

16  going to use it, you need to be well-trained on it,

17  and you just don't start doing prolapse or continence

18  procedures because a device is easy to use.  You still

19  have to be trained and read what's behind all that.

20  That's my opinion of how I run my professional career.

21  It's my -- my profession.

22          That's how we do it on credentialing in my

23  hospital, that's going to be up to the credentialing

24  institutions and the physicians to decide how much

Jaime Sepulveda, M.D.

1    training they will -- they will have.

2        Q.   (By Mr. De La Cerda)  And so at this

3    point, you can't tell me whether you can label

4    surgical mesh to repair pelvic organ prolapse as

5    high risk; right?

6        A.   Yeah, it's labeled high risk and there's

7    communication from the FDA labeling it high risk.

8    What I -- I can tell you is that the terminology of

9    high risk or low risk brings other implications.  If

10   you look at the evidence, I will say, "Well, you know,

11   it's really a risky procedure like any surgery."

12       Q.   And so you're not going to offer testimony

13   that the Gynemesh implanted transvaginally or the

14   Prosima or Prolift are low-risk devices, are you?

15           MR. SNELL:  Objection, misstates his prior

16       testimony.

17           Go ahead.

18       A.   I will not go with low risk or high risk.  I

19   think that whole terminology is so -- is so

20   nonspecific.  What's -- if I -- if you compare it to a

21   heart surgery, if you compare it to -- to any other --

22   an appendectomy, there's always risk.  So I cannot

23   classify one way or the other.

24           There's -- there's -- I believe that there

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 321 of 429 PageID 22001
Case 2:12-md-02327 Document 9141 Filed 11/24/20 Page 392 of 3051 PageID 323362
Jaime Sepúlveda, M.D.

1    is more to that high-risk, low-risk classification

2    than what we can actually explain on the frame of a

3    deposition.

4        Q.    (By Mr. De La Cerda)  Do you know whether

5    or not Ethicon did an internal risks analysis to

6    determine risk scores for the pelvic organ prolapse

7    mesh devices?  Like whether they were going to --

8    whether Ethicon was going to label them low,

9    moderate, high risk?

10       A.    I'm not aware of them doing that and

11   actually, there's -- there was an effort, not by

12   Ethicon but by the professional societies to use the

13   Dindo classification and modify it for -- for

14   prolapse.  So that's -- that tells you the extent.

15            The reason why I'm explaining is it tells

16   you the extent of how elaborate the process is.  I

17   don't think that Ethicon probably -- I think they were

18   too busy with other things to develop anything,

19   anything like that.

20       Q.    Let's switch gears a little bit here.

21            Are you okay on breaks?

22       A.    I'm good.

23       Q.    Okay.  We are getting close.  Okay.

24            If a synthetic graft product like Prosima

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 322 of 429 PageID 32002
Case 2:12-md-02327   Document 94-1   Filed 10/25/20   Page 322 of 205 PageID 32003
Jaime Sepúlveda, M.D.

1    does not do better than a native tissue repair in

2    terms of safety and efficacy, do you think it should

3    be introduced to the market?

4            MR. SNELL:  Foundation.

5            Go ahead.

6        A.   The -- the basis for Prosima for any other

7    procedure, they don't do well with whatever benchmark

8    that you use, you need to reconsider, you need -- you

9    have a choice in the market, obviously, but there's --

10   that's not what we saw with Prosima.  The cohort

11   studies done on Prosima follow the experience with

12   Prolift and it showed that it was better than native

13   tissue repairs.

14       Q.   (By Mr. De La Cerda)  You're aware that

15   Ethicon was told by some of its top consultants it

16   did not make sense to use the Prosima in people with

17   lesser degrees of prolapse given the outcomes?

18       A.   Any consultant may have an opinion.  That's

19   something that -- that's something that Ethicon always

20   foster for anyone to give an opinion.  And it's not

21   like we were that shy of giving an opinion because we

22   actually offer plenty of it.

23       Q.   Would you disagree with that -- this

24   particular opinion?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 323 of 429 PageID 32003
Case 2:12-md-02327   Document 2905-1   Filed 04/21/16   Page 324 of 305   Page ID: 32934

Jaime Sepulveda, M.D.

1      A.    I disagree.

2      Q.    Do you agree or disagree with the following

3   statement:  There is no authoritative paper to support

4   that Prosima outcomes are superior or even comparable

5   to colporrhaphy?

6      A.    I disagree with that, and the papers are

7   authoritative and within the context of evidence

8   previously gathered by the use of Gynemesh and

9   Prolift.

10     Q.    So if the primary investigator for the

11  Prosima trial which studied whether or not the product

12  was effective for Grade II and III rectocele and

13  cystoceles made that statement, you would disagree

14  with her?

15     A.    I'm not aware -- are you speaking about

16  Dr. Zyczynski?

17     Q.    I guess ultimately -- you know, what I'll

18  do, I'll just withdraw the question.  I think you've

19  already answered anyway.

20           You disagree with the prior statement, so I

21  think you answered that anyway.

22     A.    I'm going to refer to her on first name

23  because I think that she will be okay with it.  Her

24  first name is Halina, H-a-l-i-n-a.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 324 of 429 PageID 23904
Case 2:12-md-02327 Document 4 Filed Jail Page 399 of 305 PageID #: 32905
Jaime Sepúlveda, M.D.

1    Q.   If the overall consensus of a medical device

2    company's consultants and experts is that it would be

3    a mistake to launch a device on the market, do you

4    think it would be wrongful for the company to launch

5    that device anyway?

6    A.   The --

7         MR. SNELL:  Wait.  Hold on.  Objection,

8         speculation, incomplete hypothetical.

9    A.   The fact that you are a scientist doesn't

10   always mean that you're going to know marketing.

11   That's -- there's more than one person making those

12   decisions.

13   Q.   (By Mr. De La Cerda)  So you don't believe

14   that it would necessarily be wrongful for a company

15   to launch a product under those circumstances; is

16   that right?

17        MR. SNELL:  Same objection.

18   A.   I think there's more than one opinion that

19   needs to be considered, especially in a multicenter

20   study.

21   Q.   If the overall consensus of a medical device

22   company's scientists and experts is that it would be a

23   mistake to launch the device on to a market, do you

24   think that doctors or patients who are provided the

Jaime Sepulveda, M.D.

```
 1    device should be told the company's scientists and

 2    experts think that the device is a mistake?

 3              MR. SNELL:  Form, foundation, incomplete

 4         hypothetical.

 5         A.   Yeah, I don't think that any company is

 6    going to tell you, "Yeah, I'm going to release it and

 7    it's mistake."

 8              No, the evidence is there and -- and the

 9    evidence was so very clear with Prosima.  It was

10    presented in modules, it was presented on the number

11    of patients, it was presented in a multicenter study.

12    It had all the qualities of a good cohort study.

13         Q.   (By Mr. De La Cerda)  So you don't think

14    that a doctor or -- a doctor who's implanting a

15    Prosima or a patient who's going to receive a

16    Prosima wants to know before that Prosima is put in

17    that at some point the top consultants and experts

18    at the company believe that Prosima was a mistake,

19    they believe it was a reckless product, that they

20    believe if they put the product out on the market

21    they were going to stop working with Ethicon, you

22    don't think any of that information should be

23    provided to doctors or patients?

24         A.   No.
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 326 of 429 PageID #32006
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 326 of 305 PageID #: 5236
Jaime Sepulveda, M.D.

```
 1              MR. SNELL:  Hold on.  You've got to give me
 2        a chance.
 3              Form, foundation.
 4              Go ahead.
 5        A.   No, it's -- I don't think that's -- that
 6   that should be considered.  I think that the
 7   scientific evidence supersedes whoever feels that it's
 8   in so much power to say, "Oh, it's reckless because I
 9   say it's reckless."
10              Well, this is the evidence, this is the
11   scientific evidence, this is the multicenter evidence.
12   If you insist on calling it reckless or giving an
13   irresponsible opinion, which is what it is, then it's
14   up to you, but this is the evidence on this device.
15        Q.   (By Mr. De La Cerda)  So Marcus Carey, you
16   know, is the inventor of Prosima; right?
17        A.   Yes.
18        Q.   And you know he received -- he would receive
19   royalties each time the Prosima was sold; right?
20              MR. SNELL:  Foundation.
21        A.   I -- I'm aware that he got paid for his
22   work.
23        Q.   (By Mr. De La Cerda)  Do you know how much
24   he got paid?
```

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 327 of 429 PageID 22007
Case 2:12-md-02327  Document 5271-3  Filed 01/07/18  Page 327 of 305  PageID 32369
Jaime Sepulveda, M.D.

1      A.    No.

2      Q.    Do you know he was the lead author on the

3  Prosima study done by Ethicon prior to launch?

4      A.    There was the first one and then there was

5  another study.

6      Q.    Do you know what his success rate was with

7  the Prosima in that first study?

8      A.    It's -- on the -- the first study was

9  around -- above the hymenal ring, I believe it was in

10  the '70s.

11      Q.    What about below?  Below the -- I just lost

12  the word.  Hymenian, is that what you said?

13      A.    Hymenal ring.

14      Q.    Hymenal ring.

15          MR. SNELL:  Let me caution you.  If you have

16      a study, you should pull it out and look at it.

17      He's not asking you to guess.  I mean, we have

18      all this stuff here, you can look at it.

19          THE WITNESS:  Okay.

20          MR. SNELL:  I don't know where you have it,

21      but I would assume it's in one of these things.

22      A.    This is it.  This is the study.

23      Q.    (By Mr. De La Cerda)  Okay.  So go back to

24  the question.  Do you know what his success rate was

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 328 of 429 PageID 32008
Case 2:12-md-02327 Document 2905 Filed 05/06/10 Page 159 of 305 PageID #: 52369
Jaime Sepúlveda, M.D.

1    with the Prosima in his first study?

2         A.   Let me look through it and I'll --

3    73.9 percent.

4         Q.   And you say that is above or below the

5    hymenal ring?

6         A.   That's about the hymenal ring.

7         Q.   And how about below the hymenal ring?

8         A.   The rest of it.

9         Q.   What do you mean "the rest of it"?

10        A.   The other percentage.

11        Q.   So it's 70/30?

12        A.   Yes, it's 70 -- yes, it's 73.9 versus

13   20-something.  Either one, yeah.

14        Q.   Do you think the fact that he was the

15   inventor of the product introduced bias in that study?

16             THE WITNESS:  Let me point out -- do you

17        see -- you saw that, right?

18             MR. SNELL:  Okay.

19        A.   Please repeat the question.

20        Q.   Sure.

21             Do you think the fact that he was the

22   inventor of the Prosima introduced bias into that

23   study?

24        A.   No.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 329 of 429 PageID 22009
Case 2:12-md-02327 Document 2915-1 Filed 10/25/20 Page 330 of 305 PageID 82310
Jaime Sepúlveda, M.D.

1      Q.    Why not?

2      A.    I have no reason to believe that he would be

3  bias with it.

4      Q.    Do you know whether Ethicon thought there

5  was a fair amount of spin going on regarding Dr. Carey

6  reporting of his clinical data?

7      A.    Fair amount of?

8      Q.    Spin.  Have you ever heard that term "spin,"

9  spinning the data, spinning the information?

10     A.    No, no.

11     Q.    Like the politicians do?

12     A.    I have no reason to believe that

13  Professor Carey had any deviations from what he would

14  honestly do.

15     Q.    Do you know whether Ethicon believed that

16  Dr. Carey was spinning the data?

17     A.    No.  No, I don't -- I'm not aware of that.

18     Q.    The inventor of Prolift, Dr. Cosson,

19  C-o-s-s-o-n --

20     A.    Cosson.

21     Q.    Cosson.

22         MR. SNELL:  Misstates, lacks foundation.

23  You've got the wrong person.

24     Q   (By Mr. De La Cerda)  Is he the inventor of

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 330 of 429 PageID 22010
Case 2:12-md-02327   Document 2924-9   Filed 10/6/20   Page 301 of 305 PageID 52341
Jaime Sepulveda, M.D.

1    Prolift?

2          A.    It was a group.

3          Q.    It was a group, right.

4          A.    It was a group.

5          Q.    You've relied on -- have you relied on data

6    and literature published by Dr. Cosson and the TVM

7    group to support your conclusions that Prolift is safe

8    and effective?

9                MR. SNELL:   Same objection.

10         A.    Well, there was a TVM and there was Prolift.

11   And TVM was a precursor, but is different from the

12   product on Prolift.

13         Q    (By Mr. De La Cerda)   Okay.  Do you know if

14   Dr. Cosson receives royalties for the Prolift or

15   received?

16         A.    No, I don't -- I'm not aware of what he

17   received.

18         Q.    Do you believe that an inventor who receives

19   royalties for selling his invention can be potentially

20   biased when publishing data regarding his invention?

21               MR. SNELL:   Speculation.

22         A.    I don't -- I don't see them being biased.  I

23   have no reason to believe that would be the case.

24         Q.    (By Mr. De La Cerda)   You're very

1    trusting.  You're very trusting.

2         A.   This is high caliber -- high-caliber

3    investigators.

4         Q.   Well paid, too.

5             You're aware that Ethicon had an alternative

6    mesh to Gynemesh PS that they believe would cause

7    fewer compli- -- fewer serious complications at least

8    as early as 2006; right?

9             MR. SNELL:  Foundation, misstates the

10        evidence.

11        A.   Could you please repeat that?

12        Q.   (By Mr. De La Cerda)  Sure.

13            Are you aware that Ethicon had an

14   alternative mesh to Gynemesh PS that they believed

15   would cause fewer complications at least as early as

16   2006?

17            MR. SNELL:  Same objections.

18        A.   No, I'm not aware of that, any mesh like

19   that, but I'm also aware that there's very low

20   likelihood that there was any evidence strong enough

21   for Prolene polypropylene.

22        Q.   (By Mr. De La Cerda)  What do you mean by

23   that?

24        A.   The evidence on Prolene polypropylene, on

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 332 of 429 PageID #: 22012
Case 2:12-md-02327   Document 29   Filed 09/06/20   Page 332 of 305   PageID #: 52313
Jaime Sepúlveda, M.D.

1    the behavior of the material, it's -- it was

2    well-established by the time Gynemesh PS came in.

3        Q.   So you don't believe it's possible that

4    Ethicon can have evidence that it had a mesh different

5    from Gynemesh that they believe was safer than

6    Gynemesh?

7            MR. SNELL:  Objection, same objection.

8        A.   I believe it's possible to have another

9    mesh.  What I don't believe is that the mesh could be

10   based to be safer or with more evidence.

11       Q.   (By Mr. De La Cerda)  Okay.  I'm going to

12   ask you whether you agree with the following

13   statements.

14           Do you agree that physicians should be

15   aware -- made aware of all of the significant safety

16   risks associated with the product in the IFU?

17           MR. SNELL:  Objection, asked and answered.

18       I think he's testified three times on this.

19       A.   The -- the risk of the IFU should pertain to

20   the device.  There is no place in the IFU to make a

21   more comprehensive guide for incontinence, nor should

22   the IFU replace training, expertise and textbook

23   reading.

24       Q.   (By Mr. De La Cerda)  But you agree that

Case 2:20-cv-00365-SPC-MRM   Document 94-1   Filed 10/25/20   Page 333 of 429 PageID 22013
Case 2:12-md-02327   Document 2917-1   Filed 10/05/17   Page 334 of 305 PageID 82314

Jaime Sepulveda, M.D.

1    all significant safety risks associated with the

2    product should be included; right?

3           MR. SNELL:  Objection, misleads prior

4        testimony.

5           Go ahead.

6    A.    With the -- with the product specifically

7    associated to the device and -- and -- and the mesh.

8    Q.    (By Mr. De La Cerda)  Is that a "yes"?

9           MR. SNELL:  Objection, asked and answered.

10   A.    To the device and mesh, yes.

11   Q.    (By Mr. De La Cerda)  Okay.  Do you agree

12   that a manufacturer of a medical device that would

13   be implanted in a woman's body is required --

14   actually, strike that.

15          Do you agree that an IFU should never

16   exclude known hazards or complications?

17          MR. SNELL:  Objection, I think this is all

18       asked and answered.  He's given the same opinions

19       numerous times.

20          Go ahead.

21   A.    The IFU should talk about the things that

22   are inherent to the device.  It's -- it's a guide

23   about the device.

24   Q.    (By Mr. De La Cerda)  Can't -- is it okay

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 334 of 429 PageID 22914
Case 2:12-md-02327   Document 2910-3   Filed 09/28/2017   Page 335 of 305   PageID 82313
Jaime Sepulveda, M.D.

1    for it to exclude known hazards or complications?

2            MR. SNELL:  Form.

3        Q.   (By Mr. De La Cerda)  There are

4    circumstances where I think you believe that it can

5    exclude known hazards and complications; right?

6            MR. SNELL:  Same objections.

7        A.   Things that are not at risk to the patient.

8        Q.   (By Mr. De La Cerda)  No, I mean -- okay.

9            If it's a known hazard or complication to it

10   that could happen to a patient, should it ever be

11   excluded from an IFU?

12           MR. SNELL:  Same objection.

13       A.   If it's -- if the complication or the side

14   effect is the same as it would happen with a native

15   tissue repair, I believe that it does not have to be

16   included on the IFU.

17       Q.   (By Mr. De La Cerda)  Okay.  Do native

18   tissue repairs result in chronic foreign body

19   reaction?

20       A.   Yes.

21       Q.   How is that?

22       A.   There's a reaction to sutures.  There's the

23   plication of tissue that dehisce.  There is the

24   formation of hematomas or granulomas.  There are the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 335 of 429 PageID 22015
Case 2:12-md-02327 Document 2974-1 Filed 04/14/16 Page 300 of 305 PageID# 82316
Jaime Sepúlveda, M.D.

```
 1    inherent conditions of the host that could cause it,

 2    such as atrophy, autoimmune disorders, lichen planus.

 3    So there are a number of conditions that can make a

 4    native tissue repair not work, not work well or have

 5    granulation tissue or have chronic -- chronic

 6    inflammation.

 7         Q.   Chronic inflammation.  Okay.

 8              Do you agree that if a patient undergoes the

 9    TVT procedure under general anesthetic, it has the

10    potential to put the patient at increased risk for

11    urinary retention or urethral erosion?

12         A.   No.

13         Q.   And why is that?

14         A.   Initially, the idea was that when you put a

15    midurethral sling, which is tension free, that you

16    have to adjust it so the patient would not be on

17    retention.

18              It was -- it was later described that that

19    may have been true for previous slings that were used

20    ideally for vesical junction, but not for midurethral

21    slings.  Eventually, the data proved that to be

22    correct, because the rate of voiding dysfunction was

23    below 1 percent.

24              So one of the -- one of the things that that
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 336 of 429 PageID 22016
Case 2:12-md-02327 Document 2918 Filed 09/29/14 Page 305 of 305 PageID 32317
Jaime Sepúlveda, M.D.

 1   experience validated is something that they didn't

 2   know, not even the inventor actually knew that, which

 3   is that there is some viscoelasticity to the implant

 4   itself.

 5           MR. DE LA CERDA:  Okay.  What I'd like to do

 6       now is take a break and review my notes and

 7       then --

 8           MR. SNELL:  I'm ready for another bathroom

 9       break.

10           MR. DE LA CERDA:  We'll go off the record,

11       thank you.

12           (Thereupon, a recess was taken from

13       3:24 p.m. until 3:45 p.m., after which the

14       following proceedings were held:)

15       Q.   (By Mr. De La Cerda)  Okay.  Doctor, we're

16   back on the record.

17           There was one thing you mentioned that I

18   wanted to make sure was clear.  When we were talking

19   about the compensation you had received as a

20   consultant and then we had a discussion about trying

21   to get --

22           MR. SNELL:  I haven't gotten that either.

23           MR. DE LA CERDA:  That's fine.  That's fine.

24       Get a better version.

Jaime Sepúlveda, M.D.

```
 1              MR. SNELL:  People are running around like

 2         on your side, too, like all over the place.

 3         Q.   (By Mr. De La Cerda)  There was a

 4    discussion about trying to get -- there's a

 5    spreadsheet that has listed out some of this

 6    information and you mentioned, "Well, it might only

 7    be money that was allocated for me, but not

 8    necessarily money that I made."

 9              Do you remember discussing that?  You might

10    not have used the term --

11         A.   Yes.

12         Q.   -- "allocated."

13         A.   Yes, they did their own allocations for what

14    they were going to spend.  It was a budget, internal

15    thing from Ethicon, a budget planning.  So it could --

16    my point is that it could say a number -- it would

17    never be higher than that number, but it was -- it

18    could be lower than that.

19         Q.   So the numbers in the spreadsheet may just

20    be what would have been an allocation or a budget for

21    you for that year and it couldn't be higher, but it

22    might be lower?

23         A.   But it might be lower, yes.  It cannot be

24    over that number.
```

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 338 of 429 PageID 22018
Case 2:12-md-02327 Document 2014-1 Filed 04/17/16 Page 269 of 305 PageID 52319
Jaime Sepulveda, M.D.

1      Q.   Okay.  Okay.  And then have you had a chance

2   to review that on your own, that spreadsheet?

3      A.   I saw it before -- before the Cavness trial

4   and I saw it at the Cavness trial.

5      Q.   And are you sure one way or the other

6   whether those numbers are allocated versus real

7   numbers?

8      A.   They're -- I know they're not real numbers

9   because I would have -- I would have remembered that.

10     Q.   Yeah.

11     A.   The number is -- is high, and I don't

12   remember having 1099s that were that high.

13     Q.   Okay.  Okay.  Have you understood all of my

14   questions today?

15     A.   Yes, sir.

16     Q.   Have you answered them truthfully and to the

17   best of your ability?

18     A.   Absolutely.

19     Q.   Is there any testimony that you would like

20   to go back and change at this point?

21     A.   No.

22          MR. DE LA CERDA:  Okay.  I'll pass the

23      witness.

24

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 339 of 429 PageID 22019
Case 2:12-md-02327 Document ... Filed ... Page 339 of 305 Page ID# 32320
Jaime Sepúlveda, M.D.

```
 1                    CROSS-EXAMINATION

 2   BY MR. SNELL:

 3        Q.   Doctor, I want to go through some topics and

 4   I'm actually going to go in the order that

 5   Mr. de la Cerda covered things just to make sure we're

 6   all clear on the record here about where you intend to

 7   testify and the bases and whatnot.

 8             Do you recall at the beginning of the

 9   deposition you were asked by Mr. de la Cerda about

10   that Abbott study where some of the patients didn't

11   return back to the implanting surgeon for care of a

12   complication?

13        A.   Yes.

14        Q.   All right.  In formulating your opinions on

15   the devices we've been discussing today, are there

16   studies in databases that have captive audiences that

17   look at treatment over time regardless of whether it's

18   the implanter, explanter, or someone else?

19        A.   No, there's -- one of the -- one of the

20   things that we have with these type of procedures is

21   that there have been tracks on Medicare databases,

22   they -- and we have other -- other -- other databases

23   that I -- and the citations I put, the Kaiser

24   Permanente, that's --
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 340 of 429 PageID 32020
Case 2:12-md-02327   Document 9441   Filed 04/04/18   Page 1 of 305   PageID #: 82321
Jaime Sepúlveda, M.D.

1    Q.   Why don't we go there because that's what I

2  was going to ask you about.  If you turn to page 14

3  and 15 --

4    A.   Yes, I got it.

5    Q.   -- of your TVT, TVT-O report.  Do you

6  identify different database studies that assess

7  reoperation complication management regardless of who

8  actually is doing that surgery?

9    A.   Right.

10    Q.   Okay.

11    A.   The Canadian registry, there is Medicare,

12  and there's Kaiser Permanente.

13    Q.   So -- and did you find those studies to be

14  reliable?

15    A.   That is -- that is reliable.

16    Q.   So let's take the first one that I'm looking

17  at, it's reference No. 45 in your report, Jonsson

18  Funk, J-o-n-s-s-o-n, Funk.  It's the nine-year study

19  where the rate of removal for mesh urethrolysis was

20  3.7 percent.

21    A.   Yes.

22    Q.   Do you have a recollection as to whether

23  that study contained, you know, over a 100,000

24  patients or --

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 341 of 429 PageID 22021
Case 2:12-md-02327 Document 0164561c982423c4 Filed 10/25/20 Page 22 of 305 PageID 82322
Jaime Sepulveda, M.D.

1    A.   There was -- I know for a fact it's over

2    80,000 patients, close to -- close to 100,000

3    patients.  Most importantly, that rate of -- of

4    revision was about 3 percent.

5    Q.   And did you see a similar rate as to about

6    3 percent in different database studies and other

7    studies like the Cochrane reviews and randomized

8    control trials?

9    A.   Consistently you go from one paper to

10   another to another and it's 3 percent.  It's 2 percent

11   on one, 3 percent.  The maximum I have seen is

12   5 percent.  But the number that is most consistently

13   repeated is 3 percent.  And that's -- that's accurate

14   to cite to the patients.

15   Q.   So in the Abbott study, let me ask you this.

16   Do you recall that it was a case series based on

17   tertiary referral centers by Dr. Karram, who I think

18   plaintiff's counsel mentioned, and a couple other

19   doctors?

20   A.   Yes, there are probably two papers that say

21   patients would not follow through.  The first one is

22   about the -- a review about randomized control trials

23   or any follow up in which patients do not show up,

24   they tend to be considered as -- in the group that did

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 342 of 429   PageID 32022
Case 2:12-md-02327   Document 9141-1   Filed 10/25/20   Page 342 of 305   PageID 32329
Jaime Sepúlveda, M.D.

1  not respond to therapy, to treatment, or to the

2  intervention.

3         The second is that paper that you just

4  mentioned, but the overwhelming data is so high in

5  other areas, in other databases that we don't go by

6  specific papers like that.

7     Q.   So the case series, can -- when you

8  formulated your opinions, did you pay attention and

9  put more effort -- more emphasis on higher level data?

10    A.   Not only formulate my opinions.  In

11  everything I read, I need -- I need to know what is it

12  that I'm reading.  And I put that scale, that bridge,

13  some people see it as a pyramid, some people see it as

14  a list.  We know that case series are at the bottom,

15  randomized control trials reviews are on the top.

16    Q.   The first study, the Jonsson Funk study, can

17  you identify, just for the record, how many patients

18  did that involve in the assessment?

19    A.   It's 188,454 eligible women.

20    Q.   And then the other footnotes, 46, 47, 48,

21  and 49, were those also the different databases you

22  mentioned?

23    A.   Right.  The Canadian, the Canadian also has

24  good reliability because the Canadian does have -- has

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 343 of 429 PageID 22023
Case 2:12-md-02327 Document 4903-1 Filed 11/04/15 Page 274 of 305 PageID# 82324
Jaime Sepúlveda, M.D.

1    a tracking because of their socialized system.  They

2    have tracking.  They are known to be able to track a

3    variety of conditions, and this is just another one

4    that they -- that they are -- they report.

5         Q.   And so I guess my question is:  Did you find

6    these database studies from different databases, based

7    on the volume of patients assessed and the

8    methodologies, to be more reliable than a case series

9    in a limited number of patients?

10        A.   Absolutely, besides these are up in the

11   hierarchy.

12        Q.   You were asked some questions about what you

13   did in formulating your opinions and you've talked

14   about and testified that you reviewed the medical

15   literature.  I want to make sure we're clear here.

16             Did you also look at various Ethicon company

17   documents and evaluate them?

18        A.   Yes, I -- I -- I did.  I just -- in the

19   order -- in the order that I read them, I -- I read

20   them most remotely.  In other words, I -- it has been

21   more time since I read than from this.

22        Q.   Did you specifically identify in your report

23   Ethicon documents on topics that Mr. de la Cerda asked

24   you about, like mechanical cut versus laser cut, and

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 344 of 429 PageID 22924
Case 2:12-md-02327   Document 9414-1   Filed 11/25/20   Page 344 of 305   PageID 32325
Jaime Sepulveda, M.D.

1  degradation and pore size and things like that in your

2  reports?

3      A.   Well, by -- through the -- through my

4  testimony today, I address.  There is no way I would

5  have been able to address it if I wouldn't have read

6  it.

7      Q.   I think you testified to this and you can

8  tell me if I'm correct or wrong.

9           Did you earlier testify that based on all of

10  your analyses and the bases you talked about here

11  today, that you have not identified any

12  characteristics of the mesh that are a safety risk?

13      A.   Yeah, I don't -- I don't think that there

14  are concerns about safety on -- on -- on any of the

15  products that we were using.  If I would have thought

16  there were concerns about safety to begin with, I

17  wouldn't have used them.

18      Q.   And besides the medical literature and the

19  high-level data that you have referenced, do you also

20  rely on your clinical experience?

21      A.   There's -- my experience is important, the

22  data is important, and the caliber of the data is

23  important.  Not only that, my experience and the

24  experience of the people that I -- that I talk to.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 345 of 429 PageID 23025
Case 2:12-md-02327-C Document 2... Filed... Page... of 305 Page ID #: 82320

Jaime Sepúlveda, M.D.

1          You see, it's -- in medicine, we still -- we

2     still value very much the experience, the experience

3     of our colleagues, so I use that and I use also the

4     experience of -- my own experience and the experience

5     of those that investigate.  People -- people that are

6     extremely talented are looking at studies.

7          Q.   And at the end, though, in formulating your

8     opinions and coming to your final conclusions about

9     the safety and efficacy of Gynemesh PS, Prolift, TVT,

10    TVT-O, did you put more weight into the randomized

11    level on control trials than individual experience or

12    case series?

13         A.   Randomized control trial is what -- what we

14    wish we would have on everything.  But once you have a

15    few randomized control trials, you can build up with

16    other -- with the other studies.  You cannot just do

17    the reverse, you have to build up on the strongest

18    ones.

19         Q.   You were asked a lot of questions about your

20    opinions on IFUs and you told Mr. de la Cerda various

21    grounds and bases for your opinions and you talked

22    about how you had reviewed IFUs over many years and

23    numerous times.

24         Let me ask you this.  In your professional

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 346 of 429 PageID 22026
Case 2:12-md-02327-C Document 2914-1 Filed 01/16/20 Page 299 of 305 PageID# 82321
Jaime Sepúlveda, M.D.

1    education role, did you teach and cover the IFU with

2    other pelvic surgeons specific to these devices we

3    talked about today?

4        A.   We could -- we could make -- the answer is

5    yes.  We could make any presentation and present any

6    slide, but at the end when we're working together in

7    the specimen and they collaborate, it's the IFU, the

8    one that comes out.

9             And as a -- as a preceptor or as a teacher,

10   you need to know that IFU by -- by steps and know not

11   only what it says, but what it really says in terms of

12   mechanics.  That's important for all -- all products.

13       Q.   And how many of the cadaver labs or these

14   labs that you did included covering the IFU with the

15   surgeons?

16       A.   Every single -- every single lab.

17       Q.   How many cadaver labs did you do on these

18   products?  Your best estimate is fine.

19       A.   The VCS here did about six cadaver labs

20   locally.  We had -- we used to go to Orlando and it

21   was very convenient for me because when I would miss

22   the plane, because I was seeing patients, I would just

23   drive up there, and it's -- and it was six in the max

24   year, maybe eight.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 347 of 429  PageID 22027
Case 2:12-md-02327  Document 9444  Filed 12/12/19  Page 29 of 305  PageID 325329
Jaime Sepulveda, M.D.

1      Q.   Would there be just one surgeon at this

2   event or would there be multiple?

3      A.   No, multiple surgeons.  There was more than

4   one -- one preceptor.

5      Q.   Do you have an estimate as to the number of

6   pelvic floor surgeons you would have worked with and

7   trained and went through the IFU with?

8      A.   I never -- never saw more than four.  And if

9   I will have two, that would be good.  We -- we started

10   with the IFU.  We would teach the device and after

11   that, one of the opportunities that we have in the

12   cadaver lab is that we could dissect and get an

13   in-depth view of what -- where the devices went by

14   using the IFU.  So it was the ultimate test for an IFU

15   and the test is on performance of the procedure.

16      Q.   You were asked questions about TVT and these

17   products and you expressed the opinion that you don't

18   think that the devices rope, curl, degrade, et cetera.

19         Did you -- so let me -- so with that

20   preface, did you look at the literature to see whether

21   any of the studies in the patients reported a

22   difference or a hypothesis as to a difference as to

23   laser cut versus mechanical cut mesh?  Are there any

24   studies that describe it?

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 348 of 429   PageID 22028
Case 2:12-md-02327   Document 3 - Filed 04/14/16   Page 279 of 305   PageID 32329
Jaime Sepúlveda, M.D.

1    A.   There is not -- there are no actual studies

2    that define one way or the other.

3         There is actually the well-designed

4    randomized control trials, like the TOMUS, which is

5    evaluating midurethral sling, transobturator and

6    retropubic.  And what -- in that specific study, which

7    is an excellent study, it's one of the pillars of what

8    we do, it's -- we -- we found out there was no

9    description of one or the other; and I have the

10   impression that both were used and there was never any

11   difference on it.

12   Q.   For the mechanical versus laser cut, do you

13   cover that in-depth in your report on pages 23 through

14   25?

15   A.   Yes.

16   Q.   Do you have -- is there a TVT-Secur report

17   over there?

18   A.   Yeah.

19   Q.   Do you recall a study by the name -- maybe

20   the first author's name was Neuman that looked at

21   TVT-O versus TVT-Secur and it reported percentages of

22   complications for erosion and dyspareunia and there

23   was a difference seen on dyspareunia which the authors

24   reported may have been to -- may have been due to

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 349 of 429 PageID 22029
Case 2:12-md-02327 Document 2022 Filed 04/20/16 Page 30 of 305 PageID 32030
Jaime Sepúlveda, M.D.

1    laser cut mesh.  Do you recollect that?

2        A.    That's Dr. Menahem Neuman's study.  He's in

3    Israel and he study -- he studied TVT-Secur.

4        Q.    What page are you on?

5        A.    That's 44.

6        Q.    And was that the only study that you were --

7    that you found in your investigation in the clinical

8    application of these products on women that suggested

9    there may be a difference between the two?

10       A.    There's a -- there's another -- another

11   study that Bianchi-Ferraro and on the -- both of them,

12   there are TVT-Os and TVT-Securs compared and there's

13   no difference on them.  That's -- this is just -- this

14   is just illustrate that mechanical cut and laser cut,

15   unless you put it on extreme conditions, way beyond

16   the stressors that would be found on the pelvis, there

17   is no significant difference on the behavior.

18       Q.    Page 45 on the Neuman study, you wrote that

19   the authors theorized that the laser cut mesh was to

20   blame for higher dyspareunia, but there is no

21   scientific data confirming that.

22       A.    There is no scientific data and that is just

23   an opinion and that's -- that's what we -- we have to

24   define what's science, what's an opinion.  Sometimes

Jaime Sepúlveda, M.D.

1    you see a study that has good science, but then it

2    becomes an opinion at the end.

3        Q.   Do you recall Mr. De al Cerda asking you

4    about a hypothetical that if laser cut mesh was three

5    times stiffer or more stiffer than mechanical cut mesh

6    would it lead to more complications and he may have

7    even mentioned exposure.  Do you recall?

8        A.   Yeah, I do recall.

9        Q.   My question to you is:  So in that study by

10   Neuman, did the laser cut mesh have a significantly

11   different rate of erosion than the mechanical cut

12   mesh?

13       A.   There's -- the rate of erosions were -- was

14   lower on the Secur.  It was zero versus a 1.4 on the

15   TVT-O.

16       Q.   Have you found any reliable, convincing

17   clinical study evidence that, in your mind,

18   establishes that there is a significant difference in

19   laser and mechanical cut mesh when implanted with the

20   TVT devices in women?

21       A.   There has been no study up to now and,

22   obviously, I'm giving you the opinion that I will

23   welcome any study that makes a difference between --

24   between the two of them.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 351 of 429   PageID 23031
Case 2:12-md-02327-JRC   Document 9414   Filed 02/32 of 305   PageID #: 32332

Jaime Sepúlveda, M.D.

 1            The Cochrane database, actually, did not

 2   define that.  There is no other study that has defined

 3   it.

 4        Q.   Do you have an opinion as to whether the

 5   weight, pore size, and width of the TVT mesh is proper

 6   in that device for the treatment of stress urinary

 7   incontinence?

 8        A.   For which device specifically?

 9        Q.   For the TVT, TVT-O devices, do you believe

10   that the mesh is the proper weight, pore size, and

11   width?

12        A.   Yes, and that's -- that's -- that's a mesh

13   that has the evidence behind it.

14        Q.   And when you say "the evidence," are you

15   talking about the various evidence that you put into

16   your reports?

17        A.   Yeah, we have come to the point, even the

18   communication from the FDA, most recent one, just --

19   just speaks about the standard for continence care

20   being a midurethral sling.

21        Q.   You were asked a question by plaintiff's

22   counsel about the lighter weight mesh and larger pore

23   mesh.

24            Has any lighter weight or larger pore mesh

1    been studied as much or demonstrated to be as useful

2    and safe as the mesh in TVT for the application of

3    stress incontinence?

4         A.    For -- for stress incontinence specifically,

5    there is no other mesh that has been tested to the

6    extent -- actually, there's no other continence

7    procedure material that have been tested to the extent

8    of TVT.

9         Q.    And is that all different types of studies

10   or just randomized control trials?

11        A.    There are all types of studies that -- but

12   predominantly randomized control trials as -- and

13   we're talking about devices for urinary incontinence.

14        Q.    You were asked a lot of questions about

15   degradation.  Do you believe that the available data

16   shows that the Prolene mesh degrades?

17        A.    No.

18             MR. DE LA CERDA:  Form.

19        Q.    (By Mr. Snell)  And did you review

20   specifically studies referenced by plaintiff's

21   counsel and others, you went and looked for like the

22   Clavé paper, that purportedly raised this issue of

23   degradation?

24        A.    That is one descriptive paper in which we --

Case 2:20-cv-00065-SPC-MRM   Document 94-1   Filed 10/25/20   Page 353 of 429   PageID 23033
Case 2:12-md-02327   Document 2911   Filed 09/09/16   Page 354 of 305   PageID 82334
Jaime Sepúlveda, M.D.

1   we can actually look at 26 samples of low density.

2   That's 26 samples out of close to over 2 million --

3   between 2 million and 3 million slings that I don't

4   think you can reliably give any opinion on that and

5   actually, if it would degrade, I would expect it to

6   perform worse, and that's not the evidence that we

7   have.

8        Q.   Is there evidence, long-term data, that

9   shows sustained durability and low complications in

10  your view?

11       A.   Yes.  There is data at five years, ten years

12  and now I believe there is data bordering on the 15

13  years.

14       Q.   And is that data, in your opinion,

15  consistent or inconsistent with the degradation

16  theory?

17       A.   No.

18       Q.   What's that?

19       A.   It's not consistent with the degradation

20  theory.  It's actually inconsistent.

21       Q.   In the Clavé study, did you see that besides

22  the fact that a minority of the mesh is -- had this

23  surface cracking on SEM, when they actually did the

24  chemical analytical testing, did those tests

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 354 of 429 PageID 23934
Case 2:12-md-02327  Document 9341-1  Filed 02/25/19  Page 35 of 305 PageID 82339
Jaime Sepúlveda, M.D.

1    demonstrate degradation?

2        A.    No, the samples -- the samples were poorly

3    treated to the point that they -- they were not given

4    a good for analysis.

5             Classically, explant -- explanted tissue --

6    I'm sorry, explanted graft is not a good -- it's not a

7    good sample to begin with, much less when you put it

8    through -- through spectroscopy, spectroscopy or

9    chromatography and much less through thermal --

10   thermal changes.

11       Q.    Were there -- in the Clavé paper, did you

12   see that the authors acknowledged that there was no

13   control group to compare?

14       A.    No, that's not a control -- control study.

15   That's barely a descriptive study.

16       Q.    Did you find any of the data that purported

17   to raise this issue of the hypothesis degradation to

18   be reliable?

19       A.    No, I have not seen one yet that proves

20   degradation with any definition that I've been given

21   of degradation.

22       Q.    Mr. de la Cerda asked you about cytotoxicity

23   and your report -- your report, I believe, covers that

24   pretty much in-depth.

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 355 of 429   PageID 22035
Case 2:12-md-02327-DC   Document 94-1   Filed 04/04/20   Page 355 of 305   PageID# 82930

Jaime Sepulveda, M.D.

 1          A.   Yes.

 2          Q.   And you talked with Mr. de la Cerda about

 3     the various Ethicon documents and testing you've

 4     reviewed and your opinion about the different types

 5     and what those studies show or don't show.

 6          A.   Yes, I -- I reviewed the -- Ethicon actually

 7     ask a third-party lab to do it.  It's a third-party

 8     lab in Germany and the reports are clear on all the

 9     assays.

10          Q.   And I think Mr. de la Cerda asked you to

11     identify, you know, the bases for your opinion for

12     your cytotoxicity opinions and you identified those

13     documents in your analysis.

14               Let me ask you this.  Is the basis for your

15     cytotoxicity opinions also your personal experience on

16     assessing cytotoxicity issues?

17               MR. DE LA CERDA:  Leading.

18          A.   Yeah, well, I assess cytotoxicity with word

19     in science starting to see cytotoxicity in -- in 1985,

20     from 1985 to 1986, that's all I did in the lab.  And

21     it's -- I did that -- I actually presented it at a

22     conference on -- on pharmaco -- on molecular

23     pharmacology.  And that's -- that's my experience with

24     it.

Case 2:20-cv-00865-SPC-MRM  Document 94-1  Filed 10/25/20  Page 356 of 429 PageID 22036
Case 2:12-md-02327-XXX  Document XXXX  Filed XX/XX/XX  Page XXX of XXX  PageID #: XXXX
Jaime Sepúlveda, M.D.

```
 1        Q.    (By Mr. Snell)  So you have personal

 2   experience in cytotoxicity analyses?

 3        A.    I have done bench -- I have done bench work

 4   on cytotoxicity.

 5        Q.    Did you also evaluate the clinical

 6   literature on these devices to see whether they

 7   documented or raised a phenomenon that you would

 8   attribute to cytotoxicity?

 9        A.    I went through all these documents and I

10   read the results on each one of them and I -- I'm in a

11   good position to see what -- what the assays show.

12        Q.    In your opinion, is the TVT mesh cytotoxic?

13        A.    No.

14        Q.    You were asked about clinical data that was

15   available before TVT-O -- the TVT-O device was

16   marketed.  Do you recall just covering that topic with

17   Mr. de la Cerda?

18        A.    Yes.

19        Q.    Was there data on -- clinical data, clinical

20   studies on the TVT device before TVT-O went to market?

21        A.    There was clinical data, yes.

22        Q.    Is that data relevant, in your opinion, to

23   TVT-O?

24        A.    Yes, it is.
```

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 357 of 429 PageID 22037
Case 2:12-md-02327   Document 94-1   Filed 10/25/20   Page 357 of 305   PageID #: 82339
Jaime Sepúlveda, M.D.

1    Q.   Is it the same mesh?

2    A.   It's the same implant.

3    Q.   You were asked about the MSDS sheet that you

4  looked at for the raw polypropylene and a statement in

5  it to the effect that the raw polypropylene -- I don't

6  remember the specific, but it had something to do with

7  compatibility.

8         My question to you is this:  Is the TVT

9  compatible with the female human body implanted --

10  implantation in the pelvis for treatment of stress

11  incontinence?

12   A.   It is biocompatible.  It has been

13  demonstrated that it's biocompatible and it has no

14  similarity to raw polypropylene.

15   Q.   That was going to be my next question.  Is

16  raw polypropylene implanted in the TVT process -- TVT

17  device?

18   A.   It's a -- it's a different thing.  Totally

19  different -- different type of material.

20   Q.   There was a discussion about sarcoma

21  formation in rats when raw polypropylene was implanted

22  in disk or powder form.  Do you recall that?

23   A.   Yes.

24   Q.   Is TVT disk or powder form?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 358 of 429 PageID 22038
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 359 of 505 PageID 32339
Jaime Sepulveda, M.D.

1    A.   No.  And TVT has not been as to a sarcoma

2    and there is actual -- actually a publication about

3    it.

4    Q.   I think in your report at page 26 you go

5    through some of the different epidemiologic studies

6    with regard to the polypropylene slings and cancer and

7    sarcoma.

8    A.   On the --

9    Q.   On the --

10    A.   Which one of the reports?

11    Q.   Probably be TVT, TVT-O report, page 26.

12    A.   Yes.

13    Q.   The top paragraph where you state:  "The

14    available data does not show any causal links between

15    polypropylene and cancer," and then you have numerous

16    footnote citations.

17    A.   Actually, the evidence is for lack of the

18    carcinogenic.

19    Q.   And as part of Exhibit 11 there is a paper

20    by the lead author Linder where there was over 2,000

21    midurethral sling patients who were analyzed.  I'll

22    just hand it to you.  We'll make sure we put it back

23    into Exhibit 11.

24    A.   Yes.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 359 of 429 PageID 22039
Case 2:12-md-02327 Document 94-1 Filed 10/25/20 Page 360 of 305 Page ID 32340
Jaime Sepúlveda, M.D.

1    Q.   Is that one of the studies that form the

2  basis of your opinion that the data show

3  noncarcinogenic --

4    A.   The rate of cancer in these patients was

5  reported to be below baseline.

6    Q.   Have you seen any studies utilizing the

7  Prolene polypropylene in any of these devices we

8  discussed today that show a statistically significant

9  elevated risk of sarcoma formation or cancer in women

10  over and above the expected background rate?

11    A.   No.

12    Q.   And in that study by Linder you just

13  mentioned, is it correct that 49 of the 50 patients

14  had cancer already a baseline?

15    A.   Yeah, that's -- that's the only -- it's 2

16  out of 2,474.  That's what makes for .0- -- 08.

17  That's extremely low.  That's actually lower than the

18  reported -- one of the cases was an ovarian cancer and

19  that's lower than the reported rate of ovarian cancer.

20    Q.   Let me put that back in Exhibit 11.  Make

21  sure we don't lose that.

22       You were asked questions by Mr. de la

23  Cerda -- I'm going to circle back around to the

24  lighter weight, larger pore mesh theory.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 360 of 429 PageID 32040
Case 2:12-md-02327 Document 2915-1 Filed 10/14/16 Page 360 of 9005 PageID #: 82341
Jaime Sepúlveda, M.D.

1          Do you know whether actually the TVM group

2    evaluated a larger pore, lighter weight mesh in the

3    development of what became Prolift --

4          MR. DE LA CERDA:  Leading.

5          Q.   (By Mr. Snell)  -- that was besides

6    Gynemesh PS?

7          A.   They did.  They did and it's in my Reliance

8    List.  Professor Jack Tanny evaluated the IFUs of

9    different meshes with absorbable components and with

10   large pore size.  Their first conclusion and that's

11   non- -- the first conclusion wasn't Dr. -- Professor

12   Berrocal, B-e-r-r-o-c-a-l.

13          Professor Berrocal's paper in which the

14   statement was clear the TVM group decided that no

15   absorbable meshes were going to be used.  And when a

16   combination was used without a partial absorbable

17   partial polypropylene, they decided that the pore size

18   being so large did not work.

19          Q.   Did you see whether or not the surgeons

20   evaluating the different meshes also evaluated a mesh

21   called Vipro?

22          A.   They did.  That's exactly what they did.

23          Q.   Is that a large pore, lightweight mesh as

24   well?

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 361 of 429 PageID 22041
Case 2:12-md-02327-C Document 2011 Filed 04/16/16 Page 362 of 365 PageID #: 32342
Jaime Sepulveda, M.D.

1      A.   Yeah, it's a large -- large pore.  You can

2  get pores as high as 5-, 6,000 microns.

3      Q.   Did that mesh demonstrate better efficacy or

4  tolerability than the Gynemesh PS?

5      A.   No, actually it was -- the performance was

6  worse.

7      Q.   You've heard of the mesh Ultrapro,

8  obviously.  Mr. de la Cerda talked to you today about

9  presentations concerning the potential benefits of

10 lighter weight or larger pore meshes.

11     A.   Yes.

12     Q.   Does the Ultrapro mesh also have a risk of

13 mesh exposure?

14     A.   We had -- when we say "we," as the surgeons

15 doing these procedures, we expected that it was going

16 to be less mesh exposure.  We actually found that it

17 was exactly the same.

18     Q.   And same thing for dyspareunia or pain?

19     A.   Yes.

20     Q.   In your Prolift report -- do you have that

21 handy?  Let's go to page 10 and 11.

22     A.   Yes.

23     Q.   Before we actually get to that, let me ask

24 you this.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 362 of 429 PageID 22942
Case 2:12-md-02327 Document 9451 Filed 04/05/19 Page 363 of 905 PageID# 323243
Jaime Sepúlveda, M.D.

1          Did you see any clinical studies that you

2   found to be reliable that showed that a larger pore or

3   lighter weight mesh than Gynemesh PS was more

4   effective or safer than Gynemesh PS in the Prolift,

5   Prosima or Prolapse application?

6       A.   No, it was -- it remained on a hypothesis.

7   It remained just as a hypothesis and just we -- we all

8   consider at one point that when we we're talking, I'm

9   talking again about the surgeons, the word preceptors

10  and the other surgeons, which one is going to have the

11  longest data behind it and it was polypropylene.

12      Q.   You mentioned earlier, told Mr. de la Cerda,

13  based on your review of the most reliable data that

14  actually the Gynemesh PS and Prolift had a lower risk

15  of wound complications in native tissue.  Do you

16  recall that?

17      A.   Yes.

18      Q.   And I think you also testified that based on

19  your analysis, there was a lower rate or risk of

20  vaginal stenosis requiring surgery for the Gynemesh PS

21  compared to native tissue and you mentioned the Carey

22  study?

23      A.   That is correct.  That's accurate.

24      Q.   Was that the same Carey study we were

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 363 of 429 PageID 22043
Case 2:12-md-02327 Document 9341 Filed 02/12/19 Page 194 of 305 PageID 32344
Jaime Sepúlveda, M.D.

1    looking at earlier?

2         A.   Yes.

3         Q.   Do you know where that is?  I want to ask

4    you a question about it.

5         A.   That is in the --

6         Q.   My question is:  Do you have it over there

7    somewhere?  I just want to ask you a question about

8    it.

9              Oh, here it is.

10        A.   It is the paper before the last one on the

11   top to the left.

12        Q.   So page 1384, does that report and what you

13   referenced in that randomized control trial that there

14   was a higher rate of reoperation for vaginal stenosis

15   in native tissue compared to the mesh?

16        A.   That's correct.

17        Q.   Do you remember Mr. de la Cerda asked you

18   did Ethicon ever test the pliability of the mesh?

19        A.   Yes, I do recall that.

20        Q.   Now, pliability of the mesh, I think you

21   told Mr. de la Cerda, that that could be related to

22   stenosis or pain.

23        A.   Well, it's -- one thing is that the

24   pliability and the other thing is about the

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 364 of 429 PageID 22944
Case 2:12-md-02327 Document 9041 Filed 01/04/51 Page 365 of 305 PageID 52345

Jaime Sepulveda, M.D.

1  contraction or shrinkage and what we were talking was

2  along the lines of what mesh contraction or mesh can

3  increase the pliability.  Pliability of a tissue or

4  the elasticity of the tissue has more to do with the

5  tissue itself.

6          Now, the question is, if the mesh could add

7  to this and the answer is every clinical indication of

8  shrinkage or -- or elasticity does not hold the test

9  of clinical evaluation.  If there would be a

10  shrinkage, there would be an actual contraction.  The

11  vagina would be shorter.  And there is no -- there's

12  no study that demonstrates that the vagina is shorter

13  on this -- on all patients that have been repaired

14  with mesh.

15          We have had instances in which the vagina is

16  shorter with native tissue repair because there's no

17  augmentation with the mesh.  So -- and that

18  communication is not just on my opinion, that's part

19  of the communication that was sent to the FDA.

20      Q.   Are you talking about the paper that was

21  endorsed by hundreds of pelvic surgeons?

22      A.   Yes.

23      Q.   At page 10 and 11 of your report you talk

24  about the Cochrane review and then the randomized

Case 2:20-cv-00865-SPC-MRM   Document 94-1   Filed 10/25/20   Page 365 of 429 PageID 22045
Case 2:12-md-02327   Document 4952   Filed 11/05/17   Page 295 of 305 PageID #: 32340
Jaime Sepúlveda, M.D.

1    control data do not show a statistically significant

2    difference in de novo dyspareunia, de novo pelvic

3    pain, vaginal pain, change in sexual function, or

4    change in vaginal length or vaginal caliber.

5        A.    That's the latest Cochrane review, that's

6    exactly what it demonstrates.

7        Q.    And did you also assess the randomized

8    control trials to see if that was an accurate

9    statement, specifically for Gynemesh PS and Prolift?

10       A.    Yeah, there's a -- there's an actual --

11   there's a -- there are randomized control trials and

12   there is the Lowman paper in which mesh is placed

13   transabdominally, sacrospinously on fixations,

14   uterosacral suspensions, anterior/posterior repairs,

15   they were all evaluated for the incidence of

16   dyspareunia.

17       Q.    You mention that the urine analysis was

18   consistent with the findings by Dietz and Maher, who

19   did a systematic review and found no difference in

20   post-operative or de novo dyspareunia or change in

21   sexual function.  Do you see that?

22       A.    Yes.

23       Q.    And that citation is number 24?

24       A.    24.

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 366 of 429 PageID 22046
Case 2:12-md-02327 Document 9041-1 Filed 11/21/19 Page 367 of 505 PageID#: 32947
Jaime Sepúlveda, M.D.

1    Q.   Is that a high-level of evidence, a

2  systematic review metanalysis?

3    A.   That is at the highest level.

4    Q.   And is that what your opinions are based

5  upon?

6    A.   Yes.

7    Q.   You were asked questions by Mr. de la Cerda

8  about characterization of mesh as high risk or low

9  risk, and I think you basically disagreed and said you

10  prefer to kind of evaluate it on its own terms.  Is

11  that correct or not?

12    A.   I -- I saw the classification of low risk or

13  high risk to be restrictive and the question is if

14  this -- if this procedure is done with mesh have a

15  higher risk over native tissue repairs.

16    Q.   Did he -- I'm sorry, go ahead.

17    A.   And the answer to that is every time we look

18  at that randomized control trial, the answer to that

19  is no.

20    Q.   So my question is this:  Have you put in

21  your report and will you be prepared to discuss at

22  trial how Prolift, Prosima, Gynemesh PS comparing

23  risk, whether it's less risky or higher risk than

24  native tissue repair for things that we talked about

Case 2:20-cv-00065-SPC-MRM Document 94-1 Filed 10/25/20 Page 367 of 429 PageID 22047
Case 2:12-md-02327 Document Filed Page 367 of 305 Page Date 32343
Jaime Sepúlveda, M.D.

1  today with Mr. de la Cerda like recurrence, wound

2  complications, pain, change in vaginal shape, length,

3  things like that?

4          MR. DE LA CERDA:  Form.

5      A.   Surgery has risk.  Surgery has multiple

6  risk.  Surgery for prolapse has specialized risk that

7  we face every single time that we work with mesh or

8  without mesh.  We haven't had a mesh now for a few

9  years and patients still having the same kind of

10  complications that they had with the exception of a

11  mesh exposure because there's no mesh.

12          Incisions still dehisce the same way,

13  incisions still separate, challenges of wound healing

14  are still seen, granulation tissue is still seen, and

15  actually what we're seeing now is a higher rate of

16  hysterectomies with -- with shorter vaginas.

17      Q.   (By Mr. Snell)  Do you plan to discuss at

18  trial how the rates and risks with the Gynemesh PS,

19  Prolift, Prosima compare to the rates and risks with

20  native tissue?

21          MR. DE LA CERDA:  Form.

22      A.   Yes.

23      Q.   (By Mr. Snell)  For example, in your

24  report, you -- so for your Prolift report, page 9,

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 369 of 429 PageID 22048
Case 2:12-md-02327 Document 000 Filed 00/00/00 Page 000 of 000 PageID 32949
Jaime Sepulveda, M.D.

1    you have -- you have multiple studies that show the

2    efficacy of Prolift and Gynemesh PS compared to

3    native tissue.  Do you see that?

4        A.   Yes.

5        Q.   Do you plan to talk about the different

6    rates and risks of recurrence for mesh-based repair,

7    particularly I'm focused on Ethicon Gynemesh PS and

8    Prolift, Prosima compared to native tissue.

9             MR. DE LA CERDA:  Form.

10       A.   Yes.

11       Q.   (By Mr. Snell)  And do you plan to discuss

12   rates of wound complications, sexual function and

13   dyspareunia for Ethicon's meshes compared to native

14   tissue?

15            MR. DE LA CERDA:  Form.

16       A.   Yes, I plan -- I plan to testify on those.

17       Q.   (By Mr. Snell)  And have you evaluated and

18   investigated those issues?

19       A.   I have thoroughly evaluated.  I have -- I

20   run randomized control trial after randomized control

21   trial.  I have highlighted the areas that I feel are

22   most important and I have summarized them today on

23   my -- on my testimony.

24       Q.   And have you also identified those --

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 369 of 429 PageID 22049
Case 2:12-md-02327 Document 9471 Filed 03/05/20 Page 300 of 305 PageID#: 82930
Jaime Sepulveda, M.D.

1    examples of those data in your reports, as well?

2        A.   I am -- I am ready to go on presented on the

3    numbers.

4        Q.   Lastly, Mr. de la Cerda asked you about if

5    you had any plans for further work in the formulation

6    or analysis.  Obviously, you're being deposed today

7    and tomorrow and I will represent to you that there

8    are transcripts not yet available for plaintiffs'

9    experts and some of plaintiffs' experts are not being

10   deposed until even after you.

11            Do you plan to review those transcripts when

12   they're provided to you and assess them?

13       A.   I will -- I will evaluate them.  I'll assess

14   them, and I'm looking forward to see the scientific

15   validity of it.

16            MR. SNELL:  Okay.  That's all I have.

17            MR. DE LA CERDA:  Nothing further from me.

18            MR. SNELL:  Thank you.

19            THE COURT REPORTER:  Do either of you need a

20       rough draft on this?

21            MR. SPARKS:  Yeah, I put my email on --

22            MR. DE LA CERDA:  Yeah, I'll take one, too.

23            (Thereupon, the taking of the deposition

24       was concluded at 4:33 p.m. )

1

2                    CERTIFICATE OF OATH

3

4      STATE OF FLORIDA        )

       COUNTY OF BROWARD       )

5

6              I, JODY L. WARREN, Registered Professional

7      Reporter, Florida Professional Reporter, Notary

8      Public in and for the State of Florida at Large,

9      certify that the witness, JAIME SEPULVEDA, M.D.,

10     personally appeared before me on 3/30/16 and was

11     duly sworn by me.

12             DATED this 11th day of April, 2016.

13

14

15

16     _____

               JODY L. WARREN, RPR, FPR

17             Notary Public, State of Florida at Large

               My Commission Expires 2/28/19

18             My Commission No. FF 188650

19

20

21

22

23

24

1              CERTIFICATE OF REPORTER

2

3          I, JODY L.WARREN, Registered Professional

4    Reporter, Florida Professional Reporter, certify

5    that I was authorized to and did stenographically

6    report the deposition of JAIME SEPULVEDA, M.D., the

7    witness herein on 3/30/16; that a review of the

8    transcript was requested; that the foregoing pages

9    are a true and complete record of my stenographic

10   notes of the deposition by said witness.

11         I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the

13   parties, nor am I a relative or employee of any of

14   the parties' attorney or counsel connected with the

15   action, nor am I financially interested in the

16   action.

17         DATED this 11th day of April, 2016.

18

19

20

21         _____

           JODY L. WARREN, RPR, FPR

22         Notary Public, State of Florida at Large

23

24

Jaime Sepúlveda, M.D.

```
 1              -  -  -  -  -  -

                E R R A T A

 2              -  -  -  -  -  -

 3

 4   PAGE  LINE  CHANGE

 5   ____  ____  _____

 6       REASON:  _____

 7   ____  ____  _____

 8       REASON:  _____

 9   ____  ____  _____

10       REASON:  _____

11   ____  ____  _____

12       REASON:  _____

13   ____  ____  _____

14       REASON:  _____

15   ____  ____  _____

16       REASON:  _____

17   ____  ____  _____

18       REASON:  _____

19   ____  ____  _____

20       REASON:  _____

21   ____  ____  _____

22       REASON:  _____

23   ____  ____  _____

24       REASON:  _____
```

1

2       ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5   hereby certify that I have read the

6   foregoing pages, and that the same is

7   a correct transcription of the answers

8   given by me to the questions therein

9   propounded, except for the corrections or

10  changes in form or substance, if any,

11  noted in the attached Errata Sheet.

12

13

14   _____

15    JAIME SEPULVEDA, M.D.              DATE

16

17

18  Subscribed and sworn

    to before me this

19  _____ day of _____, 20_____.

20  My commission expires:_____

21


     _____

22  Notary Public

23

24

Case 2:20-cv-00865-SPC-MRM Document 94-1 Filed 10/25/20 Page 374 of 429 PageID 22054
Case 2:12-md-02327 Document 2014-1 Filed 04/25/16 Page 305 of 305 PageID 52935
Jaime Sepúlveda, M.D.

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____  _____

 4     _____  _____  _____

 5     _____  _____  _____

 6     _____  _____  _____

 7     _____  _____  _____

 8     _____  _____  _____

 9     _____  _____  _____

10     _____  _____  _____

11     _____  _____  _____

12     _____  _____  _____

13     _____  _____  _____

14     _____  _____  _____

15     _____  _____  _____

16     _____  _____  _____

17     _____  _____  _____

18     _____  _____  _____

19     _____  _____  _____

20     _____  _____  _____

21     _____  _____  _____

22     _____  _____  _____

23     _____  _____  _____

24     _____  _____  _____
```

# EXHIBIT F

Exhibit consists of deposition testimony from a Texas state court action, *Ramirez v. Cesar Reyes, M.D., Johnson & Johnson, and Ethicon, Inc.*, Cause No. 2012-CI-18690, in which Ethicon retained Dr. Sepulveda-Toro to defend Ethicon's TVT products against substantially similar allegations as presented in the instant litigation. Any excerpts contained in Ex. F are taken from portions of that deposition which speak to general causation. Because much of Ex. F contains deposition testimony directed at specific causation, that portion of the transcript is not excerpted due to confidentiality concerns. Should the Court desire to examine the entire transcript, Plaintiffs request this be submitted under seal, or some other similarly protective measure.

Jaime Sepulveda, M.D.

Page 1

CAUSE NO. 2012-CI-18690

JENNIFER RAMIREZ F/K/A     )  IN THE DISTRICT COURT
JENNIFER GALINDO,          )
                           )
           Plaintiff,      )
                           )  438th JUDICIAL DISTRICT
v.                         )
                           )
CESAR REYES, M.D., JOHNSON & )
JOHNSON, AND ETHICON, INC., )  BEXAR COUNTY, TEXAS
                           )
           Defendants.     )
_____)


DEPOSITION OF

JAIME SEPULVEDA, M.D.


DATE:  April 8, 2016


TIME:  9:17 a.m. - 5:10 p.m.


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Jaime Sepulveda, M.D.

<table>
<tr><td>

Page 2

1          I N D E X
2   WITNESS:
3                                              Page
4   Jaime Sepulveda, M.D.
     Direct Examination by MR. FREESE         9
5    Cross Examination by MR. GOSS          310
     Cross Examination by MR. FREESE        316
6
          EXHIBITS
7
    For Plaintiff:
8
    No. 1 - Deposition Notice
9    For Identification                        9
10  No. 2 - Ethicon's response to deposition
    notice
11   For Identification                       10
12  No. 3 - Reliance List
     For Identification                       12
13
    No. 4 - Supplemental Reliance List
14   For Identification                       12
15  No. 5 - Binder of Ethicon documents
     For Identification                       17
16
    No. 6 - Expert opinion
17   For Identification                       17
18  No. 7 - Invoices with cover letter
     For Identification                       75
19
    No. 8 - Cochrane review
20   For Identification                       79
21  No. 9 - FDA Executive Summary
     For Identification                       82
22
    No. 10 - Appendix III - Methodology for
23  Systematic Epidemiologic Review of
    Published Literature
24   For Identification                       89
25  No. 11 - ETH.MESH.0547953
     For Identification                      108

</td><td>

Page 4

1   e-mails
     For Identification                      308
2
    No. 27 - ETH.MESH.06878438 and 439, Memo
3    For Identification                      320
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

</td></tr>
<tr><td>

Page 3

1
    No. 12 - Transcript excerpt of Dr. Joerg
2   Holste
     For Identification                      117
3
    No. 13 - ETH.MESH.01424029
4    For Identification                      122
5   No. 14 - Transcript excerpt of Brigette
    Hellhammer, M.D.
6    For Identification                      120
7   No. 15 - Thumb drive
     For Identification                      293
8
    No. 16 - Medical records of Dr. Graham
9    For Identification                      191
10  No. 17 - CV
     For Identification                      218
11
    No. 18 - Ultrasound images
12   For Identification                      222
13  No. 19 - Ultrasound image
     For Identification                      222
14
    No. 20 - CDs
15   For Identification                      231
16  No. 21 - Ultrasound imaging of the pelvic
    floor
17   For Identification                      229
18  No. 22 - Record of Examination of
    Jennifer Ramirez by Dr. Sepulveda
19   For Identification                      234
20  No. 23 - Article on Pudendal Neuralgia
     For Identification                      274
21
    No. 24 - ETH.MESH.00028555 to 556
22   For Identification                      300
23  No. 25 - ETH.MESH.03026399, 400 and 401,
    with attachments.
24   For Identification                      306
25  No. 26 - ETH-MESH-O50983794 and 795,

</td><td>

Page 5

1        The deposition of JAIME SEPULVEDA, M.D., a
2   witness in the above-entitled and numbered cause, was
3   taken before me, Dorothy Linda Minor, Registered
4   Professional Reporter and Notary Public for the State
5   of Florida at Large, at 200 South Biscayne Boulevard,
6   Suite 4600, in the City of Miami, County of Miami-Dade,
7   State of Florida, on Friday, the 8th day of April,
8   2016.
9        APPEARING ON BEHALF OF THE PLAINTIFF:
10       Richard A. Freese, Esq.
         FREESE & GOSS, PLLC
11       3031 Allen Street, Suite 200
         Dallas, Texas  75204
12       rich@freeseandgoss.com
13       Tim K. Goss, Esq.
         FREESE & GOSS, PLLC
14       3031 Allen Street, Suite 200
         Dallas, Texas  75204
15       tim@freeseandgoss.com
16       APPEARING ON BEHALF OF DEFENDANTS JOHNSON & JOHNSON
    and ETHICON:
17
         Kat Gallagher, Esq.
18       BECK REDDEN, LLP
         1221 McKinney Street, Suite 4500
19       Houston, Texas  77010
         kgallagher@beckredden.com
20
         Jordan N. Walker, Esq
21       BUTLER SNOW, LLP
         1020 Highland Colony Parkway, Suite 1400
22       Ridgeland, Mississippi  39157
         jordan.walker@butlersnow.com
23
24
25

</td></tr>
</table>

Jaime Sepulveda, M.D.

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  APPEARANCES (Continued):
2  APPEARING ON BEHALF OF DR. REYES:
3  David J. McTaggart, Esq.
   SCOTT, CLAWATER & HOUSTON, LLP
4  2727 Allen Parkway, 7th Floor
   Houston, Texas  77019
5  dmctaggart@schlawyers.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 8**

1  cause?
2  MS. GALLAGHER:  Yes, I do, because under
3  the rule it says that notice must be given that
4  the deposition will be recorded by other than
5  stenographic means.  It does not say said.
6  MR. GOSS:  And you refuse to let us go
7  forward in the event that we want to record it,
8  video it for our own purposes and for no
9  purpose to be used at trial?
10  MS. GALLAGHER:  Yes.
11  MR. GOSS:  And we've offered you that we
12  would not use it for any purpose at trial and
13  you refuse to proceed forward, even under that
14  condition?
15  MS. GALLAGHER:  Yes.
16  MR. GOSS:  Okay.  Just for the record, we
17  will take this to the Court.  In the event that
18  the Court determines that we are entitled to
19  video it for our own purposes, then we're going
20  to ask to come down here and take it again.
21  That's all.
22  THE VIDEOGRAPHER:  This is the end of
23  video portion.  It's 9:14 a.m.
24  THE COURT REPORTER:  Raise your right
25  hand, please, sir.  Do you swear or affirm that

| Page 7 | Page 9 |
|---|---|

**Page 7**

1  THE VIDEOGRAPHER:  We're on the record.
2  The witness is not present.  Counsel Tim Goss
3  has requested the video be turned on for
4  objections regarding the video.  The time is
5  9:12 a.m., and the matter is Jennifer Ramirez
6  versus Ethicon, et al.  Today's date is April
7  8, 2016.
8  MS. GALLAGHER:  This is Kat Gallagher on
9  behalf of Johnson & Johnson, and we have a, and
10  Ethicon, and we have a deposition notice for
11  Dr. Sepulveda today that was noticed for
12  stenographic only.  Pursuant to Rule 199.2, we
13  object to this going forward by video because
14  under Rule 199.2, at least five days prior to
15  the deposition, the party must serve on the
16  witness and all parties a notice that the
17  deposition will be recorded by other than
18  stenographic means.  We did not get five days
19  notice and I object to it going forward by
20  video.
21  MR. GOSS:  And just so I'm clear on your
22  objection, you object to us by recording -- you
23  object to our recording of the deposition, even
24  in the event that we do not intend to use the
25  video of the deposition at any trial in this

**Page 9**

1  the testimony you are about to give will be the
2  truth, the whole truth and nothing but the
3  truth?
4  THE WITNESS:  I do swear.
5  THEREUPON,
6  JAIME SEPULVEDA, M.D.,
7  having been first duly sworn/affirmed to tell the
8  truth, the whole truth and nothing but the truth, was
9  examined and testified under oath as follows:
10  DIRECT EXAMINATION
11  BY MR. FREESE:
12  Q.  Good morning.  Good to see you again.
13  I'm going to mark Exhibit 1 to your deposition, which
14  is the notice of your deposition.
15  (Plaintiff Exhibit No. 1 was marked for
16  identification.)
17  BY MR. FREESE:
18  Q.  Have you seen that before, sir?
19  A.  Yes, sir.
20  Q.  All right, and you were provided a copy
21  of it before the deposition?
22  A.  Yes.
23  Q.  And you were requested to bring some
24  documents?
25  A.  Yes.

3 (Pages 6 to 9)

Jaime Sepulveda, M.D.

| Page 10 | Page 12 |
|---|---|

**Page 10**

1    Q.   Okay.  And did you do so?
2    A.   Yes, I did.
3    Q.   And I'm going to mark Exhibit 2 to your
4  deposition, which is Ethicon's response to the
5  deposition notice.
6         (Plaintiff Exhibit No. 2 was marked for
7    identification.)
8  BY MR. FREESE:
9    Q.   Have you seen that before?
10   A.   I see it for the first time now.
11   Q.   Me showing you now, that's the first time
12  you've seen it?
13   A.   Yes, sir.
14   Q.   Okay.  You don't know what Ethicon
15  objected to producing and what it didn't object to
16  producing?
17   A.   Yeah, I'm aware that they objected to my
18  1099s.
19   Q.   Okay, and other than your 1099s, was
20  there anything withheld that we requested to be
21  brought, other than the 1099s?
22   A.   Not that, not that I'm aware.
23   Q.   Okay.  So, everything that you have
24  looked at and relied upon is either physically in the
25  room either in paper form or on a thumb drive?

**Page 11**

1    A.   I have, I have made an effort to put
2  everything there on the floor and I have my thumb
3  drive.
4    Q.   Okay, my question is, is everything that
5  you have reviewed and relied on in this case either on
6  the thumb drive or on the floor in paper format?
7    A.   Yes.
8    Q.   And the only set of documents that have
9  been withheld are your 1099s?
10   A.   Yes.
11        MS. GALLAGHER:  And, Rich, just to be
12   clear, I don't know if all of the literature is
13   on this thumb drive, but I think all the
14   case-specific materials are on there.  I'm just
15   not clear if we loaded up all the literature
16   again.
17        MR. FREESE:  Okay.
18  BY MR. FREESE:
19   Q.   And, Doctor, we were provided a
20  supplemental reliance list of yours this week.  Did you
21  realize that?
22   A.   Yes.
23   Q.   So, let me go ahead, and I'm going to
24  mark what was referenced to us as your reliance list as
25  Exhibit 3, and I'm going to mark as Exhibit 4 your

**Page 12**

1  supplemental reliance list that is printed, it says
2  April 5, 2005, which I guess was three days ago.
3         (Plaintiff Exhibits No. 3 and 4 were
4    marked for identification.)
5    A.   Yeah.
6  BY MR. FREESE:
7    Q.   Is that right?
8    A.   That's right.
9    Q.   Okay.  And is Exhibit 4 your supplemental
10  reliance list?
11   A.   Yes, this looks like my reliance list and
12  I would say supplemental reliance list.
13   Q.   Okay, and do you know sitting here what
14  was added or subtracted from your supplemental reliance
15  list?
16   A.   This has articles on, on other, other,
17  this has articles on biomechanics, and, as I can see
18  just flipping through these, these pages, it has my,
19  all the things that I relied that I testified on last
20  week.
21   Q.   Okay.  Well, what I'm, what I'm trying to
22  find out is, is there a way that I can, without going
23  line by line, figure out what it is you added to your
24  supplemental reliance list on the 5th of April, three
25  days ago?

**Page 13**

1    A.   No, I've been giving articles that I come
2  across but I did bring the articles that are not in
3  here.
4         MS. GALLAGHER:  Rich, I might be able to
5    short change this.  I think the only thing that
6    was added were additional medical records that
7    didn't make the original list.  I don't believe
8    there's any additional articles on there, is my
9    understanding.
10        MR. FREESE:  That's what I'm trying to
11   find out.
12  BY MR. FREESE:
13   Q.   So, based on what, what Ms. Gallagher
14  said, does that sound accurate to you, Doctor, that the
15  only supplement has been additional records?
16   A.   That sounds accurate.
17   Q.   And in fairness, this reliance list is
18  not prepared by you, is it?
19   A.   No, initially it's given in a packet,
20  although I can tell you that most of these articles I
21  read through them through the years.
22   Q.   I understand.  I move to strike that.
23  That's not really my question, Dr. Sepulveda.  These
24  reliance lists, Exhibit 3 and Exhibit 4, are prepared
25  by lawyers for Ethicon, not by you, correct?

4 (Pages 10 to 13)

Jaime Sepulveda, M.D.

| Page 14 | Page 16 |
|---|---|

**Page 14**

1    A.  That is correct.

2    Q.  You didn't sit here at your computer and

3 create 70 or 80 pages of single-spaced reliance

4 materials?

5    A.  I did put together the articles, I did

6 the research for the articles that are included

7 initially on the TVTO summary that is used in this

8 case.

9        MR. FREESE:  Move to strike.

10 BY MR. FREESE:

11    Q.  Not my question, sir.  You didn't sit

12 here and prepare at a computer your reliance materials.

13 That was done by the lawyers, correct?

14    A.  Yes, on the computer was done by them.

15    Q.  And then it's attached to your report,

16 correct?

17    A.  Yes.

18    Q.  Okay.  And your testimony is that you

19 think over the years you've seen or read most of the

20 things on your reliance list?

21    A.  I would say all of them.

22    Q.  So you've read all the internal Ethicon

23 documents referenced on your reliance list?

24    A.  I have a binder that has been provided to

25 me with the TVTO company documents.

**Page 16**

1    A.  No.

2    Q.  Okay.  So, one hundred percent of the

3 internal documents that you've looked at regarding TVTO

4 or any meshes that you testify about are hand selected

5 and given to you by Ethicon, correct?

6    A.  Yes.

7    Q.  All right, Doctor, we're going to go

8 ahead and mark your copy of the -- this is the report

9 prepared in this case, is that correct?

10    A.  Yes.

11    Q.  All right, I'm going to mark as Exhibit

12 5 --

13        MR. JORDAN:  Can we mark this and get a

14 copy of this?  I think what we would like to do

15 is just mark it so he can have his original

16 back and we can replace the copy with the depo

17 when we get it.  I just want it in the record

18 that he brought this and what it is.

19        MS. GALLAGHER:  Yeah, that's fine, it's

20 just because trial is so close we just want to

21 get his materials back to him as fast as we

22 can.

23 BY MR. FREESE:

24    Q.  So, I'm going to mark as Exhibit 5 the

25 documents that Ethicon's lawyers provided to you of the

| Page 15 | Page 17 |
|---|---|

**Page 15**

1    Q.  Okay, and did you bring it here with you

2 today?

3    A.  Yes, I did.

4    Q.  And do you have a binder of those?

5    A.  Yes.

6    Q.  Do you mind grabbing that?

7    A.  No.

8    Q.  And would you go ahead and describe

9 what's in this binder for me?

10    A.  It's a, it's a group of, it's a mixed

11 group of the history of TVTO, the -- I'm not going to

12 read the whole thing.

13    Q.  That's fine, just a narrative.

14    A.  But, the summaries of how TVTO was

15 developed.

16    Q.  Okay.  And, again, these were internal

17 documents that were hand picked by the lawyers for

18 Ethicon, is that correct?

19    A.  They, they were provided to me.  I don't

20 know what, what method they used.

21    Q.  Well, the method was, they chose which

22 documents to supply to you, correct?

23    A.  I, I think, I think, yes.

24    Q.  Okay.  And is there any specific internal

25 document that you asked them to provide to you?

**Page 17**

1 internal records of the company, the binder.

2    A.  I understand.

3        (Plaintiff Exhibit No. 5 was marked for

4    identification.)

5 BY MR. FREESE:

6    Q.  Okay.  I'll mark as Exhibit 6 your expert

7 opinion in the Jennifer Ramirez case.

8        (Plaintiff Exhibit No. 6 was marked for

9    identification.)

10 BY MR. FREESE:

11    Q.  Is that correct?

12    A.  Yes.  You mean my marked copy?

13    Q.  Yes, I want to mark your marked copy.

14    A.  Yes.

15    Q.  And these are, the pink stickies are

16 yours?

17    A.  Yes.

18    Q.  In your handwriting?

19    A.  Yes.

20    Q.  And there's highlighting here also,

21 correct?

22    A.  Yes.

23    Q.  Generally, what is it that you

24 highlighted?

25    A.  Anything that I, I anticipate that you

5 (Pages 14 to 17)

Jaime Sepulveda, M.D.

| Page 18 | Page 20 |
|---|---|
| 1 would ask me about. | 1 care plan? |
| 2     Q.  Okay.  Fair enough.  And I'm going to | 2     A.  If I -- repeat that again, please. |
| 3 give it back to you, and I may, I may ask to get it | 3     Q.  Yes, sir.  There's four pages of, of |
| 4 back to see what's highlighted and what the notes say | 4 opinions that you have about the life care plan that |
| 5 when I get to that particular page.  Okay? | 5 you say you did not prepare. |
| 6     A.  Okay. | 6     A.  No, I did not type those, and, and those |
| 7     Q.  Doctor, I'm going to try to do this in | 7 were prepared by the attorney's office and I reviewed |
| 8 just page-flipping order so we can get through this, | 8 them. |
| 9 but am I correct that this expert report is virtually | 9     Q.  Okay, you reviewed the comments? |
| 10 identical to a number of expert reports that you have | 10     A.  Yes. |
| 11 issued in synthetic mesh litigation lawsuits? | 11     Q.  Did you review any of the underlying |
| 12     A.  They, the general report, yes. | 12 documents that made up the life care plan? |
| 13     Q.  The credentials and qualifications would | 13     A.  Yes, I reviewed the documents prepared by |
| 14 be virtually identical? | 14 Mr. Harrell, and I read the deposition of Dr. Elizondo. |
| 15     A.  Yes. | 15     Q.  All right, and these are -- were there |
| 16     Q.  Okay, and the general opinions that you | 16 anything other than those two depositions that you |
| 17 hold about TVT and TVTO and TVTS are all virtually | 17 read? |
| 18 identical? | 18     A.  No. |
| 19     A.  Yes, sir. | 19     Q.  Did you read the entirety of the |
| 20     Q.  Okay, and then we have some opinions that | 20 depositions? |
| 21 are specific to Ms. Ramirez's case, correct? | 21     A.  I, yeah, Elizondo, I read the whole |
| 22     A.  Yes. | 22 thing. |
| 23     Q.  Okay.  Am I correct, like your reliance | 23     Q.  Were there portions selected for you by |
| 24 list, that your expert report is not prepared by you | 24 the lawyers, or did you just, you sat down and read the |
| 25 but rather is prepared by the lawyers for Ethicon? | 25 whole deposition? |

| Page 19 | Page 21 |
|---|---|
| 1     A.  No, that's not correct. | 1     A.  No, that one I read the whole, whole |
| 2     Q.  Okay.  So, who actually types this | 2 deposition. |
| 3 report? | 3     Q.  I can look at your reliance list, but |
| 4     A.  I, I did. | 4 there are a lot of depositions that are listed here. |
| 5     Q.  You typed this 66-page report? | 5 Did you read every one of them? |
| 6     A.  I actually did. | 6     A.  At some point, I have read them, because |
| 7     Q.  Okay, and how long did it take you to | 7 being this is so long, this is two years, but yes, I |
| 8 type this 66-page report? | 8 have read the depositions, and they don't all come, as |
| 9     A.  I'm going to, I'm going to, I misspoke on | 9 you probably would know, they don't come at one time. |
| 10 the, the whole report.  The, the part that has to do | 10 They come in sequence. |
| 11 with the life care plan, I did not type that one. | 11     Q.  So, over the period of Ms. Ramirez's |
| 12     Q.  Okay.  So, the life care plan opinion | 12 case, you've read several thousands of pages of |
| 13 starts at page 63 of your report? | 13 deposition testimony to form your opinion, correct? |
| 14     A.  Yes, that's correct. | 14     A.  Yes, sir. |
| 15     Q.  And you did not type that? | 15     Q.  And that would include all of her |
| 16     A.  No, I did not type the comments on the | 16 treating physicians? |
| 17 life care plan. | 17     A.  Yes, all the treating physicians that |
| 18     Q.  Who prepared your comments on the life | 18 I've been made aware of by the medical records. |
| 19 care plan? | 19     Q.  Her deposition, correct? |
| 20     A.  The, the attorney's office. | 20     A.  Two, both of them. |
| 21     Q.  Okay.  Do you know who in the attorney's | 21     Q.  Three of them.  Did you know there were |
| 22 office? | 22 three, three installments of her deposition? |
| 23     A.  No. | 23     A.  No, I read two, two depositions. |
| 24     Q.  Okay.  Did you actually review any | 24     Q.  Did you know there were three? |
| 25 underlying records to create the comments in the life | 25     A.  No. |

Golkow Technologies, Inc. - 1.877.370.DEPS

Jaime Sepulveda, M.D.

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  Q.  Okay.  What two versions did you read?
2  A.  I read the first and the second
3  depositions.
4  Q.  Okay.
5  A.  That's the transcript of each one.
6  Q.  You didn't read the third version?
7  A.  No.
8  Q.  So your opinions can't be influenced in
9  any way by what she said in her third deposition,
10  correct?
11  A.  No, I have not read it, I cannot rely on
12  it.
13  Q.  And you don't intend to give any opinions
14  based on anything that was said in her third
15  deposition?
16  A.  I'm not even aware that there was a third
17  deposition, so I definitely could got rely on.
18  Q.  So anything that was said in the third
19  deposition can't form any basis for any opinion you're
20  giving, correct?
21  A.  Unless I read them before trial, and then
22  everybody should be aware if anything changes.
23  Q.  I'm talking about as you sit here today,
24  we've got your report, we've got you here under oath
25  giving your opinions, you can't opine, don't intend to

**Page 24**

1  hospital, and I put together the research, I cooperate
2  with the research instruments, I oversee the research
3  instruments as the principal investigator.  That
4  includes IRB submissions and registering in the
5  clinicaltrials.gov site.
6  Q.  But the registry is closed?
7  A.  Yes, when we finish our project, we are
8  required to close that registry or that project on the
9  clinicaltrials.gov.
10  Q.  So you're no longer an investigator for
11  that?
12  A.  No.
13  Q.  I guess we should take that out of your
14  résumé, should we not?
15  A.  You can actually strike it, yeah.
16  Q.  Okay.  And it says that, the conference
17  director for the Pelvic Floor Board.  What is that?
18  A.  The Pelvic Floor Board is a group of
19  colorectal, radiologists, physical therapists,
20  gastroenterologists, neurologists, urogynecologists,
21  gynecologists, and neurologists and pain management
22  specialists.  We all get together every quarter and we
23  present cases, discuss cases and treatment strategies
24  and share knowledge.
25  Q.  Is this national or international, or is

| Page 23 | Page 25 |
|---|---|

**Page 23**

1  opine on anything said in her third deposition?
2  A.  No, I have not read it.
3  Q.  Okay.  Now, real quickly, you're the
4  medical director of South Miami Medical Arts Surgery,
5  correct?
6  A.  Yes.
7  Q.  And that's, that's where you work?
8  A.  That's one of the places where I work.
9  That's, that's a surgery center that is a partnership
10  between the surgeons and Baptist Health System.
11  Q.  And what do you do as the medical
12  director?
13  A.  I oversee credentialing, oversee the
14  directory for pharmacy, I oversee any incidents,
15  incident reports, and I, I also prepare for joint
16  commission reviews and AHCA, A-H-C-A, reviews.
17  Q.  It says you are a principal investigator
18  of the Fibroid Registry Research Project.  What is
19  that?
20  A.  Yes, that's a registry, it's a research,
21  and, it's a research project, and it was registered and
22  has been closed.
23  Q.  What was it a research project of?  And
24  what was the purpose of the project?
25  A.  Well, there's a fibroid center at the

**Page 25**

1  that just here in Miami?
2  A.  That's a CME activity.  It's one-credit
3  CME activity here at Baptist Health.
4  Q.  Okay, that's what I'm getting at, it's a
5  local entity?
6  A.  That's correct.
7  Q.  And you set up the conferences for it?
8  A.  Yes, I'm the conference director.
9  Q.  Okay.  Now, you're a member of the
10  American Urologic, Urogynecologic Society, is that
11  right?
12  A.  Yes.
13  Q.  That is an organization made up of
14  doctors who practice urology and gynecology?
15  A.  Yeah, we, AUGS started in the '90s, and
16  it was put together by Dr. Jack Robertson, and he, now
17  it's just the society that represents those with an
18  interest or a board certification in urogynecologic
19  medicine and reconstructive surgery.
20  Q.  That's commonly referred as to AUGS?
21  A.  AUGS.
22  Q.  And am I correct, as long as you're a
23  doctor practicing urology or urogynecology and you
24  submit your application, you can be a member of the
25  organization, correct?

Jaime Sepulveda, M.D.

Page 26

1    A.   That's correct.
2    Q.   You don't have to take a test to get in
3  there?
4    A.   No.
5    Q.   You don't have to be invited?
6    A.   No.
7    Q.   You're just, I'm a doctor, I do
8  gynecology, I do urology, I would like to be a member,
9  here's my dues, I'm in, correct?
10    A.   Yes.
11    Q.   Okay, and in fact, Ethicon is a member of
12  AUGS, is that correct?
13    A.   I did not know that.
14    Q.   Is me telling you, is that the first time
15  you ever heard it?
16    A.   Yes.
17    Q.   Okay.  And then it says that you're a
18  member of the American Urological Association, AUA, is
19  that correct?
20    A.   Yes.
21    Q.   Same thing, that's an organization that
22  you don't have to be invited to, correct?
23    A.   No, that one I was invited.
24    Q.   You don't have to be invited to it,
25  correct?

Page 27

1    A.   For me as a gynecologist to be a member,
2  yes.
3    Q.   Generally, anyone who is a practicing
4  urologist who wants to be a member of the AUA can
5  submit an application to be a member, correct?
6    A.   If you are a urologist.
7    Q.   That's my point.  And you are.
8    A.   No, I'm a urogynecologist.
9    Q.   I understand, but you practice urology
10  and gynecology, do you not?
11    A.   I practice female pelvic medicine and
12  reconstructive surgery.  That's my board certification.
13    Q.   And, so, any doctor who practices in that
14  field can apply, pay a due and be a member of AUA,
15  correct?
16    A.   I think for urologists, they are board
17  certified in urology.  I am not sure.
18    Q.   As you sit here today, you didn't have to
19  take a test to be an AUA member, did you?
20    A.   No, for me to be a member, I had to be
21  invited and sponsored by a urologist.
22    Q.   And then you pay your dues and you become
23  a member, correct?
24    A.   Yes.
25    Q.   All right.  The IUA, the International

Page 28

1  Urogynecologic Association?
2    A.   Yes.
3    Q.   Is that IUGA?
4    A.   Yes.
5    Q.   Okay.  What about that organization, do
6  you have to be invited to that, or can you simply join
7  it?
8    A.   No, you join.
9    Q.   Okay, you pay your dues, submit your
10  application, Dr. Sepulveda, you're a member, correct?
11    A.   Yes.
12    Q.   ICS, International Continence Society,
13  that's also a group, that was founded in England,
14  right?
15    A.   I don't know if it was founded in
16  England.  I know it's a great source of information.
17    Q.   And that's simply, I'm Jaime Sepulveda
18  and I want to be a member, here's my money and here's
19  my application, and you're in, correct?
20    A.   Yes.
21    Q.   All right, you were not invited to be a
22  member of ICS?
23    A.   No.
24    Q.   Anybody who is a doctor who pays the dues
25  can be a member of ICS, correct?

Page 29

1    A.   Yes.
2    Q.   Does your experience in neuromodulation
3  have anything to do with the opinions you're giving in
4  this case?
5    A.   No, not neuromodulation.
6    Q.   It's in your report, so I just want to
7  make sure, as I go through this, I want to see if it
8  impacts your opinions, and if it doesn't, we won't
9  spend any time on it.
10    A.   No, neuromodulation is used for urge
11  incontinence, but it's not something that I would
12  recommend for Mrs. Ramirez at this time.
13    Q.   And you said that you have a good bit of
14  experience with TVT, TVTO and TVT Secur, correct?
15    A.   Yes.
16    Q.   And you describe it in your report as
17  three generations of TVT products, correct?
18    A.   Yes.
19    Q.   Okay.  And all three of those use the
20  same mesh, correct?
21    A.   Yes.
22    Q.   The, the method of implanting is
23  different, correct?
24    A.   Yes.
25    Q.   The length is different?

8 (Pages 26 to 29)

Jaime Sepulveda, M.D.

| Page 30 | Page 32 |
|---|---|

**Page 30**

1    A.  Yes.
2    Q.  And, but in your mind, those three
3  products represent three different generations of, of
4  the TVT family of products?
5    A.  Yes.
6    Q.  All right.  You also implant TVT
7  Abbrevos, do you not?
8    A.  Yes.
9    Q.  Is that part of the third generation, or
10  is it a fourth generation, or where do you put Abbrevo
11  in the hierarchy of --
12    A.  It's probably, we're going to call it
13  fourth generation just by when they came in.
14    Q.  Okay.  It was put on the market in 2010
15  after, after the other three, correct?
16    A.  It might be around that time.
17    Q.  I'm just curious why you didn't put
18  Abbrevo in your report.
19    A.  I don't know, probably just going the
20  Abbrevo in the same, in my mind I think it's the same
21  way as the TVTO.
22    Q.  It's an obturator approach?
23    A.  It's a transobturator approach with
24  midurethral synthetic sling.
25    Q.  And you put a lot of Abbrevos in, don't

**Page 31**

1  you?
2    A.  Yes.
3    Q.  Okay.  You're not putting the Secur in
4  anymore, correct?
5    A.  I don't have it.
6    Q.  Okay.  Because it was taken off the
7  market, wasn't it?
8    A.  I don't have it, I just don't have it
9  available.
10    Q.  I know you don't, and the reason you
11  don't have it is because it's not made anymore, is it?
12    A.  It's not made anymore.
13    Q.  Because Ethicon took it off the market,
14  correct?
15    MS. GALLAGHER:  Object to form.
16    A.  Yeah, they decommercialized it.
17  BY MR. FREESE:
18    Q.  Well, decommercialization, is that what
19  you mean, they decommercialized it?
20    A.  Yeah, that's the term that has been used.
21    Q.  That's not even a word, is it?
22    A.  I don't know.
23    Q.  I mean, I'm not trying to be funny.
24  Decommercialization is not even a word, is it, Doctor?
25    A.  I don't know.

**Page 32**

1    Q.  Did you ever look up decommercialization
2  in the dictionary?
3    A.  Never looked at it.
4    Q.  It doesn't exist, I'll invite you to look
5  it up.  What you mean by decommercialization is, TVT
6  Secur was taken off the market by Ethicon, was it not?
7    MS. GALLAGHER:  Object to form.
8    A.  What I consider is that they don't sell
9  it anymore.
10  BY MR. FREESE:
11    Q.  That's right, because they don't make it
12  anymore and they don't market it anymore, correct?
13    A.  They don't sell it, they don't market it
14  anymore.
15    Q.  And why don't they market it anymore?
16    MS. GALLAGHER:  Object to form.
17    A.  It was a decision that came on, on a
18  letter that they explained that, because there were
19  other, other -- there was other methodology that was
20  going to be used for submission to the FDA.  They, they
21  could not make it anymore.  They decided not to make it
22  anymore.
23  BY MR. FREESE:
24    Q.  And they decided not to make it anymore
25  because the FDA told them that the FDA was not

**Page 33**

1  satisfied with the safety of the TVT Secur, correct?
2    MS. GALLAGHER:  Object to form.
3    A.  I think that it was -- I don't know if it
4  was about safety, I think it was more about getting
5  post-market surveillance.
6  BY MR. FREESE:
7    Q.  You know that the FDA sent a letter to
8  Ethicon saying that it was not satisfied that the
9  safety of the TVT Secur was established and therefore
10  the company was going to be required to do 522 studies
11  in order to keep marketing the product, and rather than
12  do the studies to prove the safety, the company took
13  the product off the market, correct?
14    MS. GALLAGHER:  Object to form.
15    A.  I know that there was a request for a
16  522.  I cannot tell you that it was because of safety.
17  BY MR. FREESE:
18    Q.  Well, what else does the FDA regulate
19  products for other than safety?
20    A.  They, they, they do safety, efficacy and
21  quality of products.
22    Q.  Okay, and as you sit here today, do you
23  know of anybody disputing the quality of the TVT Secur?
24    A.  No.
25    Q.  Do you know of anybody disputing the

9 (Pages 30 to 33)

Jaime Sepulveda, M.D.

Page 34

1  efficacy of the TVT Secur?
2      A.   No.
3      Q.   You do know that they were disputing the
4  safety of the TVT Secur, correct?
5      A.   I do not know that.
6      Q.   As you sit here today, you have no idea
7  why the company took the TVT Secur off the market?
8      A.   I, I don't have a clear idea why.
9      Q.   And does the 522 order relate to the
10  safety of a product or the efficacy of a product?
11      A.   I think it has to do with post-market
12  surveillance.
13      Q.   And is post-market surveillance focused
14  on safety or efficacy?
15      MS. GALLAGHER:  Object to form.
16      A.   I already say I don't know if it's about
17  safety.  I know a post-market surveillance is a lot
18  more involved than just safety.
19  BY MR. FREESE:
20      Q.   You think post-market surveillance has to
21  do with the efficacy of a product?
22      A.   I believe it does.
23      Q.   And you think the criticism that the FDA
24  had in the post-market surveillance of TVT Secur was
25  because of the efficacy of the product?

Page 35

1      MS. GALLAGHER:  Object to the form.
2      A.   There was a, there was a, now that you
3  mentioned it -- can I refer to one of my documents?
4  Because it's in my, it's in one of the documents that I
5  brought.
6  BY MR. FREESE:
7      Q.   Sure.  Do you need to look at a document
8  to answer my question?
9      A.   Well, we have been talking about the same
10  question already in four separate instances, and if I'm
11  going to answer your question accurately I would like
12  to refer to my document.
13      Q.   You mean four separate depositions you've
14  given?
15      A.   I don't understand your question.
16      Q.   I don't understand your answer.  You said
17  we've been talking about it in four separate instances.
18  What did you mean, sir?
19      A.   Well, you asked me already about safety
20  and that the 522 has to do with safety, and before I
21  give you an answer I want to make sure that I give you
22  an accurate answer, and I want to see the document.
23      Q.   Go ahead.
24      A.   I'm looking at the white paper from the
25  FDA.

Page 36

1      Q.   All right.  Look at page 4, if you don't
2  mind, sir.
3      MS. GALLAGHER:  What document are you
4      looking at?
5      MR. FREESE:  I'm looking at this
6      document.
7  BY MR. FREESE:
8      Q.   Is that the same one you're looking at?
9      A.   Yes, this is the FDA Executive Summary
10  for surgical mesh for treatment of women with pelvic
11  organ prolapse and stress urinary incontinence.
12      Q.   Look at page 4, section 2.3, regarding
13  522 post-market surveillance studies.
14      A.   I'm looking at page 4.
15      Q.   Okay.  Is this what you needed to look at
16  to answer the question?
17      A.   No, I was looking at the decision of the
18  committee on the post-market option.  Yes.  What would
19  you like me to read?
20      Q.   My question is, the post-market
21  surveillance studies that the FDA had required Ethicon
22  to conduct related to the serious adverse health
23  consequences that may be caused by a failure of the
24  product, correct?
25      A.   About the, about the efficacy and safety

Page 37

1  and quality.
2      Q.   About the, the 522 allows the FDA to
3  order the study where the failure of the device was
4  reasonably likely to have a serious adverse health
5  consequence.  Correct?
6      A.   Are you reading on the pelvic organ
7  prolapse section?
8      Q.   I'm reading page 4 on 522 studies.
9      A.   Yes.  Well, I'm going to read on page 47,
10  which is a more specific question about TVT Secur.
11      Q.   Okay.  Go ahead.
12      A.   The panel will be asked to consider
13  whether 522 studies are needed for cleared mini-slings,
14  all cleared surgical mesh indicated for stress urinary
15  incontinence, not needed for these devices.  If the
16  panel believes 522 are needed for all or just a subset
17  of these products, the panel will be asked to discuss
18  the type clinical study that should be required with
19  consideration to patient selection, controls,
20  randomizations, outcome measures, concomitant
21  surgeries, follow-up duration, etcetera.
22      Q.   Okay, and you agree with the FDA
23  statements in the summary about the TVT Secur?
24      A.   I, I agree that they are in all the power
25  to choose whatever method they decide to choose.

10 (Pages 34 to 37)

Jaime Sepulveda, M.D.

| Page 38 | Page 40 |
|---|---|
| 1  Q.  I understand, but do you agree with the | 1  A.  That's correct. I think it's based on |
| 2 comments that they made about the safety of the TVT | 2 the best science that they consider, but there's a bias |
| 3 Secur? | 3 on the methodology to come to their conclusions and |
| 4  A.  I don't think that TVT Secur is an unsafe | 4 recommendations. |
| 5 procedure; therefore, I see no reason to go beyond what | 5  Q.  Can you describe to me, Dr. Sepulveda, |
| 6 was already being done. Now, I do understand that will | 6 what bias the FDA has? |
| 7 benefit from surveillance in any product in which there | 7  A.  Well, it's a very small group, and, and |
| 8 are being reports of any, any type of incident. | 8 it's, it's a group, I believe it's 12, 12 individuals, |
| 9  Q.  Rather than do the post-market 522 | 9 and the methodology used on the statistical analysis |
| 10 studies, the company, rather than approve the safety of | 10 was not, was not fully, fully completed, fully |
| 11 the product through those post-market studies, chose to | 11 disclosed, I should have said, fully disclosed. Also, |
| 12 take it off the market, correct? | 12 the way the complaint were examined, from the MAUDE, |
| 13  MS. GALLAGHER: Object to form. | 13 from the MAUDE database was put through an Excel |
| 14  A.  The safety of the product has been, is | 14 program, it was required to be placed on an Excel |
| 15 already being examined independently from the FDA. | 15 program to trim down the repeated complaints. So, the |
| 16 There have been through, there have been studies | 16 MAUDE database was used but there's, within itself has |
| 17 through separate, separate studies and trials. What | 17 its own, its own limitations. |
| 18 they, the FDA decided was to do 522 because that's a | 18  I'm going to, I'm going to, I'm going to |
| 19 mechanism that they have in place. | 19 read the limitations of the MAUDE data analysis, which |
| 20 BY MR. FREESE: | 20 is on the FDA reports, in which it says the reports |
| 21  Q.  All you're saying is the FDA did what | 21 were unduplicated using Excel on duplication function, |
| 22 they have the right to do. I'm asking you if you | 22 not by reviewing the individual reports. A few |
| 23 agreed with what they did. | 23 unduplicated reports might still exist in the data. |
| 24  MS. GALLAGHER: Object to form. | 24 This auto function does not exemplify reports that have |
| 25  A.  I, I disagree with the methodology of the | 25 different numbers but are related to the same events. |

| Page 39 | Page 41 |
|---|---|
| 1 FDA which has proven to this time to be inadequate to | 1 If one event has two reports, one from the manufacturer |
| 2 regulate and innovate at the same time. This type of | 2 and one from voluntary reporter, but they are not |
| 3 criminology of 522s or 510(k)s have in place for a | 3 linked in the MAUDE database as one event, they will |
| 4 long period of time, and it's, there's a consensus that | 4 not be taped by auto function as one event. |
| 5 this need to be reviewed. Now, at the time that this | 5  So, that tells you the accuracy of the |
| 6 was decided, all this consensus came through, the 522 | 6 data that was obtained on, on, on this recommendations. |
| 7 was the mechanism in place. | 7  In addition, even though the result of |
| 8 BY MR. FREESE: | 8 data mining were refined multiple times, it is still |
| 9  Q.  Right. You read the executive summary, | 9 possible that a few reports are placed in the wrong |
| 10 did you not? | 10 group and in the wrong adverse event group. |
| 11  A.  I did. | 11  I just read the way, the way the FDA |
| 12  Q.  And you read it in forming your opinions | 12 itself, the group, says that there's a limitation about |
| 13 in this case? | 13 data analysis. That is biased. |
| 14  A.  Yes. | 14  Q.  And, therefore, you think that |
| 15  Q.  And you agree with all the, the FDA | 15 conclusions that the FDA reached are unreliable? |
| 16 statements in the summary? | 16  A.  I think that they were biased. |
| 17  A.  No, I don't agree with all of them and I | 17  Q.  Okay, and therefore, if they're biased, |
| 18 don't disagree with all of them. | 18 they're unreliable, correct? |
| 19  Q.  You disagree with some and agree with | 19  A.  They're not accurate. |
| 20 others? | 20  Q.  And if they're not accurate, they're not |
| 21  A.  There are parts in which I have no | 21 reliable? |
| 22 opinion. | 22  A.  If you want to equate accurate with |
| 23  Q.  I guess it would be fair to say you don't | 23 reliable, yes. |
| 24 think that FDA statements are always well founded in | 24  Q.  I just want to see if you agree with me. |
| 25 science, correct? | 25  A.  Well, reliable is more, is no more the |

11 (Pages 38 to 41)

Jaime Sepulveda, M.D.

| Page 42 | Page 44 |
|---|---|
| 1 word of accuracy. Reliable is how good the<br>2 methodology and conclusions are.<br>3    Q.   And if methodology is biased, that would<br>4 lead to unreliable results, correct?<br>5    A.   I think that most people would judge it<br>6 as unreliable.<br>7    Q.   I mean, you understand evidence-based<br>8 medicine, correct?<br>9    A.   Yes.<br>10    Q.   If you're practicing evidence-based<br>11 medicine, you don't want unreliable data to rely on, do<br>12 you?<br>13    A.   No, I want the most accurate data that I<br>14 can obtain.<br>15    Q.   And, therefore, bias would be a type of<br>16 unreliable data, correct?<br>17       MS. GALLAGHER:  Object to form.<br>18    A.   There's no cohort methodology, there's no<br>19 randomization, there's no actual analysis conducted on<br>20 this. The whole, the whole concept of evaluating<br>21 either efficacy or quality in general, in general, I'm<br>22 talking in general now, in general, we already<br>23 mentioned for mini-slings and now we're talking in<br>24 general, in general is that the amount of database is<br>25 not accurate, and if it's not accurate, you cannot | 1 you have had over 500 surgeons visit your operating<br>2 room to watch you place slings, correct?<br>3    A.   Yes.<br>4    Q.   How many of those were sponsored by<br>5 Ethicon?<br>6    A.   I think that the majority of them.<br>7    Q.   Well, I mean, like 99 percent or 51<br>8 percent?<br>9    A.   I never run a percentage of it, but I<br>10 have had, I have had surgeons that come without,<br>11 without Ethicon. The majority could be more than 50<br>12 percent. This, this pelvic floor, pelvic floor surgery<br>13 and the specific procedures did not start with mesh.<br>14 We were doing this procedures and we were using<br>15 different procedures even before mesh. In the same way<br>16 that I visited many surgeons, even before there was<br>17 mesh, they also visited me.<br>18    Q.   Okay. Well, did you place any<br>19 midurethral slings that weren't synthetic?<br>20 Midurethral slings by definition are synthetic slings,<br>21 are they not?<br>22    A.   Yes, there's no data that indicates that<br>23 midurethral slings should be anything but synthetic.<br>24    Q.   I understand. My question, Doctor, I'm<br>25 asking you about your report, and you said 500 doctors |
| **Page 43** | **Page 45** |
| 1 consider reliable.<br>2 BY MR. FREESE:<br>3    Q.   Thank you. And, Dr. Sepulveda, do you<br>4 think that you are more qualified to assess the safety<br>5 and efficacy of mesh products than the FDA?<br>6    A.   I, I cannot substitute a panel of 12<br>7 people. I cannot substitute a cohort study. It's not<br>8 that I'm more qualified. I, I am the receiving end of<br>9 it. So, I can tell you in this receiving end how I can<br>10 use it.<br>11    Q.   Okay, that's not really my question. My<br>12 question is, do you think that you're more qualified to<br>13 assess the safety and efficacy of mesh products than<br>14 the FDA, yes or no?<br>15       MS. GALLAGHER:  Object to form.<br>16    A.   I have, I have the experience with<br>17 working with mesh, I have the knowledge on the<br>18 biomechanics of mesh, I have the knowledge on the<br>19 conditions that require the mesh, and I have 25 years<br>20 doing surgery, but that still leaves me in the<br>21 receiving end of it. Am I more qualified than FDA?<br>22 I think I am as qualified as anyone that was in that<br>23 panel or that spoke to the FDA.<br>24 BY MR. FREESE:<br>25    Q.   Now, Doctor, you said in your report that | 1 have come to my operating room to watch Dr. Sepulveda<br>2 put in midurethral slings. You did say that, did you<br>3 not?<br>4    A.   No, not just midurethral slings.<br>5    Q.   Well, let's look at your report, sir.<br>6 Page 2, quote, "I have had over 500 physicians visit my<br>7 operating room to watch me place midurethral slings."<br>8 Did you write that?<br>9    A.   Midurethral slings along with other<br>10 procedures.<br>11    Q.   That's not what your report says, is it,<br>12 Doctor? Is it?<br>13    A.   No, it's not what my report says.<br>14    Q.   What your report says is 500 doctors have<br>15 come to your OR to watch you place midurethral slings,<br>16 correct?<br>17    A.   Yes.<br>18    Q.   That means 100 percent of those 500<br>19 doctors would be watching you place a synthetic<br>20 midurethral sling, correct?<br>21    A.   Yes, they have watched me place a<br>22 midurethral sling, correct.<br>23    Q.   Okay. How many of these 500 doctors that<br>24 came to watch you put synthetic slings in were<br>25 sponsored by Ethicon? |

12 (Pages 42 to 45)

Jaime Sepulveda, M.D.

<table>
<tr><td>

Page 46

```
 1      A.   The majority.
 2      Q.   Is it closer to 500 or is it closer to
 3   250?
 4      A.   It might be a number between the both of
 5   them, but I can not give you an accurate number because
 6   I never recorded it.
 7      Q.   Okay.  How do you know it's 500 then, if
 8   you never recorded it?
 9      A.   Because that's the number, that's the
10   number that -- it may have been a thousand.
11      Q.   Okay.
12      A.   It may have been a thousand, may have
13   been 400, but I can tell you that at least 500, because
14   in 25 years doing surgery and you have individuals
15   coming to watch you.
16      Q.   Did you just pick the 500 out of the air?
17      A.   Yeah, that's the safest number I could
18   pick.  I could have picked a larger number, though.
19      Q.   Okay.  And how many years have you been
20   doing midurethral slings?
21      A.   It's since TVT came out.
22      Q.   1998?
23      A.   Yes.
24      Q.   All this 25-year stuff you're talking
25   about has nothing to do with when you're talking about
```

</td><td>

Page 48

```
 1   that come and watch me place it.  That's essentially.
 2   I could go on with a list, but I don't keep a registry.
 3      Q.   All right.  And when, when Ethicon
 4   sponsors these doctors to come watch you place slings,
 5   is Ethicon paying you to do that?
 6      A.   Yes, they, they, they were, those were
 7   mostly activities in which I demonstrated how to place
 8   product, and some patients with product also had a
 9   midurethral sling.
10      Q.   Okay, but when these doctors that are
11   sponsored by Ethicon are coming in, you're being paid
12   by Ethicon to let them come into your OR to watch you
13   do surgeries?
14      A.   Yeah, they compensate me for my time
15   before I do my surgery.  When I'm doing my surgery, I'm
16   being compensated for my surgery.
17      Q.   Now, you say that you, you've used
18   laser-cut mesh and mechanically-cut mesh, correct?
19      A.   Yes.
20      Q.   If I'm holding a TVTO box, for example,
21   all right, how can I tell if it's a mesh, if the mesh
22   is laser cut or mechanically cut?
23      A.   I don't know by looking at the box
24   because when I'm scrubbed, I'm not looking at a box but
25   I look at the product.
```

</td></tr>
<tr><td>

Page 47

```
 1   midurethral slings, does it?
 2      A.   No, we, we actually dissected the
 3   urethra, so that -- okay, yes --
 4      Q.   Just answer my question, Doctor.  All of
 5   this talk about I've been doing this 25 years has no
 6   application to midurethral slings, correct?
 7      A.   Yes, I have not placed midurethral slings
 8   for 25 years.
 9      Q.   Because they've only been on the market
10   for 18 years, correct?
11      A.   That is correct.
12      Q.   Okay, and no 500 doctors have seen you
13   place a midurethral sling?
14      A.   It might be 500, it might be more.
15      Q.   And who comes and sees you place
16   midurethral slings in the OR other than people
17   sponsored by Ethicon?
18      A.   I have, I have colleagues that come in, I
19   do Miami, they come to Miami, and they say I'm going to
20   go and see Jaime do surgery.  The first one that comes
21   to mind is the chairman, the director of gynecologic
22   surgery at the University of Puerto Rico.  Another
23   colleague in Savannah.  Another colleagues also from
24   Puerto Rico that is doing academics.  I have had
25   fellows, I have had residents from other institutions
```

</td><td>

Page 49

```
 1      Q.   Okay.  So, you're an expert, you hold
 2   yourself out as an expert in TVTO, correct?
 3      A.   Right.
 4      Q.   And we can agree that if you're looking
 5   at the box, even you, who implants them all the time,
 6   you don't know if it's mechanical cut or laser cut?
 7      A.   I think that there's a way to know it.  I
 8   just never looked at that box.
 9      Q.   But sitting here today, you can't think
10   of what that way is?
11      A.   Yeah, I look at the sling.
12      Q.   Okay, you pull it out and you look at it,
13   so you don't know until you open the box, pull back
14   the, the plastic cover to figure out if it's laser cut
15   or mechanical cut?
16      A.   No, not with the plastic cover.  You can
17   actually see it on the sheet.
18      Q.   But you have to open the plastic
19   container to get to the TVTO, do you not?
20      A.   No, it's transparent.  You can actually
21   see it without even opening it.
22      Q.   Well, the body is transparent, the top is
23   not transparent, is it?
24      A.   The body, yeah, all the other sides are
25   transparent.
```

</td></tr>
</table>

13 (Pages 46 to 49)

Jaime Sepulveda, M.D.

| Page 50 |
| --- |

1    Q.   The tub is transparent but the top is
2  not?
3    A.   No, the top is like a paper with a name.
4    Q.   And you can look through the plastic tub
5  and tell if it's laser cut or mechanical cut?
6    A.   You can look at the sling in that area,
7  yes.
8    Q.   Without opening it?
9    A.   Without opening it.
10    MS. GALLAGHER:  Y'all are talking about
11    different things.  He's talking about the top
12    of the box.  Can you look through the top of
13    the box and tell whether it's laser cut or
14    machine cut?
15    THE WITNESS:  No.
16    MR. FREESE:  I understand what he was
17    saying.
18  BY MR. FREESE:
19    Q.   You're saying you can look through the
20  clear plastic portion of the TVT before you even open
21  the tub and tell if it's laser cut or mechanical cut?
22    A.   I have used it so many times and I have,
23  and there's a plastic cover in there, and you can see
24  the whole device right through there.  It's, it's, if I
25  tell you, though, in order to be accurate with you, I

| Page 51 |
| --- |

1  cannot tell you that I look right through there and
2  say, okay, which one is that, laser cut or mechanical
3  cut.
4    Q.   I'm asking you, are you able to do that?
5    A.   I will have to look at it, because as I
6  sit here today, I don't remember looking through it.
7    Q.   When you open it and pull it out, it's
8  got a plastic sheath on it, does it not?
9    A.   It does.
10    Q.   Well, can you see the edges?
11    A.   Yes.
12    Q.   And you can tell if it's laser cut or
13  mechanical cut without ever pulling the plastic sheath
14  back?
15    A.   Yes.
16    Q.   Okay.  Is there any study that you have
17  looked at that compared how laser-cut versus
18  mechanical-cut mesh performs?
19    A.   No.
20    Q.   Do you order the slings, Doctor, that you
21  implant in your patients?
22    A.   No, the hospital orders it.
23    Q.   When, when you order them, do you tell
24  the hospital I need five TVTOs, or do you say, I need
25  five TVTO laser cut or five TVTO mechanical cut?

| Page 52 |
| --- |

1    A.   No, I have ordered just, just give me
2  five TVTOs.  Actually, you know, I don't tell someone I
3  need TVTOs.  Someone keeps my TVTOs there and and, and
4  I don't, I don't order like I would say that I order
5  things for my office, no.
6    Q.   Okay, but what I'm getting at is, when
7  you, I mean, you are the doctor and if a TVTO is needed
8  to be implanted in your patient, do you know whether or
9  not it's a laser cut or mechanical cut?
10    A.   Well, I look at it.
11    Q.   At the time of the placement?
12    A.   At the time that I have it there.
13    Q.   Yes, sir, what I'm trying to find out is
14  at the time that you buy it from Ethicon, are you
15  dictating it be one or the other?
16    A.   No.
17    Q.   Who does that?
18    A.   They, they, they order it from, from the
19  company.  There's no one that determines laser cut or
20  mechanical cut.
21    Q.   And it doesn't make any difference to you
22  which one it is?
23    A.   No.
24    Q.   Am I correct that after the TVTO laser
25  cut was introduced, Ethicon introduced several more

| Page 53 |
| --- |

1  synthetic sling products, correct?
2    A.   I overheard on the, on the different
3  conferences and activities by Ethicon that there was,
4  they were talking about laser cut and mechanical cut.
5  It never made a difference to me, laser cut or
6  mechanical cut.
7    Q.   And is that -- it's fair to say then that
8  you've actually never studied the clinical differences
9  between laser cut and mechanical cut?
10    A.   No, there has been no actual clinical
11  studies to my knowledge, and if you have something that
12  I don't know, please, I will read it.
13    Q.   Sure, and that's fine, Doctor, but my
14  question to you is, and I think you may have told me,
15  there are no studies comparing laser cut to mechanical
16  cut and you have not endeavored in forming your
17  opinions in this case to do any studies on the
18  difference from a clinical standpoint of laser cut
19  versus mechanical cut, correct?
20    A.   To my knowledge, there has not been a
21  randomized control trial comparing laser cut versus
22  mechanical cut.
23    Q.   Yes, sir, I understand that, and nor have
24  you done any kind of literature search to see if
25  there's any literature, even if it's not a randomized

14 (Pages 50 to 53)

Jaime Sepulveda, M.D.

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  control trial, correct, about the difference between
2  mechanical cut versus laser cut?
3      A.  No, there's no -- I actually look for
4  mechanical cut versus laser cut, and what I have is
5  what's in the company documents.
6      Q.  So the only documents you've looked at
7  that discuss the difference between mechanical cut and
8  laser cut is what the company lawyers supplied you?
9      A.  Yes, the company documents.
10     Q.  And you've done no other independent
11  literature review or scientific review of any
12  literature on any difference that may exist between
13  laser cut and mechanical cut from a clinical
14  standpoint?
15     A.  I did an PubMed search and I could not
16  find any.
17     Q.  Okay.  The only documents that you have
18  looked at comparing laser cut to mechanical cut are the
19  internal documents of Ethicon, correct?
20     A.  That is correct.
21         MR. FREESE:  Let's take a break.
22         (Break taken from 10:25 to 10:30 a.m.)
23  BY MR. FREESE:
24     Q.  Dr. Sepulveda, before our break we were
25  talking about laser cut versus mechanical cut, and real

**Page 55**

1  quickly, I am correct that after TVTO laser cut was
2  introduced, Ethicon introduced TVT Secur, correct?
3      A.  Yes.
4      Q.  TVT Abbrevo, correct?
5      A.  Yes.
6      Q.  TVT Exact, correct?
7      A.  Yes.
8      Q.  Am I also correct that after TVTO laser
9  cut was introduced, Ethicon never introduced another
10  mechanically-cut synthetic midurethral sling again, am
11  I correct?
12     A.  I, I could not track, but I take it as
13  you're telling me.
14     Q.  You agree with me that TVT Secur is laser
15  cut, correct?
16     A.  Yes.
17     Q.  Every version of it?
18     A.  Yes.
19     Q.  TVT Exact is laser cut, is it not, every
20  version of it?
21     A.  Yes.
22     Q.  TVT Abbrevo is laser cut, every version
23  of it, correct?
24     A.  Yes.
25     Q.  So you cannot think of a single

**Page 56**

1  midurethral sling that Ethicon manufactured after the
2  introduction of TVTO that was anything other than
3  laser-cut mesh, correct?
4      A.  I cannot think of any other.
5      Q.  And do you have any explanation why that
6  was, why they don't make mechanically-cut mesh in any
7  of the products once laser-cut TVTO became available?
8          MS. GALLAGHER:  Object to form.
9      A.  I did not know the reason for it.
10  BY MR. FREESE:
11     Q.  Okay.  Doctor, in your overview and
12  review of literature, you say stress urinary
13  incontinence is a common condition in women, and we can
14  look at some data, but am I correct that, that AUA said
15  that up to 50 percent of women will suffer some form of
16  the SUI in their lifetime?
17     A.  I read that, yes.
18     Q.  And you agree with that?
19     A.  I would agree with that.
20     Q.  It's that common of a problem?
21     A.  It is a very common problem, yes.
22     Q.  You say all procedures, but in
23  particular, you say earlier procedures, in other words
24  pre, pre-midurethral sling procedures I gather is what
25  you're talking about here?

**Page 57**

1      A.  Yes.
2      Q.  Carry the risk of urinary outlet
3  obstruction, voiding dysfunction, major nerve and
4  vascular injuries, pain, relatively high frequency of
5  revision and wound healing complications?
6      A.  Yes.
7      Q.  No previous surgery prior to midurethral
8  slings caused a risk of erosion, am I correct?
9      A.  No, there was exposure of the sutures, we
10  did see that, and we did see sutures inside the
11  bladder.
12     Q.  Okay.  That's not my question.  My
13  question is that erosion of the midurethral sling is a,
14  is a, is a complication unique to midurethral slings,
15  synthetic midurethral slings, correct?
16     A.  Yes, exposure of the tape was not seen
17  before when tapes were not being used.
18     Q.  Okay, and, Doctor, you say that Burch
19  colposuspensions had earlier been associated with the
20  term gold standard which established a clinical
21  benchmark of efficacy for the treatment of SUI.  You
22  see that?
23     A.  Yes.
24     Q.  I'm read some of your prior depositions,
25  so I'm going to try to speed through some of this.

15  (Pages 54 to 57)

Jaime Sepulveda, M.D.

| Page 58 | Page 60 |
|---|---|

Page 58

1  You're not a fan of the phrase gold standard, are you?
2      A.   Never been much of a fan of them.
3      Q.   So you're not going to come into court
4  and start giving us opinions that the TVTO is the gold
5  standard of anything, correct?
6      A.   I would refer to anything that was
7  referred before as a gold standard as the current
8  clinical standard.
9      Q.   Current standard, and in fact, there have
10  been articles published in the New England Journal of
11  Medicine that say you shouldn't use the word gold
12  standard, you should use the word current standard,
13  correct?
14      A.   Yes, it was in -- I don't know if it was
15  in the New England Journal of Medicine, but it was
16  definitely in the AUGS Journal.
17      Q.   Okay.  And you agree that that's a more
18  appropriate phrase to use?
19      A.   Current clinical standard seems to be a
20  more objective way of looking at things.
21      Q.   And, so, when you come to San Antonio to
22  testify, is it fair to say that you're not going to be
23  sitting there pontificating about gold standards,
24  that's just not a term that you think is appropriate?
25      A.   I agree, I would not be pontificating

Page 60

1  trial.
2      Q.   All right, and the reason I asked you
3  about gold standard is because about three pages later
4  you then invoke the gold standard language on the TVT.
5      A.   I actually saw that on my report, and I,
6  I apologize for that.  That should be current clinical
7  standards.
8      Q.   Okay, and that's fine, and fair enough.
9  So, even though you have it in your report, you won't
10  be referring to the TVTO as the gold standard?
11      A.   I'm going to repeat my answer, I will not
12  be pontificating about gold standard.  I will be saying
13  current clinical standards.
14      Q.   Thank you, sir.  You have no idea how
15  much time that saved us.
16          Doctor, when you say, quote, "The use of
17  monofilament, non-absorbable polypropylene predominates
18  in the current clinical practice," you're not
19  distinguishing between mechanical cut and laser cut?
20      A.   I'm not distinguishing between one or the
21  other.
22      Q.   Am I correct that in that sentence there,
23  when you say that those monofilament non-absorbables
24  predominate the current clinical practice, you're
25  lumping mechanical cut and laser cut meshes together?

| Page 59 | Page 61 |
|---|---|

Page 59

1  about the gold standard.
2      Q.   Okay, thank you.  Doctor, you said that
3  the studies in the medical literature prior to the
4  midurethral sling, prior to the arrival of TVT were
5  lacking and of poor quality.  Do you see that?
6      A.   Yes.
7      Q.   And I'm just, I'm just trying to figure
8  out, what is your basis for saying that the studies
9  prior to TVT were of poor quality?
10      A.   Well, there were, there were
11  retrospective cohort studies that were case reports,
12  there were groups of case reports, but there was a lack
13  of randomized control trials.
14      Q.   Is this just simply, and -- strike that.
15          The lack of a substantial number of
16  randomized control studies is, is how you reached the
17  conclusion that the study quality is poor?
18      A.   Right.
19      Q.   In other words, you have to have a
20  significant number of randomized control studies in
21  order to have good-quality data, in your mind?
22      A.   I, I look at the, at the cohort studies
23  and there are instances in which I may not have a
24  randomized control trial.  I would like to see multiple
25  cohort studies if I don't have a randomized control

Page 61

1      A.   Yes.
2      Q.   Okay.
3      A.   As they are available, because we don't
4  have it available anymore in the mechanical cut.
5      Q.   When did Ethicon stop making TVTO
6  mechanical cut?
7      A.   I, I, I cannot recall one specific date,
8  no.
9      Q.   So, let me clarify that.  So, as of
10  today, you think all TVTOs are laser cut?
11          MS. GALLAGHER:  Object to form.
12      A.   Yes.
13  BY MR. FREESE:
14      Q.   And you don't know exactly when Ethicon
15  stopped manufacturing TVTO mechanical-cut mesh?
16          MS. GALLAGHER:  Object to form.
17      A.   I don't know a specific date.
18  BY MR. FREESE:
19      Q.   And is that why you said you don't
20  concern yourself with it, because it's only laser cut,
21  right?
22      A.   It's only laser cut now.
23      Q.   All right, thank you.  Doctor, you say
24  that, quote, "These anatomical considerations," and I'm
25  on page 8 of your report if you want to follow along

16 (Pages 58 to 61)

Jaime Sepulveda, M.D.

| Page 62 | Page 64 |
|---|---|

**Page 62**

1 with me. Quote, "These anatomical considerations were
2 well documented during the description and the design
3 of the TVTO." Do you see that?
4     A. Okay, yes. These anatomical
5 considerations were well documented during the
6 description and design of the TVTO. I am talking about
7 the hammock of the, in the suburethra and the
8 periurethral tissue.
9     Q. All right, and we can agree that prior to
10 the launch of the TVTO, there were no randomized
11 controlled studies of that product done, correct?
12     A. No.
13     Q. Okay, and the product was launched in the
14 U.S. and worldwide without a single randomized control
15 study being performed by Ethicon, correct?
16     A. It was, it was released on a 510(k)
17 approval.
18     Q. And, so, the answer to my question is, at
19 the time the TVTO was released to the world by Ethicon,
20 there were no randomized control studies demonstrating
21 the safety or efficacy of the product, correct?
22     A. That's correct.
23     Q. And the prelaunch studies that Dr. de
24 Laval performed didn't even use the same kit that
25 became the TVTO, did it?

**Page 63**

1     A. I think that the needles were, were
2 different.
3     Q. Okay. And he was, he was, he was cutting
4 it himself, correct?
5     A. He may have cut it himself, I'm not aware
6 of which methodology he used for that.
7     Q. Because there was no kit for him to
8 implant in women, he created it, correct?
9     A. He created it.
10     Q. And just so we're clear, Doctor, my
11 question may have lent us to RCTs. At the time that
12 the TVTO was launched by Ethicon, there were no
13 clinical studies whatsoever on the TVTO, correct?
14     A. There were, there were the studies from
15 the, from the inventor, and there was data on the TVT.
16     Q. And I'm not talking about TVT now,
17 because that's a different product, isn't it?
18     A. That, that is, there's a different site
19 on the anatomy where it's inserted.
20     Q. And it's implanted differently, correct?
21     A. It is implanted different.
22     Q. You say there existed the de LaVal
23 clinical data, correct?
24     A. Yes.
25     Q. But he's the inventor, correct?

**Page 64**

1     A. He's the inventor.
2     Q. And you know he had an economic stake in
3 the results that he reported on his clinical data,
4 correct?
5     A. Yeah, you know, I was asked the same
6 question last week, and these are high-caliber
7 investigators. I have no reason to believe that they
8 are going to be biased specifically by money. I cannot
9 say, I cannot sit here and testify under oath that I
10 believe that that's the case.
11     Q. Okay. Well, I'm simply asking you, you
12 recognize that the only clinical data that existed was
13 that produced by the guy who had an economic stake in
14 the outcome of these results, correct?
15     A. That's correct.
16     Q. Okay. And that data was based on his own
17 pre-cut invention, not what ultimately became TVTO,
18 correct?
19     A. His own device.
20     Q. In other words, de LaVal was using a
21 homemade product when he was implanting women with the,
22 the, his obturator-approach midurethral sling, correct.
23     MS. GALLAGHER: Object to form.
24     A. I don't think he made it at home. He may
25 have made it elsewhere, but I --

**Page 65**

1 BY MR. FREESE:
2     Q. In his own lab is what I mean.
3     A. In his own lab, correct.
4     Q. Okay. It wasn't done in a factory like
5 TVTO is made today, correct?
6     A. It wasn't manufactured by a third party,
7 no.
8     Q. And have you reviewed the original launch
9 plan that Ethicon prepared before the launch of the
10 TVTO?
11     A. I went through a few papers because I
12 believe it's included in that binder, and I reviewed
13 them probably, I saw it about a year ago.
14     Q. Okay, and do you know the original launch
15 plan Ethicon had was that they were going to do
16 clinical studies before the TVTO was launched?
17     A. I can't recall specifically they were
18 deciding to do clinical studies on TVTO.
19     Q. I'll make that representation to you.
20 You don't have any reason to dispute that, do you?
21     A. No, no reason to one way or the other.
22     Q. And if the original launch plans
23 anticipated Ethicon was going to conduct its own or
24 independent clinical trials before the launch of TVTO,
25 you would have no objection to that, would you?

17 (Pages 62 to 65)

Jaime Sepulveda, M.D.

| Page 66 | Page 68 |
|---|---|

**Page 66**

1    A.   I would have no objection to, to, to
2  that.
3    Q.   So, because that would be the responsible
4  thing to do, wouldn't it?
5    MS. GALLAGHER:  Object to form.
6    A.   No, they'll have their reasons to conduct
7  their studies, and they have their, their own
8  justifications to do whatever trial they may think.  I
9  believe that what, what determined that was what their
10  interaction was between what was established between
11  the FDA and Ethicon at that time.
12  BY MR. FREESE:
13    Q.   And that's not really my question, Dr.
14  Sepulveda.  My question is, you would agree with me
15  that the plan to do clinical trials before launching a
16  product is a responsible thing to do, that plan itself,
17  theoretically?
18    A.   In general terms, you could say that
19  doing clinical trials is a good idea, as long as those
20  clinical trials don't put unnecessary subjects to
21  demonstrate things that have already been demonstrated.
22    Q.   Okay.  And that's why you normally want
23  to do clinical trials, right?  You want to build a body
24  of science that supports the safety and efficacy of
25  your product, correct?

**Page 67**

1    A.   Before I continue, I may have said
2  unnecessary subjects.  I mean as long as it doesn't put
3  subjects through unnecessary risks.  That's what I
4  meant on my answer.
5    Q.   Yes, sir.
6    A.   And following with your question?
7    MR. FREESE:  Would you read back my
8  question?  I'm sorry.
9    THE COURT REPORTER:  And that's why you
10  normally want to do clinical trials, right?
11  You want to build a body of science that
12  supports the safety and efficacy of your
13  product, correct?
14    A.   Yes, science built up on previous
15  studies.
16  BY MR. FREESE:
17    Q.   And you know that those clinical trials
18  never just occurred, correct?
19    A.   I am not aware of those clinical trials
20  happening.
21    Q.   And you don't know the reason why they
22  didn't occur, correct?
23    A.   No, I don't know the reason.
24    Q.   You said for whatever, whatever reason
25  Ethicon had for not doing those clinical trials prior

**Page 68**

1  to the launch of the TVT is an Ethicon decision and you
2  have no idea why they didn't do it?
3    A.   That's going to be an Ethicon decision
4  alone in their interaction with the FDA.
5    Q.   Should the decision to not do clinical
6  trials ever be based on simply wanting to rush your
7  product to market?  Should that ever be a basis not to
8  do a clinical trial?
9    MS. GALLAGHER:  Object to form.
10    A.   No, I think that --
11    THE WITNESS:  Did you get that objection?
12    MR. FREESE:  She got it, don't worry.
13  She's a big girl.  You worry about you, she'll
14  worry about her.
15    A.   The decision, I believe whenever there
16  are products like this that are innovative, that that
17  decision is going to be again, what I already said, I'm
18  not going to repeat, I mean, I will repeat what I
19  already said, between Ethicon and the FDA, but it's
20  also determined internally by Ethicon, by the different
21  branches that are input in a project, because you may
22  have marketing individuals, you may have sales
23  individuals, you will have scientific individuals, you
24  have engineers, medical liaisons, so you cannot, you
25  cannot just point to one area.  I believe that in every

**Page 69**

1  company, every device company, there's going to an
2  interaction between all these different individuals
3  deciding which, which product gets the studies done.
4  BY MR. FREESE:
5    Q.   And I'm not quibbling with you about
6  that, Doctor.  My question was quite different.  Do you
7  agree with me, generally speaking, that, that a
8  responsible medical device company shouldn't forgo
9  clinical trials simply to rush their product onto the
10  market?  That's my only question.
11    MS. GALLAGHER:  Object to form.
12  BY MR. FREESE:
13    Q.   That would not be the responsible thing
14  to do.  You agree with that?
15    MS. GALLAGHER:  Object to form.
16    A.   It's going to be a decision of the
17  company, but in general, in general, you don't, you
18  don't rush things.  You don't rush decisions for
19  surgery, you don't rush decisions to place or take out
20  implants.  You don't rush in general any of these
21  decisions.
22  BY MR. FREESE:
23    Q.   And if the decision to forgo clinical
24  trials was simply an economic decision and not based on
25  safety or efficacy, we can agree that that would be

18 (Pages 66 to 69)

Jaime Sepulveda, M.D.

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  something that Dr. Sepulveda would be critical of?
2      MS. GALLAGHER: Object to form.
3      A.   If anything that is motivated purely by
4  economics, it belongs in a different arena and not
5  health care.
6  BY MR. FREESE:
7      Q.   Thank you. Doctor, this is sort of a
8  question we had started the last hour, but other than
9  the life care plan, you said that you prepared the
10  entirety of this report. Is that correct?
11      A.   Yes.
12      Q.   Did you prepare all the footnotes, too?
13      A.   Yes, I did, I did, I did prepare those,
14  those papers.
15      Q.   And the reason I was curious is because
16  the reports and the footnotes have a remarkable
17  similarity to doctors from all over the country that
18  work for Ethicon, Dr. Permugia and Dr. Grier and Dr.
19  Flynn, I mean, we've got these reports and it's
20  remarkable how similar your work is and their work.
21      A.   I can tell you this, I spent a lot of
22  time sitting down and writing. It has, there were a
23  few other things that were added to it, there were
24  things that have been edited by me on consultation with
25  the attorneys, but there's, there's no attorney that is

**Page 71**

1  going to bring out a report that I don't, I don't
2  approve.
3      Q.   I'm not saying you don't approve, but, I
4  mean, you sat down and actually put all these footnotes
5  in your report?
6      A.   Yeah, actually the footnotes, I remember
7  exactly going through the two papers on the frequency
8  of these devices, I remember going through all the
9  papers that I have saved over time, and there are other
10  papers that were given to me about randomized control
11  trials. I wrote this, I wrote this just after, just
12  after my, my board, my subspecialty board
13  certification.
14      Q.   Did you cut and paste any of this report
15  from another report?
16      A.   No, I wrote a report, I submitted it, and
17  then they came back with extra, extra bibliography, but
18  I actually submitted a bibliography.
19      Q.   Okay, you said they came back with a
20  bibliography. You're talking about the footnotes,
21  correct?
22      A.   No, if there's a footnote, if there's a
23  citation, there's a citation, I look at these
24  citations, and the ones that were submitted, I look at
25  them before they came.

**Page 72**

1      Q.   My question is, was any of this report
2  cut and pasted from any other report, or was this all
3  original work product as of March 23rd, 2016?
4      A.   No, my report on TVTO is my report on
5  TVTO, and if it looks like Christina Permugia's report
6  or whoever report, it's what's available there. There
7  are no more papers.
8      Q.   But what I'm saying is this, I won't find
9  any, any language in your report that, in any report
10  prior to March 23rd, 2016, correct, because this is all
11  your work product, so I won't be able to go and find
12  any reports prepared by you that looks identical, in
13  fact is identical in the entire report, because you
14  created this on March 23rd, 2016, correct?
15      MS. GALLAGHER: Object to form.
16      A.   I did not create this on March 23rd.
17  This has been written and reviewed over the last year
18  and a half, two years.
19  BY MR. FREESE:
20      Q.   When did you start writing your Ramirez
21  report?
22      A.   Over a year ago.
23      Q.   How many hours do you have in the Ramirez
24  matter?
25      A.   Lot of hours. I mean, this is probably

**Page 73**

1  the case that has taken the longest number of hours.
2      Q.   And so what is that?
3      A.   I put it together and I submitted as a
4  whole group. Let me tell you, when I started seeing
5  this, this, these cases, I had like four or five cases
6  that I was reviewing, and, then, I was asked to do a
7  report on Ramirez. There were other cases that did not
8  require a report. That's how I know that I, I recall
9  sitting weekends and going, and writing this.
10      Q.   I just haven't seen a Ramirez invoice.
11  Have you prepared one?
12      A.   I believe that there are a few with
13  Ramirez numbers.
14      Q.   But do you have a total Ramirez invoice
15  somewhere?
16      A.   They were submitted last -- well, that's,
17  that's, there was a time in which I say no, we want you
18  to put for each specific case, and that's when I
19  started doing it, a few months ago, that was for
20  Ramirez, and I was here with, with Mr. Schnel last week
21  and he had, he had those documents.
22      Q.   Do you have your Ramirez invoice with
23  you?
24      A.   No.
25      MS. GALLAGHER: You already have them.

19 (Pages 70 to 73)

Jaime Sepulveda, M.D.

| Page 74 | Page 76 |
|---------|---------|

**Page 74**

1  They were here we when started the depo.
2      MR. FREESE: Where are they?
3      THE WITNESS: These are my invoices.
4      MR. JORDAN: There were two exhibits to
5  the letter that Chris Morris sent. One of them
6  you were asking to be blown up. The other is
7  the invoice.
8      MR. FREESE: Right.
9  BY MR. FREESE:
10     Q. These don't break down Ramirez. Are
11 these all Ramirez invoices?
12     A. No, there's a group, it's grouping all
13 the MDL cases, the most recent ones.
14     Q. But you can't tell from these invoices
15 what they're for?
16     A. Yeah, I just group all the hours on
17 there.
18     Q. How many hours do you have in your best
19 judgment on the Ramirez matter?
20     A. I would say over, over a hundred hours.
21     Q. Over a hundred hours on Ramirez?
22     A. Yeah, easily.
23     Q. And that doesn't include your MDL time?
24     A. Nor my MDL.
25     Q. I'm going to mark as the, the cover

**Page 76**

1  procedures manuals, there are lab manuals. So this is
2  not, there are people looking over each other's
3  shoulders on research projects. So that's what I call,
4  what I call about the methodology is not only the
5  methodology for the randomized control trial but also
6  the surveillance on it.
7      Q. Who was overlooking Dr. Ulmsten's study,
8  for example, on TVT? Who is looking over his shoulder?
9      A. I don't know who was looking at him.
10     Q. Nobody was. You know that, don't you?
11     A. No, I don't.
12     Q. You realize that nobody was overlooking
13 Ulmsten's studies?
14     A. No, I don't know that.
15     Q. Well, can you name me one person who
16 oversaw what Dr. Ulmsten prepared?
17     A. No, I just don't know who overlooked.
18     Q. Did you ever look at the patient level
19 data for Dr. Ulmsten?
20     A. No.
21     Q. Did you know that Ethicon never even
22 looked at the patient data for TVT studies that Ulmsten
23 did?
24     A. No, I do not know how Ulmsten conducted
25 his research, his research project.

**Page 75**

1  letters from, the payments from Ethicon and the
2  invoices here as Exhibit 7 to your deposition. Okay?
3      A. Okay.
4      (Plaintiff's Exhibit No. 7 was marked for
5      identification.)
6  BY MR. FREESE:
7      Q. When doing your report, Dr. Sepulveda,
8  did you attempt to look and see how many of the authors
9  that you were citing in support of your opinions were
10 paid consultants by Ethicon?
11     A. No.
12     Q. Do you even know how many of these
13 authors you cited are paid consultants of Ethicon?
14     A. No.
15     Q. And were paid consultants at the time
16 they wrote their reports?
17     A. I do not know that.
18     Q. Is that a fact of no consideration of
19 yours, you don't care?
20     A. No, the methodology takes care of
21 whatever bias to be introduced.
22     Q. Well, assuming one knew what the
23 methodology was.
24     A. Yes, there's a methodology, there's
25 auditing on research projects, there's supervision,

**Page 77**

1      Q. Am I correct that you have not looked at
2  the patient level data of any of these authors that
3  you're citing in your report?
4      A. No, that's not correct. I have looked
5  at, at these reports and I look at the methodology that
6  they have used.
7      Q. I'm not asking that. I'm talking about,
8  I know you've looked at the methodology. Have you
9  looked at the patient level data that the authors were
10 looking at when they write these reports?
11     A. Define patient level data.
12     Q. The actual data that's collected at the
13 sites for these trials that are being performed.
14     A. How it was collected?
15     Q. Yes, sir. Have you ever gotten the
16 patient level data of any of these studies?
17     A. No, it's not described on the report on
18 any papers, any research papers.
19     Q. You simply take what the authors say and
20 give credit to what they say, assuming that they have
21 given credible, reliable, unbiased results, correct?
22     A. They -- I don't assume. I read the
23 papers, and I read papers that have more accuracy than
24 others in methodology, but that's why there's a section
25 on methodology on each paper.

Jaime Sepulveda, M.D.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  Q.   And you see what the methodology is and
2  then read it, decide you like it, and then cite it?
3  A.   I decide if I find it accurate, yes.
4  Q.   You say on page 4 of your report:
5  Overall, there are over 100 randomized control trials
6  that have accumulated and countless more cohort studies
7  on TVT and TVTO.  Do you see that?
8  A.   Yes.
9  Q.   We can agree, you've lumped TVT and TVTO
10  there in that sense together, have you not?
11  A.   Yes.
12  Q.   And we've agreed that they're two
13  different products, correct?
14  A.   The insertion is different.
15  Q.   And they're different products?
16  A.   They are different products because the
17  insertion is different, the needles are different.
18  Q.   And they have different clearance
19  applications, correct?
20  A.   They have different clearance
21  applications.
22  Q.   The TVT was cleared using ProteGen as the
23  predicate product, correct?
24  A.   Yes.
25  Q.   So when you say a hundred randomized

**Page 79**

1  control trials, we can agree that you didn't mean to
2  suggest to the reader of this that there are over 100
3  randomized control trials of TVTOs.  We can agree on
4  that, can we not?
5  A.   No, of TVT and TVTO.
6  Q.   Yeah.  So, my question to you is, you
7  agree with me that there are not over 100 randomized
8  control trials of TVTO, correct?
9  A.   That is correct.
10  Q.   And if you then looked and said I want to
11  know how many -- first of all, do you know how many
12  randomized control trials of TVTO exists?
13  A.   It's in the Cochrane paper, and I do have
14  an abbreviated portion of the Cochrane and I can refer
15  to it.
16  Q.   All right, without referring, do you have
17  a judgment how many randomized control trials of TVTO
18  exists?
19  A.   No, it's in the Cochrane.  If I would
20  have asked, if a patient would come and ask me that
21  question I would say I will have to look at the
22  Cochrane review.
23  Q.   Do you have the Cochrane review with you
24  right now?
25  A.   Yes.

**Page 80**

1  Q.   Why don't you grab that.
2  MR. FREESE:  Let's go ahead and mark
3  that, let's slap Exhibit 8 on there.
4  BY MR. FREESE:
5  Q.   And would you tell us what you're looking
6  at there, sir?
7  A.   I'm looking at the review article from
8  Neurourology and Urodynamics from 2011, and I should
9  have an updated version in my reliance list.
10  Q.   Okay.  Do you know whether or not this
11  was the one that the FDA was looking at in the white
12  paper?
13  A.   Most likely that's the one that they
14  were, they were looking at.
15  Q.   Because it's 2011?
16  A.   Exactly.  I don't have the 2016 easily
17  marked in here.  I know it's in this pile.
18  Q.   Let's try to work on this.  If you think
19  it's substantially different, then we can maybe find it
20  during a break.  Does Exhibit 8 answer your question
21  that I -- does it answer my question?  Do you want me
22  to remind you what my question is?
23  A.   It's how many randomized control trials
24  are on TVTOs.
25  Q.   Yes, sir.

**Page 81**

1  A.   Okay, they found 24 trials.
2  Q.   Where are you looking?
3  A.   Right here.
4  Q.   Okay.  Are you saying 24 trials address
5  the comparison of transobturator route versus
6  retropubic route?
7  A.   Yes.
8  Q.   And then it has those cited.  Okay, now,
9  let me ask you further, of these 24, of these 24
10  randomized control studies, they weren't all TVTO
11  studies, were they?  They were comparing retropubic
12  versus obturator approach, correct?
13  A.   Right.
14  Q.   So, of those 24, not even all 24 of those
15  are dealing with Ethicon's TVTO, is that correct?
16  A.   No, there's, to do a randomized control
17  trial, if it would be just TVTO, it would be a cohort
18  study.  If it's a randomized control trial, you have to
19  have two arms, and with those two arms classically what
20  we have is the retropubic and the, and the TVTO.  The
21  biggest study on that is the TOMUS, T-O-M-U-S, the
22  TOMUS trial.
23  Q.   But my question is, some of these 24
24  studies are not even studying the Ethicon TVTO, they
25  are simply comparing midurethral slings that are using

Jaime Sepulveda, M.D.

| Page 82 | Page 84 |
|---|---|

**Page 82**

1  an obturator approach, it may not even be Ethicon's
2  products being studied, correct?
3      A.   There are two, they made two comparisons
4  in the Cochrane data review.  They made a comparison
5  between transobturator slings and they made a
6  comparison between retropubic and transobturator
7  slings.
8      Q.   And not necessarily even Ethicon's
9  transobturator slings, correct?
10     A.   Yeah, they compared different ones.
11     Q.   And, so, am I correct, you cannot sit
12  here today, Dr. Sepulveda, and tell me how many
13  randomized control studies have been done looking at
14  Ethicon's TVTO?  Can you agree that you can't tell me
15  that number?
16     A.   I can, I can say for certain, without
17  looking into the long version, this is the short
18  version of the Cochrane data review, I can say with
19  accuracy the TOMUS trial.
20     Q.   One?
21     A.   Yes.
22     Q.   Okay.  I'll mark Exhibit 9 to your
23  deposition, which is the, do you recognize that as the
24  white paper?
25     A.   Yes, the FDA Executive Summary.

**Page 83**

1          (Plaintiff's Exhibit No. 9 was marked for
2      identification.)
3  BY MR. FREESE:
4      Q.   And you've looked and relied upon this,
5  did you not, in forming your opinions?
6      A.   I read it and it just allow me to
7  understand.  There was no specific cite on my opinion
8  that refers to, to that paper.
9      Q.   But you actually showed up to your
10  deposition with a highlighted copy of it, did you not?
11     A.   No, I -- yes, I actually did have a
12  highlight copy, but the only data, the only place in
13  which I refer to the Executive Summary from my report
14  is when I, when I speak about the MAUDE database.
15     Q.   Let's talk about something different,
16  though.  Let me show you Exhibit 9, page 42, of the FDA
17  Executive Paper.
18          Now, you've -- and before we get to that,
19  your testimony is you relied on the Cochrane report in
20  forming your opinions today about the safety and
21  efficacy of TVTO, am I correct?
22     A.   And the Cochrane report and the TOMUS
23  trial and the Tommaselli analysis.
24     Q.   And the FDA had some comments about the
25  Cochrane review, did it not?

**Page 84**

1      A.   Yes, they did have an opinion here.
2      Q.   And it says in the first paragraph, under
3  conclusion, safety of mesh used in repair of stress
4  urinary incontinence based on published literature.  Do
5  you see that?
6      A.   Yes.
7      Q.   Quote, "The Cochrane reviews are limited
8  in the ability to fully evaluate the safety of profile
9  of the surgical mesh used in SUI patients.  The main
10  objective of these reviews is to evaluate the
11  effectiveness of the SUI procedures using randomized
12  control trials that have compared a mesh procedure to
13  another approach."  Do you see that?
14     A.   Yes.
15     Q.   So, the FDA was criticizing the
16  reliability of the Cochrane reviews from a safety
17  standpoint, correct?
18          MS. GALLAGHER:  Object to form.
19     A.   That is, that is, that is correct.  They
20  disagree with the methodology.
21  BY MR. FREESE:
22     Q.   I accurately read what the FDA said about
23  the Cochrane reviews that you are relying on, correct?
24     A.   Yes, they, I think that, when you look --
25     Q.   Hold on.  I don't mean to cut you off,

**Page 85**

1  but I'm simply asking you, did I accurately read to you
2  just now what the FDA's conclusion was of the Cochrane
3  reviews?
4      A.   That's what they described, yes.
5      Q.   If you'll drop down three paragraphs, it
6  says, quote, "The Cochrane reviews did however identify
7  noteworthy differences between mesh procedures and open
8  colposuspension.  The risk of perioperative
9  complications favored colposuspension compared to all
10  sling procedures combined, and the risk of voiding
11  dysfunction was similar between colposuspension and the
12  TVT sling."  Do you see that?
13     A.   Yes.
14     Q.   Did I read that correctly?
15     A.   You read that.  I didn't follow word by
16  word, but you...
17     Q.   Okay, and that's, that's contrary to the
18  opinion that you've expressed in your report, is it
19  not?
20     A.   That's, the Cochrane review and the most
21  recent Cochrane review and the TOMUS report are what's
22  used in my report, and there's, I was looking for my
23  2015 Cochrane review, and I just found it.
24     Q.   Okay, and we'll get to that, but let me
25  finish my question here.  You agree with me that the

Jaime Sepulveda, M.D.

| Page 86 | Page 88 |
|---|---|
| 1 FDA concluded that the, the Cochrane reviews that you<br>2 have relied on were noteworthy because they found, in<br>3 the view of the FDA, that the risks of perioperative<br>4 complications made mesh less safe compared to<br>5 colposuspension, correct?<br>6     A. But that's not what it says on the<br>7 Cochrane review.<br>8     Q. That's what the FDA concluded after<br>9 reading the Cochrane review, correct?<br>10     A. Yes, but I don't know how they came to<br>11 that conclusion.<br>12     Q. And you understand, Doctor, what the FDA<br>13 was doing in 2011 when they prepared this white paper,<br>14 they were doing a systematic review of all known<br>15 literature, were they not?<br>16         MS. GALLAGHER: Object to form.<br>17     A. Yes, but that's not what's been published<br>18 on the summary.<br>19 BY MR. FREESE:<br>20     Q. But what I'm saying, you understand<br>21 that's what the FDA undertook to do? They undertook to<br>22 independently collect all known literature on the<br>23 safety and efficacy of midurethral slings and draw some<br>24 conclusions from those studies, correct?<br>25     A. If they did a systematic review, I have | 1     A. This is not a report of a systematic<br>2 review. This is an executive summary.<br>3     Q. Have you looked at the systematic review?<br>4     A. I have not seen a systematic review.<br>5     Q. So you're not saying that the systematic<br>6 review came to any different conclusion than what the<br>7 summary did, correct?<br>8     A. Well, I have not seen it.<br>9     Q. Okay. But you disagree with the<br>10 conclusions they reached regarding the Cochrane<br>11 reviews?<br>12     A. Yes, I do disagree.<br>13     Q. Okay. So, in your view, at least in this<br>14 respect, Dr. Sepulveda, you would say that the FDA got<br>15 it wrong in their conclusion regarding what the<br>16 Cochrane reviews showed about complications from<br>17 midurethral slings, correct?<br>18     A. Yes, and I base my, my answer on the<br>19 last, on the last statement on the review article, that<br>20 says that monofilament tape has significantly higher<br>21 objective cure rates, and the obturator use wasn't less<br>22 favorable than retropubic, but only on an 84 to 88<br>23 percent --<br>24     Q. That's on the cure rates, though.<br>25     A. That's on cure rate. |

| Page 87 | Page 89 |
|---|---|
| 1 not seen any publication about the systematic review<br>2 made by the FDA, because the document that you have in<br>3 front of you is an executive summary, it's not a<br>4 systematic review report.<br>5     Q. Would you look at the second paragraph,<br>6 sir?<br>7     A. Yes.<br>8     Q. Okay. Quote, "The FDA's systematic<br>9 literature review found that the weighted average rates<br>10 of urinary problems, re-surgery rates and perioperative<br>11 organ perforations were similar to overall rates<br>12 presented in published meta-analyses and systematic<br>13 reviews." Do you see that?<br>14     A. Yes.<br>15     Q. They're saying they did a systematic<br>16 literature review.<br>17     A. Yes, they say that.<br>18     Q. Do you dispute that they did a systematic<br>19 literature review?<br>20     A. I don't dispute they did it. I just have<br>21 not seen the document.<br>22     Q. Well, we're looking at the document.<br>23     A. No, this is not a report of a systematic<br>24 review.<br>25     Q. This is the report of the review. | 1     Q. We're talking about complications right<br>2 now.<br>3     A. Yes, we go through that. However, there<br>4 were less voiding dysfunction, blood loss, bladder<br>5 perforation with the obturator route.<br>6     Q. Compared to what?<br>7     A. Compared to colposuspension, pubovaginal<br>8 slings and retropubic procedures.<br>9     Q. Doctor, let's move up a paragraph here.<br>10 In the Cochrane review, minimally-invasive synthetic<br>11 suburethral sling operation appeared to be as effective<br>12 as open retropubic colposuspension, correct?<br>13     A. Yes.<br>14     Q. That's talking about efficacy, correct?<br>15     A. Yes.<br>16     Q. But that it had significantly more<br>17 bladder perforations, correct?<br>18     A. There were more bladder perforations when<br>19 we compare, when you compare colposuspensions with<br>20 retropubic slings.<br>21     Q. Doctor, I'm going to mark as Exhibit 10<br>22 to your deposition the actual appendix to the published<br>23 review of literature that we've looked at with the FDA.<br>24         (Plaintiff's Exhibit No. 10 was marked<br>25     for identification.) |

23 (Pages 86 to 89)

Jaime Sepulveda, M.D.

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  BY MR. FREESE:
2      Q.  Do you see, you've seen this was actually
3  part of the Executive Summary.  Correct?
4      A.  Yes.
5      Q.  And it says the FDA evaluated the
6  peer-reviewed scientific literature to revisit the
7  fundamental question of safety and effectiveness for
8  surgical mesh for POP and SUI, correct?
9      A.  Yes.
10     Q.  A systematic literature review was
11 conducted by searching the PubMed database from
12 January, 1996, to April, 2011.  Do you see that?
13 A.   Yes.
14     Q.  I won't read you all this, but this says
15 what the FDA actually did, correct?
16     A.  Yes.
17     Q.  You have no reason to dispute that they
18 actually did what they say here in Exhibit 10?
19     A.  I have no reason to dispute that's what
20 they do.
21     Q.  You just dispute some conclusions they
22 reached?
23     A.  Yes, I think that the Cochrane review,
24 with all the possible limitations that any study would
25 have, have less limitations than the FDA executive

**Page 91**

1  report.
2      Q.  Even the FDA said the Cochrane review
3  results were only of moderate value, did they not?
4      A.  Well, there's no standardization of
5  statistical analysis done in concluding that, if they
6  say that.
7      Q.  Well, they do that say that, don't they?
8  They said that the strength of the Cochrane data is
9  moderate.  That's how way they described it, did they
10 not?
11     A.  Yes, most of it is not moderate.
12     Q.  And, Doctor, back to page 43 of the
13 executive study.
14     A.  Yes, I have that right here.
15     Q.  The FDA said that in the systematic
16 review of the literature conducted by the FDA and based
17 on adverse event reports in the MAUDE database, there's
18 a potential for serious complications with mesh
19 products indicated for SUI repair.  Do you see that?
20     A.  Yes.
21     Q.  Do you disagree with that?
22     A.  No, they actually table it, they actually
23 got the frequency, and they actually mentioned the
24 limitations of the MAUDE database.  So, that's, I find
25 this, this statement to be overreaching.  I think that

**Page 92**

1  this, the fact that we're looking at an executive
2  summary and the fact that we don't have a systematic
3  review publication just speaks for itself in looking at
4  the overreaching of these conclusions.
5      Q.  And this goes on to say, quote, "The FDA
6  is concerned that the safety outcomes may not have been
7  comprehensively evaluated by the randomized control
8  trial to date and that the safety of SUI repair with
9  mesh needs to be further considered in evaluating the
10 overall risk-to-benefit profile of these products."  Do
11 you see that?
12     A.  And it was actually further considered.
13     Q.  Did I read that correctly?
14     A.  Yes.
15     Q.  Okay, and do you agree with that
16 conclusion?
17     A.  Yes, it needs to be further considered.
18 I do agree with that.  And it was further considered.
19     Q.  And you agree that the comprehensive
20 review of the RCTs may not have been able to
21 comprehensively capture all of the safety data on the
22 midurethral slings?
23     A.  No, the RCTs will have established
24 benchmark for safety.
25     Q.  Well, the conclusion was that they didn't

**Page 93**

1  comprehensively gather the safety data, the RCTs
2  didn't.
3      A.  That's the executive summary conclusion,
4  but that's not the conclusion of the mesh analysis done
5  by the Cochrane review.
6      Q.  Again, that's the conclusion of the FDA
7  that you disagree with?
8      A.  That's what they state and I disagree
9  with it, yes.
10     Q.  And let me just ask one more question and
11 we'll move on to something else.  So, now that we've
12 gone through this discussion here, Dr. Sepulveda, we
13 can agree that the only long-term randomized controlled
14 study of TVTO that you're aware of is the TOMUS study?
15     A.  No, I am aware of the, of the study done
16 by Cloe in 2013, which is a randomized control trial of
17 the TVT and TOT.  I'm also aware of the RCT comparing
18 TVT and TVTO of Aniulene, which is a prospective
19 randomized control trial of TVTO and TVT.
20     Q.  Over what period of time?
21     A.  On 264 women.
22     Q.  For how long?
23     A.  For -- I cannot answer that question
24 based on this, on what I have.
25     Q.  So you can't tell if it's a long-term

Jaime Sepulveda, M.D.

| Page 94 | Page 96 |
|---|---|

**Page 94**

1  study or not?
2     A.  Well, it's a randomized control trial
3  that looks at safety of the TVTO. I also have, and
4  these are from the new Cochrane review which I found,
5  the one from 2015. I have TVTO being compared to TOT
6  in 2008.
7     Q.  How long?
8     A.  That's a three month, three month.
9     Q.  That's not a long-term study, is it?
10     A.  No, there are other longer-term studies.
11     Q.  But we can agree that three months is not
12  by anybody's definition a long-term study, correct?
13     A.  No, that's a study just about safety.
14     Q.  First of all, you're looking at the 2015
15  Cochrane review?
16     A.  Yes.
17     Q.  Okay. As you sit here today, Doctor, can
18  you tell me how many long-term randomized control
19  trials there are of TVTO --
20         MS. GALLAGHER: Object to form.
21  BY MR. FREESE:
22     Q.  -- whose primary end point is safety?
23         MS. GALLAGHER: Object to form.
24  BY MR. FREESE:
25     Q.  How many of those exist?

**Page 96**

1     Q.  Okay, and in those five-, seven- and
2  ten-year trials, the primary objective was safety. Is
3  that correct?
4     A.  Safety.
5     Q.  As opposed to efficacy?
6     A.  Safety and efficacy is evaluated on both,
7  but now that you mention, the TOMUS trial was safety
8  and efficacy. The Tommaselli medium-term and long-term
9  following midurethral slings, which is a systematic
10  review of meta-analysis as the highest level of
11  evidence, was at 36 months and at 60 months.
12     Q.  Okay. So, there's one at 60 months,
13  correct?
14     A.  I can, I can continue looking, looking
15  for it, on the different ones, but --
16     Q.  That's fine, and this is not a memory
17  test, and I'm sure your lawyer will be happy to walk
18  you through when we get to the courthouse, but just
19  sitting here right now, you can't name me one study
20  that meets the parameters I just defined, correct?
21     A.  Yes, I just, I just mentioned them to
22  you.
23     Q.  Which, TOMUS?
24     A.  Tommaselli.
25     Q.  Tommaselli?

| Page 95 | Page 97 |
|---|---|

**Page 95**

1     A.  I'm just looking through them.
2     Q.  Listen to my question. How many of those
3  are long-term studies, what I mean by that, five years
4  or more, how many long-term, controlled, randomized
5  controlled studies of TVTO exist, five years or
6  greater, with the primary end point of safety? How
7  many of those studies?
8     A.  Well, I've already gone through three of
9  them, because there's also the Chen study.
10     Q.  How long is that?
11     A.  This was 12 to 24 months.
12     Q.  That's not five years. Doctor, listen to
13  my question. Close the book, you've got to look at me
14  and listen to my question because I think you're
15  getting distracted. Do you know how many randomized
16  controlled studies, long term, by which I mean longer
17  than five years, and whose primary end point was
18  safety, are there dealing with TVTO?
19     A.  No, I do not, I do not recall the
20  specific number of them and I know there are trials at
21  five years, seven years, and ten years.
22     Q.  Okay.
23     A.  There are trials in here, and I have it
24  in my reliance list, but if you're asking me just to
25  recall as a memory test, no, I do not recall that.

**Page 97**

1     A.  TOMUS trial, which is the best designed
2  and most accurate trial that have ever been done with
3  TVT and TVTO. There's the, there's Chen.
4     Q.  Chen was five years or greater?
5     A.  That's less.
6     Q.  Doctor, we're not getting -- it has to be
7  five years or greater. That's all I'm asking you. How
8  many studies, TVTO, five years or longer, that study
9  the safety of the device?
10         MS. GALLAGHER: Object to form.
11     A.  I, I already say that I cannot recall one
12  specific number.
13  BY MR. FREESE:
14     Q.  And we can agree that it's way less than
15  a hundred, correct?
16     A.  It is less than, than a hundred.
17     Q.  It's way less than 24, is it not?
18     A.  It might be more than 24 now.
19     Q.  As you sit here right now, you're unable
20  to name one.
21         MS. GALLAGHER: Object to form.
22  BY MR. FREESE:
23     Q.  Correct?
24     A.  I said I cannot recall it.
25     Q.  That's fine. That's all I want to know.

25  (Pages 94 to 97)

Jaime Sepulveda, M.D.

| Page 98 | Page 100 |
|---|---|

**Page 98**

1  Sitting here right now, you cannot name one.
2      MS. GALLAGHER:  Object to form.  He's
3  already told you about three.
4      MR. FREESE:  Counsel.
5      A.    I already told you the studies that I can
6  recall, and I looked at them and I gave you my best
7  effort to give you that information.
8  BY MR. FREESE:
9      Q.   All right.  And of the TVTO studies that
10  you rely on, Doctor, can we agree that none of them
11  make a distinction between laser cut versus mechanical
12  cut?
13      A.   Yes, that has been established already.
14      Q.   Even the doctors who did the study don't
15  say whether or not the patients they are studying were
16  implanted with laser-cut versus mechanical-cut TVTO,
17  correct?
18      A.   That's correct, there's no definition of
19  it.
20      Q.   And you don't know?
21      A.   No, I don't know because they did not
22  disclose it.
23      Q.   And if there's in fact a clinically
24  significant difference in safety between
25  mechanically-cut TVTO and laser-cut TVTO, it won't be

**Page 99**

1  discernable from the studies, will it?
2      A.   No, it's not discernable from the
3  studies.  That has not been defined.
4      Q.   That has what?
5      A.   That has not been defined.
6      Q.   Okay.  Doctor, would you look at page 14
7  of your report?
8      A.   Yes.
9      Q.   I just want to ask you real quick, the
10  bottom of the first paragraph there, it says no medical
11  certification of these complications or diagnostic
12  confirmation was required on this report.  Do you see
13  that?
14      A.   Yes.
15      Q.   Would you just -- I don't understand the
16  sentence.  Can you tell me what that means?
17      A.   Before we, we saw TVT and before we saw
18  TVTO, before we actually saw midurethral slings, the
19  quality of the studies were not, were not strong.  We,
20  we actually saw the first comparison between
21  pubourethral slings and colposuspension in the, in the
22  Alba trial published in the New England Journal of
23  Medicine, but until then there was a very weak, very,
24  very small cohort studies establishing the safety and
25  efficacy of Burch colposuspensions and pubovaginal

**Page 100**

1  slings.
2      Q.   It goes on to say, quote, "Surgical
3  experience made clear that patients treated with TVT
4  had less voiding dysfunction, less wound complications
5  and less retention than the historic numbers from
6  patients treated with pubovaginal slings, needle
7  procedures or retropubic procedures."  Do you see that?
8      A.   Yes.
9      Q.   You don't cite anything for that
10  statement, do you?
11      A.   No, but I --
12      Q.   Hold on, I'll ask, you don't cite
13  anything for that statement?
14      A.   No, sir, I don't.
15      Q.   And you're referring to TVT studies, not
16  TVTO studies, correct?
17      A.   I'm referring to TVT studies and I'm
18  referring to TVTO studies.
19      Q.   Well, it says TVT.  The sentence says
20  that surgical experience made clear that patients
21  treated with TVT.  That's a different product than
22  TVTO, is it not?
23      A.   Okay, we keep saying that it's a
24  different product.  I have the impression that we're
25  going to be looking at those different products through

**Page 101**

1  the course of the day.  So, do you want me to go
2  through the, and I'm sure if you want you'll probably
3  ask, but in which regard are we defining those
4  differently?
5      Q.   Well, if I said give me a TVT and give me
6  a TVTO, we would have to have two different boxes,
7  wouldn't we?
8      A.   Yes.
9      Q.   Okay, because they're two different
10  products, correct?
11      A.   They're two different products in the
12  insertion needles, yes.
13      Q.   They were cleared in a different way?
14      A.   They were cleared in a different way.
15      Q.   They had different predicate products?
16      A.   Yes.
17      Q.   That's what I mean by they're different
18  products.  So, when you're citing a TVT study, that's
19  not a study of TVTO, correct?
20      A.   That's, that's not necessarily a study of
21  TVTO.  That's a study about the tape.
22      Q.   That's my point.  When you cite a TVT
23  study, it's not a study of TVTO, is it?
24      A.   No, if I cite a TVT study, I'm citing
25  that.  TVTO is TVTO.  But, yes, the surgical experience

26 (Pages 98 to 101)

Jaime Sepulveda, M.D.

Page 102

1    showed that there were less complications with
2    pubovaginal slings or colposuspensions.
3        Q.   Against TVT?
4        A.   Against TVT, and when TVTO was compared
5    to TVT, there was less.
6        Q.   But your sentence doesn't even mention
7    TVTO, is my only point.
8        A.   I did not mention TVTO in that sentence.
9        Q.   I mean, is the point you're trying to
10   make, Dr. Sepulveda, that, that you, you like to use
11   TVT and TVTO studies interchangeably because they
12   involve the same polypropylene mesh?
13       A.   Well, there are more similarities than
14   differences.
15       Q.   But is it because they use the same mesh?
16       A.   No, not necessarily just the same mesh.
17       Q.   Well, is that one of the reasons why you
18   use the studies interchangeably?
19       A.   Yes, you can actually use one or the
20   other, but I don't even need to refer to TVT.  TVTO has
21   been shown in randomized control trials has been as
22   effective and safer than TVT.
23       Q.   Okay.  And, so I guess it would be a fair
24   comparison to compare TVT Secur to TVTO, right, because
25   it uses the same mesh?

Page 103

1        MS. GALLAGHER:  Object to form.
2        A.   We're not talking about TVT Secur now.
3    We can talk about how TVT Secur, and I have provided
4    testimony before about how TVT Secur shares
5    similarities with previous generations of TVTs.
6    BY MR. FREESE:
7        Q.   They share the same mesh, do they not?
8        A.   They do.
9        Q.   As does Abbrevo, that has the same mesh?
10       A.   That has the same mesh, right.
11       Q.   So, basically, Doctor, on page 14, all
12   these numbers and results of studies you're referring
13   to, these are all TVT studies, are they not?
14       A.   These are TVT studies.
15       Q.   They're not TVTO studies.
16       A.   And whatever complication might be
17   reported from TVT is not going to be higher on TVTO.
18       Q.   That's not my question, sir.  Everything
19   you're quoting here in your report are TVT studies, not
20   TVTO studies?
21       A.   These are TVT studies, right.
22       MR. FREESE:  Let's take about two
23   minutes.  I want to grab some exhibits real
24   quick.
25       (Break from 11:35 a.m. to 11:45 a.m.)

Page 104

1    BY MR. FREESE:
2        Q.   Now, Doctor, am I correct that Prolene
3    mesh is the mesh that's used in all TVT products,
4    correct?
5        A.   Yes.
6        Q.   And that's the original old construction
7    Prolene, correct?
8        A.   That is the construction of Prolene and,
9    and it's to the same degree of crystallinity that the,
10   of Prolene sutures.
11       Q.   I'm not asking about sutures right now,
12   we can talk about that in a minute, but am I correct
13   that the Prolene that is in the TVTO is the same
14   Prolene that was used in Dr. Ulmsten's original TVT
15   product?
16       A.   It's the same construction Prolene.  I
17   cannot recall if the exact crystallinity or purity or
18   analysis from Ulmsten.  I don't think that he did that.
19       Q.   Well, you know that the formulation for
20   Prolene mesh has not changed since the original TVT
21   produced by Ethicon, correct?  And what I'm asking
22   there is, the same mesh that's in TVT is in TVTO, is in
23   TVT Abbrevo, TVT Secur, TVT Exact.  Correct?
24       A.   Yes.
25       Q.   Okay.  And that is a, that is a

Page 105

1    small-pore, heavyweight mesh, is it not?
2        A.   No, it's not small pore.
3        Q.   You think it's a large-pore mesh?
4        A.   It is a large pore.
5        Q.   And do you think it's a heavyweight mesh?
6        A.   It's, in all, of all the applications
7    that I use for midurethra, it's a lightweight mesh.
8    When it's compared to the meshes for prolapse, it's on
9    the heavyweight, it's close to the heavyweight, but not
10   at the level that was the old meshes for hernias.
11       Q.   Well, the old hernia mesh is Prolene,
12   correct?
13       A.   The old hernia mesh is Prolene.
14       Q.   Okay.  So, you're agreeing that the
15   Prolene mesh is heavyweight mesh?
16       A.   The Prolene mesh is heavyweight, yes.
17   The Prolene that was initially described that we had 20
18   years ago, that's heavyweight.
19       Q.   Well, what is used today is heavyweight
20   mesh, is it not?
21       A.   No, the fiber is lightweight.
22       Q.   You think the fiber in the TVTO is
23   lightweight?
24       A.   Yes.
25       Q.   And you think it's large pore?

27 (Pages 102 to 105)

Jaime Sepulveda, M.D.

| Page 106 | Page 108 |
|---|---|
| 1      A.   It's large pore. | 1   company, I wouldn't find any internal documents in |
| 2      Q.   What is the basis for that opinion? | 2   there saying that Prolene is small pore, heavyweight, |
| 3      A.   The large pore is over 75 microns, and | 3   would I? |
| 4   the pore size on the mesh for TVT is 1,200 microns. | 4      A.   That would be the basis of the |
| 5      Q.   That's an AMI classification that you're | 5   disagreement of the engineers with me.   So if there's a |
| 6   using? | 6   document in there, I would like to see it. |
| 7      A.   That's on the AMI classification, which | 7      Q.   I'm asking you, Doctor, if I look through |
| 8   we know has its own limitations, but that's the only | 8   here, as you sit here right now, you don't remember |
| 9   one that we have to compare the, the large pores with | 9   them supplying you with any internal documents where |
| 10   the small pores. | 10   the scientists and the researchers at Ethicon |
| 11      Q.   The sole basis of you describing Prolene | 11   repeatedly described their Prolene mesh as heavyweight |
| 12   as large pore and lightweight is the AMI | 12   and small pore?   It's not in that binder, is it? |
| 13   classification? | 13      A.   I don't recall it being in the binder, |
| 14      A.   Yes, on the, on the slings, on the | 14   no. |
| 15   monofilament polypropylene slings, this is one of the | 15      Q.   And as you sit here, you don't have any |
| 16   largest pores. | 16   recollection that they supplied you any such documents |
| 17      Q.   I'm just asking the sole basis for your | 17   stating that Prolene is heavyweight and small pore? |
| 18   opinion on that is the AMI classification? | 18      A.   No, I do not. |
| 19      A.   No, that's not the sole basis.   It's also | 19      (Plaintiff's Exhibit No. 11 was marked |
| 20   the fact that it's a large pore, it's over 75 microns, | 20      for identification.) |
| 21   and even when you define larger pores at 200, 300, it's | 21   BY MR. FREESE: |
| 22   still a lot larger than that. | 22      Q.   Now, I'm going to show you what I've |
| 23      Q.   I'm asking you what is your basis for 75 | 23   marked as Exhibit 11 to your deposition.   And do you |
| 24   microns, other than the AMI classification? | 24   see this chart here, Doctor? |
| 25      A.   For the classification of 75 microns, it | 25      A.   Yes, I do see it. |

| Page 107 | Page 109 |
|---|---|
| 1   is the AMI classification. | 1      Q.   Have you ever seen this chart before? |
| 2      Q.   So, if I say, Doctor, what is the basis | 2      A.   No. |
| 3   of your opinion that Prolene mesh is lightweight and | 3      Q.   Okay.   You see where it has type of mesh, |
| 4   large pore, you would say AMI classification, correct? | 4   microporous, medium, and macroporous? |
| 5      A.   That's, that's the only classification | 5      A.   Yes. |
| 6   that defines pores. | 6      Q.   Can we agree microporous means small pore |
| 7      Q.   And you have no other basis for that | 7   and macroporous means large pore? |
| 8   opinion other than that? | 8      A.   We can agree on that, yes. |
| 9      A.   I would not have any, any other on that | 9      Q.   All right, and, then, you see where it |
| 10   specific pore size. | 10   says hernia? |
| 11      Q.   You understand, Dr. Sepulveda, that the | 11      A.   Yes. |
| 12   engineers at Ethicon disagree with you, do you not? | 12      Q.   And then you see where it EWH&U?   Do you |
| 13      A.   No, I -- | 13   see that? |
| 14      MS. GALLAGHER:   Object to form. | 14      A.   Yes. |
| 15      A.   I cannot base, that's an ambiguous | 15      Q.   Is that abbreviation for Ethicon Women's |
| 16   question.   I don't know which way they would disagree | 16   Health? |
| 17   or what they're saying. | 17      A.   Yes. |
| 18   BY MR. FREESE: | 18      Q.   And if you look at the first page, you'll |
| 19      Q.   I'm asking you, have you ever seen any | 19   see that this document came out of Ethicon's internal |
| 20   internal Ethicon documents describing the Prolene mesh | 20   files, correct? |
| 21   as heavyweight and small pore? | 21      A.   Yes. |
| 22      A.   They -- no, I don't, I don't, I haven't | 22      Q.   Because it bears a Bates stamp number |
| 23   seen anything as small pore. | 23   from the company, correct? |
| 24      Q.   Okay.   So, if I looked through your TVTO | 24      A.   That's correct. |
| 25   company documents selected for your review by the | 25      Q.   And under microporous meshes, does the |

Golkow Technologies, Inc. - 1.877.370.DEPS

Jaime Sepulveda, M.D.

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  document list Prolene as a microporous mesh?
2      A.  This documents list Prolene as
3  microporous.
4      Q.  And it's not just talking about hernia
5  mesh, is it?
6      A.  No, it does mention TVT slings.
7      Q.  Okay.  That includes TVTO, doesn't it?
8      A.  It just says TVT slings, in plural.
9      Q.  Which would include the entire family of
10  TVT slings, correct?
11      MS. GALLAGHER:  Object to form.
12      A.  I cannot testify to that because there's
13  no date on this document and there's no specification
14  of TVTO or TVT or any other TVTs.
15  BY MR. FREESE:
16      Q.  Well, because TVTs all use the same mesh,
17  do they not?
18      A.  TVTs use the same, and all the products
19  use the same mesh.
20      Q.  So, when it says TVT slings, that
21  includes the entire family of TVTs, right, because they
22  all use the same, and have always used the same mesh?
23      A.  Yes, but all it says is TVT slings.
24      Q.  Right, and they're talking about the mesh
25  being microporous.  You see that?

**Page 111**

1      A.  Yes.
2      Q.  And you've never seen this document
3  before, have you?
4      A.  No.
5      Q.  The lawyers didn't show it to you, did
6  they?
7      A.  I, I just, I just haven't seen it.
8      Q.  You disagree with that description, I
9  gather?
10      A.  I do.
11      Q.  Okay.  And it says macroporous, and it
12  has Vypro, Vypro II, Ultrapro.  Do you know what those
13  are?
14      A.  Yes.
15      Q.  Those are, Ultrapro is the mesh that was
16  used in Gynemesh Plus M and Prolift Plus M, correct?
17      A.  Yes.
18      Q.  And you're familiar with those products,
19  correct?
20      A.  I am familiar with them.
21      Q.  You implanted Prolift repeatedly, did you
22  not?
23      A.  I did.
24      Q.  And that used a lighter-weight,
25  large-pore mesh, did it not?

**Page 112**

1      A.  It used a light, lighter weight, yes.
2      Q.  And the lighter-weight, large-pore
3  Ultrapro mesh has been available to the market since at
4  least 2003, has it not?
5      A.  I don't know exactly when.  You're
6  talking about the Ultrapro?
7      Q.  Yes, sir.
8      A.  No, I don't know when that was available
9  on the market.
10      Q.  You know it was years before 2010,
11  though?
12      A.  No, I do not know that.
13      Q.  You don't know, you have no clue when
14  Ultrapro was put on the market?
15      A.  No.
16      Q.  Okay.  Do you, you, you've implanted
17  Prolift Plus Ms, have you not?
18      A.  Yes.
19      Q.  Okay.  That's a partially-absorbable
20  mesh?
21      A.  That's a partially-absorbable mesh, yes.
22      Q.  And you know you were implanting that
23  years before 2010, correct?
24      A.  I did not use Ultrapro.
25      Q.  Okay.  When did you use Ultrapro?

**Page 113**

1      A.  I used the polyglecaprone polypropylene
2  mesh when it became available with Gynemesh.  I'm
3  sorry, with Prolift Plus M.
4      Q.  What mesh was Prolift Plus M?
5      A.  Polyglecaprone polypropylene.
6      Q.  Okay.  That's partially absorbable, is it
7  not?
8      A.  That's partially absorbable.
9      Q.  It's a lighter-weight mesh, is it not,
10  than Prolene?
11      A.  It's heavier when it's implanted.  It
12  just gets lighter as the polyglecaprone component is
13  absorbed.
14      Q.  Because it absorbs and becomes a lighter
15  mesh, correct?
16      A.  Yes, it's lighter when you, when you take
17  it out, and you measure after the polyglecaprone
18  component, it's lighter.
19      Q.  And the pores on the Ultrapro are
20  considerably larger than they are in the Prolene, are
21  they not?
22      A.  I don't know exactly in the product of
23  Ultrapro, and I don't want to infer from one product to
24  another on these, on these devices.
25      Q.  You've implanted all of them, Prolifts,

29 (Pages 110 to 113)

Jaime Sepulveda, M.D.

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    TVT slings, correct?
2        A.   Yes.
3        Q.   And you know that they have considerably
4    larger pores in the Ultrapro than the TVT Prolift.
5        A.   You're asking about Ultrapro, but if you
6    ask me about Prolift Plus M, we'll have a better
7    understanding of it.  I just don't want to give
8    testimony on Ultrapro that is used for hernia.
9        Q.   Okay.  I see the distinction.  Let me
10   clear it up.  You know that Ultrapro mesh is used in
11   Prolift Plus M?
12       A.   It is polyglecaprone polypropylene, yes.
13       Q.   And you've used it?
14       A.   I have used it, yes.
15       Q.   And it has considerably larger pores than
16   Prolene mesh, correct?
17       A.   It has a larger pore than Prolene mesh,
18   yes.
19       Q.   And all of these products that are being
20   discussed here, these are either pelvic floor prolapse
21   products or stress urinary incontinence products,
22   correct?
23       A.   Well, Gynemesh Plus M and Prolift Plus M
24   are for prolapse.  TVT slings are for incontinence.
25       Q.   And Prosima is for prolapse, correct?

**Page 115**

1        A.   Prosima is for prolapse as well as
2    Prolene and Gynemesh.
3        Q.   That's what I'm saying, every one of the
4    products listed on this exhibit are products for the
5    treatment of either pelvic organ prolapse or stress
6    urinary incontinence, correct?
7        A.   On the column, on the side, under EWH&U,
8    yes.
9        Q.   And you would disagree with that
10   document?
11       A.   On what part would I disagree?
12       Q.   That, describing TVT slings as being
13   microporous?
14       A.   Yeah, I do disagree with that.
15       Q.   Do you agree that Gynemesh Plus M and
16   Prolift Plus M is macroporous, do you agree with that
17   portion?
18       A.   They're all macroporous.
19       Q.   You would put every one of these products
20   in the macroporous category, not the three separate
21   categories that Ethicon internally did, correct?
22       A.   Yes, that's, they're all macroporous
23   products.
24       Q.   Even if Ethicon describes them as three
25   different weights?

**Page 116**

1        A.   Yeah, the, the reports for -- the
2    definitions for microporous and macroporous are very
3    clear.
4        Q.   Now, do you know Joerg Holste?
5        A.   No.
6        Q.   Have you ever heard of him before?
7        A.   No.
8        Q.   I'm the first, me uttering his name is
9    the first time you ever heard it?
10       A.   Yes.
11       Q.   Okay.
12       A.   I may have heard his name from, or seen
13   it, but I don't, maybe once, I don't know, I don't
14   recall this, this person.
15       Q.   Okay, did you know that you put down on
16   your reliance list that you read his deposition and
17   relied on it in forming your report in this case?
18       A.   I read that over a year, a year ago, yes.
19       Q.   Well, you just signed this last week,
20   didn't you, sir?
21       A.   Well, you just asked me if I knew him.  I
22   don't know him.
23       Q.   I asked you do you know who he is.  You
24   don't even know who he is?
25       A.   I don't know who he is.

**Page 117**

1        Q.   Okay, that's fine.  And three days ago
2    you supplemented your reliance list, and Dr. Holste is
3    listed as one of the depositions you read and relied on
4    in forming your opinions, correct?
5        A.   Yeah, I read it a very long time ago.
6        Q.   Okay.  But he's on your reliance list,
7    correct?
8        A.   He's on my reliance list, yes.
9             (Plaintiff's Exhibit No. 12 was marked
10            for identification.)
11   BY MR. FREESE:
12       Q.   Let me show you Exhibit 12 to your
13   deposition, sir, and show you a question and answer
14   that Dr. Holste was asked at his deposition, the
15   deposition that you got on your reliance list.  He
16   says, the question is, quote, "And Prolene
17   old-construction mesh at 100 to 110 grams per meter
18   squared is considered a heavyweight mesh, correct?"
19            Answer:  "Correct."
20            Do you see that?
21       A.   Yes.
22       Q.   And you disagree with Dr. Holste?
23       A.   No, 110 grams per square meter, that's
24   heavy.
25       Q.   That's a heavyweight?

Golkow Technologies, Inc. - 1.877.370.DEPS

Jaime Sepulveda, M.D.

| Page 118 | Page 120 |
|---|---|

**Page 118**

1  A.  That's the heaviest I've ever seen, by
2  the way.
3  Q.  Did you know that Prolene was 100 to 110
4  grams per meter squared?  Did you know that was the
5  weight of Prolene?
6  A.  No, that's old-construction Prolene.
7  Q.  That's old-construction Prolene.  Do you
8  know that's the same mesh that TVTs are made out of?
9  A.  No, I don't know that.
10  Q.  Okay, you don't believe that?
11  A.  I don't believe that.
12  Q.  Okay.  But you would agree that if the
13  mesh is 100 to 110 grams per meter squared, that's a
14  heavyweight mesh under anybody's definition, correct?
15  A.  That's the heaviest I've ever seen.
16  Q.  Okay.  And you think that's a different
17  mesh than what's used in TVT?
18  A.  Yes.
19  Q.  And you've never seen, that you recall,
20  this deposition testimony I just showed you, right?
21  MS. GALLAGHER:  Object to form.
22  A.  I, I read about his deposition, I read
23  his, may have read his deposition once.
24  BY MR. FREESE:
25  Q.  Which you said you relied on in your

**Page 120**

1  Q.  Now, do you know who Brigette Hellhammer
2  is?
3  A.  No.
4  Q.  Have you ever heard that name before?
5  A.  I don't recall that one.
6  (Plaintiff's Exhibit No. 14 was marked
7  for identification.)
8  BY MR. FREESE:
9  Q.  All right.  Let me show you what I've
10  marked as Exhibit 14 to your deposition, sir.
11  MS. GALLAGHER:  Did we skip 13?
12  MR. FREESE:  I did.  I'm going to come
13  back to 13.
14  BY MR. FREESE:
15  Q.  You see Dr. Hellhammer here?  Do you see
16  that, sir?
17  A.  Okay, yeah, I see her name here.
18  Brigette Hellhammer.
19  Q.  And you testified that Prolene was, was a
20  large-pore mesh, correct?
21  A.  Yes.
22  Q.  All right.  And you see that in
23  September, 2013, Dr. Hellhammer's deposition was taken,
24  just like we're here taking yours, and she's under
25  oath, and she was asked the question:  "And you agree

| Page 119 | Page 121 |
|---|---|

**Page 119**

1  reliance materials, correct?
2  A.  Right.
3  Q.  This is the guy who you said you relied
4  on, correct?
5  A.  No, this is the guy that you're showing
6  me a picture right now that you tell me that I have
7  relied on.
8  Q.  No, sir, I'm showing you your reliance
9  list.  Joerg Holste.  You see that?  Here's a nice
10  picture of Dr. Holste.  Deposition testimony of Dr.
11  Holste taken July 29th, 2013.  Do you see that?
12  A.  Yes.
13  Q.  Same guy, right?
14  A.  Yes.
15  Q.  Okay.
16  A.  I don't know if that's the same guy.
17  Q.  Well, if it's not, I'm sure Ms. Gallagher
18  is going to let me know very quickly, but if that's the
19  same guy, we can at least agree that you don't agree
20  with Dr. Holste saying that Prolene mesh is
21  heavyweight, but you agree that at 110 grams per meter
22  squared is heavyweight mesh?
23  MS. GALLAGHER:  Object to form.
24  A.  Yes, that's the heaviest I've ever seen.
25  BY MR. FREESE:

**Page 121**

1  that Prolene mesh that was used in TVT was small-pore
2  mesh, correct?"  And what was her answer, sir?
3  A.  She answered yes.
4  Q.  And do you recall ever seeing this
5  deposition question and answer before today?
6  A.  No.  No, I certainly do not recall this
7  one specifically.
8  Q.  Do you realize that she also appears on
9  your reliance list?
10  A.  Yes.
11  Q.  That you relied specifically on her
12  deposition that was taken on 9/11 and 9/12 of 2013.  Do
13  you see that?
14  A.  Oh, she's in the whole list of those
15  documents.  I did not, I do not rely for my opinion on
16  whatever she says.
17  Q.  I'm not asking you that, sir.  I'm asking
18  you, you put on your reliance list that you read and
19  relied on Dr. Hellhammer, and I've just shown you a
20  question and answer where she said Prolene mesh was a
21  small-pore mesh.  Do you see that?
22  MS. GALLAGHER:  Object to form.
23  A.  But I disagree with her.
24  BY MR. FREESE:
25  Q.  I understand that.  That was my next

31 (Pages 118 to 121)

Jaime Sepulveda, M.D.

| Page 122 | Page 124 |
|---|---|
| 1 question. You disagree with her, correct? | 1 A. Yes. |
| 2 A. Yes, I do. | 2 Q. That's heavyweight mesh, is it not? |
| 3 Q. Do you know who she is? | 3 A. That is a heavyweight, yes. |
| 4 A. No. | 4 Q. And you just described, you told me |
| 5 Q. Do you know what her background is? | 5 anything that would be 105 to 110 grams would be the |
| 6 A. No. | 6 heaviest mesh you can recall, correct? |
| 7 Q. Do you know whether or not you're more | 7 A. A hundred ten is the largest that I have |
| 8 familiar with the pore size of mesh than Dr. Hellhammer | 8 seen. |
| 9 is? | 9 Q. And if we look at Prolene mesh, that is |
| 10 A. I know what I know. I don't know what | 10 the mesh used in TVT, is it not? |
| 11 she knows. | 11 A. The Prolene mesh are used on TVT may be |
| 12 Q. Do you know she's a German employee of | 12 lower than that. |
| 13 Ethicon? | 13 Q. Well, do you have anything that says it |
| 14 A. No. | 14 is? |
| 15 Q. Did you know that Dr. Holste was a | 15 A. Yes, actually, yes, I think I have a |
| 16 materials expert for Ethicon in Germany? | 16 paper that actually says that. |
| 17 A. No, I don't, I don't know that. | 17 Q. Well, I'm showing you a paper that you |
| 18 Q. And you simply disagree with her | 18 relied on to put in your, your reliance list that says |
| 19 conclusion, is that correct? | 19 the weight of the Prolene mesh is 105 grams per meter |
| 20 A. Yes. | 20 squared. You have no reason to dispute that, do you? |
| 21 Q. All right. Now, let me show you what I'm | 21 A. Yeah, but this is a, this is a paper |
| 22 marking as Exhibit 13 to your deposition. | 22 about hernia. |
| 23 (Plaintiff's Exhibit No. 13 was marked | 23 Q. It's dealing with Prolene mesh, sir. You |
| 24 for identification.) | 24 understand that, do you not? |
| 25 BY MR. FREESE: | 25 A. Yeah, I do understand that. |

| Page 123 | Page 125 |
|---|---|
| 1 Q. I think we went backwards. But, you see | 1 Q. And it's reporting Prolene mesh at 105 |
| 2 this article, sir? | 2 grams per meter squared, correct? |
| 3 A. Yes. | 3 A. Yes, it is reporting that. |
| 4 Q. The argument for lightweight | 4 Q. And you said it's dealing with hernia, |
| 5 polypropylene mesh in hernia repair? | 5 but you cited it yourself in your own report, did you |
| 6 A. I see this article, yes. | 6 not? |
| 7 Q. By Dr. Cobb and Dr. Kercher and Dr. | 7 A. It's not specifically for this hernias. |
| 8 Heniford? | 8 I do not cite in this report for Jennifer Ramirez, I do |
| 9 A. Yes. | 9 not cite this specific report. |
| 10 Q. Have you seen this article before, sir? | 10 Q. Yes, you did. You don't think that you |
| 11 A. I may have seen it. I can not remember. | 11 cited this article in your report? |
| 12 Q. Did you realize it's on your reliance | 12 A. Yeah, I want to see exactly where, where |
| 13 list? | 13 is it. |
| 14 A. It's probably on my reliance list, yes. | 14 Q. I'm talking about in your reliance list. |
| 15 Q. Okay. And did you read it? | 15 A. Oh, okay, you're talking about reliance |
| 16 A. Yes, actually, I read that sometime ago, | 16 list, yes, it is in the reliance list. |
| 17 even before it was, it was a matter of litigation. | 17 Q. Okay, because you've given us a 100-page |
| 18 Q. Okay, turn to the second page. It says | 18 reliance list that says these are the materials that |
| 19 concept of lightweight mesh. Do you see that? | 19 Jaime Sepulveda has relied on in forming my opinions, |
| 20 A. Yes. | 20 correct? |
| 21 Q. And you see that there's a table of | 21 A. Yes, but -- |
| 22 polypropylene meshes with different densities? | 22 MS. GALLAGHER: Form. |
| 23 A. Yes. | 23 BY MR. FREESE: |
| 24 Q. And you see that Dr. Cobb has reported | 24 Q. And that includes this article, does it |
| 25 that Prolene mesh is 105 grams per meter squared? | 25 not? |

32 (Pages 122 to 125)

Jaime Sepulveda, M.D.

| Page 126 | Page 128 |
|---|---|

**Page 126**

1     A.   Yes, but the definition of relied doesn't
2  mean that I'm using it for my, for my, to, to
3  substantiate my, my opinion.  I, I do read papers that
4  I exclude as I, as I'm reading them.
5     Q.   You didn't exclude this paper from your
6  reliance list, did you?  You included it.
7     A.   Yes, it's included in there, but it's not
8  in my report.
9     Q.   And, in fact, Prolene mesh is even
10  heavier than Marlex, is it not?
11     A.   Yes, it shows that.
12     Q.   And you know what Marlex is, do you not?
13     A.   I know Marlex, yes.
14     Q.   It's polypropylene also, is it not?
15     A.   Yes, but it's not a multifilament.
16     Q.   You think Marlex is a multifilament?
17     A.   Yes, it's just a multifilament.
18     Q.   Okay, and what product is Marlex used in?
19     A.   The pore size is a lot smaller because
20  it's a multifilament.
21     Q.   Okay, where did you get that from?
22     A.   From what I have read.
23     Q.   Okay, can you cite me any --
24     A.   That's Mersilene.
25     Q.   You think Marlex is Mersilene?

**Page 128**

1     Q.   And that is about one-quarter the weight
2  of Prolene, is that correct?
3     A.   That's about a quarter, yes, according to
4  this table, yes.
5     Q.   Now, Doctor, would you look at, down at
6  the first column on the concept of lightweight mesh,
7  you see it there?
8     A.   Yes.
9     Q.   See where it says Marlex?
10     A.   Yes.
11     Q.   Marlex, paren, C.R. Bard.  Do you know
12  who C.R. Bard is?
13     A.   That's a company, yes.
14     Q.   That makes slings, correct?
15     A.   They, they do make slings.
16     Q.   It says Marlex is a standard monofilament
17  heavyweight polypropylene mesh.  Do you see that?
18     A.   Is a monofilament, yes.
19     Q.   So, you want to retract your last answer
20  about Marlex?
21     A.   No, because it's a, with the pore size
22  that it has, it's a, that's a multifilament.
23     Q.   Well, according to the Cobb article, it's
24  a standard monofilament.  Do you disagree, then, that
25  Marlex is a standard monofilament heavyweight

| Page 127 | Page 129 |
|---|---|

**Page 127**

1     A.   Yes.
2     Q.   Okay.  Marlex is polypropylene, Dr.
3  Sepulveda.
4     A.   Yes, so, it's a Mersilene.
5     Q.   And you think that, that Marlex is a
6  multifilament?
7     A.   Yes.
8     Q.   And what is your support for that?
9     A.   That I have read about Marlex before.
10     Q.   Okay.  Do you know that it's used in, in
11  Boston Scientific and AMS slings?
12     A.   I never used a Boston Scientific.
13     Q.   You've used AMS slings before, have you
14  not?
15     A.   I used AMS slings, but they were not made
16  of Marlex.
17     Q.   Okay.  Who do you think makes the
18  polypropylene for AMS and Bard and Boston Scientific
19  slings?
20     A.   I don't know.
21     Q.   You don't think it's Marlex, though?
22     A.   No, it's not Marlex.
23     Q.   And you see where it says the weight of
24  Ultrapro is 28 grams per meter squared?
25     A.   Yes.

**Page 129**

1  polypropylene mesh?
2     A.   Yes, the pore size in Marlex is a small,
3  is a small size and it behaves like a multifilament.
4  The weave, the weave -- I'm sorry, the knit is a
5  multifilament.
6     Q.   This article says it's a monofilament,
7  not a multifilament.  Do you see that?
8     A.   That's what this article says.
9     Q.   And you disagree with the Cobb article on
10  that?
11     A.   Yes, the fibers are too close.
12     Q.   It goes on to say that it contains 95
13  grams per meter squared of polypropylene, is porous but
14  has very small inter -- I always have a hard time
15  pronouncing that.
16     A.   Interstices.
17     Q.   Would you tell us what that is, please?
18     A.   It's the space in between the fibers.
19     Q.   It says it's extremely strong.  It says
20  several comparable formulations of heavyweight
21  polypropylene are available with a similar
22  polypropylene content as Marlex, including Prolene,
23  Ethicon, Inc., Somerville, New Jersey.  Do you see
24  that?
25     A.   Yes, that's what it says, yes.

33 (Pages 126 to 129)

Jaime Sepulveda, M.D.

| Page 130 | Page 132 |
|---|---|

**Page 130**

1  Q.  That's saying that, that from a weight
2  standpoint, that Prolene and Marlex are both
3  monofilament heavyweight meshes, correct?
4  A.  Marlex is lighter, but the configuration
5  of Marlex makes it as a multifilature.
6  Q.  That's not my question.  According to Dr.
7  Cobb, both Prolene and Marlex are heavyweight
8  polypropylene meshes, correct?
9  A.  According to, to Dr. Cobb, it's, it's
10  porous but has very small interstices, which is what
11  I've been referring to.
12  Q.  And it says several comparable
13  formulations of heavyweight polypropylene are available
14  with similar polypropylene content as Marlex, including
15  Prolene, correct?
16  A.  Yes, including Prolene.
17  Q.  Do you agree or disagree with that
18  statement?
19  A.  Well, it says that there are several,
20  several heavyweights.  That's what he is explaining.
21  Q.  He says Marlex and Prolene are both
22  heavyweight polypropylene mesh.
23  A.  That's what he says, that it's
24  heavyweight, yes.
25  Q.  And you disagree with that?

**Page 131**

1  A.  Yeah, the, the mesh in use of slings is
2  not a heavyweight mesh.
3  Q.  Well, if it's 105 grams per meter
4  squared, you would agree that it's heavyweight, right?
5  A.  Yes, that's heavy.
6  Q.  All right, and if I proved to you at
7  trial that Prolene mesh used in TVT and TVTO and TVT
8  Abbrevo and TVT Secur is 105 grams per meter squared,
9  we would all agree then that that's heavyweight mesh?
10  A.  At 105 or 110, what I have shown you, you
11  have shown me, I will have no other choice but to agree
12  with you.
13  Q.  Thank you, sir.  Dr. Sepulveda, if you
14  would look at page 18 of your report.  You see where,
15  in the first full paragraph, you say, when placed per
16  the IFU, the risk of deformation of the tape is
17  reduced?
18  A.  When placed per the IFU, the risk of
19  deformation of the tape is reduced.
20  Q.  You see that?
21  A.  Yes.
22  Q.  And my only question is, is reduced
23  compared to what?
24  A.  It's to, to the deformation that you
25  would have if you put it without plastic sheaths.

**Page 132**

1  Q.  Okay, you're saying the use of the
2  plastic sheath reduces the deformation of the mesh when
3  it's being implanted?
4  A.  Yes, and the, when the IFU explains that
5  there is, not to put it too tight, that's how you
6  prevent deformation.
7  Q.  Deformation of the, of the mesh is an
8  unwanted result, is it not?
9  A.  No, when I talk about deformation, I'm
10  talking about biomechanical deformation.  Deformation
11  in biomechanics is different from deformation that we
12  see normally, and deformation has to do with the change
13  on the dimensions of the tape.
14  Q.  I'm not, I'm not quibbling with you about
15  that, but we can agree that deformation generally is an
16  unwanted result of the mesh, either mechanically or in
17  vivo, or any process you don't want the mesh to deform,
18  correct?
19  A.  Well, in any viscoelastic that is used
20  will have a degree of deformation, which is that it
21  changes in shape.  Any, any viscoelastic, any
22  viscoelastic substance will go through deformation,
23  your skin, your ligaments, and any implant that you may
24  place.
25  Q.  Look at page 19, sir.  The last

**Page 133**

1  paragraph, where it starts with complications.
2  A.  Yes.
3  Q.  You see where it says the transobturator
4  approach showed a higher frequency of early
5  postoperative pain as the insertion needle went through
6  the superficial muscles of the leg?  Do you see that?
7  A.  Yes.
8  Q.  What are you defining as superficial
9  muscles of the leg?
10  A.  Specifically, the adductor magnus.
11  Q.  The adductor magnus muscles?
12  A.  Yes.
13  Q.  Okay.  And you go on, this complication
14  is most often transient and managed with medication.
15  What does it mean, most often transient?
16  A.  It's of short duration.
17  Q.  Okay.  So, more than half the time it's
18  of short duration?
19  A.  Yes.
20  Q.  All right, and it could also be a
21  long-term pain and a long-term complication, can it
22  not?
23  A.  I think that was defined as something
24  that is extremely rare.
25  Q.  And how do you define extremely rare?

34 (Pages 130 to 133)

Jaime Sepulveda, M.D.

Page 134

1    A.   It's when, when you look at the, at the
2 leg pain in the cohorts that are five years and seven
3 years, there's, there's a very low rate of long-term
4 pain.  Actually, it's not, it's not described in many
5 of these papers, it's not described.
6    Q.   Look on page 20.  You see the paragraph
7 that begins it became evident that specialized
8 knowledge of the obturator site and the anatomy and
9 relationship of the vascular, muscular and nerve
10 studies were required for a reproducible and safe
11 obturator procedure, do you see that?
12    A.   Yes.
13    Q.   Where is that in the IFU?  Where does it
14 say that, that you need special knowledge of the
15 anatomy in order to safely implant an obturator device?
16    A.   It's part, knowing the anatomy is part of
17 what is required from a physician as stated on the IFU.
18 It's physicians that are familiarized with continence
19 procedures.
20    Q.   But you're saying specialized knowledge
21 over and above the average physician is necessary?
22    A.   No, specialized knowledge is knowing
23 exactly about the obturator space.
24    Q.   But specialized knowledge compared to
25 who?

Page 135

1    A.   Compared to what you do normally.  I'm
2 going to explain that.
3    Q.   What I want to know is, are you talking
4 about special knowledge within a subgroup of doctors,
5 or simply you have to have more anatomical knowledge
6 than, say, a court reporter or a lawyer?
7    A.   No, you, you need, even if do you
8 continence procedures, you're going to, you're needing
9 to know the anatomy of the obturator space.
10    Q.   Is it anywhere in the IFU that you have
11 to have specialized knowledge of the anatomy in order
12 to safely reproduce an obturator procedure?
13    A.   It just says that physicians should be
14 trained on the procedure.
15    Q.   Okay.  And it says that the, the, the
16 obturator neurovascular bundle 1.2 to 1.5 centimeters
17 for TVTO, that's the distance between where a
18 properly-placed TVTO should go in the obturator nerves?
19    A.   That's what has been, has been measured.
20    Q.   Okay.  So, in other words, if a TVTO is
21 properly placed, it should be 1.2 to 1.5 centimeters
22 from the obturator nerve bundle?
23    A.   Yes, there's a safe area for placement of
24 a transobturator sling that is about 2.5 centimeters,
25 1.5 to 2.5 centimeters from the obturator neurovascular

Page 136

1 bundle.
2    Q.   How far is a properly-placed TVTO from a
3 pudendal nerve bundle?
4    A.   It's at least four centimeters.
5    Q.   You go on to say, on the next page, the
6 proximity to the obturator neurovascular bundle was
7 most frequently a failure to orient the device from 45
8 degrees to 90 degrees as specified by the IFU.
9    A.   Yeah, there are three, three factors that
10 have been validated as the variations in the placement
11 of a transobturator sling from the inside out.  The
12 first factor is the dorsal lithotomy position, which is
13 addressed by the IFU.  The second factor is the
14 insertion, or the depth of the insertion of the needle
15 in the periurethral space, and the, the third factor is
16 a full rotation of the wrist with rotation from 45 to
17 90 degrees when the needle is exteriorized.  These
18 three factors determine how close the tape is going to,
19 is going to be in relation to the neurovascular bundle.
20    Q.   All right, and if it's not done that way,
21 then you can get an obturator nerve injury?
22    A.   Yes, if you, if you actually dissect a
23 cadaver and you insert it wrong to see where you get
24 out, you can, you can get there.
25    Q.   You say you can get there, you can get

Page 137

1 there and you can damage or injure an obturator nerve?
2    A.   You can, you can injure an obturator
3 nerve as has been shown in some, some reports.
4    Q.   Now, Doctor, you discussed --
5    A.   And when I say as it has been shown in
6 some reports is that anatomically, it has been
7 described that when you don't insert the device
8 properly, you can injure the neurovascular bundle.
9    Q.   All right.  Have you ever seen a report
10 of an obturator nerve injury from the explant of a TVT?
11    A.   No.
12    Q.   As you sit here today, there's no
13 literature that we can find that, that you've seen
14 that's been reported where any patient has suffered an
15 obturator nerve injury from the revision or removal of
16 a mesh sling?
17    A.   No, I have not seen an obturator nerve
18 injury from the removal of a, a sling.
19    Q.   And what about the pudendal nerve injury,
20 have you ever seen a report of a patient getting a
21 pudendal nerve injury from the removal or revision of a
22 sling?
23    A.   I have not seen that, that report.
24    Q.   Ever?
25    A.   It has not been published.

35 (Pages 134 to 137)

Jaime Sepulveda, M.D.

| Page 138 | Page 140 |
|---|---|

**Page 138**

1    Q.   Have you in your practice come across
2  that?
3    A.   No, I have not seen that in my practice.
4    Q.   You say in 2013 that the -- well, strike
5  that.
6        You document 2008, 2011, 2013 FDA Public
7  Health Notifications regarding synthetic mesh?
8    A.   Well, for this one it's the 2008 because
9  the sling wasn't implanted in 2010 in this case.
10    Q.   Right.  So, the only, the only FDA notice
11  that Dr. Reyes could have been aware of is the 2008,
12  correct?
13    A.   That is correct.
14    Q.   Because the 2011, 2013, hadn't even come
15  out yet?
16    A.   That's correct.
17    Q.   All right.  Doctor, you say on page 22 of
18  your report that the TVTO device is accompanied by an
19  IFU and that you have reviewed the TVTO IFU.  Correct?
20    A.   Please repeat that.
21    Q.   Yeah, I was reading that you have
22  reviewed the TVTO IFU and you find it adequate and
23  complete for its use in the operating room?
24    A.   Yes, I did.
25    Q.   And you said I understand that the IFU is

**Page 139**

1  not a comprehensive guide for surgical treatment of
2  SUI.  Do you see that?
3    A.   Yes, that's the way it's stated.
4    Q.   Do you agree that a doctor implanting a
5  TVTO should be allowed to rely solely upon the IFU to
6  ascertain what complications if any may result from the
7  use of that device in counseling his patient?
8    A.   I think that the IFU needs to speak about
9  the specifics of the implant, but the continence
10  procedure, the risk of the continence procedure
11  pertains to the formation and the training of the
12  doctor.
13    Q.   Well, that's not my question.  My
14  question is, do you agree that a doctor should be able
15  to rely solely on the IFU and nothing else in educating
16  himself about the complications that could result from
17  the use of a device?
18    A.   No.
19    Q.   Is that reasonable or not?
20    A.   No, they should not rely just on the IFU.
21  There's a wealth of data out there about the
22  indications and the use of the device.
23    Q.   Do you agree with me that in order for
24  Ethicon to do its best to make sure that a patient is
25  appropriately counseled, that Ethicon needs to provide

**Page 140**

1  the known risks and adverse events in the IFU so that
2  information will be available to the doctor to pass on
3  to patient, do you agree with that?
4    A.   I expect Ethicon to state the risks
5  inherently associated to the mesh.
6    Q.   And do you agree with me that if Ethicon
7  fails to provide the necessary information regarding
8  the risks and adverse events and complications to the
9  doctor, there's a risk at that point that the patient
10  cannot be properly counseled because the information
11  has not been provided to the doctor, do you agree with
12  that statement?
13    A.   The IFU is intended to educate the
14  physician on the performance of the procedure.  Part of
15  it is going to be the complications from the device
16  that remains on the patient.
17    Q.   Listen to my question.  Do you agree with
18  me that if Ethicon fails to provide the necessary
19  information regarding the risks and adverse events and
20  complications to the doctor, there's a risk at that
21  point that the patient cannot be properly counseled?
22        MS. GALLAGHER:  Object to form.
23  BY MR. FREESE:
24    Q.   Do you agree with that statement or not?
25    A.   We don't, we don't use the IFU for

**Page 141**

1  patient counseling.
2    Q.   Well --
3    A.   So I disagree, I disagree with the
4  statement that if it's not placed on the IFU, I expect
5  the IFU to address the complications that have to do
6  with the tape, it should give me direction on how to
7  use the device, but I, I don't expect them to give me
8  the benchmark for patient education.
9    Q.   And, Doctor, that question didn't involve
10  the IFU.
11    A.   Okay.
12    Q.   So, you have to listen to my question.
13  I'm just asking you if you agree with this statement,
14  that if Ethicon fails to provide the necessary
15  information regarding the risks and adverse events of
16  complications to a doctor, there's a risk at that point
17  that the patient cannot be properly counseled because
18  the information has not been provided to the doctor.
19  Do you agree with that?
20        MS. GALLAGHER:  Object to form.
21    A.   No, I disagrees with that because the
22  only source of information for a physician before they
23  counsel a patient is not Ethicon.
24  BY MR. FREESE:
25    Q.   And do you agree or disagree that if

36 (Pages 138 to 141)

Jaime Sepulveda, M.D.

Page 142

1  Ethicon fails, if it happens that Ethicon fails to
2  provide material information about the risks of, for
3  example, a TVT or any medical device, to the physician,
4  if it actually happens and the doctor just relies on
5  the IFU regarding the risks and doesn't tell a patient
6  a risk that the doctor wasn't told about, the patient
7  would not have been properly counseled?
8      MS. GALLAGHER:  Object to form.
9  BY MR. FREESE:
10     Q.  Do you agree or disagree with that?
11     A.  I agree that if the doctor relies just on
12  the IFU, they will not be able to provide enough
13  counseling to the patient.
14     Q.  Do you know Dr. Hinoul?
15     A.  Yes.
16     Q.  He's a medical affairs director at
17  Ethicon, is he not?
18     A.  Yes.
19     Q.  He's a urogynecologist, is he not?
20     A.  He is.
21     Q.  He's trained the same way you're trained,
22  correct?
23     A.  I don't know if it was the same way, but
24  I know he's a urogynecologist.
25     Q.  And his job is to make sure that, from a

Page 143

1  medical standpoint, that doctors are getting properly
2  warned of the risks of using TVT, correct?
3      MS. GALLAGHER:  Object to form.
4      A.  I'm not aware of his job description.
5  BY MR. FREESE:
6      Q.  When is the last time you talked to him?
7      A.  At an AUGS meeting.
8      Q.  Okay.  You actually reviewed and logged
9  his deposition in this case, did you not?
10     A.  Yes, I did see one of his depositions.
11     Q.  I want to show you page 2007 and 2008 of
12  his deposition that was given January 14th, 2014, okay?
13  And you see where it says, quote, "In order for Ethicon
14  to do its best to make sure that a patient is
15  appropriately counseled, Ethicon needs to provide the
16  known risks and adverse events in the IFU so that
17  information will be available to the doctor to pass on
18  to the patient.  Right?"  And he says, "Absolutely."
19  Do you see that?
20     A.  Yes.
21     Q.  Do you agree with his answer?
22     A.  If Ethicon is the only source, but I
23  think in the context in which he was asked, from what I
24  see from that answer, absolutely, is, is Ethicon going
25  to provide that information, and he's testifying as a

Page 144

1  medical director for Ethicon.
2      Q.  Yes.
3      A.  So, so, the question is, is that the only
4  thing the doctor relies on, do I agree to that?
5      Q.  No, I'm asking do you agree with Dr.
6  Hinoul's answer, absolutely, to the question that was
7  just asked; do you agree with his answer?
8      A.  Yeah.  In order for Ethicon to do its
9  best to make sure that a patient is properly counseled,
10  Ethicon needs to provide the known risks and events in
11  the IFU so that information will be available to a
12  doctor to pass on to the patient.  Yes, that's --
13     Q.  You agree with that?
14     A.  If they're aware, if they're aware of any
15  complications, that will be, that's, Ethicon will have
16  to transmit it for the doctor to be aware.
17     Q.  If Ethicon is aware of a complication,
18  they have to transmit it to the doctor?
19         MS. GALLAGHER:  Object to form.
20     A.  I would agree that that's the only way
21  that the doctor could know.
22  BY MR. FREESE:
23     Q.  All right.  Okay.  And, he goes on to
24  say, "And, therefore, if Ethicon fails to provide the
25  necessary information regarding risks and adverse

Page 145

1  events and complications to the doctor, there's a risk
2  at that point that the patient cannot be properly
3  counseled because the information has not been provided
4  to the doctor, correct?"  And Dr. Hinoul's answer is,
5  "That is correct."  Do you see that?
6      A.  Yes, but I disagree with him because I
7  don't --
8      Q.  So, let me, first of all, did I read the
9  question and answer correctly?
10     A.  Yes, sir.
11     Q.  Do you agree with Dr. Hinoul?
12     A.  No, I don't agree that Ethicon is the
13  only source.  In his answer, he's saying that, I mean,
14  there's this long, long question, and then he says he
15  agrees.  The substance of it is Ethicon is not the only
16  source that I'm going to consider counseling my
17  patients.
18     Q.  It doesn't say only source.  It says if
19  Ethicon fails to provide the necessary information
20  regarding risks and adverse events and complications.
21  to the doctor, there's a risk at that point that the
22  patient cannot be properly counseled because the
23  information has not been provided to the doctor,
24  correct?  And Dr. Hinoul says that is correct, and you
25  disagree with that?

Jaime Sepulveda, M.D.

<table>
<tr><td>

Page 146

1    A.  Okay, the specific question there on what
2  can be inferred from the question, so I'm going to
3  answer to you the best, the best way I can answer is,
4  if Ethicon does not disclose it, if there's no
5  disclosure, there's no way for the physician to know it
6  unless it has to do with the procedure itself.  Now, we
7  don't rely just on the IFU and we don't just rely on
8  Ethicon to tell us about the, the procedure.
9    Q.  I'm going to get there, Doctor.  I just
10  want to know whether or not you agree or disagree with
11  what Dr. Hinoul just said there.
12      MS. GALLAGHER:  Objection to form.  He's
13  explaining to you why he can't say agree or
14  disagree.
15      MR. FREESE:  Well, I'm not sure he is --
16      MR. GOSS:  I think the form is fine.
17      MR. FREESE:  Just form, that's all we
18  need.
19  BY MR. FREESE:
20    Q.  Do you understand my question, Dr.
21  Sepulveda?  I read you the question on lines 1 through
22  7 of page 1208 and the answer on line 8.  All I want to
23  know is, do you agree with Dr. Hinoul or do you
24  disagree with Dr. Hinoul?
25      MS. GALLAGHER:  Objection to form.

</td><td>

Page 148

1    A.  I would disagree on that, no.
2    Q.  Even though Dr. Hinoul says absolutely, a
3  doctor should be able to rely solely on the IFU, you
4  disagree with Dr. Hinoul?
5      MS. GALLAGHER:  Object to form.
6  BY MR. FREESE:
7    Q.  Correct?
8    A.  Yes, I don't think you're going to find
9  any physician that would agree with just relying solely
10  on the IFU.
11    Q.  Let me ask you this, Dr. Sepulveda.  Who
12  knows more about the complications of Ethicon's
13  products, you or the medical affairs doctor at Ethicon?
14      MS. GALLAGHER:  Object to form.
15    A.  I think I'm in a privileged position to
16  know what kind of complications patients have when you
17  follow the IFU.
18  BY MR. FREESE:
19    Q.  I'm asking you, who knows more about the
20  complications related to TVTs, Dr. Hinoul or you?
21      MS. GALLAGHER:  Object to form.
22    A.  I do.
23  BY MR. FREESE:
24    Q.  Okay.  So the jury should conclude that
25  Jaime Sepulveda knows more than the urogynecologist

</td></tr>
<tr><td>

Page 147

1    A.  I will have to disagree with that with
2  Dr. Hinoul, because it implies that the only source
3  that you have is Ethicon, and that's not the only
4  source that I have.
5  BY MR. FREESE:
6    Q.  And you understand he was speaking on
7  behalf of Ethicon in his deposition?
8      MS. GALLAGHER:  Objection to form.
9    A.  Yes, he's the medical director for
10  Ethicon.
11  BY MR. FREESE:
12    Q.  And the next question, "And, in fact, if
13  Ethicon fails, if it happens that Ethicon fails to
14  provide material information about the risks, for
15  example, of the TVT or any medical device, to the
16  physician, if that actually happens and the doctor just
17  relies on the IFU regarding the risks and doesn't tell
18  the patient the risks that the doctor wasn't told
19  about, the patient would not have been properly
20  counseled, correct?"  His answer is, "I am in full
21  agreement, the surgeon should be able to rely solely on
22  the IFU, absolutely."  Do you see that?
23    A.  For the patient counseling, solely on the
24  IFU?
25    Q.  Yes, sir.

</td><td>

Page 149

1  hired by Ethicon to be its worldwide medical affairs
2  doctor, you know more than he does?
3      MS. GALLAGHER:  Object to form.
4    A.  Yes, I have implanted more TVTs than he
5  has.
6  BY MR. FREESE:
7    Q.  Who has seen more internal documents
8  about the complications of the use of TVT, you or Dr.
9  Hinoul?
10    A.  Dr. Hinoul sees more internal documents.
11    Q.  It's not your job to write the IFUs for
12  TVT, is it, or TVTO?
13    A.  No, it's not, I don't write the IFUs.
14    Q.  You understand that all of the warnings
15  and complications that appear in a TVTO IFU are written
16  by the medical affairs people at Ethicon, correct?
17      MS. GALLAGHER:  Object to form.
18    A.  That's what I would expect to write it,
19  yes.
20  BY MR. FREESE:
21    Q.  People like Dr. Hinoul?
22    A.  Yes.
23    Q.  He's the one in charge of making sure
24  it's accurate and full and gives the doctors all the
25  information they need regarding complications of the

</td></tr>
</table>

38 (Pages 146 to 149)

Jaime Sepulveda, M.D.

| Page 150 | Page 152 |
|---|---|

**Page 150**

1  procedure, correct?
2        MS. GALLAGHER: Object to form.
3        A.  He writes the IFU.
4  BY MR. FREESE:
5        Q.  And that's his job 24/7, correct?
6        MS. GALLAGHER: Object to form.
7        A.  I don't know if it's 24/7.  He writes the
8  IFU.
9  BY MR. FREESE:
10       Q.  But that's his job, that's what a medical
11 affairs director does, correct?
12       A.  I'm not familiar with their duties, but I
13 think that he has an input on the IFU.
14       Q.  And yet, you would substitute your
15 judgment for his on what a doctor should rely or not
16 rely on out of the IFU?
17       A.  No, I did not testify on that.  I said --
18       Q.  I'm asking you, is it your opinion
19 that --
20       MS. GALLAGHER: Don't cut him off,
21 please.
22 BY MR. FREESE:
23       Q.  Sorry.  Go ahead.
24       A.  What I testified is that I have placed
25 more TVTOs, I've done more follow up on these patients

**Page 152**

1        A.  I can tell you that any of my 2,000
2  patients have called him and say, Piet Hinoul, I'm
3  doing great.
4        Q.  Let's do this, Doctor, can you we agree
5  you don't know what, you have no personal knowledge of
6  what Dr. Hinoul knows or he doesn't know?
7        MS. GALLAGHER: Object to form.
8        A.  No, I already testified, I'm not aware of
9  his job description.
10 BY MR. FREESE:
11       Q.  And you have no idea what he knows or
12 what he doesn't know, do you?
13       A.  Actually, I --
14       Q.  My question is, what personal knowledge
15 do you have of what Piet Hinoul knows or doesn't know
16 about complications of TVT slings?
17       A.  I do not know.  I just, I do not know
18 that.  I just --
19       Q.  And how many --
20       MS. GALLAGHER: Please, let him finish
21 his answer.
22       MR. FREESE: Because he's now off, not
23 responding to my question anymore.  He's
24 answered my question, now he editorializing.
25 So, I mean, as long as I can charge the time

| Page 151 | Page 153 |
|---|---|

**Page 151**

1  than he has.  I use the product, I would know about any
2  problems it would have.  I would not have continued to
3  use the polypropylene mesh for midurethral slings to
4  this day if I would have seen or I would have had any
5  problems.
6        MR. FREESE: Move to strike.
7  BY MR. FREESE:
8        Q.  That's not my question, sir.  My question
9  is simply, Doctor, you would substitute your judgment
10 on what an implanting physician should rely on in the
11 IFU over Dr. Hinoul's judgment about what a doctor
12 should rely on or can rely on from the IFU, correct?
13       MS. GALLAGHER: Object to form.
14       A.  No, Dr. Hinoul does the, he writes the
15 IFU.  Dr. Hinoul is in a, in a position to see skewed
16 data of how the procedure performs, because I can tell
17 you that Dr. Hinoul do not get a phone call or a report
18 of how many patients have done better and how many
19 patients have been improved in their quality of life.
20 He gets --
21 BY MR. FREESE:
22       Q.  How do you know that?
23       A.  He gets a report about complications.
24       Q.  How do you know that?  How do you know
25 what he gets?

**Page 153**

1  back to you, I don't mind, but he can't sit
2  here and read out of a telephone book, either.
3  So, if it's not responsive to my question,
4  we're wasting time.  He's answered my question.
5  If you want to ask him a question on redirect,
6  that's fine.
7  BY MR. FREESE:
8        Q.  My question to you is you have no clue
9  how many slings Dr. Hinoul has implanted, do you?
10       A.  Yeah, actually, I asked him.
11       Q.  And what was his answer?
12       A.  I, I, I probably remember that it was
13 none here in the United States.
14       Q.  I didn't ask you that.  How many slings
15 has Dr. Hinoul implanted in his life?
16       A.  I think in my conversation with him at
17 some point, I asked him if he could, if he could just
18 come to clinical practice on this, on on, on the
19 United States, and he told me no, that he is a medical
20 director.
21       Q.  Dr. Sepulveda, I have no idea what you
22 just said.  My question is just simply --
23       A.  I agree that I ramble.  I agree with you
24 on that.
25       Q.  Sir, I have a great deal of respect for

39 (Pages 150 to 153)

Jaime Sepulveda, M.D.

Page 154

1    you, let's try not to ramble. My question is simply,
2    do you know how many slings Dr. Hinoul has ever
3    implanted in his life?
4         A.   No, Mr. Freese, I don't know how many
5    slings he has implanted.
6         Q.   And do you know how many slings he has
7    taken out in his life?
8         A.   No.
9         Q.   Do you know how many peer-reviewed
10   articles he's written about slings?
11        A.   No, I'm only familiar with his articles
12   on the anatomy of TVTO.
13        Q.   You know he's written at length on TVT,
14   correct?
15        A.   He, for this case, I actually relied on
16   one specific article that he wrote about the anatomy.
17        Q.   My question is you understand that Dr.
18   Hinoul is published in peer-review articles, correct,
19   on TVTs?
20        A.   Yes.
21        Q.   You, sir, have published zero peer-review
22   articles on TVT slings, correct?
23        A.   Yes.
24        Q.   Okay. And you've done 2 to 3,000 sling
25   procedures, correct?

Page 155

1         A.   Yes.
2         Q.   And you've only seen two or three
3    complications in your entire 2 to 3,000?
4         A.   Yes.
5         Q.   Do you know how many complications Dr.
6    Hinoul has seen?
7         A.   In his line of work, probably has seen
8    more than three.
9         Q.   And, so, you've seen three out of 3,000,
10   you have no idea how many he's seen, yet you feel
11   comfortable saying you know more about complications
12   from slings and what doctors need to know than he does?
13        A.   No, I say I know more about outcomes. I
14   could say, I could say that I know more about outcomes.
15        Q.   You know about three complications out of
16   3,000, he may know way more than that. Yet you want to
17   say that your information is superior to his?
18             MS. GALLAGHER: Object to form.
19   BY MR. FREESE:
20        Q.   I mean, you realize Dr. Hinoul is
21   responsible --
22        A.   I still have to answer your question.
23        Q.   I'm sorry. Go ahead.
24        A.   My, my information, my information is on
25   the, on the, on my clinical experience and my

Page 156

1    information is based on my, on dissection of multiple
2    specimens, on the communications that I've had with my
3    peers, and on the, on the, on what's published,
4    although it is true that I have not published on TVT, I
5    am in the forefront of providing patient care, so I
6    know how this product performs.
7              MR. FREESE: Move to strike,
8              non-responsive.
9    BY MR. FREESE:
10        Q.   Doctor, you have no personal knowledge of
11   how many doctors just like you that Dr. Hinoul talks to
12   every day in his job?
13        A.   I don't know who he talks to in his job.
14        Q.   He talks to you, right?
15        A.   No, we, we don't talk as part of his job.
16   We, the last time we spoke we were sitting on a meeting
17   enjoying the presentations of the scientific meeting.
18        Q.   So, you were not talking about business
19   with Ethicon with Dr. Hinoul?
20        A.   No, I don't, I don't talk about those
21   things. We have, we have other subjects that we speak
22   about.
23        Q.   You understand Dr. Hinoul has access to
24   all the internal information available at Ethicon,
25   correct?

Page 157

1         A.   Yes.
2         Q.   You do not, do you?
3         A.   I do not.
4         Q.   In fact, all you have available to you,
5    Dr. Sepulveda, is what the lawyers for Ethicon want to
6    show you, correct?
7              MS. GALLAGHER: Object to form.
8         A.   In terms of the company documents, yes.
9    BY MR. FREESE:
10        Q.   Okay. So, the company documents, let's
11   define that, company documents about complications and
12   the frequency of complications, those type of documents
13   within Ethicon you don't have access to, do you?
14        A.   No, I do not have access to that.
15        Q.   Dr. Hinoul does, does he not?
16        A.   I think he does.
17        Q.   He has to. He's the medical affairs
18   director.
19        A.   He's the medical director for Ethicon.
20        Q.   Real quick, Dr. Sepulveda, you've never
21   measured the pore size of the TVT sling, have you?
22        A.   Yes.
23        Q.   Yes, you have never measured it?
24        A.   Yes, I have measured it.
25        Q.   Okay, when did you measure it?

40 (Pages 154 to 157)

Jaime Sepulveda, M.D.

| Page 158 | Page 160 |
|---|---|
| 1  A.  I put it together actually under the | 1  Q.  Let me stop you and do it one at a time, |
| 2  microscope at the pathology at South Miami Hospital, | 2  okay?  What is your basis for saying biomechanically |
| 3  and I look at it and I measure it and then I confirmed | 3  they will not operate the same? |
| 4  what it was.  Not only that, the pore size, but also | 4  A.  Well, they're two different types of |
| 5  the pore sizes with, with Prolift Plus M. | 5  material. |
| 6  Q.  The Ultrapro? | 6  Q.  Let me ask a better question.  Have you |
| 7  A.  Prolift Plus M. | 7  seen any internal documents from Ethicon saying that |
| 8  Q.  Ultrapro? | 8  they will act differently biomechanically? |
| 9  A.  It could be Ultrapro, but I did not take | 9  A.  No, I have not seen any internal |
| 10  it as Ultrapro. | 10  documents.  I have not read any internal documents. |
| 11  Q.  Okay.  What was the largest dimension of | 11  Q.  If there are internal documents that say |
| 12  the pore? | 12  they would behave similarly biomechanically, would you |
| 13  A.  On which one? | 13  have liked to have seen these documents? |
| 14  Q.  On Prolene. | 14  A.  Either similarly or separate, but that's |
| 15  A.  On the Prolene used for TVT was 1,200. | 15  just the first part of my answer. |
| 16  Q.  Okay.  And what was -- but that's not | 16  Q.  I understand.  We're taking them one at a |
| 17  symmetrical, is it? | 17  time.  So you've seen no document that says it would, |
| 18  A.  No, because of the knit, because of the | 18  that an Ultrapro TVTO sling would operate differently |
| 19  way it's knitted, it could be 1,200, but it's never | 19  than one made for a POP, correct? |
| 20  less than a thousand on each side. | 20  A.  They're two different, those are two |
| 21  Q.  It's never less than a thousand and at | 21  different applications. |
| 22  its greater point it's 1,200? | 22  Q.  Okay, and you've never seen a single |
| 23  A.  Yes. | 23  internal document making that comparison, correct? |
| 24  Q.  1,200 microns? | 24  A.  No, I have not seen that comparison. |
| 25  A.  Microns. | 25  Q.  And whether or not Ethicon concluded |

| Page 159 | Page 161 |
|---|---|
| 1  Q.  And what did you use to measure the | 1  internally that it would be suitable to use Ultrapro in |
| 2  microns? | 2  a TVTO application? |
| 3  A.  There's a little caliber on the | 3  MS. GALLAGHER:  Object to form. |
| 4  microscope. | 4  A.  I have not seen, I have not that on |
| 5  Q.  When did you do this? | 5  internal documents from Ethicon. |
| 6  A.  Years so. | 6  BY MR. FREESE: |
| 7  Q.  Okay.  It's not in your report anywhere. | 7  Q.  So your opinion is, I'm Dr. Sepulveda and |
| 8  A.  No. | 8  because they're two different applications my opinion |
| 9  Q.  Okay, why didn't you put it in the | 9  is they would behave differently? |
| 10  report? | 10  MS. GALLAGHER:  Object to form. |
| 11  A.  I didn't think it was relevant because | 11  A.  Yes, biomechanically, they would behave |
| 12  the pore size have been well established by other | 12  differently.  It's not that they would say that to me. |
| 13  publications. | 13  BY MR. FREESE: |
| 14  Q.  Did you record this somewhere when you | 14  Q.  And it's so because Jaime Sepulveda says |
| 15  did it? | 15  it's so. |
| 16  A.  No, I did not record that. | 16  A.  No, that's not exactly the case.  That |
| 17  Q.  Why did you measure the pore size? | 17  brings me to the -- |
| 18  A.  Because I like to become familiarized | 18  Q.  Hold on, we'll stay on this for a second. |
| 19  with what I implant in my patients. | 19  What is your basis other than it's my opinion that they |
| 20  Q.  What is the basis of your opinion that a | 20  would behave differently biomechanically? |
| 21  TVTO made out of Ultrapro is not a safer alternative | 21  A.  By my biomechanical knowledge. |
| 22  than a TVTO made out of Prolene? | 22  Q.  Okay.  Have you conducted any |
| 23  A.  There's a few areas on that.  Number one | 23  biomechanical testing of Prolene mesh versus Ultrapro |
| 24  is biomechanically, the TVT made of Ultrapro will not | 24  mesh? |
| 25  behave in the same way that a TVT made of Prolene. | 25  A.  No, I have not conducted that test. |

41 (Pages 158 to 161)

Jaime Sepulveda, M.D.

| Page 162 | Page 164 |
|---|---|
| 1  Q.  Okay.  All right, what's your second | 1  form objection? |
| 2  basis for saying that Ultrapro would not be suitable? | 2  MS. GALLAGHER:  No, because you're asking |
| 3  A.  There was, the way they behave, in my, | 3  him about -- I thought the question had safety |
| 4  when you're using it in the operating room, the way | 4  in it and suitability.  He's talking about |
| 5  they handle, they're different. | 5  safer alternative design.  That's a different |
| 6  Q.  I understand that's your opinion, but | 6  analysis.  That's my objection. |
| 7  you've done no bench testing on that, correct? | 7  MR. FREESE:  Okay. |
| 8  A.  There's no bench testing on it. | 8  BY MR. FREESE: |
| 9  Q.  You've done no tensile testing, correct? | 9  Q.  Let me clarify.  You're answering, Dr. |
| 10  A.  I have not done any of the bench testing | 10  Sepulveda, why Ultrapro would not be suitable or a |
| 11  that would be required to make that conclusion. | 11  safer alternative than Prolene for use in a sling |
| 12  Q.  You've done no cadaveric testing on | 12  application, correct?  That's what you're answering? |
| 13  Ultrapro as a sling versus Prolene, correct? | 13  A.  In the sling application, yes. |
| 14  A.  No, I have not done that test. | 14  Q.  And you told me biomechanically, you |
| 15  Q.  And have you reviewed any of Ethicon's | 15  didn't think it would operate the same? |
| 16  internal cadaveric testing? | 16  A.  That's correct. |
| 17  A.  No. | 17  Q.  All right, what's your next reason? |
| 18  Q.  Do you know whether or not actually | 18  A.  The second is that we already have a |
| 19  Ethicon even tested Ultrapro in a sling application in | 19  device in place that has been tested extensively |
| 20  cadavers? | 20  clinically.  So, whatever, whatever evidence is, comes |
| 21  A.  No, I'm not aware of their testing. | 21  in has to be stronger than the evidence that we have on |
| 22  Q.  So they didn't show you the results of | 22  TVT. |
| 23  any cadaver testing for the use of Ultrapro as a sling | 23  Q.  All right.  Now, the only, you say that |
| 24  internally, correct? | 24  there's not demonstrating empirical evidence because |
| 25  A.  I can not say, I can not under oath say | 25  you haven't seen any, you don't know if it's been done |

| Page 163 | Page 165 |
|---|---|
| 1  that I'm aware of specific testing or, or experiment | 1  or not, you just haven't seen any, right? |
| 2  that has been done. | 2  A.  Yes, there's, there has been no |
| 3  Q.  On anything, bench, cadaver, any kind of | 3  presentations that I heard on conference, there has |
| 4  application? | 4  been no texts that I have read, there has been no |
| 5  A.  No, I'm not aware of that. | 5  scientific randomized control trials, not even a cohort |
| 6  Q.  All right, what was the next reason, | 6  study that shows the use of a hybrid or partially |
| 7  other than biomechanical, why you said that Ultrapro | 7  absorbable sling. |
| 8  would not be suitable as a sling? | 8  Q.  So, basically, then, that would be just |
| 9  MS. GALLAGHER:  Object to form. | 9  the same as TVTO, wouldn't it?  There were no |
| 10  A.  The next reason is that there have been | 10  randomized control studies, there were no cohorts, any |
| 11  no clinical studies -- | 11  of that done before TVTO was launched, correct? |
| 12  MR. FREESE:  Stop for a second.  What's | 12  A.  No, that mischaracterizes my testimony on |
| 13  the objection?  I want to cure it. | 13  the basis that they're different, they're two different |
| 14  MS. GALLAGHER:  Because it's as a safer | 14  implants.  The implant used on TVTO was the same |
| 15  alternative design, that's the question you're | 15  implant that was used on TVT.  The implant that would |
| 16  asking him. | 16  be used on Ultrapro is not the same as the implant that |
| 17  MR. FREESE:  No, he told me that he had | 17  would be used on TVTO. |
| 18  three reasons why Ultrapro would not be | 18  Q.  Well, it's the same implant that was used |
| 19  suitable as a, to be used as a TVTO. | 19  in Prolift, was it not? |
| 20  MS. GALLAGHER:  As a safer alternative | 20  A.  They are different applications.  One |
| 21  design is what you're questioning him about. | 21  is -- |
| 22  That's what he's answering. | 22  Q.  They're both pelvic surgeries, are they |
| 23  MR. FREESE:  Yes. | 23  not? |
| 24  MS. GALLAGHER:  Okay. | 24  A.  Well, they're different applications. |
| 25  MR. FREESE:  So, will you withdraw your | 25  One is urinary incontinence, the other one is prolapse. |

42 (Pages 162 to 165)

Jaime Sepulveda, M.D.

| Page 166 | Page 168 |
|---|---|

**Page 166**

1    Q.   Okay, so, you said that there was no
2  empirical science, and that is because you haven't seen
3  any, you don't know if there is empirical data within
4  Ethicon because you haven't seen that, but you're
5  simply saying you have not seen a published empirical
6  data comparing an Ultrapro as a sling versus a Prolene,
7  correct?
8        MS. GALLAGHER:  Object to form.
9    A.   There's no clinical evidence that shows
10  that using a partially-absorbable sling is superior to
11  the sling that we have used.
12  BY MR. FREESE:
13    Q.   Okay, any other reason?
14    A.   Yeah, the third reason is the consensus
15  from the societies.
16    Q.   Well, what has the society said about
17  using Ultrapro as a sling?
18    A.   I trust that the societies will come up
19  with, with recommendations specifically on the use of
20  the established clinical standard for the treatment of
21  incontinence.
22    Q.   Should I interpret that to mean that the
23  relevant clinical societies have not commented one way
24  or the other about the use of Ultrapro as a sling?
25    A.   Actually, they have commented that

**Page 168**

1  reason against it.  It's silent.
2        MS. GALLAGHER:  Object to form.
3    A.   They have no evidence to speak one way or
4  the other.
5        The fourth reason is that the FDA, the
6  panel on the FDA on the executive summary did not offer
7  that even as an alternative.
8        MS. GALLAGHER:  We have lunch.  Do you
9  want to break?
10        MR. FREESE:  Sure.
11        (A lunch break was taken from 1:17 p.m.
12  to 1:29 p.m.)
13  BY MR. FREESE:
14    Q.   Dr. Sepulveda, I want you to turn to the
15  Roman numeral IV, expert opinion overview in your
16  report.  I think it may be 55 on your version.  It's
17  page 54 on mine, I think that's just because of the way
18  it's printed.  Tell me when you get there.
19    A.   Yeah, I'm here.
20    Q.   Just so I understand, you give opinions
21  throughout your report, but is section IV intended to
22  sort of like summarize the important opinions that you
23  intend to give in a case?
24    A.   Yes.
25    Q.   Okay, I realize you give more than what's

**Page 167**

1  specifically the use of monofilament polypropylene is
2  the clinical standard on the case, on the treatment of
3  urinary stress incontinence.
4    Q.   I understand that.  I'm asking -- my
5  question is different, that no society has said that,
6  that use of Ultrapro as a mesh sling would not be safer
7  than the current design?
8    A.   They have not recommended it, and they
9  have not said that it's safer.
10    Q.   So that's not really a reason because
11  they haven't said one way or the other, correct?
12    A.   As surgeons, we also follow the
13  recommendations of the societies.
14    Q.   I know, but the society has made no
15  assertion one way or the other, so there's nothing to
16  follow.
17    A.   I'm not saying the society, I'm saying
18  the societies, the clinical societies.
19    Q.   I understand, you're talking about AUGS
20  and ACOG and --
21    A.   Right.
22    Q.   And they have just not spoken to it,
23  correct?
24    A.   That's correct.
25    Q.   Okay, so that's not a reason for it or a

**Page 169**

43 (Pages 166 to 169)

Jaime Sepulveda, M.D.

| Page 314 | Page 316 |
|---|---|
| | 1   whether or not polypropylene mesh degrades? |
| | 2     A.  I may be asked questions about it.  I |
| | 3   think I have testified already last week on, on, on the |
| | 4   degradation of polypropylene. |
| | 5     Q.  But you're not a polymer scientist? |
| | 6     A.  No, I'm not a polymer scientist. |
| | 7     Q.  And there are others that are more |
| | 8   qualified than you to testify about whether or not |
| | 9   polypropylene degrades? |
| | 10     A.  I think that as a surgeon, there is a |
| | 11   very limited information that we can give about |
| | 12   degradation. |
| | 13     Q.  And that would be including yourself? |
| | 14     A.  Yes, we don't have that information one |
| | 15   way or the other. |
| | 16       MR. GOSS:  Thank you, Doctor. |
| | 17        CROSS EXAMINATION |
| | 18   BY MR. FREESE: |
| | 19     Q.  Dr. Sepulveda, we were talking briefly |
| | 20   about the particle loss.  Remember the discussion we |
| | 21   had about Jennifer's TVTO sling, and you said Dr. Reyes |
| | 22   reported he didn't see any particles.  Do you remember |
| | 23   that discussion? |
| | 24     A.  Yes. |
| | 25     Q.  Is the phrase linting the same thing as |

| Page 315 | Page 317 |
|---|---|
| | |

Golkow Technologies, Inc. - 1.877.370.DEPS

# EXHIBIT G

# LCM Project

## Photographs Comparing

## Laser Cut Mesh

## vs

## Mechanical Cut Mesh

# Description of results

- The accompanying photographs show a comparison between the laser cut mesh (LCM) and the mechanical cut mesh (MCM).
- Both sets of samples have been pulled to 50% elongation and then relaxed.
- The MCM samples show the degradation of the structure of the mesh in certain areas where, because of particle loss, the knit has opened and a portion of the construction has been lost. The area may also be stretched and narrowed resulting in roping due to this occurrence.
- The LCM samples show no degradation of the structure of the mesh, because no or nearly no particles have been lost. The knit construction remains intact. The area may be stretched and narrowed, but is generally less than the MCM. Roping does not occur.

# Side by Side

## Relaxed after 50% elongation

MCM                    LCM

Degradation

Particles

Stretching



Case 2:12-md-02327   Document 2014-7   Filed 04/21/16   Page 5 of 10   PageID #:53005

# Description of Side by Side views

- The previous slide shows views of the areas which remain stretched. It can be seen in the MCM sample that the integrity of the knit has been lost and the outer most wale on each side is degraded. Particles are seen separated from the sample

- Conversely, for the LCM it can be seen that the outermost wales, although distorted are still intact and the integrity of the knit across the full width of the sample still holds. No particles can be seen separated from the sample.

# Mesh Degradation

## MCM

## LCM

**Loss of structure**





**Stretched, but structure remains**

# Description of Degradation views

- It can be seen in the specific comparison of the degradation between the MCM and LCM samples that the area in the center of the MCM sample has had a significant amount of loss of the knit construction, both on the outer edge, where the wales are lost, and across the internal portion, where in some cases only two wales remain.

- In the LCM sample the outer wales are still intact, and the internal structure remains the same as before testing.

Case 2:19-md-02327-MDL   Document 2094-1   Filed 11/15   Page 8 of 10   PageID #:53008

# Pre & Post Elongation

MCM

LCM



Pre

Post

Pre

Post

# Description of Pre & Post views

- In the comparison between the pre-elongation and post-elongation samples for the MCM, it is seen that some times the edges are slightly rough in the pre-elongation samples. In the post elongation sample the mesh has narrowed, roped prior to relaxation and some of the knit has fallen apart. The difference between them is noticeable.

- In the comparison, between the pre-elongation and post-elongation samples for the LCM it is seen that the edges are consistently uniform along the length in the pre-elongation sample. In the post elongation sample, although some areas remained stretched after relaxation, the edges are still uniform. No roping occurred and the knit is intact throughout. The difference is not as noticeable.

# Summary

- In conclusion, it can be stated that the LCM resists degradation of the knit construction, particle loss and permanent narrowing better than the MCM in these representative samples. There is some variation in the results and some of the MCM samples held up very well. However, overall this finding holds true across all the tested articles and the LCM samples prove more consistent in their good results.